FILED

1   THOMAS P. LAMBERT (SBN 50952),
tpl@msk.com
2   JEAN PIERRE NOGUES (SBN 84445),
jpn@msk.com
3   KEVIN E. GAUT (SBN 117352),
keg@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
5   Los Angeles, California 90064-1683
Telephone:   (310) 312-2000
6   Facsimile:   (310) 312-3100

2011 NOV 16   AM 10: 13

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

7   Attorneys for Plaintiffs
Manwin Licensing International S.à.r.l.
8   and Digital Playground, Inc.

9

10                    UNITED STATES DISTRICT COURT

11                    CENTRAL DISTRICT OF CALIFORNIA

12

13   MANWIN LICENSING                    Case No. CV 11-9514 -PSG
     INTERNATIONAL S.A.R.L., a                              (JCGx)
14   Luxemburg limited liability company
     (s.à.r.l.), and DIGITAL             COMPLAINT FOR:
15   PLAYGROUND, INC., a California
     corporation,
16                                       (1) VIOLATIONS OF SECTION 1
                    Plaintiffs,          OF THE SHERMAN ANTITRUST
17                                       ACT [15 U.S.C. § 1];
                    v.
18                                       (2) VIOLATIONS OF SECTION 2
     ICM REGISTRY, LLC, d/b/a .XXX, a    OF THE SHERMAN ANTITRUST
19   Delaware limited liability corporation;  ACT [15 U.S.C. § 2];
     INTERNET CORPORATION FOR
20   ASSIGNED NAMES AND NUMBERS,         (3) VIOLATIONS OF THE
     a California nonprofit public benefit   CARTWRIGHT ACT [CAL. BUS. &
21   corporation; and Does 1-10,        PROF. CODE §§ 16720, 16722, AND
                                         16726];
22                  Defendants.
                                         (4) UNFAIR COMPETITION [CAL.
23                                       BUS. & PROF. CODE  §§ 17200,
                                         17203]
24
                                         DEMAND FOR JURY TRIAL
25

26

27

28

Mitchell
Silberberg &
Knupp LLP

268925.1

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1   Plaintiffs Manwin Licensing International S.à.r.l. ("Manwin") and Digital

2   Playground, Inc. aver as follows:

3

4   **I.     NATURE OF THE ACTION**

5       1.      Manwin owns and licenses the trademarks and domain names used for

6   many of the most popular adult-oriented websites, including YouPorn.com, the

7   single most popular free adult video website on the Internet, as well as xTube.com,

8   Pornhub.com, and Brazzers.com, to cite only a few examples.  Manwin also

9   manages online content under the "Playboy" trademark and runs Playboy TV

10  worldwide, both under license from Playboy Enterprises, Inc.  This Complaint

11  refers to Manwin as "YouPorn."  YouPorn and other Manwin licensed companies

12  operate "tube" sites that offer free user-generated and searchable adult content.

13      2.      In this lawsuit, YouPorn and Digital Playground seek redress for

14  monopolistic conduct, price gouging, and anti-competitive and unfair practices,

15  broadly harming competition, businesses, and consumers, and arising out of the

16  establishment of .XXX, a new Top-Level Domain Name ("TLD") intended for

17  adult-oriented content.  (Other TLDs are, for example, .com and .org.)  The

18  business practices at issue have enormous and worldwide consequences for the

19  Internet, an essential engine in all domestic and international commerce.

20      3.      Defendant the Internet Corporation for Assigned Names and Numbers

21  ("ICANN") controls and is responsible for the entire worldwide Internet Domain

22  Name System ("DNS").  The DNS makes the Internet work by assigning unique

23  "domain names" to web sites, and by coordinating master computer servers which

24  ensure that all Internet users typing a domain name into their browsers reach the

25  same "host" computer and website.  ICANN also determines whether to permit

26  new TLDs in the DNS.  ICANN recently approved the .XXX TLD, and contracted

27  with defendant ICM Registry, LLC ("ICM") to make ICM the sole "registry" or

28  operator of that TLD.  As explained more fully below, that approval and that

Mitchell
Silberberg &
Knupp LLP

4268925.1

2

1   contract were rife with unfair, inappropriate, and anticompetitive conduct.  For

2   example, YouPorn is informed and believes as follows:

3        (a)     The creation of the .XXX TLD is forcing owners of trademarks and

4   domain names in other TLDs to purchase from ICM expensive "defensive

5   registrations" (or the right to block or prevent the use by others) of those same

6   names in .XXX.  Such defensive registrations are necessary to preclude others

7   from registering and using the owners' names in .XXX, and prevents the confusion

8   or dilution in value of those names that would otherwise result.  For example,

9   YouPorn.com needs to block anyone else from establishing a website using the

10  confusingly similar name YouPorn.xxx.  Otherwise, consumers seeking

11  YouPorn.com may instead reach YouPorn.xxx, causing YouPorn.com to lose

12  business and harming its reputation.

13       (b)     The significant costs and disadvantages of such defensive

14  registrations, and their detrimental effect on competition, outweigh any alleged

15  benefit of the .XXX TLD.  Indeed, the .XXX TLD has been strenuously criticized

16  for extorting defensive registrations.  For these and other reasons, governmental

17  bodies, the adult entertainment industry, and other interested constituencies largely

18  opposed the formation of .XXX, which primarily serves to enrich ICM and its

19  affiliates.

20       (c)     In fact, ICM promoted .XXX in large measure first to create and then

21  exploit the need for just such defensive registrations.  ICM has sold, during an

22  initial two-month pre-operation "Sunrise" period, almost 80,000 special .XXX

23  registrations at average fees to ICM of more than $150 per registration.  These

24  registrations are apparently largely for defensive purposes.  They do not include

25  hundreds of millions of additional dollars in annual fees that ICM has announced it

26  expects to earn from later defensive and also later "affirmative" .XXX

27  registrations.  (Name holders "affirmatively" register names for use in operating an

28

Mitchell
Silberger &
Knupp LLP

4268925.1

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1   active .XXX website displaying new content, rather than for "defensively"

2   preventing someone else from exploiting the name in .XXX.)

3        (d)      There is no reasonable substitute for defensive registration in .XXX.

4   For example, by blocking use of a domain name in a TLD other than .XXX, the

5   name holder does not prevent the harm suffered if a non-owner registers that name

6   in the .XXX TLD.  The .XXX TLD thus constitutes a separate antitrust market for

7   defensive registrations.  Also, ICM is actively attempting to establish and

8   monopolize, and has a dangerous probability of establishing and monopolizing, an

9   additional separate market for affirmative registrations in TLDs with names that

10   uniquely connote (or that are otherwise predominately intended for) adult content.

11   For example, the letters ".XXX" connote adult content, as could other hypothetical

12   TLD names such as ".sex" or ".porn."  However, .XXX is currently the only adult-

13   oriented TLD, giving ICM a present monopoly in such TLDs.

14        (e)      ICM initially attempted to coerce ICANN to approve the .XXX TLD

15   and to approve ICM's anti-competitive .XXX registry services.  That coercion took

16   the form of misleading predatory conduct and aggressive litigation tactics,

17   described more fully below.  Eventually, ICANN agreed to approve the .XXX

18   TLD, and to approve ICM as the .XXX registry, not only in response to those

19   improper and coercive tactics but also because ICM promised to pay ICANN what

20   is expected to be millions of dollars in fees.

21        (f)      ICANN has a monopoly over the DNS and over the approval of TLDs

22   and their registries.  There was no competitive process for the award of the .XXX

23   registry contract.  ICANN awarded ICM that contract without soliciting or

24   accepting competing bids, and without any market considerations whatsoever, thus

25   awarding ICM monopoly control and free rein to impose anti-competitive prices

26   and practices within the distinct .XXX TLD.  The .XXX registry contract itself

27   places no restrictions upon (and in fact enhances) ICM's abilities to exploit that

28   monopoly position to the disadvantage and harm of competition, consumers and

Mitchell
Silberberg &
Knupp LLP

4268925.1

4

1   businesses.  For example, the contract imposes no price restrictions of any kind on
2   ICM (despite such price restrictions in the contracts between ICANN and the
3   registries for other TLDs which host adult-content as well as other websites).  It
4   also grants ICM a 10-year contract term which "shall" be perpetually renewed,
5   absent narrow exceptions, thus ensuring that ICM will continue to be forever
6   insulated from competition.

7          (g)      ICM has reacted to these circumstances with the anti-competitive
8   behavior expected of a monopolist.  It has, for example, improperly exploited the
9   newly created market for .XXX defensive registrations by making such
10   registrations unreasonably expensive and difficult, and by placing onerous burdens
11   on parties seeking to protect their intellectual property rights.  It has required that
12   registrants of names in .XXX waive legal rights and claims against ICM as a
13   condition of registering.  It has reserved to itself some of the most popular or
14   desirable domain names, which it has sold at prices substantially above those in a
15   competitive market.  Its Chairman Stuart Lawley has announced that he expects to
16   be able (and intends) to prevent the establishment of any other (potentially
17   competing) adult-content TLDs, including through a contractual promise by
18   ICANN not to approve such TLDs.  Lawley has also announced that he projects
19   that ICM will earn annual profits of $200 million from operating the .XXX TLD –
20   profits to be earned by charging prices well above those in a competitive market.
21   Indeed, ICM is charging $60 annually for .XXX registrations, more than ten times
22   the annual registration charges in other relevant TLDs.  As Lawley admitted in a
23   March 18, 2011 *USA Today* article in responding to complaints about such prices:
24   "This was always going to be a very lucrative arrangement."

25          (h)      These activities have not only restrained trade among businesses by
26   making .XXX TLD services more expensive and of lower quality, but will
27   detrimentally affect consumers.  For example, businesses forced to pay excessive
28   fees for .XXX defensive registrations will pass those expenses on to consumers,

Mitchell
Silberberg &
Knupp LLP

4268925.1

5

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1  either by charging consumers more or by offering consumers fewer or less costly

2  (and less appealing) services.

3      (i)    Through their actions, ICANN and ICM have knowingly conspired to

4  eliminate competitive bidding and competition in the markets for certain .XXX

5  TLD registry services, with the intent to injure competition and consumers.

6

7  ## II.    THE PARTIES

8      4.    Plaintiff Manwin Licensing International S.à.r.l. is and at all relevant

9  times was a business entity organized as a "Société à responsabilité limitée" under

10  the laws of Luxembourg, and having its principal place of business in the City of

11  Luxembourg, Luxembourg.  Manwin owns and licenses one of the largest

12  portfolios of premium adult-oriented website domain names and trademarks.

13  These include "YouPorn.com," the domain name for the website which is the

14  world's most popular source for free adult-oriented streaming videos.  Indeed,

15  YouPorn.com is consistently one of the top 100 most visited sites on the entire

16  Internet.  Domain names and trademarks owned by Manwin also include

17  Pornhub.com, xTube.com, Brazzers.com, and numerous other of the world's most

18  popular adult entertainment websites.  In addition, under license from Playboy

19  Enterprises, Inc., Manwin operates and manages all "Playboy" online content and

20  runs Playboy Television worldwide, using the "Playboy Premium Entertainment"

21  label.  This Complaint refers to Manwin as "YouPorn."

22      5.    Plaintiff Digital Playground, Inc. ("Digital Playground") is and at all

23  relevant times was a corporation organized and existing under the laws of

24  California, and having its principal place of business in Van Nuys, California,

25  within the Central District of California.  Digital Playground is a world leader in

26  adult-oriented filmmaking and interactive formats, boasting one of the world's

27  largest high definition libraries of original adult content.  Digital Playground

Mitchell
Silberberg &
Knupp LLP

4268925.1

28

1  operates and makes this content available through its websites, including

2  digitalplayground.com.

3        6.      Defendant ICANN is a California non-profit public benefit

4  corporation, with its principal place of business in Marina Del Rey, California,

5  within the Central District of California.  ICANN was created in 1998, in response

6  to a policy directive of the United States Department of Commerce, to administer

7  the Domain Name System.  ICANN is charged by the Department of Commerce

8  with, among other things, selecting and entering into agreements with TLD registry

9  operators.

10        7.      Defendant ICM Registry, LLC ("ICM") is a Delaware limited liability

11  corporation, with its principal place of business in Palm Beach Gardens, Florida,

12  and doing business in the Central District of California.  ICM currently acts under

13  contract with ICANN as the registry for the .XXX TLD.

14        8.      Plaintiffs are unaware of the true names or capacities of the

15  Defendants sued under the fictitious names DOES 1 through 10, inclusive.

16  Plaintiffs are informed and believe that DOES 1 through 10, and each of them,

17  either participated in performing the acts averred in this Complaint or were acting

18  as the agent, principal, alter ego, employee, or representative of those who

19  participated in the acts averred in this Complaint.  Accordingly, Defendants

20  DOES 1 through 10 are each liable for all of the acts averred in this Complaint.

21  Plaintiffs will amend this Complaint to state the true names of Defendants DOES 1

22  through 10 when their identity is discovered.

23

24  **III.    JURISDICTION AND VENUE**

25        9.      This is a case asserting claims under the Sherman Act, 15 U.S.C. §§ 1

26  and 2, et seq.  This Court thus has subject matter jurisdiction pursuant to 28 U.S.C.

27  § 1331 because this is a case arising "arising under … laws of the United States."

28

Mitchell
Silberberg &
Knupp LLP

4268925.1

7

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1      10.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C.

2  § 1367 over Plaintiffs' claims that arise under the laws of the State of California.

3      11.    Defendant ICANN is subject to personal jurisdiction in the State of

4  California, including because it is a public benefit corporation organized under the

5  laws of the State of California, because it has its principal place of business in

6  Marina del Rey, California, and because its acts and omissions and the events

7  which are the subject of this Complaint took place in substantial part and caused

8  impacts in the State of California.

9      12.    Defendant ICM is subject to personal jurisdiction in the State of

10  California, including because its acts and omissions and the events which are the

11  subject of this Complaint took place in substantial part and caused impacts in the

12  State of California.

13      13.    Venue is proper in this judicial district pursuant to 28 U.S.C.

14  § 1391(b) and 15 U.S.C. § 22 in that: (a) Defendants may be found and transact

15  business in this judicial district and are subject to personal jurisdiction in this

16  judicial district; and (b) a substantial part of the acts, omissions and events giving

17  rise to the claims asserted in this complaint occurred in this judicial district.

18

19  ## IV.    FACTUAL BACKGROUND

20  **A.    The DNS System**

21      14.    The Internet is an international network of interconnected servers and

22  computers.

23      15.    The World Wide Web is a collection of files, or "websites," hosted on

24  computers and servers and made available to consumers via the Internet,

25  containing text, graphics, audio, and video.

26      16.    Consumers typically access the World Wide Web using a software

27  application known as a browser (e.g., Microsoft Internet Explorer, Google Chrome

28  or Apple Safari).

Mitchell
Silberberg &
Knupp LLP

4268925.1

17.     Each computer or host server connected to the Internet has a unique identity, established by its Internet Protocol address ("IP address"). An IP address consists of four numbers between 0 and 255, separated by periods (e.g., 123.45.67.89). The unique IP address ensures that users are directed to the computer or host server for the particular website they intend to visit.

18.     Because the string of numbers contained in IP addresses is difficult to remember, the Domain Name System ("DNS") was introduced to allow individual users to identify a computer using an easier-to-remember alphanumeric "domain name" such as "YouPorn.com." The unique domain name is incorporated into a Uniform Resource Locator ("URL"). Internet users connect to a website by typing the URL into (or linking to the URL through) their browser. The DNS ensures that each unique alphanumeric "domain name" and URL corresponds to a specific numerical IP address.

19.     When an Internet user enters a domain name and URL into a browser, the URL is sent to a DNS server. The server looks up the IP address assigned to that domain name. The browser then links to the server having that IP address and which hosts the desired website.

**B.    Top Level Domains**

20.     Within each domain name, the alphanumeric field to the far right is the Top Level Domain ("TLD"). The field to the left of the period preceding the TLD is the Second Level Domain ("SLD"). The field (if any) to the left of the period preceding the SLD is the Third Level Domain, and so on. For example, in the domain name "YouPorn.com," the TLD is ".com," and the SLD is "YouPorn." (That name has no Third Level Domain.) Accordingly, TLDs are the highest subdivisions of Internet domain names.

21.     Most TLDs with three or more characters are referred to as "generic" TLDs ("gTLDs"). Common gTLDs include .com, .org, and .biz. gTLDs can either be "sponsored" or "unsponsored." A sponsored TLD ("sTLD") is a

Mitchell
Silberberg &
Knupp LLP
4268925.1

9

1   specialized TLD that has a sponsor, usually an organization representing by

2   consensus the narrower industry, interest group, or community most affected by or

3   interested in the particular TLD.  The sponsor makes policy decisions for the

4   sTLD.  An example of an sTLD is .museum, the sTLD sponsored by and for the

5   use of museums, museum associations and museum professionals.[1]

6       22.    There are currently twenty-two gTLDs, fourteen of which are sTLDs.

7       23.    A particular assigned organization is responsible for operating each

8   TLD.  These operating responsibilities include overseeing the sale and allocation

9   of domain names in the TLD and maintaining a database directory or "zone file,"

10  also commonly known as a "registry," ensuring that each Second Level Domain

11  name within the TLD is assigned and "resolves" to a unique numerical IP Address.

12  The organization responsible for operating a particular TLD is referred to as a

13  "registry operator" or "registry."  Registries in turn authorize separate companies

14  called "registrars" to directly sell the TLD domain names to the ultimate

15  businesses or consumers owning and using those names in the TLD.  The ultimate

16  owners or users are called "registrants."  Registrars like GoDaddy.com and

17  Network Solutions are approved by many TLDs to sell Second Level Domain

18  Names in those TLDs.  Registrants buy domain names through such registrars

19  which then register those names with the TLD registry.  Registrants pay fees to

20  registrars, which themselves then pay fees to the registries (usually on an annual or

21  other periodic basis), to register domain names within particular TLDs.  The

22  registries for the TLDs in turn pay fees to ICANN, periodically (e.g. quarterly) on

23  a per-registration or per-renewal basis.

24  **C.    ICANN's Internet Role**

25      24.    Before ICANN's formation in 1998, overall management of the

26  Domain Name System was carried out under contractual arrangements between the

27  ─────────────────────────

[1] *See* http://about.museum/background/

Mitchell
Silberberg &
Knupp LLP

4268925.1

28

1    United States Government, which developed and initially controlled the Internet,

2    and other parties.

3        25.    In 1998, the U.S. Department of Commerce ("DOC") and ICANN

4    entered into the first of a series of agreements that assigned to ICANN overall

5    authority to manage the DNS.  Under those agreements, ICANN's duties include

6    determining what new TLDs to approve, choosing registries for existing or newly

7    approved TLDs, and contracting with the registries to operate the TLDs.  ICANN

8    also has some responsibility over the root server system.  The root server system is

9    the physical system of related computers which store the authoritative master list

10   of all TLDs and which thus permit users of the Internet to reach the intended

11   websites and email addresses.

12       26.    According to its Articles of Incorporation, ICANN was established

13   "for the benefit of the Internet industry as a whole."  ICANN's Articles of

14   Incorporation state its purposes as follows: "the Corporation shall . . . pursue the

15   charitable and public purposes of lessening the burdens of government and

16   promoting the global public interest in the operational stability of the Internet by

17   (i) coordinating the assignment of Internet technical parameters as needed to

18   maintain universal connectivity on the Internet; (ii) performing and overseeing

19   functions related to the coordination of the Internet Protocol ('IP') address space;

20   (iii) performing and overseeing functions related to the coordination of the Internet

21   domain name system ('DNS'), including the development of policies for

22   determining the circumstances under which new top-level domains are added to the

23   DNS root system; (iv) overseeing operation of the authoritative Internet DNS root

24   server system; and (v) engaging in any other related lawful activity in furtherance

25   of items (i) through (iv)."

26       27.    Pursuant to its Bylaws, ICANN receives input from several Advisory

27   Committees.  One of those committees is the Governmental Advisory Committee

28   ("GAC").  Membership in the GAC is open to all national governments.  In

Mitchell
Silberberg &
Knupp LLP
4268925.1

11

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1    addition, other multinational inter-governmental or economic organizations may

2    under certain circumstances participate in the GAC.  ICANN's Bylaws provide

3    that "the advice of the Governmental Advisory Committee on public policy matters

4    shall be duly taken into account, both in the formulation and adoption of policies."

5        28.    In 2009, in one of its agreements with the DOC, ICANN reaffirmed

6    its commitments to the DOC that: "ICANN will ensure that as it contemplates

7    expanding the top-level domain space, the various issues that are involved

8    (including competition, consumer protection, security, stability and resiliency,

9    malicious abuse issues, sovereignty concerns, and rights protection) will be

10   adequately addressed prior to implementation."  In other bylaws and agreements

11   with the DOC, ICANN also confirms that its activities in approving TLDs and

12   registries will appropriately consider the need for market competition and the

13   protection of rights in names and other intellectual property.

14       29.    In order to fulfill its commitments under its agreements with the DOC

15   and to comply with its Articles of Incorporation and Bylaws, the ICANN Board in

16   2006 instructed ICANN to conduct economic studies regarding TLD competition

17   issues.  These issues included the question whether individual TLDs compete with

18   one another or function as self-contained markets.  The U.S. Department of Justice

19   reiterated the need for such studies in 2008.

20       **D.    History Of The .XXX TLD**

21           **1.    ICM Fails To Obtain .XXX Approval In 2000.**

22       30.    In about 2000, ICM first applied to ICANN for approval of a new

23   .XXX TLD, intended primarily for adult content.  ICANN rejected the application,

24   finding among other things that "ICM Registry's application for an .xxx TLD does

25   not appear to meet unmet needs.  Adult content is readily available on the

26   Internet."  ICANN also "not[ed] the opposition of at least some segments of the

27   adult online content industry to a .xxx TLD."  That opposition was based in part on

28   concerns that a .XXX TLD could lead to "ghettoization" of adult content solely

Mitchell
Silberberg &
Knupp LLP

4268925.1

12

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1    within a single TLD, and thus to enhanced risks that such materials could be easily

2    and improperly censored.

### 2.    ICM Fails to Obtain .XXX Approval In 2004.

4        31.    In 2004, ICM applied again to have ICANN approve the .XXX TLD,

5    this time as a sponsored TLD.  Under its rules, ICANN would not approve

6    sponsored TLDs unless they "address[ed] the needs and interests of a clearly

7    defined industry (the Sponsored TLD Community), which can benefit from the

8    establishment of a TLD operating in a policy formulation environment in which

9    the community would participate."  The ICANN rules also required that the

10   "Sponsored TLD Community" be "precisely defined"; that the Community have

11   "differentiated" needs that would benefit from a separate sTLD; that the sTLD

12   applicant propose a "sponsoring organization" that would produce sTLD polices

13   benefitting and that would represent the Sponsored Community; and that the

14   proposed sTLD enjoy "broad-based support" from the Sponsored Community.

15       32.    As part of its application, ICM proposed the International Foundation

16   for Online Responsibility ("IFFOR") as the required sponsoring organization for

17   the .XXX TLD.  IFFOR supposedly was an independent organization representing

18   the "responsible" adult entertainment community.  However, Plaintiffs are

19   informed and believe that ICM and its Chairman Stuart Lawley in fact created

20   IFFOR for the sole purpose of the .XXX TLD application, and that they dominated

21   and manipulated IFFOR as expedient for the attempted approval of the .XXX

22   TLD.  Plaintiffs are informed and believe that IFFOR does not represent the

23   responsible (or any significant) adult entertainment community.

24       33.    On or about August 27, 2004, ICANN rejected ICM's 2004

25   application for a .XXX TLD in part because ICM had failed to demonstrate a

26   defined sponsorship community which broadly supported and would benefit from

27   .XXX.

28

Mitchell
Silberberg &
Knupp LLP

4268925.1

13

**3.    ICM's Misleading And Predatory Campaign To Obtain .XXX Approval.**

34.    Plaintiffs state the averments in paragraphs 35-45 below on information and belief.

35.    Leading to and after the rejection of its 2004 application, ICM embarked on a predatory campaign of misrepresentations and other misconduct in an effort to persuade ICANN that ICM and the .XXX TLD met the sponsorship criteria.  More specifically:

(a)    Anticipating ultimate ICANN approval of its proposed .XXX TLD, ICM permitted members of the adult entertainment industry to preregister in .XXX names that such members already used for other websites.  Members desired such pre-registration in order to prevent their names from being misappropriated by others in the .XXX TLD.  While desiring to thus protect their names, many such members also opposed .XXX, and ICM promised them that it would not "count" their registrations as support for the .XXX proposal.  Despite that promise, ICM represented to ICANN that the pre-registrants supported .XXX.

(b)    ICM continued to claim support from several major adult entertainment industry companies, when in fact those companies subsequently opposed the .XXX application or took neutral positions.

(c)    ICM attempted to obtain support for .XXX from the Free Speech Coalition ("FSC"), an adult entertainment industry umbrella group, by offering various inducements, including cash and Board memberships on IFFOR, and by attempting to "stack" FSC meetings with supporters.

(d)    ICM generated fake comments in support of its application by posting a link that purported to lead to additional information about the .XXX proposal, but which in fact automatically generated emails to ICANN supporting ICM's .XXX application.

Mitchell
Silberberg &
Knupp LLP
4268925.1

14

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1    (e)    ICM submitted misleadingly edited videos and/or photos of an adult
2  industry conference to falsely suggest that there was limited opposition to its
3  application.

4    (f)    ICM submitted partial and redacted information concerning persons
5  purportedly supportive of its application who were allegedly involved in the adult
6  entertainment industry, but who in fact appeared not to have been involved in the
7  industry.

8    (g)    ICM touted support from some actual and alleged participants in the
9  adult entertainment industry and related fields but without properly disclosing that
10 at the time or later such supporters were employed or paid by (or otherwise in
11 receipt of benefits or promises from) ICM.

12   (h)    ICM offered various inappropriate inducements to persons and entities
13 to support ICM's application.

14   (i)    ICM asserted that IFFOR was an independent "sponsoring" entity for
15 the .XXX TLD when in fact IFFOR was created and controlled by ICM and its
16 Chairman Stuart Lawley.

17   (j)    When questioned about these tactics, ICM refused to publicly disclose
18 the identities of its alleged supporters, ostensibly on privacy grounds, making it
19 difficult if not impossible for opponents to challenge the veracity of ICM's claims.

20   (k)    ICM engaged in other predatory, improper, and/or misleading
21 conduct.

22   36.    In reliance on certain of ICM's lobbying efforts described above, and
23 without knowing that some of ICM's tactics or representations were false or
24 misleading, ICANN in June 2005 took the preliminary step of authorizing its
25 President and General Counsel to enter into negotiations with ICM for the .XXX
26 TLD.

27

28

Mitchell
Silberberg &
Knupp LLP
4268925.1

15

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

### 4.    ICM Fails To Obtain .XXX Approval In 2006 and 2007.

37.    After its June 2005 preliminary authorization to negotiate with ICM, ICANN received significant and widespread opposition to an .XXX TLD. Opposition came from members of the GAC, from various individual governments (including the United States Department of Commerce), from members of the adult entertainment industry, and from the broader public.  For example, in March 2006, the GAC issued the so-called Wellington Communiqué which noted that several GAC members were "emphatically opposed from a public policy perspective to the introduction of a .XXX sTLD."  ICANN deferred a final decision on the ICM application to consider these objections.

38.    While ICANN considered these objections, ICM applied improper pressure in an effort to coerce ICANN's approval of .XXX.  For example, ICM knew that the United States Government was under international political pressure to avoid exercising control over the DNS and Internet.  ICM made Freedom of Information Act requests intended to obtain documents that would embarrass the Department of Commerce and the Department of State by demonstrating their interest in the .XXX issue, despite international concern about such activity, and with the intent of muting the Department of Commerce and the Department of State.  ICM eventually filed a lawsuit against the Department of State and Department of Commerce in an effort to force disclosure of the documents requested under the Freedom of Information Act.  ICM also submitted a complaint to the ICANN ombudsman about ICANN's treatment of ICM's .XXX application.

39.    Despite these efforts, on May 10, 2006, ICANN again rejected ICM's .XXX proposal.  On May 19, 2006, ICM filed with ICANN a request for reconsideration, later withdrawn.  Governmental entities, members of the adult entertainment industry, and others continued to voice strong and widespread opposition to the .XXX TLD through March 30, 2007, when ICANN again rejected the .XXX TLD.

### 5.   ICM's 2008 IRP.

40.   On June 6, 2008, ICM filed an Independent Review Proceeding ("IRP") challenging ICANN's rejection of the .XXX TLD.  ICANN has established IRPs as a non-binding quasi-arbitral process for attempting to resolve disputes concerning its activities.  In the IRP filed by ICM, ICM contended that ICANN had approved ICM's application for the .XXX TLD in June of 2005, when ICANN's Board had directed that its President and General Counsel begin negotiating an agreement with ICM, and that ICANN had thereafter improperly "reconsidered" that decision.  On February 19, 2010, the majority of the three-person Independent Review Panel, over a strong dissent, issued an expressly non-binding Declaration that ICANN had in June 2005 determined that ICM met the sponsorship criteria, and that ICANN could not thereafter properly reopen the issue.  The Declaration did not address whether ICM had in fact met the sponsorship criteria or whether its sponsorship evidence was fraudulent or misleading.  The Panel did not hear from the GAC, other governments, members of the adult entertainment industry, or others vitally concerned with and opposed to the .XXX TLD.

41.   On March 26, 2010, ICANN publicly posted a document listing its options for responding to the non-binding IRP Declaration.  The ICANN posting noted that, among other things, ICANN could accept the majority decision and approve .XXX; could adopt the dissenting decision and reject .XXX; or could take other courses.  ICM then sent ICANN a "response" stating that it was "self-evident" that litigation would result if ICANN did not adopt the IRP majority Declaration.  ICM made additional threats of litigation against ICANN, its Board members, and others it perceived as responsible in some way for the denial of ICM's .XXX application.

Mitchell
Silberberg &
Knupp LLP

4268925.1

17

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

### 6.    ICANN Approves .XXX To Avoid Further Threats And Enrich Itself.

42.    On March 18 and 19, 2011, ICANN approved ICM's application for the .XXX TLD.  On March 31, 2011, ICANN and ICM signed a registry contract under which ICM agreed to provide registry services for the .XXX TLD.

43.    ICANN approved the .XXX TLD and the ICM registry contract despite ongoing, extensive, strenuous, and legitimate objections to both.  These objections came from the public at large, from members of the GAC, from the adult entertainment industry, from the business community, and from others.  These objections were expressed in writing, orally, on the Internet, and in various public forums.  The objections included legitimate concerns that .XXX served limited purposes because adult content could be and was distributed in other TLDs; that establishing .XXX would require trademark holders and others with name rights to take expensive and otherwise unnecessary and economically detrimental steps to block use of those names in the .XXX TLD; that .XXX had obtained and would (for reasons explained below) retain a monopoly on TLDs intended for adult content; that ICM had engaged in anti-competitive, predatory, and other improper and misleading conduct; that adult content might, in violation of free speech rights, be forced exclusively into the .XXX TLD and then more readily censored; and that the adult entertainment industry generally opposed ICM and the .XXX TLD.

44.    Before approving the .XXX TLD, ICANN failed to conduct proper economic studies about the competitive effects of or economic needs for new TLDs, including the .XXX TLD, despite the conclusion of ICANN's Board and the U.S. Department of Justice that such studies were required by ICANN's bylaws, its contractual commitments, and legitimate competition concerns.  ICANN did perform some perfunctory studies that never properly or fully addressed the important economic and competition issues posed by the .XXX TLD.

Mitchell
Silberberg &
Knupp LLP
4268925.1

18

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

45.     ICANN approved .XXX and the ICM registry contract, despite these legitimate and strenuously voiced concerns, in violation of its bylaws and contractual obligations, and despite the lack of complete and requisite economic studies, only because: (a) ICANN was intimidated and coerced by ICM's improper conduct (described above) which threatened ICANN, imposed significant economic expense on ICANN, and promised to continue such tactics if ICANN did not consent to .XXX; and (b) ICM promised ICANN significant financial payments, likely to amount to millions of dollars, under the .XXX registry contract. Reflecting that ICANN's approvals were in part a reaction to improper ICM pressure, ICANN insisted upon and obtained a release from ICM – barring ICM from further litigation threats – as a condition to signing the .XXX registry contract.

## V.     THE ANTI-COMPETITIVE .XXX REGISTRY CONTRACT

46.     Plaintiffs state the averments in paragraphs 47 to 53 below on information and belief.

47.     Only ICANN can approve new TLDs. With the exception of certain limited legacy TLDs, no one may operate a TLD without ICANN approval. There is no practical way to use the Internet without using the DNS and an ICANN-approved TLD. Because ICANN controls the DNS and TLD approvals, ICANN has significant monopoly control over the Internet and DNS.

48.     The contracts between ICANN and TLD registries generally provide for the registry to pay fees to ICANN (often in part on a periodic (e.g quarterly) and per-registration basis). Those contracts also generally provide that the registry will, through registrars, offer prescribed services (including of course the registration of domain names) to TLD registrants.

49.     ICANN in other registry contracts has attempted to address issues posed by its sole power to approve TLD registries, which may in turn exert

Mitchell
Silberberg &
Knupp LLP

4268925.1

19

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1   (through registrars) monopolistic and anti-competitive power over registrants.  For

2   example, in some cases, ICANN has required competitive bids for TLD registry

3   contracts.  The bidding process may include competition among registry applicants

4   over the services and prices to be offered, through registrars, to registrants.  In

5   other cases, ICANN has imposed price caps upon what registries may charge for

6   TLD services, or has imposed requirements for the services registries must offer.

7   In a competitive market, registries would compete not only on price but services.

8   For example, registries may adopt different processes for allocating domain names

9   among competing registrants.

10       50.    ICANN did not solicit, approve, or consider any adult-content TLDs

11   other than .XXX.  ICANN entertained no competitive bids for the .XXX registry

12   contract.  ICANN had no process for separating approval of the .XXX TLD from

13   approval of ICM as the .XXX registry.  After it approved the .XXX TLD, ICANN

14   did not offer any parties but ICM an opportunity to become the .XXX registry.

15   ICANN's approval of the .XXX TLD was thus also approval of ICM as the .XXX

16   registry.  The negotiation of the .XXX registry contract was a closed process.  The

17   lack of competitive bidding eliminated any market restraints that would have

18   prevented ICM from engaging in monopolistic and anti-competitive pricing and

19   practices in the sale of .XXX registry services.  ICANN could have required

20   competing bids for the rights to act as the .XXX registry, just as it has required

21   competing bids for the right to act as the registry of other TLDs.

22       51.    Not only did the selection of ICM lack any market restraints, the

23   ICM/ICANN contract contains no substitute for such restraints (e.g., price caps)

24   such as those imposed by ICANN in other TLD registry contracts.  In fact, the

25   terms of the ICM/ICANN contract bolster ICM's ability to engage in anti-

26   competitive and monopolistic practices in the sale of .XXX TLD registry services.

27   In particular and without limitation:

28

Mitchell
Silberberg &
Knupp LLP
4268925.1

20

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

(a)    The ICM/ICANN contract contains no price caps or other restrictions of any kind on what ICM can charge for .XXX registry services. ICM has complete price discretion and no fetters on its ability to charge monopolistic prices considerably higher than those which would exist in a competitive market. Such higher prices raise costs for registrants and harm consumers through higher prices and/or fewer choices.

(b)    The ICM/ICANN contract leaves ICM with broad discretion to fashion and limit in a non-competitive, unreasonable manner the nature, quality and scope of .XXX registry services it offers registrars and registrants. Such restrictions raise costs and limit innovation, thus harming registrants and consumers.

(c)    Under the terms of the ICM/ICANN contract, ICM may cancel the contract at any time, and for any reason, on 120 days notice. By contrast, ICANN may not terminate the contract unless ICM fails to cure adjudicated, material breaches of its limited contractual obligations. Moreover, the ICM/ICANN contract lasts for a minimum 10-year term, but "shall" be renewed perpetually subject only to an ambiguous obligation to negotiate in good faith certain new terms, none of which appear necessarily to provide registrant or consumer protections. The unlimited term of the ICM/ICANN agreement permits ICM to continue insulating itself from market restraints and from any threat of competition in .XXX registry services.

(d)    The ICM/ICANN contract contains a provision which ICM contends will preclude ICANN from approving any arguably competing TLD designated for adult content, such as ".sex" or ".porn." This restriction limits future competition, enabling ICM to bar the threatened entry of new market competitors.

52.    ICANN failed to take any reasonable contractual or other steps to restrain ICM from engaging in monopolistic and anti-competitive conduct, not only because ICANN was intimidated by ICM's previous pressure tactics and

Mitchell
Silberberg &
Knupp LLP

4268925.1

21

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1    strategies but also because ICM agreed to pay ICANN very significant

2    compensation for the right to act as the .XXX registry, as more particularly averred

3    above.

4        53.    Through the above-described processes for approving the .XXX TLD

5    and the .XXX registry contract, and through the terms of the .XXX registry

6    contract, ICANN and ICM conspired, intentionally agreed, and intended to

7    eliminate competitive bidding and competition in the .XXX TLD and in .XXX

8    TLD registry services and to create illegal monopolies.   ICANN and ICM also

9    knew and intended that such processes and terms would harm competition, restrain

10   trade, and result in higher-cost and lower quality services both to registrants and to

11   consumers.

12

13                                       **VI.    RELEVANT MARKETS**

14       54.    Plaintiffs state the averments in paragraphs 55 to 61 below on

15   information and belief.

16       55.    The .XXX TLD registry services comprise a separate market for

17   blocking services and defensive registrations in .XXX.  Owners of trademarks, of

18   domain names in other TLDs, or of other name rights purchase services in .XXX

19   for defensive or blocking purposes – i.e., to prevent others from registering or

20   using those same names in the .XXX TLD.  Such defensive purchases are not

21   intended to make use of a registered name for an operating .XXX website with new

22   content, but only to prevent or block such use by others.  Owners suffer dilution in

23   their names' value or goodwill if others register or use their names in the .XXX

24   TLD.  Owners are also damaged by consumer confusion if others register or use

25   their names in the .XXX TLD.  Consumers intending to reach the owners' website

26   may instead reach the website of others who are using the owners' names in the

27   .XXX TLD.

Mitchell
Silberberg &
Knupp LLP
4268925.1

28

56.     The market for blocking services or defensive registrations in the .XXX TLD is a distinct and separate market in part because there is no reasonable substitute for such registrations.  For example, blocking or preventing others' use of names in a non-.XXX TLD is not such a substitute.  Blocking use of a name in a non-.XXX TLD does not prevent use of the name in the .XXX TLD.  Blocking use of a name in a non-.XXX TLD also does not prevent the harm caused by others' registration or use of the name in the .XXX TLD.  Even if name owners can preclude their names' registration or use by others in every non-.XXX TLD, they still need to defensively register or block such names in the .XXX TLD in order to prevent dilution and consumer confusion.

57.     The need for defensive registrations is particularly acute in .XXX, both for those within and without the adult entertainment industry.  Owners of names not associated with adult content need to prevent the names' use in .XXX in order to avoid an undesirable association.  For example, prominent celebrities may wish to avoid .XXX websites under their names.  Owners of children's character names may wish to bar registration of such names in .XXX to  prevent any resulting adult or sexual connotation to the character.  Those owning names already associated with adult content also have a particularly acute need to defensively register in .XXX.  Because the letters "XXX" universally connote adult content, owners of names already associated with adult content face a heightened risk of consumer confusion, dilution, and free-riding if their names are used by others in the .XXX TLD.

58.     ICM has a complete monopoly in the market for the sale of .XXX TLD blocking or defensive registration services through registrars.  No other company or entity can or does provide such services.

59.     ICM is also attempting to establish and monopolize a separate market for "affirmative registrations" of names (i.e., registrations of names for use in identifying operating websites showing new content) within TLDs connoting or

Mitchell
Silberberg &
Knupp LLP

4268925.1

23

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1    intended predominately for adult content.  There is a serious danger that ICM will

2    establish and monopolize such a distinct market.  As consumers seeking adult

3    content become more aware of the .XXX TLD, registering and displaying websites

4    in other generic TLDs may not easily be substituted for registration in the .XXX

5    TLD.  That is because of the unique association of the "XXX" name with adult

6    content.  Furthermore, as explained below, contractual provisions and other forces

7    make it unlikely that other potential TLDs with names that could similarly connote

8    adult content, such as .sex or .porn, will be established.

9        60.    ICM currently has a complete monopoly in TLDs that have a name

10   connoting adult content.  There are currently no other TLDs beside .XXX with

11   names that connote adult content.  No other company or entity besides ICM

12   currently can or does provide, through registrars, affirmative registrations in TLDs

13   that connote adult content.  This control makes it more likely that ICM will extend

14   its monopoly on blocking or defensive registrations into a distinct monopoly for

15   affirmative registrations in TLDs connoting or predominately intended for adult

16   content.

17       61.    ICM's Chairman and Chief Executive Officer Stuart Lawley has

18   expressly announced his intention to establish a separate market for affirmative

19   registrations in TLDs intended for adult content and to monopolize that market.

20   Mr. Lawley has stated that he can legally prevent, through provisions in the

21   ICM/ICANN contract, ICANN's approval of any TLDs which compete with .XXX

22   by also having names – e.g. .sex or .porn – that connote adult content.  He has also

23   stated that for a variety of other reasons he does not ever expect any such approval.

24   Those reasons include the controversy surrounding the approval of .XXX (making

25   future approval of other adult-content TLD names less likely), and new rules

26   restricting the creation of any "controversial" TLD strings.  There is also the

27   possibility that .XXX could, for various regulatory or other reasons, become the

28   exclusive permitted TLD for adult web content.

Mitchell
Silberberg &
Knupp LLP

4268925.1

24

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

## VII.  ICM'S ANTI-COMPETITIVE PRACTICES IN THESE MARKETS

62.    Plaintiffs state the averments in paragraphs 63 to 78 below on information and belief.

63.    ICM has in fact exploited its above-described monopoly or incipient monopoly in the TLD registry services, and the lack of market or other restraints on its conduct, by engaging in anti-competitive and predatory behavior unreasonably injurious and harmful to the economy, competition, consumers and businesses, as averred in the paragraphs below.  ICANN has conspired to engage in these illegal practices by its conduct in eliminating competition for .XXX registry services and by agreeing with ICM to refrain from adopting any other measures to prevent anti-competitive conduct in the .XXX registry.  Both ICM and ICANN knew and intended that their actions would restrain trade, and harm competition, businesses, and consumers, through (among other things) creating higher prices and more limited services than would exist in a competitive market, as more particularly averred below.

### A.    <u>Unreasonable Pricing For And Restrictions Upon Permanent Blocking</u>

64.    ICM incurs very little cost for permanently blocking names from the .XXX TLD.  For that reason, ICM has determined that it will permanently block, entirely on its own accord and at no charge, certain celebrity and other names from .XXX use or registration except by the actual celebrity or name owner.  Nevertheless, ICM is charging other name owners (through registrars) supra-competitive, monopoly prices for permanent name blocking services.  More particularly, subject to certain restrictions described below, ICM has sold through approved registrars, and in exchange for a one-time fee of about $150, the permanent right to block use of names in the .XXX TLD.  For example, by paying a registrar which in turn pays ICM about a $150 fee, Mercedes Benz could have purchased the right to preclude anyone from operating a "MercedesBenz.xxx"

Mitchell
Silberberg &
Knupp LLP

4268925.1

25

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1  website.  The approximately $150 price charged by ICM for such permanent

2  blocking is far higher than that which would exist in a competitive market, and so

3  constitutes an unreasonable restraint on trade and also harms competition.

4       65.    ICM is not only charging these supra-competitive prices for the

5  permanent blocking services it does sell, but (in an apparent effort to maximize its

6  monopoly profits) has unreasonably limited the sale of such permanent blocking.

7  For example, ICM has refused to sell permanent blocking to address so-called

8  "typo-squatting."  Typo-squatting is the practice of registering close variants or

9  misspelling of another's name, e.g. someone other than Mercedes Benz registering

10  "Mercedez Benz" instead of "Mercedes Benz."  Typo-squatters hope that

11  consumers may accidentally misspell or slightly mis-recall the intended name and

12  thus be diverted from the name holder's website to the typo-squatter's website.

13  Name owners must often register or block all possible misspellings or name

14  variants in order to prevent confusion and name dilution through typo-squatting

15  and similar activities.

16       66.    However, ICM would only sell trademark owners the permanent right

17  to block the *exact* trademark. It would not sell them the right to block other

18  closely-related names as necessary to prevent typo-squatting or similar

19  misconduct.  The ICM policies also precluded permanent blocking even of exact

20  names if included in a longer domain-name string.  For example, ICM would have

21  permitted Mercedes Benz to purchase the right to permanently block

22  "MercedesBenz.XXX" but not to purchase the right to permanently block

23  "sexinaMercedesBenz.XXX."

24       67.    ICM's policies also impose other unreasonable and anti-competitive

25  restrictions on the purchase of permanent blocking.  More specifically:

26       (a)    Members of the adult entertainment community may not purchase

27  permanent blocking.

Mitchell
Silberberg &
Knupp LLP
4268925.1

28

26

1     (b)    Permanent blocking is limited to registered trademark owners, and

2    does not extend to owners of other name rights (e.g., domain names used in other

3    TLDs).

4     (c)    Permanent blocking is not available to those with pending but not yet

5    final trademark registrations.

6     (d)    Companies purchasing affirmative registrations for operating active

7    .XXX websites under certain names may not purchase permanent blocking of other

8    names.

9     (d)    ICM limited the sale of permanent blocking rights to an

10    approximately two month, pre-operation "Sunrise" period, now expired.  Thus, no

11    one can any longer purchase permanent blocking.

12     (f)    Any party purchasing a defensive or blocking registration of a name

13    in .XXX is permanently barred from translating that name into an affirmative

14    registration for use as an operating website displaying content.

15     68.    A name holder precluded by ICM policies from buying required

16    permanent blocking services has few and inadequate options.  Name holders

17    unable to buy permanent blocking services for a one-time fee may instead purchase

18    annual registrations, for an annual fee, of names or near names.  These annual

19    registrations can be used defensively in either of two ways.  First, the owner may

20    create a standard "non-resolving" message that will be received by those who

21    attempt to access the name in .XXX.  For example, Mercedes Benz could annually

22    register its name and then configure its "MercedesBenz.xxx" web address so that

23    those trying to reach that site would receive a "no such page" or similar message.

24    Second, certain owners could create a "redirection" site that automatically redirects

25    those who reach the .XXX site to an active site in another TLD.  For example,

26    YouPorn could configure its site so that any web user seeking "YouPorn.xxx"

27    would instead be redirected to the pre-existing and active "YouPorn.com" site.

28

Mitchell
Silberberg &
Knupp LLP

4268925.1

1   However, only members of the adult entertainment community may purchase such

2   a redirecting site.

3       69.    ICM currently charges registrars $60 in recurring annual fees for such

4   "non-resolving" or "redirecting" defensive registrations.  Thus, in about three

5   years, these annual fees will in the aggregate be more than the already excessive

6   one-time approximately $150 permanent blocking fee charged by ICM.  That is

7   true even if ICM does not in future years raise the annual registration fees, which

8   ICM reserves the right to do.  ICM has in fact limited sales of permanent blocking

9   services with the very intent of forcing name owners to purchase more expensive

10   annual registrations for defensive purposes.  The annual fees charged by ICM for

11   defensive registrations are many times higher than those which would exist in a

12   competitive market and thus harm competition and restrain trade.  Moreover, those

13   purchasing annual registrations, even for certain defensive purposes, are forced by

14   ICM to agree to comply with policies of IFFOR, the allegedly independent

15   "sponsoring" organization for the .XXX TLD.  Many registrants do not wish to be

16   subject to IFFOR policies.

17       70.    Those name holders not willing or able to purchase annual

18   registrations for defensive purposes may need to engage in costly legal efforts to

19   prevent improper exploitation of their names in .XXX.

20       71.    Holders of valuable names may need to defensively register or

21   permanently block many dozens of near-name variants.  Businesses owning

22   multiple trademarks or domain names may need to purchase many hundreds or

23   thousands of permanent blocking rights or other defensive registrations. The

24   charges imposed by ICM for permanent blocking services and other defensive

25   registrations are thus huge and extremely significant in the aggregate.  They create

26   a "deadweight" economic loss and cost increase that would not exist but for the

27   .XXX TLD and its anti-competitive registry practices.

Mitchell
Silberberg &
Knupp LLP

4268925.1

28

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

72.     By thus unreasonably restricting and pricing the purchase of blocking services or defensive registrations, ICM has created an unjustified and unreasonable restraint on trade and has harmed competition.

73.     The huge problem and expense posed by the need for defensive registrations in .XXX imposes unreasonable "deadweight" economic and market costs and burdens exceeding any perceived benefit of the TLD. The establishment of the XXX TLD is therefore alone anti-competitive and in restraint of trade. In fact, ICM sought approval of the .XXX TLD in no small part to extract monopoly profits from otherwise unnecessary defensive registrations. Stuart Lawley, the Chairman and Chief Executive Officer of ICM, has expressly recognized that he expects most businesses registering in .XXX to already have operating websites showing the same content and under the same Second Level Domain name, but in another TLD. This confirms that Lawley expects most registrations in .XXX to be defensive (and thus unnecessary but for .XXX). Also, other sTLDs do not sell permanent "blocking" registrations to those who are not part of the sponsored community. That .XXX sells such services underscores that .XXX is designed to create and, then exploit in an anti-competitive manner, a unique need for defensive registrations.

74.     Numerous businesses have legitimately complained about the .XXX defensive registration practices. For example:

(a)     Hustler President Michael Klein has stated: "[I]t appears that the .XXX TLD will do nothing but drive up costs to the adult community and will force us to fight infringement on yet another front.... [N]or will...we be shaken down by ICM." Quoted in *xBiz* (July 12, 2011) at http://www.xbiz.com/news/136179.

(b)     "Porn and mainstream businesses alike complain they are being forced to buy domain names they don't want, don't need and won't use – and compare the process to a hold-up. ... 'Many feel they're being blackmailed to protect their

Mitchell
Silberberg &
Knupp LLP

4268925.1

29

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1   brands,' said Kristina Rosette, a trademark lawyer at the law firm Covington &

2   Burlington." Quoted in *Reuters* (August 15, 2011), "Businesses in U.S. Complain of

3   .xxx Shakedown," at http://www.reuters.com/article/2011/08/15/us-internet-xxx-

4   idUSTRE77E5W920110815.

5        (c)   "What's bugging many businesses about the new porn domain is that

6   they're being forced to cough up $200 or so to protect their brands from being

7   exploited by smut peddlers.  In fact, initial returns in the UK indicate that four of

8   five businesses that have pre-registered for the XXX domain have no relationship to

9   the porn industry.  Furthermore, ICM, which administers the domain, told Reuters

10   that [it received] 900,000 'expressions of interest' from companies who want to pre-

11   register their trademarks to block porn purveyors from using the brands in a XXX

12   domain name ....  Failure to block a domain at this stage of the process can be costly

13   in the long run for a brand.  That's because challenging a domain that's been

14   awarded to someone can take months to resolve – months that the brand's image

15   may be tarnished by an association with adult content – and, of course, thousands of

16   dollars in legal fees...."  Quoted in *PCWorld* (August 16, 2011), "XXX Pricing Set

17   by GoDaddy: Businesses Bellyache About Domain Extortion" at

18   http://www.pcworld.com/businesscenter/article/238167/xxx_pricing_set_by_go_dad

19   dy_businesses_bellyache_about_domain_extortion.html.

20   **B.   Monopolistic Pricing For Affirmative Registrations**

21        75.   ICM has reserved to itself, and sold at above-market, supra-

22   competitive prices, the rights to register in the .XXX TLD for affirmative use

23   particularly desirable so-called "premium names."  These sales at above-market

24   prices have harmed competition and unreasonably restrained trade.  An ICM press

25   release dated October 6, 2011 noted as follows:  "ICM has now sold nine premium

26   .XXX domain names for $100,000 or more, which is unparalleled in any other

27   domain launch and reports that there are many other similar deals in progress.

28   'Domain names in most other TLDs typically sell for 1-10% of the value of their

Mitchell
Silberberg &
Knupp LLP

4268925.1

30

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1  .com equivalent.  The .XXX names are already selling for 30-40% and we are just

2  getting started,' said [ICM Chairman Stuart] Lawley."  ICM also announced a

3  $1.65 million sale for a collection of .XXX domain names, and a $500,000 sale for

4  a single .XXX domain name.  It reported the latter to be "the highest price ever

5  paid for a domain name in any extension pre-launch.  This is also the 5th highest

6  sale price of any domain name sold in 2011 and one of the top 30 most expensive

7  domain names sold in the last 3 years ...."

8       76.   ICM is also selling its other affirmative registration services at above-

9  market, supra-competitive prices generating monopolistic profits.  ICM is currently

10  charging registrars $60 annually for the registrations used for affirmative purposes,

11  the same amount it charges for annual defensive registrations.  That is ten or more

12  times the annual registration rates for other TLDs used for affirmative registrations

13  of adult content, with insufficient cost justifications for the differences.  These

14  excessive charges also harm competition and unreasonably restrain trade.

15      **C.**    **Other Unreasonable Restrictions On The Sale of Registry Services**

16       77.   ICM has conditioned the sale of .XXX  registry services on

17  registrants' agreement to unreasonable and anti-competitive terms and conditions.

18  For example, ICM has required that all .XXX registrants and those who purchase

19  permanent blocking waive and release certain claims against ICM.  ICM has also

20  required that those purchasing certain premium .XXX services agree in exchange

21  to refrain from disparaging ICM or the .XXX TLD.  These terms and conditions

22  constitute an unreasonable restraint on trade and harm competition.

23      **D.**    **Harm to Consumers**

24       78.   All these anti-competitive practices harm consumers.  Businesses

25  which pay higher than competitive prices for .XXX registry services, or who

26  receive lower quality .XXX registry services than would exist in a competitive

27  market, react in a manner that harms consumers.  They will either charge

28  consumers higher prices for using websites or other services, offer less desirable

Mitchell
Silberberg &
Knupp LLP

4268925.1

31

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1 websites or other services and experiences, or altogether forego offering websites

2 or other services that they would offer if .XXX registry services were competitive.

3

4 ## VIII. INTERSTATE COMMERCE

5 79.     Plaintiffs are informed and believe that the actions of ICM and

6 ICANN averred above have a substantial effect on both interstate and international

7 commerce because (among other reasons): (a) thousands of permanent blocking

8 services or annual registrations intended for defensive purposes have been

9 purchased in the .XXX TLD by market participants located throughout the fifty

10 United States and in countries throughout the world; (b) the need for such services

11 or registrations has a direct, substantial, and reasonably foreseeable effect on

12 commerce, trade, and competition throughout the fifty United States and in

13 countries throughout the world; and (c) thousands of affirmative registrations have

14 been purchased in the .XXX TLD, by market participants located throughout the

15 fifty United States and in countries throughout the world.

16

17 ## IX.     PLAINTIFFS' STANDING AND INJURY

18 80.     Both YouPorn and Digital Playground have extensive domain names

19 and/or websites intended for and associated with adult content.  It is necessary to

20 defensively register or permanently block their respective domain names and

21 trademarks in the .XXX TLD in order to protect their business interests and

22 property.  They have been unable to do so due to the anti-competitive conduct

23 averred in this Complaint.  For example, YouPorn and Digital Playground have

24 been barred by .XXX policies from buying permanent blocking rights, which

25 purchases in any event would purportedly require them to waive legal rights,

26 including their federal antitrust claims asserted in this Complaint.  Plaintiffs are

27 informed and believe that, because they have been unable to register in .XXX due

28 to the conduct averred above, they are at imminent risk of incurring loss in the

Mitchell
Silberberg &
Knupp LLP

4268925.1

32

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1   value of and business income from their domain names and web businesses

2   because: (a) the probable registration of similar names by others in .XXX which

3   will cause diversion of business away from Plaintiffs, harm to Plaintiffs' name

4   rights, and loss of Plaintiffs' business income; and (b) to the extent consumers

5   associate the .XXX TLD with adult content, Plaintiffs will lose business and

6   income they could otherwise earn from affirmative registrations in .XXX.

7

8   **FIRST CLAIM FOR RELIEF**

9   **Contract, Combination Or Conspiracy in Restraint of Trade Under Section 1**

10   **Of The Sherman Antitrust Act, 15 U.S.C. § 1**

11   **(.XXX Permanent Blocking And Defensive Registration Market)**

12       81.   Plaintiffs incorporate each of the averments set forth above.

13       82.   For purposes of this cause of action, and as averred in greater detail in

14   paragraphs 55-58 above, the relevant market is defined as the market for

15   permanent blocking and other defensive registrations in the .XXX TLD.

16       83.   For purposes of this cause of action, the relevant geographic market is

17   the United States and the world.

18       84.   Plaintiffs are informed and believe that ICM and ICANN conspired

19   and agreed to at least the following anti-competitive practices:

20       (a)   Approving the .XXX TLD without competition from any other adult-

21   content TLD, as more particularly averred in paragraph 50 above.

22       (b)   Approving ICM as the registry of the .XXX TLD, and approving the

23   ICANN/ICM contract, without permitting any competition for .XXX TLD registry

24   services, as more particularly averred in paragraph 50 above.

25       (c)   Entering into terms of the ICM/ICANN contract for .XXX registry

26   services without providing that ICM would be subject to price caps or other

27   limitations restraining ICM from engaging in unreasonable pricing and other

28   practices, as more particularly averred in paragraph 51 above.

Mitchell
Silberberg &
Knupp LLP

4268925.1

33

1    (d)    Permitting ICM to engage in anticompetitive practices in providing

2  permanent blocking and defensive registrations in the .XXX TLD, including (as

3  more particularly averred in, for example, paragraphs 64-74 and 77 above),

4  charging prices for such services that are significantly higher than would exist in a

5  competitive market; limiting such services in a manner that would not exist in a

6  competitive market; and imposing restrictions on such services that would not exist

7  in a competitive market.

8    85.    Plaintiffs are informed and believe that by so conspiring and agreeing,

9  ICM and ICANN have engaged in anti-competitive processes, acquired and

10  perpetuated a monopoly, unreasonably restrained trade, and harmed competition in

11  the above-defined geographic and product market, to the detriment of businesses

12  and consumers and in violation of Section 1 of the Sherman Antitrust Act, 15

13  U.S.C. section 1, including because as result of their conduct (and as more

14  particularly averred in paragraphs 47-53, 64-74 and 77 above):

15    (a)    The approval of the .XXX TLD has imposed enormous "deadweight"

16  permanent blocking and defensive registration costs unjustified by any consumer

17  or other benefits of the .XXX TLD.

18    (b)    Prices in the market for permanent blocking and defensive

19  registrations in the .XXX registry are far above those that would exist in a

20  competitive market.

21    (c)    Services in the market for permanent blocking and defensive

22  registrations in the .XXX registry are subject to anti-competitive limitations and

23  restrictions that would not exist in a competitive market.

24    86.    Plaintiffs are informed and believed that ICANN and ICM knew and

25  intended that the result of their anti-competitive and illegal actions would be to

26  acquire and perpetuate a monopoly, unreasonably restrain trade, and harm

27  competition, businesses, and consumers, as more particularly averred (for

28  example) in paragraphs 64-75 and 77-78 above.

Mitchell
Silberberg &
Knupp LLP

4268925.1

34

87.     Because of the anti-competitive and illegal actions by ICANN and ICM in unreasonable restraint of trade and which harm competition, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such relief should include an order, for example:

(a)     Enjoining the .XXX TLD altogether;

(b)     That the .XXX registry contract be openly rebid to introduce competition for .XXX registry services; and/or

(c)     Imposing reasonable price constraints and service requirements on permanent blocking services and other defensive registrations in the .XXX TLD.

88.     Under this cause of action, Plaintiffs also are entitled to recovery of their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

## SECOND CLAIM FOR RELIEF

**Monopolization Under Section 2 Of The Sherman Antitrust Act, 15 U.S.C. § 2**

**(.XXX Permanent Blocking And Defensive Registration Market)**

89.     Plaintiffs incorporate each of the averments set forth above.

90.     For purposes of this cause of action, and as averred in greater detail in paragraphs 55-58 above, the relevant market is defined as the market for permanent blocking and other defensive registrations in the .XXX TLD.

91.     For purposes of this cause of action, the relevant geographic market is the United States and the world.

92.     Plaintiffs are informed and believe that ICM and ICANN have acted willfully to have ICM acquire and perpetuate a complete monopoly in that geographic and product market, holding one hundred percent of the market share.

93.     Plaintiffs are informed and believe that ICM and ICANN engaged in at least the following anti-competitive practices in order to acquire and perpetuate that complete monopoly:

Mitchell
Silberberg &
Knupp LLP

4268925.1

35

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

(a)    Approving the .XXX TLD without competition from any other adult-content TLD, as more particularly averred in paragraph 50 above.

(b)    Approving ICM as the registry of the .XXX TLD, and approving the ICANN/ICM contract, without permitting any competition for .XXX TLD registry services, as more particularly averred in paragraph 50 above.

(c)    Entering into terms of the ICM/ICANN contract for .XXX registry services without providing that ICM would be subject to price caps or other limitations restraining ICM from engaging in unreasonable pricing and other practices, as more particularly averred in paragraph 51 above.

(d)    Permitting ICM to engage in anticompetitive practices in providing permanent blocking and defensive registrations in the .XXX TLD, including (as more particularly averred in, for example, paragraphs 64-74 and 77 above), charging prices for such services that are significantly higher than would exist in a competitive market; limiting such services in a manner that would not exist in a competitive market; and imposing restrictions on such services that would not exist in a competitive market.

94.    Plaintiffs are also informed and believe that ICM willfully acquired that monopoly through additional predatory acts and practices, including but not limited to those misleading acts and litigation tactics more particularly averred in paragraphs 32-45 above, which pressured and coerced ICANN into permitting ICM to acquire and perpetuate the monopoly.

95.    Plaintiffs are informed and believe that by willfully acquiring and perpetuating the monopoly, ICM and ICANN have unreasonably restrained trade, and harmed competition in the above-defined geographic and product market, to the detriment of businesses and consumers and in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. section 2, including because as result of their conduct (and as more particularly averred in paragraphs 47-52, 61-72 and 75-76 above):

Mitchell
Silberberg &
Knupp LLP

4268925.1

36

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

1      (a)     The approval of the .XXX TLD has imposed enormous "deadweight"

2  permanent blocking and defensive registration costs unjustified by any consumer

3  or other benefits of the .XXX TLD.

4      (b)     Prices in the market for permanent blocking and defensive

5  registrations in the .XXX registry are far above those that would exist in a

6  competitive market.

7      (c)     Services in the market for permanent blocking and defensive

8  registrations in the .XXX registry are subject to anti-competitive limitations and

9  restrictions that would not exist in a competitive market.

10      96.    Plaintiffs are informed and believed that ICANN and ICM knew and

11  intended that the result of their anti-competitive and illegal actions would be to

12  acquire and perpetuate a monopoly, unreasonably restrain trade, and harm

13  competition, businesses, and consumers, as more particularly averred (for

14  example) in paragraphs 68-71 and 75-76 above.

15      97.    Because of the anti-competitive and illegal actions by ICANN and

16  ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such

17  relief should include an order, for example:

18      (a)     Enjoining the .XXX TLD altogether;

19      (b)     That the .XXX registry contract be openly rebid to introduce

20  competition for .XXX registry services; and/or

21      (c)     Imposing reasonable price constraints and service requirements on

22  blocking services and other defensive registrations in the .XXX TLD.

23      98.    Under this cause of action, Plaintiffs also are entitled to recovery of

24  their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

25

26

27

28

Mitchell
Silberberg &
Knupp LLP
4268925.1

## THIRD CLAIM FOR RELIEF

### Monopolization And Attempted Monopolization Under Section 2 Of The

### Sherman Antitrust Act, 15 U.S.C. § 2

### (Market For Registration In TLDs Intended For Adult Content)

99.   Plaintiffs incorporate each of the averments set forth above.

100.   For purposes of this cause of action, and as averred in greater detail in paragraphs 59-61 above, the relevant product market is defined as the incipient market for the affirmative registration of domain names in the .XXX TLD and in any other potential future TLDs having names connoting (or intended predominately for) adult content.

101.   For purposes of this cause of action, the relevant geographic market is the United States and the world.

102.   Plaintiffs are informed and believe that ICM and ICANN have acted willfully to establish (through the affiliation of .XXX with adult content), and then to acquire monopoly power within, a separate geographic and product market for affirmative registrations in TLDs intended for adult content.

103.   Plaintiffs are informed and believe that ICM and ICANN have a dangerous probability of acquiring monopoly power in that incipient geographic and product market.

104.   Plaintiffs are informed and believe that ICM and ICANN have engaged in at least the following anti-competitive practices in order to attempt to acquire monopoly power in that incipient separate geographic and product market:

(a)   Approving the .XXX TLD without competition from any other adult-content TLD, as more particularly averred in paragraph 50 above.

(b)   Approving ICM as the registry of the .XXX TLD, and approving the ICANN/ICM contract, without permitting any competition for .XXX TLD registry services, as more particularly averred in paragraph 50 above.

1       (c)    Entering into terms of the ICM/ICANN contract for .XXX registry

2   services without providing that ICM would be subject to price caps or other

3   limitations restraining ICM from engaging in unreasonable pricing and other

4   practices, as more particularly averred in paragraph 51 above.

5       (d)    Encouraging and/or exploiting impediments to other competitors in

6   any market for TLDs intended for adult content, including by entering into a

7   contract provision which may preclude ICANN from approving such TLDs and

8   exploiting and by encouraging or exploiting the other factors averred in paragraphs

9   60-61 above which prevent competition in any such market.

10       (e)    Permitting ICM to engage in anticompetitive practices in providing

11   affirmative registration services in the .XXX TLD, including (as more particularly

12   averred in, for example, paragraphs 75-76 above), charging prices for such services

13   that are significantly higher than would exist in a competitive market, and

14   imposing restrictions on such services that would not exist in a competitive market.

15       105.   Plaintiffs are also informed and believe that ICM has further

16   attempted to willfully acquire such monopoly power in the above-described

17   incipient product and geographic market through additional predatory acts and

18   practices, including but not limited to those misleading acts and litigation tactics

19   more particularly averred in paragraphs 32-45 above, which pressured and coerced

20   ICANN into participating in the efforts to acquire monopoly power.

21       106.   Plaintiffs are informed and believe that by attempting to willfully

22   acquire monopoly power in the above-described incipient product and geographic

23   market, ICM and ICANN may already have, and if they successfully acquire

24   monopoly power ICM and ICANN will have, unreasonably restrained trade, and

25   harmed competition, to the detriment of businesses and consumers and in violation

26   of Section 2 of the Sherman Antitrust Act, 15 U.S.C. section 2, including because

27   as result of their conduct:

Mitchell
Silberberg &
Knupp LLP

4268925.1

28

1      (a)    Prices for affirmative registrations in that market are or will become

2  higher than those that would exist in a competitive market, as more particularly

3  averred in part in paragraphs 75-76 above.

4      (b)    Services for affirmative registrations in that market are or will become

5  subject to anti-competitive limitations and restrictions that would not exist in a

6  competitive market, as more particularly averred in part in paragraph 77 above.

7      (c)    Such conduct has harmed or will harm consumers as more particularly

8  averred in part in paragraph 78 above.

9      107.   Plaintiffs are informed and believed that ICANN and ICM knew and

10  intend that the result of their anti-competitive and illegal actions would or will be

11  to acquire and perpetuate monopoly power, unreasonably restrain trade, and harm

12  competition, businesses, and consumers, as more particularly averred above.

13      108.   Because of the anti-competitive and illegal actions by ICANN and

14  ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such

15  relief should include an order, for example:

16      (a)    Enjoining the .XXX TLD altogether;

17      (b)    That the .XXX registry contract be rebid to introduce competition;

18  and/or

19      (c)    Imposing reasonable price constraints and service requirements on

20  affirmative registrations in the .XXX TLD.

21      109.   Under this cause of action, Plaintiffs also are entitled to recovery of

22  their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

4268925.1

## FOURTH CLAIM FOR RELIEF

### Unlawful Trust In Restraint Of Trade Under The Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16722, 16726

### (.XXX Permanent Blocking And Defensive Registration Market)

110.   Plaintiffs incorporate each of the averments set forth above.

111.   For purposes of this cause of action, and as averred in greater detail in paragraphs 55-58 above, the relevant market is defined as the market for permanent blocking and other defensive registrations in the .XXX TLD.

112.   For purposes of this cause of action, the relevant geographic market is the United States and the world.

113.   Plaintiffs are informed and believe that the conspiracies, agreements, and monopolization activities described in paragraphs 83-86 and 92-95 above constitute an illegal trust and unreasonable restraint of trade in that geographic and product market, in violation of the Cartwright Act, sections 16720, 16722, and 16726 of the California Business and Professions Code.

114.   Because of the anti-competitive and illegal actions by ICANN and ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such relief should include an order, for example:

(a)   Enjoining the .XXX TLD altogether;

(b)   That the .XXX registry contract be openly rebid to introduce competition for .XXX registry services; and/or

(c)   Imposing reasonable price constraints and service requirements on blocking services and other defensive registrations in the .XXX TLD

115.   Under this cause of action, Plaintiffs also are entitled to recovery of their attorneys' fees and costs pursuant to California Business and Professions Code section 16750(a).

Mitchell
Silberberg &
Knupp LLP

4268925.1

41

# FIFTH CLAIM FOR RELIEF

## Unlawful Trust In Restraint Of Trade Under Cartwright Act

## (Market For Registration In TLDs Intended For Adult Content)

116.   Plaintiffs incorporate each of the averments set forth above.

117.   For purposes of this cause of action, and as averred in greater detail in paragraphs 59-61 above, the relevant product market is defined as the incipient market for the affirmative registration of domain names in the .XXX TLD and in any other potential future TLDs having names connoting (or intended predominately for) adult content.

118.   For purposes of this cause of action, the relevant geographic market is the United States and the world.

119.   Plaintiffs are informed and believe that the conspiracies, agreements, and monopolization activities described in paragraphs 102-107 above constitute an illegal trust and unreasonable restraint of trade in that incipient geographic and product market, in violation of the Cartwright Act, sections 16720, 16722, and 16726 of the California Business and Professions Code.

120.   Because of the anti-competitive and illegal actions by ICANN and ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such relief should include an order, for example:

(a)   Enjoining the .XXX TLD altogether;

(b)   That the .XXX registry contract be rebid to introduce competition; and/or

(c)   Imposing reasonable price constraints and service requirements on affirmative registrations in the .XXX TLD.

121.   Under this cause of action, Plaintiffs also are entitled to recovery of their attorneys' fees and costs pursuant to California Business and Professions Code section 16750(a).

1
2
3

## SIXTH CLAIM FOR RELIEF

## UNFAIR COMPETITION UNDER CALIFORNIA STATUTORY LAW

## (CALIFORNIA BUS. AND PROF. CODE §§ 17200 AND 17203)

4       122.   Plaintiffs incorporate each of the averments set forth above.

5       123.   Defendants' conduct in violation of the Sherman Act and Cartwright
6   Act as averred above constitutes "illegal" conduct and thus unfair competition
7   within the meaning of California Business and Professions Code section 17203.

8       124.   Defendants' conduct as averred above constitutes "unfair" conduct
9   and thus unfair competition within the meaning of California Business and
10  Professions Code section 17203.

11      125.   ICM's conduct in misleading ICANN as averred in paragraphs 32-45
12  above constitutes "fraudulent" conduct and thus unfair competition within the
13  meaning of California Business and Professions Code section 17203.

14      126.   As the result of Defendants' acts of unfair competition, Plaintiffs are
15  entitled to injunctive relief as more particularly averred in paragraphs 87 and 108
16  above.

17                          **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiffs pray for relief as follows:

19      1.     For preliminary and permanent injunctive relief as more particularly
20  averred above;

21      2.     For their costs and attorneys' fees; and

22      3.     For such other and further relief as the Court deems just and proper.

23  Dated:  November 15, 2011          THOMAS P. LAMBERT
24                                     JEAN PIERRE NOGUES
                                       KEVIN E. GAUT
                                       MITCHELL SILBERBERG & KNUPP LLP
25
26                                     By: _____
27                                         Kevin E. Gaut
                                           Attorneys for Plaintiffs,
28                                         Manwin Licensing International S.à.r.l.
                                           and Digital Playground, Inc.

Mitchell
Silberberg &
Knupp LLP

268925.1

43

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiffs demand trial by jury of all issues so triable by right.

3

4
Dated:  November 15, 2011

THOMAS P. LAMBERT
5
JEAN PIERRE NOGUES
KEVIN E. GAUT
6
MITCHELL SILBERBERG & KNUPP LLP

7

8
By:
    Kevin E. Gaut
9
    Attorneys for Plaintiffs,
    Manwin Licensing International S.à.r.l.
10
    and Digital Playground, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

268925.1

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CARTWRIGHT ACT,
AND UNFAIR COMPETITION; DEMAND FOR JURY TRIAL

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 9514 PSG (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

JEAN PIERRE NOGUES (SBN 844) jpn@msk.com
KEVIN E. GAUT (SBN 117352) keg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone:     (310) 312-2000
Facsimile:     (310) 312-3100

**ORIGINAL**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANWIN LICENSING INTERNATIONAL S.à.R.L., a Luxemburg limited liability company (s.à.r.l.,), and DIGITAL PLAYGROUND, INC., a California corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>ICM REGISTRY, LLC, d/b/a .XXX, a Delaware limited liability corporation; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit public benefit corporation; and Does 1-10,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV11-9514-PSG (JCGx)**<br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Mitchell, Silberberg & Knupp LLP, whose address is 11377 West Olympic Blvd, Los Angeles, CA 90064-1683. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: ___NOV 16 2011___

Clerk, U.S. District Court

By: _Manly Dua_
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*



American LegalNet, Inc.
www.FormsWorkFlow.com

THOMAS P. LAMBERT (SBN 50952)    tpl@msk.com
JEAN PIERRE NOGUES (SBN 84      )  jpn@msk.com
KEVIN E. GAUT (SBN 117352)      keg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone:    (310) 312-2000
Facsimile:    (310) 312-3100

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANWIN LICENSING INTERNATIONAL S.À.R.L., a Luxemburg limited liability company (s.à.r.l.,), and DIGITAL PLAYGROUND, INC., a California corporation, <br><br> PLAINTIFF(S) <br><br> v. <br><br> ICM REGISTRY, LLC, d/b/a .XXX, a Delaware limited liability corporation; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit public benefit corporation; and Does 1-10, <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV11-9514** -PSG (JCGx) <br><br><br> **SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Mitchell, Silberberg & Knupp LLP</u>, whose address is <u>11377 West Olympic Blvd, Los Angeles, CA 90064-1683</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: ___NOV 1 6 2011___

Clerk, U.S. District Court

By: ___MARILYN DAVIS___
SEAL
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.
www.FormsWorkFlow.com

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
MANWIN LICENSING INTERNATIONAL S.A.R.L., a Luxemburg limited liability company (s.à.r.l.), and DIGITAL PLAYGROUND, INC., a California corporation,

**DEFENDANTS**
ICM REGISTRY, LLC, d/b/a .XXX, a Delaware limited liability corporation; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit public benefit corporation; and Does 1-10,

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
(310) 312-2000

**Attorneys** (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No  **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Antitrust Act, 15 U.S.C. § 1 et seq., Calfifornia Cartwright Act, ,Cal. Bus. & Prof. Code § 16720, et seq., California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: **CV11-9514**

V-71 (05/08)  CIVIL COVER SHEET  Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s):

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

Check all boxes that apply:  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles (Digital Playground, Inc.) | Luxembourg (Manwin Licensing International S.à.r.l.) |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles (Internet Coalition for Assigned Names and Numbers) | Florida and Delaware (ICM Registry, LLC) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Kevin E. Gaut_   Date November 15, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com