1   THOMAS P. LAMBERT (SBN 50952),
    tpl@msk.com
2   JEAN PIERRE NOGUES (SBN 84445),
    jpn@msk.com
3   KEVIN E. GAUT (SBN 117352),
    keg@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
5   Los Angeles, California 90064-1683
    Telephone:  (310) 312-2000
6   Facsimile:  (310) 312-3100

7   Attorneys for Plaintiffs
    Manwin Licensing International S.à.r.l.
8   and Digital Playground, Inc.

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  MANWIN LICENSING<br>     INTERNATIONAL S.A.R.L., a<br>14  Luxembourg limited liability company<br>     (s.à.r.l.), and DIGITAL<br>15  PLAYGROUND, INC., a California<br>     corporation,<br>16<br>                    Plaintiffs,<br>17<br>           v.<br>18<br>     ICM REGISTRY, LLC, d/b/a .XXX, a<br>19  Delaware limited liability corporation;<br>     INTERNET CORPORATION FOR<br>20  ASSIGNED NAMES AND NUMBERS,<br>     a California nonprofit public benefit<br>21  corporation; and Does 1-10,<br>22                    Defendants. | Case No. CV 11-9514-PSG (JCGx)<br><br>**FIRST AMENDED COMPLAINT<br>FOR:**<br><br>**(1) VIOLATIONS OF SECTION 1<br>OF THE SHERMAN ANTITRUST<br>ACT [15 U.S.C. § 1];**<br><br>**(2) VIOLATIONS OF SECTION 2<br>OF THE SHERMAN ANTITRUST<br>ACT [15 U.S.C. § 2];**<br><br>**DEMAND FOR JURY TRIAL** |

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP

28

1541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN...

1  Plaintiffs Manwin Licensing International S.à.r.l. ("Manwin") and Digital
2  Playground, Inc. aver as follows:

4  **I.  NATURE OF THE ACTION**

5  1.  Manwin owns and licenses the trademarks and domain names used for
6  many of the most popular adult-oriented websites, including YouPorn.com, the
7  single most popular free adult video website on the Internet, as well as xTube.com,
8  Pornhub.com, and Brazzers.com, to cite only a few examples.  Manwin also
9  manages online content under the "Playboy" trademark and runs Playboy TV
10  worldwide, both under license from Playboy Enterprises, Inc.  This Complaint
11  refers to Manwin as "YouPorn."  YouPorn and other Manwin licensed companies
12  operate "tube" sites that offer free user-generated and searchable adult content.
13  Manwin or its licensors also offer paid subscriptions to high-quality adult content.

14  2.  In this lawsuit, YouPorn and Digital Playground seek redress for
15  monopolistic conduct, price gouging, and anti-competitive and unfair practices,
16  broadly harming competition, businesses, and consumers, and arising out of the
17  establishment of .XXX, a new Top-Level Domain Name ("TLD") intended for
18  adult-oriented content.  (Other TLDs are, for example, .com and .org.)  The
19  business practices at issue have enormous and worldwide consequences for the
20  Internet, an essential engine in all domestic and international commerce.

21  3.  Defendant the Internet Corporation for Assigned Names and Numbers
22  ("ICANN") controls and is responsible for the entire worldwide Internet Domain
23  Name System ("DNS").  The DNS makes the Internet work by assigning unique
24  "domain names" to web sites, and by coordinating master computer servers which
25  ensure that all Internet users typing a domain name into their browsers reach the
26  same "host" computer and website.  ICANN also determines whether to permit
27  new TLDs in the DNS, and decides who will operate those TLDs.  ICANN
28  recently approved the .XXX TLD, and contracted with defendant ICM Registry,

1   LLC ("ICM") to make ICM the sole "registry" or operator of that TLD.  As

2   explained more fully below, the approval and contract were rife with unfair,

3   inappropriate, and anti-competitive conduct and terms.  For example, Plaintiffs are

4   informed and believe as follows:

5            (a)     The creation of the .XXX TLD is forcing owners of trademarks and

6   domain names in other TLDs to purchase from ICM expensive "defensive

7   registrations" (or the right to block or prevent the use by others) of those same

8   names in .XXX.  Such defensive registrations are necessary to preclude others

9   from registering and using the owners' names in .XXX, and prevent the confusion

10  or dilution in value of those names that would otherwise result.  For example,

11  YouPorn.com needs to block anyone else from establishing a website using the

12  confusingly similar name YouPorn.xxx.  Otherwise, consumers seeking

13  YouPorn.com may instead reach YouPorn.xxx, causing YouPorn.com to lose

14  business, harming its reputation, and also causing consumers to be misled as to the

15  source of the material they are viewing.

16           (b)     The significant costs and disadvantages of such defensive

17  registrations, and their detrimental effect on competition, outweigh any alleged

18  benefit of the .XXX TLD.  Indeed, the .XXX TLD has been strenuously criticized

19  for extorting defensive registrations.  For these and other reasons, governmental

20  bodies, the adult entertainment industry, and other interested constituencies largely

21  opposed the formation of .XXX, which primarily serves to enrich ICM and its

22  affiliates.

23           (c)     In fact, ICM promoted .XXX in large measure first to create and then

24  exploit the need for just such defensive registrations.  ICM sold, during an initial

25  two-month pre-operation "Sunrise" period, almost 80,000 special .XXX

26  registrations at average fees to ICM of more than $150 per registration.  Various

27  publications have reported that to date, ICM has sold a total of at least 200,000

28  domain name registrations, including the Sunrise period registrations.  Reports

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1   have estimated that 80% or more of these registrations have been for defensive

2   purposes.  These registrations also include at least some "affirmative" .XXX

3   registrations, where persons and entities "affirmatively" register names purportedly

4   for use in operating an active .XXX website displaying new content, rather than for

5   purposes of "defensively" preventing someone else from exploiting in .XXX an

6   existing trademark or non-.XXX domain name.

7        (d)    There are no reasonable substitutes for defensive registration in

8   .XXX.  For example, by blocking use of a domain name in a TLD other than

9   .XXX, the name holder does not prevent the harm suffered if a non-owner registers

10  that name in the .XXX TLD.  The .XXX TLD thus constitutes a separate product

11  market for defensive registrations.  Also, ICM, by conspiring with ICANN, is

12  actively attempting to establish and monopolize, and has a dangerous probability

13  of establishing and monopolizing, an additional separate market for affirmative

14  registrations in TLDs with names that uniquely connote (or that are otherwise

15  predominately intended for) adult content.  For example, the letters ".XXX"

16  connote adult content, as could other hypothetical TLD names such as ".sex" or

17  ".porn."  However, .XXX is currently the only adult-oriented TLD, giving ICM a

18  present monopoly in such TLDs.

19       (e)    ICM initially attempted to coerce ICANN to approve the .XXX TLD

20  and to approve ICM's anti-competitive .XXX registry services.  That coercion took

21  the form of misleading predatory conduct and aggressive and sham litigation

22  tactics and threats, described more fully below.  Eventually, ICANN agreed in a

23  written contract to approve the .XXX TLD, and to approve ICM as the .XXX

24  registry, not only in response to those improper and coercive tactics but also

25  because ICM promised to pay ICANN what is expected to be millions of dollars in

26  annual fees derived from ICM's sales of .XXX registrations, and in particular

27  defensive registrations.  ICANN and ICM both knew and intended, at the time they

28  entered the contract, that the contract would permit and be used by ICM to charge

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1   supra-competitive prices, prevent future entrants into the market for adult-oriented

2   TLDs, and lead to poorer quality services and less innovation than would result if

3   ICM had to compete for the .XXX registry or with other adult-oriented TLDs.  In

4   fact, during contract negotiations, ICM informed ICANN of the above-market

5   prices ICM intended to charge and from which ICANN would profit.

6        (f)     ICANN has a monopoly over the DNS and over the approval of TLDs

7   and their registries.  ICANN exercised that power in combination, agreement and

8   conspiracy with ICM to award ICM the .XXX registry contract, without soliciting

9   or accepting competing bids, and without any market considerations whatsoever,

10  thus awarding ICM monopoly control and free rein to impose anti-competitive

11  prices and practices within the distinct .XXX TLD.  The .XXX registry contract

12  itself places no restrictions upon (and in fact enhances) ICM's abilities to exploit

13  that monopoly position to the disadvantage and harm of competition, consumers

14  and businesses.  For example, the contract imposes no price restrictions of any kind

15  on ICM (despite such price restrictions in the contracts between ICANN and the

16  registries for other TLDs which host adult-content as well as other websites).  The

17  contract also grants ICM a 10-year contract term which "shall" be perpetually

18  renewed, absent narrow exceptions, thus ensuring that ICM will continue to be

19  forever insulated from competition.

20       (g)     ICM has reacted to these circumstances with the anti-competitive

21  behavior expected of a monopolist.  It has, for example, improperly exploited the

22  newly created market for .XXX defensive registrations by making such

23  registrations unreasonably expensive and difficult, and by placing onerous burdens

24  on parties seeking to protect their intellectual property rights.  It has required that

25  registrants of names in .XXX waive certain legal rights and claims against ICM,

26  purportedly including antitrust claims, as a condition of registering.  It has reserved

27  to itself some of the most popular or desirable domain names, which it has sold at

28  prices substantially above those in a competitive market.  Its Chairman Stuart

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1    Lawley has announced that he expects to be able (and intends) to prevent the

2    establishment of any other (potentially competing) adult-content TLDs, including

3    through a contractual promise by ICANN not to approve such TLDs. Lawley has

4    also announced that he projects that ICM will earn annual profits of $200 million

5    from operating the .XXX TLD – profits to be earned by charging prices well above

6    those in a competitive market. Indeed, ICM is charging $60 annually for .XXX

7    registrations, more than ten times the annual registration charges in other TLDs

8    allowing adult-content websites. As Lawley admitted in a March 18, 2011 *USA*

9    *Today* article in responding to complaints about such prices: "This was always

10   going to be a very lucrative arrangement."

11        (h)    These activities have not only restrained trade among businesses by

12   making .XXX TLD services more expensive and of lower quality than they would

13   be in a competitive market, but will detrimentally affect consumers. For example,

14   businesses forced to pay excessive fees for .XXX defensive registrations will pass

15   those expenses on to consumers, either by charging consumers more or by offering

16   consumers fewer or less costly (and less appealing) services. Moreover, ICM's

17   perpetual monopolistic control of the relevant markets will preclude the entry of

18   new competitors who would offer better quality and/or lower priced registration

19   services for .XXX or other adult-oriented TLDs.

20        (i)    Through their actions, ICANN and ICM have knowingly conspired to

21   eliminate competitive bidding and competition in the markets for .XXX TLD

22   registry services with the intent to injure competition and consumers.

23

24                    **II.    THE PARTIES**

25        4.    Plaintiff Manwin Licensing International S.à.r.l. is and at all relevant

26   times was a business entity organized as a "Société à responsabilité limitée" under

27   the laws of Luxembourg, and having its principal place of business in the City of

28   Luxembourg, Luxembourg. Manwin owns and licenses one of the largest

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1 portfolios of premium adult-oriented website domain names and trademarks.

2 These include "YouPorn.com," the domain name for the website which is the

3 world's most popular source for free adult-oriented streaming videos. Indeed,

4 YouPorn.com is consistently one of the top 100 most visited sites on the entire

5 Internet. Domain names and trademarks owned by Manwin also include

6 Pornhub.com, xTube.com, Brazzers.com, and numerous other of the world's most

7 popular adult entertainment websites. In addition, under license from Playboy

8 Enterprises, Inc., Manwin operates and manages all "Playboy" online content and

9 runs Playboy Television worldwide, using the "Playboy Premium Entertainment"

10 label. This Complaint refers to Manwin as "YouPorn."

11      5.    Plaintiff Digital Playground, Inc. ("Digital Playground") is and at all

12 relevant times was a corporation organized and existing under the laws of

13 California, and having its principal place of business in Van Nuys, California,

14 within the Central District of California. Digital Playground is a world leader in

15 adult-oriented filmmaking and interactive formats, boasting one of the world's

16 largest high definition libraries of original adult content. Digital Playground

17 operates and makes this content available through its websites, including

18 digitalplayground.com.

19      6.    Defendant ICANN is a California non-profit public benefit

20 corporation, with its principal place of business in Marina Del Rey, California,

21 within the Central District of California. ICANN was created in 1998, in response

22 to a policy directive of the United States Department of Commerce ("DOC"), to

23 administer the DNS. ICANN is charged by DOC with, among other things,

24 exclusive authority to decide which TLDs to approve and select and to enter into

25 agreements with TLD registry operators.

26      7.    Defendant ICM Registry, LLC ("ICM") is a Delaware limited liability

27 corporation, with its principal place of business in Palm Beach Gardens, Florida,

Mitchell
Silberberg &
Knupp LLP
28

4461541.2

7

1  and doing business in the Central District of California.  ICM currently acts under
2  contract with ICANN as the registry operator for the .XXX TLD.

3      8.      Plaintiffs are unaware of the true names or capacities of the
4  Defendants sued under the fictitious names DOES 1 through 10, inclusive.
5  Plaintiffs are informed and believe that DOES 1 through 10, and each of them,
6  either participated in performing the acts averred in this Complaint or were acting
7  as the agent, principal, alter ego, employee, or representative of those who
8  participated in the acts averred in this Complaint.  Accordingly, Defendants
9  DOES 1 through 10 are each liable for all of the acts averred in this Complaint.
10 Plaintiffs will amend this Complaint to state the true names of Defendants DOES 1
11 through 10 when their identity is discovered.

12

13                      **III.    JURISDICTION AND VENUE**

14     9.      This is a case asserting claims under the Sherman Act, 15 U.S.C. §§ 1
15 and 2, et seq.  This Court thus has subject matter jurisdiction pursuant to 28 U.S.C.
16 § 1331 because this is a case arising "arising under … laws of the United States."

17     10.     Defendant ICANN is subject to personal jurisdiction in the State of
18 California, including because it is a public benefit corporation organized under the
19 laws of the State of California, because it has its principal place of business in
20 Marina del Rey, California, and because its acts and omissions and the events
21 which are the subject of this Complaint took place in substantial part and caused
22 impacts in the State of California.

23     11.     Defendant ICM is subject to personal jurisdiction in the State of
24 California, including because its acts and omissions and the events which are the
25 subject of this Complaint took place in substantial part and caused impacts in the
26 State of California.

27     12.     Venue is proper in this judicial district pursuant to 28 U.S.C.
28 § 1391(b) and 15 U.S.C. § 22 in that: (a) Defendants may be found and transact

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  business in this judicial district and are subject to personal jurisdiction in this

2  judicial district; and (b) a substantial part of the acts, omissions and events giving

3  rise to the claims asserted in this complaint occurred in this judicial district.

4

5               **IV.    FACTUAL BACKGROUND**

6    **A.    <u>The DNS System</u>**

7         13.    The Internet is an international network of interconnected servers and

8  computers.

9         14.    The World Wide Web is a collection of files, or "websites," hosted on

10  computers and servers and made available to consumers via the Internet,

11  containing text, graphics, audio, and video.

12         15.    Consumers typically access the World Wide Web using a software

13  application known as a browser (e.g., Microsoft Internet Explorer, Google Chrome

14  or Apple Safari).

15         16.    Each computer or host server connected to the Internet has a unique

16  identity, established by its Internet Protocol address ("IP address").  An IP address

17  consists of four numbers between 0 and 255, separated by periods (e.g.,

18  123.45.67.89).  The unique IP address ensures that users are directed to the

19  computer or host server for the particular website they intend to visit.

20         17.    Because the string of numbers contained in IP addresses is difficult to

21  remember, the Domain Name System ("DNS") was introduced to allow individual

22  users to identify a computer using an easier-to-remember alphanumeric "domain

23  name" such as "YouPorn.com."  The unique domain name is incorporated into a

24  Uniform Resource Locator ("URL").  Internet users connect to a website by typing

25  the URL into (or linking to the URL through) their browser.  The DNS ensures that

26  each unique alphanumeric "domain name" and URL corresponds to a specific

27  numerical IP address.

Mitchell  28
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

18.     When an Internet user enters a domain name and URL into a browser, the URL is sent to a DNS server.  The server looks up the IP address assigned to that domain name.  The browser then links to the server having that IP address and which hosts the desired website.

**B.     Top Level Domains**

19.     Within each domain name, the alphanumeric field to the far right is the Top Level Domain ("TLD").  The field to the left of the period preceding the TLD is the Second Level Domain ("SLD").  The field (if any) to the left of the period preceding the SLD is the Third Level Domain, and so on.  For example, in the domain name "YouPorn.com," the TLD is ".com," and the SLD is "YouPorn." (That name has no Third Level Domain.)  Accordingly, TLDs are the highest subdivisions of Internet domain names.

20.     Most TLDs with three or more characters are referred to as "generic" TLDs ("gTLDs").  Common gTLDs include .com, .org, and .biz.  gTLDs can either be "sponsored" or "unsponsored."  A sponsored TLD ("sTLD") is a specialized TLD that has a sponsor, usually an organization representing by consensus the narrower industry, interest group, or community most affected by or interested in the particular TLD.  The sponsor makes policy decisions for the sTLD.  An example of an sTLD is .museum, the sTLD sponsored by and for the use of museums, museum associations and museum professionals.[1]

21.     There are currently twenty-two gTLDs, fourteen of which are sTLDs.

22.     A particular assigned organization is responsible for operating each TLD.  These operating responsibilities include overseeing the sale and allocation of domain names in the TLD and maintaining a database directory or "zone file," also commonly known as a "registry," ensuring that each Second Level Domain name within the TLD is assigned and "resolves" to a unique numerical IP Address.

---

[1] *See* http://about.museum/background/.

Mitchell
Silberberg &
Knupp LLP

4461541.2

1    The organization responsible for operating a particular TLD is referred to as a

2    "registry operator" or "registry."  Registries in turn authorize separate companies

3    called "registrars" to directly sell the TLD domain names to the ultimate

4    businesses or consumers owning and using those names in the TLD.  The ultimate

5    owners or users are called "registrants."  Registrars like GoDaddy.com and

6    Network Solutions are approved by many TLDs to sell Second Level Domain

7    Names in those TLDs.  Registrants buy domain names through such registrars

8    which then register those names with the TLD registry.  Registrants pay fees to

9    registrars, which themselves then pay fees to the registries (usually on an annual or

10    other periodic basis), to register domain names within particular TLDs.  The

11    registries for the TLDs in turn pay fees to ICANN, periodically (e.g. quarterly) on

12    a per-registration or per-renewal basis.

13        **C.**     **ICANN's Internet Role**

14       23.     Before ICANN's formation in 1998, overall management of the DNS

15    was carried out under contractual arrangements between the United States

16    Government, which developed and initially controlled the Internet, and other

17    parties.

18       24.     Beginning no later than 1997, DOC came under increasing pressure

19    from various governments and users of the Internet to give up all control over the

20    DNS and to privatize management of the DNS.

21       25.     In 1998, DOC and ICANN entered into the first of a series of

22    agreements that divested DOC of control over the DNS and assigned to ICANN

23    overall authority to manage the DNS.  Under those agreements, ICANN's duties

24    include determining what new TLDs to approve, choosing registries for existing or

25    newly approved TLDs, and contracting with the registries to operate the TLDs.

26    ICANN also has some responsibility over the root server system.  The root server

27    system is the physical system of related computers which store the authoritative

28

1   master list of all TLDs and which thus permit users of the Internet to reach the

2   intended websites and email addresses.

3          26.     Although DOC has through written contracts charged ICANN with

4   such responsibilities, DOC has no regulatory oversight and no statutory authority

5   to direct ICANN's decisions about (for example) which TLDs to establish and

6   which registry operators to select.  As the National Telecommunication and

7   Information Administration stated in 2009 in the Federal Register: "The

8   [agreements between ICANN and DOC do] not give the Department of Commerce

9   the ability to exercise oversight [over ICANN] in the traditional context of

10  regulation and the Department of Commerce plays no role in the internal

11  governance or day-to-day operations of ICANN."  In fact, no governmental entity

12  or regulatory scheme governs ICANN's decisions to approve TLDs or registries,

13  and ICANN acts as purely private entity in making such decisions.  Indeed, the

14  Ninth Circuit has previously held that ICANN "is a private body with no public

15  accountability."  *Coalition for ICANN Transparency v. Verisign Inc.*, 611 F.3d

16  495, 507 (9th Cir. 2010).  As a result, only the antitrust (and comparable) laws

17  provide redress for anti-competitive conduct by ICANN and registry operators.

18  *See* DOC/NTIA Statement of Policy on the Management of Internet Names and

19  Addresses, 63 Fed. Reg. 31741, 31747 (June 5, 1998) ("Applicable antitrust law

20  [as applied to ICANN] will provide accountability to and protection for the

21  international Internet community.  Legal challenges and lawsuits can be expected

22  within the normal course of business for any enterprise and the new corporation

23  [ICANN] should anticipate this reality.")

24         27.     According to its Articles of Incorporation, ICANN was established

25  "for the benefit of the Internet industry as a whole."  ICANN's Articles of

26  Incorporation state its purposes as follows: "the Corporation shall . . . pursue the

27  charitable and public purposes of lessening the burdens of government and

28  promoting the global public interest in the operational stability of the Internet by

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  (i) coordinating the assignment of Internet technical parameters as needed to

2  maintain universal connectivity on the Internet; (ii) performing and overseeing

3  functions related to the coordination of the Internet Protocol ('IP') address space;

4  (iii) performing and overseeing functions related to the coordination of the Internet

5  domain name system ('DNS'), including the development of policies for

6  determining the circumstances under which new top-level domains are added to the

7  DNS root system; (iv) overseeing operation of the authoritative Internet DNS root

8  server system; and (v) engaging in any other related lawful activity in furtherance

9  of items (i) through (iv)."

10      28.     Pursuant to its Bylaws, ICANN receives input from several Advisory

11  Committees.  One of those committees is the Governmental Advisory Committee

12  ("GAC").  Membership in the GAC is open to all national governments.  In

13  addition, other multinational inter-governmental or economic organizations may

14  under certain circumstances participate in the GAC.  ICANN's Bylaws provide

15  that "the advice of the Governmental Advisory Committee on public policy matters

16  shall be duly taken into account, both in the formulation and adoption of policies."

17  However, ICANN is not obligated to follow instructions from DOC, GAC or any

18  government.

19      29.     In 2009, in one of its agreements with DOC, ICANN reaffirmed its

20  commitments to DOC that: "ICANN will ensure that as it contemplates expanding

21  the top-level domain space, the various issues that are involved (including

22  competition, consumer protection, security, stability and resiliency, malicious

23  abuse issues, sovereignty concerns, and rights protection) will be adequately

24  addressed prior to implementation."  In other bylaws and agreements with DOC,

25  ICANN also confirms that its activities in approving TLDs and registries will

26  appropriately consider the need for market competition and the protection of rights

27  in names and other intellectual property.

28

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

30.     In order to fulfill its commitments under its agreements with DOC and to comply with its Articles of Incorporation and Bylaws, the ICANN Board in 2006 instructed ICANN to conduct economic studies regarding TLD competition issues.  These issues included the question whether individual TLDs compete with one another or function as self-contained markets.  The U.S. Department of Justice reiterated the need for such studies in 2008.

### D.     ICANN Control Over TLDs And Receipt Of TLD Revenues

31.     Under its contracts with DOC, its Articles of Incorporation, and its Bylaws, ICANN controls what TLDs are inserted into and recognized by the root server system, and can be used on the Internet.  Thus, only ICANN can approve new TLDs.  Also, with the exception of certain limited legacy TLDs, no one may operate a TLD or become a registrar without ICANN approval.  There is no practical way to use the Internet without using the DNS, an ICANN-approved TLD, an ICANN-approved registry operator, and an ICANN-approved registrar. Because ICANN controls the DNS, TLD approvals, and the selection of registry operators and registrars, ICANN has monopoly power over the Internet and DNS. Also, because ICANN controls whether new TLDs are established, ICANN has the power to create (or to decline to create) new product markets resulting from the formation of TLDs.  ICANN is not required to obtain approval of its decisions from any governmental or other entity or person.

32.     ICANN earns fees from approving new TLDs, new registry operators, and new registrars.  For example, ICANN charges fees for applications to approve TLDs or to become a registry operator or registrar.  ICANN also charges registries and registrars fixed annual fees and per-transaction fees (e.g., registries and registrars pay ICANN a certain amount for every domain name registered). According to its audited financial statements, ICANN received over $59 million in such fees in fiscal year 2009, nearly $65 million in such fees in fiscal year 2010,

1  and nearly $68 million in such fees in 2011.  According to ICANN's 2012 budget,

2  nearly half of those sums represent per-transaction fees.

3       33.    By contrast, in fiscal years 2009 through 2011, ICANN's financial

4  statements show that "contributions" to ICANN, a category which appears to

5  include things such as meeting sponsorships, were approximately 2% of ICANN's

6  total revenues.

7       E.    **History Of The .XXX TLD**

8            **1.    ICM Fails To Obtain .XXX Approval In 2000.**

9       34.    In about 2000, ICM first applied to ICANN for approval of a new

10  .XXX TLD, intended primarily for adult content.  ICANN rejected the application,

11  finding among other things that "ICM Registry's application for an .xxx TLD does

12  not appear to meet unmet needs.  Adult content is readily available on the

13  Internet."  ICANN also "not[ed] the opposition of at least some segments of the

14  adult online content industry to a .xxx TLD."  That opposition was based in part on

15  concerns that a .XXX TLD could lead to "ghettoization" of adult content solely

16  within a single TLD, and thus to enhanced risks that such materials could be easily

17  and improperly censored.

18            **2.    ICM Fails To Obtain .XXX Approval In 2004.**

19       35.    In 2004, ICM applied again to have ICANN approve the .XXX TLD,

20  this time as a sponsored TLD.  Under its rules, ICANN would not approve

21  sponsored TLDs unless they "address[ed] the needs and interests of a clearly

22  defined industry (the Sponsored TLD Community), which can benefit from the

23  establishment of a TLD operating in a policy formulation environment in which

24  the community would participate."  The ICANN rules also required that the

25  "Sponsored TLD Community" be "precisely defined"; that the Community have

26  "differentiated" needs that would benefit from a separate sTLD; that the sTLD

27  applicant propose a "sponsoring organization" that would produce sTLD polices

Mitchell
Silberberg &
Knupp LLP   28

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  benefitting and that would represent the Sponsored Community; and that the
2  proposed sTLD enjoy "broad-based support" from the Sponsored Community.
3      36.   As part of its application, ICM proposed the International Foundation
4  for Online Responsibility ("IFFOR") as the required sponsoring organization for
5  the .XXX TLD.  IFFOR supposedly was an independent organization representing
6  the "responsible" adult entertainment community.  However, Plaintiffs are
7  informed and believe that ICM and its Chairman Stuart Lawley in fact created
8  IFFOR for the sole purpose of the .XXX TLD application, and that they dominated
9  and manipulated IFFOR as expedient for the attempted approval of the .XXX
10  TLD.  Plaintiffs are informed and believe that IFFOR did not and does not
11  represent the responsible (or any significant portion of the) adult entertainment
12  community.
13      37.   On or about August 27, 2004, ICANN rejected ICM's 2004
14  application for a .XXX TLD in part because ICM had failed to demonstrate a
15  defined sponsorship community which broadly supported and would benefit from
16  .XXX.

17          **3.   ICM's Misleading And Predatory Campaign To Obtain**
18                **.XXX Approval.**

19      38.   Plaintiffs state the averments in paragraphs 39-51 below on
20  information and belief.
21      39.   Leading to and after the rejection of its 2004 application, ICM
22  embarked on a predatory campaign of misrepresentations and other misconduct in
23  an effort to persuade ICANN that ICM and the .XXX TLD met the sponsorship
24  criteria or pressure ICANN into approving the .XXX TLD and ICM as the registry
25  operator regardless of whether those criteria were met.  More specifically:
26      (a)   Anticipating ultimate ICANN approval of its proposed .XXX TLD,
27  ICM permitted members of the adult entertainment industry to preregister in .XXX
28  names that such members already used for other websites.  Members desired such

Mitchell
Silberberg &
Knupp LLP
4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

pre-registration in order to prevent their names from being misappropriated by others in the .XXX TLD.  While desiring to thus protect their names, many such members also opposed .XXX, and ICM promised them that it would not "count" their registrations as support for the .XXX proposal.  Contrary to that promise, ICM represented to ICANN that the pre-registrants supported .XXX.

(b)     ICM continued to claim support from several major adult entertainment industry companies, when in fact those companies subsequently opposed the .XXX application or took neutral positions.  Such companies include Hustler and AVN.

(c)     ICM attempted to obtain support for .XXX from the Free Speech Coalition ("FSC"), an adult entertainment industry umbrella group, by offering various inducements, including cash and Board memberships on IFFOR, and by attempting to "stack" FSC meetings with supporters.

(d)     ICM generated fake comments in support of its application by posting a link that purported to lead to additional information about the .XXX proposal, but which in fact automatically generated emails to ICANN supporting ICM's .XXX application.

(e)     ICM submitted misleadingly edited videos and/or photos of an X-biz adult industry conference to falsely suggest that there was limited opposition to its application.

(f)     ICM submitted partial and redacted information concerning persons purportedly supportive of its application who were allegedly involved in the adult entertainment industry, but who in fact appeared not to have been involved in the industry.

(g)     ICM touted support from some actual and alleged participants in the adult entertainment industry and related fields but without properly disclosing that at the time or later such supporters were employed or paid by, or otherwise in

1    receipt of benefits or promises from, ICM.  Such persons include Jonathan

2    Silverstein (aka J$tyles) and Greg Dumas, among others.

3           (h)     ICM offered various inappropriate inducements to persons and

4    entities, including FSC, to support ICM's application.

5           (i)     ICM asserted that IFFOR was an independent "sponsoring" entity for

6    the .XXX TLD when in fact IFFOR was created and controlled by ICM and its

7    Chairman Stuart Lawley.

8           (j)     When questioned about these tactics, ICM refused to publicly disclose

9    the identities of its alleged supporters, ostensibly on privacy grounds, making it

10   difficult if not impossible for opponents to challenge the veracity of ICM's claims.

11          (k)     ICM engaged in other predatory, improper, and/or misleading

12   conduct.

13          40.     In reliance on certain of ICM's false and misleading lobbying efforts

14   described above, and apparently without knowing that some of ICM's tactics or

15   representations were false or misleading, ICANN in June 2005 took the

16   preliminary step of authorizing its President and General Counsel to enter into

17   negotiations with ICM for the .XXX TLD.

18          **4.     ICM Fails To Obtain .XXX Approval In 2006 And 2007.**

19          41.     After its June 2005 preliminary authorization to negotiate with ICM,

20   ICANN received significant and widespread opposition to an .XXX TLD.

21   Opposition came from members of the GAC, from various individual governments

22   (including DOC), from members of the adult entertainment industry, and from the

23   broader public.  For example, in March 2006, the GAC issued the so-called

24   Wellington Communiqué which noted that several GAC members were

25   "emphatically opposed from a public policy perspective to the introduction of a

26   .XXX sTLD."  ICANN deferred a final decision on the ICM application to

27   consider these objections.

28

42.    While ICANN considered these objections, ICM applied improper pressure in an effort to coerce ICANN's approval of .XXX.  For example, ICM knew that the United States Government was under international political pressure to avoid exercising control over the DNS and Internet.  ICM made intentionally overbroad and baseless Freedom of Information Act requests intended to obtain documents that would embarrass DOC and the Department of State by demonstrating their interest in the .XXX issue, despite international concern about such activity, and with the intent of muting DOC and the Department of State.  ICM eventually filed a baseless lawsuit against the Department of State and DOC in an unsuccessful effort to force disclosure of the documents requested under the Freedom of Information Act.  In that lawsuit, ICM falsely accused the U.S. government of engaging in improper and misleading conduct in the ICANN domain approval process to deprive ICM of its legal rights, and falsely claimed that there was overwhelming support for and minimal opposition to its application.  For example, in its May 19, 2006 complaint, ICM represented that "the comments filed in ICANN's evaluation period regarding ICM's .xxx sTLD proposal were overwhelmingly favorable" and that "a negative lobbying campaign was initiated by a few U.S.-based activist groups in response to ICANN's June 1, 2005 vote in support of the ICM application."  These assertions were untrue.  To put further pressure on ICANN, ICM also submitted a complaint to the ICANN ombudsman about ICANN's treatment of ICM's .XXX application.

43.    Despite these efforts, on May 10, 2006, ICANN again rejected ICM's .XXX proposal.  On May 19, 2006, ICM filed with ICANN a request for reconsideration, later withdrawn.  Governmental entities, members of the adult entertainment industry, and others continued to voice strong and widespread opposition to the .XXX TLD through March 30, 2007, when ICANN again rejected the .XXX TLD.

### 5. ICM's 2008 IRP.

44.   On June 6, 2008, ICM filed an Independent Review Proceeding ("IRP") challenging ICANN's rejection of the .XXX TLD.  ICANN has established IRPs as a private, non-binding quasi-arbitral process for attempting to resolve disputes concerning its activities.  In addition to being non-binding, the IRP process is not mandated by law, is not a prerequisite to suit against ICANN, and is entirely voluntary.  In the IRP filed by ICM, ICM contended that ICANN had approved ICM's application for the .XXX TLD in June of 2005, when ICANN's Board had directed that its President and General Counsel begin negotiating an agreement with ICM, and that ICANN had thereafter improperly "reconsidered" that decision.

45.   During the IRP, ICM continued in its campaign of false and misleading representations.  For example, in its June 6, 2008 Request for IRP, ICM claimed that "[t]here is substantial industry support for the .XXX domain, as evidenced by the number of providers that have participated in ICM's pre-reservation program, which allows for applicants to reserve domain names in advance of the approval of the sTLD application."  However, as noted above, ICM had previously told persons who pre-reserved domain names on .XXX that it would not assert that such pre-reservations, many of which were strictly for defensive purposes, were evidence of support for the .XXX domain.  ICM repeated this misleading statement in a January 22, 2009 "Memorial on the Merits."

46.   On February 19, 2010, the majority of the three-person Independent Review Panel, over a strong dissent, issued an expressly non-binding Declaration that ICANN had in June 2005 determined that ICM met the sponsorship criteria, and that ICANN could not thereafter properly reopen the issue.  The Declaration did not address whether ICM had in fact met the sponsorship criteria or whether its sponsorship evidence was fraudulent or misleading.  The Panel did not hear from the GAC, other governments, members of the adult entertainment industry, or

1    others vitally concerned with and opposed to the .XXX TLD.  The panel did not

2    consider antitrust or other competition issues.

3        47.    On March 26, 2010, ICANN publicly posted a document listing its

4    options for responding to the non-binding IRP Declaration.  The ICANN posting

5    noted that, among other things, ICANN could accept the majority decision and

6    approve .XXX; could adopt the dissenting decision and reject .XXX; or could take

7    other courses.  ICM then sent ICANN a "response" stating that it was "self-

8    evident" that litigation would result if ICANN did not adopt the IRP majority

9    Declaration.  ICM made additional threats of litigation against ICANN, its Board

10   members, and others it perceived as responsible in some way for the denial of

11   ICM's .XXX application.  ICM made these threats vexatiously, without legal or

12   factual basis, and for the purpose of coercing ICANN to approve the .XXX TLD

13   and ICM as the registry operator.

14              **6.     ICANN Agrees With ICM to Approve .XXX To Avoid**

15                       **Further Threats And Enrich Itself.**

16       48.    On March 18 and 19, 2011, ICANN agreed with ICM to approve

17   ICM's application for the .XXX TLD.  On March 31, 2011, ICANN and ICM

18   signed a registry contract under which ICM agreed to provide registry services for

19   the .XXX TLD.

20       49.    ICANN agreed with ICM to approve the .XXX TLD and entered into

21   the ICM registry contract despite ongoing, extensive, strenuous, and legitimate

22   objections to both.  These objections came from the public at large, from members

23   of the GAC, from the adult entertainment industry, from the business community,

24   and from others.  These objections were expressed in writing, orally, on the

25   Internet, and in various public forums.  The objections included legitimate

26   concerns that .XXX served limited purposes because adult content could be and

27   was distributed in other TLDs; that establishing .XXX would require trademark

28   holders and others with name rights to take expensive and otherwise unnecessary

Mitchell
Silberberg &
Knupp LLP

4461541.2

21

1   and economically detrimental steps to block use of those names in the .XXX TLD;

2   that .XXX had obtained and would (for reasons explained below) retain a

3   monopoly on TLDs intended for adult content; that ICM had engaged in anti-

4   competitive, predatory, and other improper and misleading conduct; that adult

5   content might, in violation of free speech rights, be forced exclusively into the

6   .XXX TLD and then more readily censored; and that the adult entertainment

7   industry generally opposed ICM and the .XXX TLD.

8          50.    Before agreeing, combining and conspiring with ICM to approve the

9   .XXX TLD, ICANN failed to conduct proper economic studies about the

10  competitive effects of or economic needs for new TLDs, including the .XXX TLD,

11  despite the conclusion of ICANN's Board and the U.S. Department of Justice that

12  such studies were required by ICANN's bylaws, its contractual commitments, and

13  legitimate competition concerns.  ICANN did perform some perfunctory studies

14  that never properly or fully addressed the important economic and competition

15  issues posed by the .XXX TLD.  Even so, some of those perfunctory studies

16  recognized the potential for monopoly power and anti-competitive effects from

17  establishing new TLDs.

18         51.    ICANN agreed, combined and conspired with ICM to approve .XXX

19  and entered into the ICM registry contract, despite these legitimate and strenuously

20  voiced concerns, in violation of its bylaws and contractual obligations, and despite

21  the lack of complete and requisite economic studies, only because: (a) ICANN was

22  intimidated and coerced by ICM's improper conduct (described above) threatening

23  ICANN and imposing significant economic expense on ICANN, tactics that ICM

24  promised to continue as long as ICANN did not approve the .XXX TLD and ICM

25  to act as registry for .XXX; and (b) ICM promised ICANN significant financial

26  payments, likely to amount to millions of dollars, under the .XXX registry

27  contract.  Reflecting that ICANN's approvals were in part a reaction to improper

28  ICM pressure, ICANN insisted upon and obtained an agreement with ICM to a

Mitchell
Silberberg &
Knupp LLP

4461541.2

1    release – barring ICM from further litigation threats – as a condition to agreeing to

2    approve .XXX and to signing the .XXX registry contract.

3

4    **V.    THE ANTI-COMPETITIVE .XXX REGISTRY CONTRACT**

5        52.    Plaintiffs state the averments in paragraphs 53 to 58 below on

6    information and belief.

7        53.    In its Agreement with ICM, in addition to allowing ICM to operate

8    the .XXX TLD, ICANN agreed to provide the following services to ICM, among

9    others, in exchange for the substantial fees received by ICANN from ICM:

10       (a)    Ensure that the authoritative root will point to the TLD zone servers

11   designated by ICM for the .XXX registry;

12       (b)    Implement any changes to the TLD zone server designation by ICM;

13       (c)    Implement ICM requests for changes in the nameserver delegation for

14   the Registry TLD in the authoritative root;

15       (d)    Publish root-zone contact information for the .XXX TLD;

16       (e)    Grant ICM a non-exclusive royalty-free license to state that it is

17   designated by ICANN as the Registry Operator for the .XXX and to use the

18   ICANN logo to signify that ICM is an ICANN-designated registry authority.

19       54.    ICANN in other registry contracts has attempted to address issues

20   posed by its sole power to approve TLD registries, which may in turn exert

21   monopolistic and anti-competitive power over registrants.  For example, in some

22   cases, ICANN has required competitive bids for TLD registry contracts.  The

23   bidding process may include competition among registry applicants over the

24   services and prices to be offered, through registrars, to registrants.  In other cases,

25   ICANN has imposed price caps upon what registries may charge for TLD services,

26   or has imposed requirements for the services registries must offer.  In a

27   competitive market, registries would compete not only on price but services.  For

28

1   example, registries may adopt different processes for allocating domain names

2   among competing registrants.

3       55.   ICANN did not solicit, approve, or consider any adult-content TLDs

4   other than .XXX.  ICANN entertained no competitive bids for the .XXX registry

5   contract.  ICANN had no process for separating approval of the .XXX TLD from

6   approval of ICM as the .XXX registry.  After it agreed, combined and conspired

7   with ICM to approve the .XXX TLD, ICANN did not offer any parties but ICM an

8   opportunity to become the .XXX registry.  ICANN's agreement, combination and

9   conspiracy to approve the .XXX TLD was thus also an agreement, combination

10   and conspiracy to approve ICM as the .XXX registry.  The negotiation of the

11   .XXX registry contract was a closed process.  The lack of competitive bidding

12   eliminated any market restraints that would have prevented ICM from engaging in

13   monopolistic and anti-competitive pricing and practices in the sale of .XXX

14   registry services.  ICANN could have required competing bids for the rights to act

15   as the .XXX registry, just as it has required competing bids for the right to act as

16   the registry of other TLDs.

17       56.   Not only did the selection of ICM lack any market restraints, the

18   ICM/ICANN contract contains no substitute for such restraints (e.g., price caps)

19   such as those imposed by ICANN in other TLD registry contracts.  In fact, the

20   terms of the ICM/ICANN contract bolster ICM's ability to engage in anti-

21   competitive and monopolistic practices in the sale of .XXX TLD registry services.

22   In particular and without limitation:

23       (a)   The ICM/ICANN contract contains no price caps or other restrictions

24   of any kind on what ICM can charge for .XXX registry services.  ICM thus has

25   complete price discretion and no fetters on its ability to charge monopolistic prices

26   considerably higher than those which would exist in a competitive market.  Also

27   before the ICM/ICANN contract was executed, ICM told ICANN about the supra-

28   competitive prices ICM anticipated charging.  ICANN declined to regulate such

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  anti-competitive prices; on the contrary, it agreed with ICM that it would profit

2  from them.  It did so by requiring ICM to pay ICANN an enhanced fee for each

3  .XXX domain name registration.  That fee is larger than the per-registration fees

4  ICANN charges for most other TLDs, and is several times higher than the per-

5  registration fee charged by ICANN to any registry for any other TLD that permits

6  adult-content websites.

7       (b)    The ICM/ICANN contract leaves ICM with broad discretion to

8  fashion and limit in a non-competitive, unreasonable manner the nature, quality

9  and scope of .XXX registry services it offers registrars and registrants.  Such

10  restrictions raise costs and limit innovation, thus harming registrants and

11  consumers.

12       (c)    Under the terms of the ICM/ICANN contract, ICM may cancel the

13  contract at any time, and for any reason, on 120 days notice.  By contrast, ICANN

14  may not terminate the contract unless ICM fails to cure adjudicated, material

15  breaches of its limited contractual obligations.  ICANN and ICM understood and

16  intended that ICANN's termination provision would almost certainly never be

17  invoked, particularly given the requirement that any breaches be adjudicated and

18  uncured.  Moreover, the ICM/ICANN contract lasts for a minimum 10-year term,

19  but "shall" be renewed perpetually subject only to an ambiguous obligation to

20  negotiate in good faith certain new terms, none of which appear to provide

21  registrant or consumer protections.  The unlimited term of the ICM/ICANN

22  agreement permits ICM to continue insulating itself from market restraints and

23  from any threat of competition in .XXX registry services.  The lack of competition

24  removes incentives for ICM to innovate, reduce prices, operate efficiently or

25  otherwise serve consumers.

26       (d)    The ICM/ICANN contract contains a provision which ICM contends

27  will preclude ICANN from approving any arguably competing TLD designated for

28  adult content, such as ".sex" or ".porn."  This restriction limits future competition,

1    enabling ICM to bar the threatened entry of new market competitors.  ICM has

2    publicly touted the existence of this anti-competitive contractual provision.

3         57.    ICANN failed to take any reasonable contractual or other steps to

4    restrain ICM from engaging in monopolistic and anti-competitive conduct, not

5    only because ICANN was intimidated by ICM's previous pressure tactics and

6    strategies but also because ICM agreed to pay ICANN very significant

7    compensation for the right to act as the .XXX registry, as more particularly averred

8    above.

9         58.    Through the above-described processes for approving the .XXX TLD

10   and the .XXX registry contract, and through the terms of the .XXX registry

11   contract, ICANN and ICM conspired, intentionally agreed, and intended to

12   eliminate competitive bidding and competition in the .XXX TLD and in .XXX

13   TLD registry services and to create illegal monopolies.   ICANN and ICM also

14   knew and intended that such processes and terms would harm competition, restrain

15   trade, and result in higher-cost and lower quality services both to registrants and to

16   consumers.

17

18                    **VI.    RELEVANT MARKETS**

19        59.    Plaintiffs state the averments in paragraphs 60 to 70 below on

20   information and belief.

21        60.    The .XXX TLD registry services comprise a separate market for

22   blocking services and defensive registrations in .XXX.  Owners of trademarks, of

23   domain names in other TLDs, or of other name rights purchase services in .XXX

24   for defensive or blocking purposes – i.e., to prevent others from registering or

25   using those same names in the .XXX TLD.  Such defensive purchases are not

26   intended to make use of a registered name for an operating .XXX website with new

27   content, but only to prevent or block such use by others.  Owners suffer dilution in

28   their names' value or goodwill if others register or use their names in the .XXX

Mitchell
Silberberg &
Knupp LLP
4461541.2

1   TLD.  Owners are also damaged by consumer confusion if others register or use

2   their names in the .XXX TLD.  Consumers intending to reach the owners' website

3   may instead reach the website of others who are using the owners' names in the

4   .XXX TLD, not only resulting in a redirection of traffic away from the lawful

5   holders of name rights, but also confusing and misleading consumers.

6          61.    The market for blocking services or defensive registrations in the

7   .XXX TLD is a distinct and separate market in part because there is no reasonable

8   substitute for such registrations.  For example, blocking or preventing others' use

9   of names in a non-.XXX TLD is not such a substitute.  Blocking use of a name in a

10  non-.XXX TLD does not prevent use of the name in the .XXX TLD.  Blocking use

11  of a name in a non-.XXX TLD also does not prevent the harm caused by others'

12  registration or use of the name in the .XXX TLD.  Even if name owners can

13  preclude their names' registration or use by others in every non-.XXX TLD, they

14  still need to defensively register or block such names in the .XXX TLD in order to

15  prevent dilution and consumer confusion.

16         62.    The need for defensive registrations is particularly acute in .XXX,

17  both for those within and without the adult entertainment industry.  Owners of

18  names not associated with adult content need to prevent the names' use in .XXX in

19  order to avoid an undesirable association.  For example, prominent celebrities may

20  wish to avoid .XXX websites under their names.  Owners of children's character

21  names may wish to bar registration of such names in .XXX to prevent any resulting

22  adult or sexual connotation to the character.  Those owning names already

23  associated with adult content also have a particularly acute need to defensively

24  register in .XXX.  Because the letters "XXX" universally connote adult content,

25  owners of names already associated with adult content face a heightened risk of

26  consumer confusion, dilution, and free-riding if their names are used by others in

27  the .XXX TLD.

28

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

63.     The need for defensive registrations in .XXX is also heightened by another factor.  ICM agreed in its registry contract with ICM that .XXX would be an industry-limited and sponsored TLD.  Under the contract, only those providing adult entertainment services are supposed to operate .XXX web sites.  But ICM has not enforced this restriction.  Instead, ICM has allowed .XXX registrations by those having nothing to do with adult entertainment.  For example, the following non-adult websites are currently found on the .XXX TLD: onlineclasses.xxx (online universities), musicvideos.xxx (embedded YouTube music videos), discoverme.xxx (advertising for musicians, artists, comedians and models for hire), eflowers.xxx (florist), rentacar.xxx (car rental services), insurancerates.xxx (various lines of insurance), and homesforsale.xxx (real estate services).  Permitting broad, unregulated access to .XXX enhances the likelihood that others will register .XXX sites infringing rights of name holders.  ICM's breach of its contractual obligations thus makes defensive .XXX registrations more necessary.

64.     ICANN-commissioned and other economic studies have recognized a separate market for defensive registration.  *See, e.g.*, M. Kende, "Assessment of ICANN Preliminary Reports on Competition and Pricing" at 7-12 (discussing separate demand characteristics for "core" or affirmative registrations and defensive registrations, noting that defensive registrations are less price sensitive, and concluding that "without a price cap, the new [TLD] registries could choose to keep prices relatively high to profit from defensive registrations, at the expense of competing over [affirmative] registrations").

65.     ICM has a complete monopoly in the market for the sale of .XXX TLD blocking or defensive registration services through registrars.  No other company or entity can or does provide such services.

66.     ICM is also attempting to establish and monopolize a separate market for "affirmative registrations" of names (i.e., registrations of names for use in identifying operating websites showing new content) within TLDs connoting or

1   intended exclusively or predominately for adult content.  There is a serious danger
2   that ICM will establish and monopolize such a distinct market because of the
3   unique association of the "XXX" name with adult content and the resulting self-
4   reinforcing pattern that will arise from that association with adult content.  In
5   particular, users expecting to find adult content on sites associated with "XXX"
6   will migrate to the .XXX TLD, attracting more providers, in turn drawing more
7   users, in turn again attracting yet additional providers, and so on.  This pattern is an
8   example of the well-known economic phenomenon of "network effects" which
9   could contribute to making .XXX the monopoly source of adult content.  As
10  explained below, contractual provisions and other forces make it unlikely that
11  other potential TLDs with names that could similarly connote adult content, such
12  as .sex or .porn, will be established.

13       67.    ICM currently has a complete monopoly in TLDs that have a name
14  connoting adult content.  There are currently no other TLDs beside .XXX with
15  names that connote adult content.  No other company or entity besides ICM
16  currently can or does provide, through registrars, affirmative registrations in TLDs
17  that connote adult content.  This control makes it more likely that ICM will extend
18  its monopoly on blocking or defensive registrations into a distinct monopoly for
19  affirmative registrations in TLDs connoting or predominately intended for adult
20  content.

21       68.    ICM's Chairman and Chief Executive Officer Stuart Lawley has
22  expressly announced his intention to establish a separate market for affirmative
23  registrations in TLDs intended for adult content and to monopolize that market.
24  Mr. Lawley has stated that he can legally prevent, through provisions in the
25  ICM/ICANN contract, ICANN's approval of any TLDs which compete with .XXX
26  by also having names – e.g. .sex or .porn – that connote adult content.  He has also
27  stated that for a variety of other reasons he does not ever expect any such approval.
28  Those reasons include the controversy surrounding the approval of .XXX (making

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  future approval of other adult-content TLD names less likely), and new ICANN

2  rules adopted after ICANN and ICM agreed combined and conspired regarding the

3  .XXX TLD, restricting the creation of any other "controversial" TLD strings.

4  There is also reasonable possibility that .XXX could, through legislation,

5  regulation or for other reasons, become the exclusive permitted TLD for adult web

6  content.  In fact, in 2006, the United States Congress introduced legislation that, if

7  passed, would force adult content exclusively to the .XXX TLD.

8        69.    There is a serious danger that, due to network effects and the other

9  factors described above, the establishment and monopolization of a separate

10  market for affirmative registrations of adult content (and the relating anti-

11  competitive effects) will occur rapidly and be difficult or impossible to undo after

12  the fact.  This heightens the need for prompt injunctive relief.

13        70.    ICANN has knowingly and intentionally combined and conspired

14  with ICM to obtain a monopoly in the above-described markets by, among other

15  things:

16  •     Agreeing to grant ICM sole and complete control over .XXX, the only TLD

17        intended exclusively or predominately for adult content.

18  •     Agreeing in the ICM-ICANN contract to preclude new entrants into that

19        market.

20  •     Adopting new rules and procedures (some as recent as January 12, 2012)

21        effectively preventing new entrants into that market by allowing

22        governmental or other objectors to veto any new adult-oriented TLDs.

23

24  **VII.   ICM'S ANTI-COMPETITIVE PRACTICES IN THESE MARKETS**

25        71.    Plaintiffs state the averments in paragraphs 72 to 88 below on

26  information and belief.

27        72.    ICM has in fact exploited its above-described monopoly or incipient

28  monopoly in the TLD registry services, and the lack of market or other restraints

Mitchell
Silberberg &
Knupp LLP

4461541.2

1   on its conduct, by engaging in anti-competitive and predatory behavior

2   unreasonably injurious and harmful to the economy, competition, consumers and

3   businesses, as averred in the paragraphs below.  ICANN has conspired to engage in

4   these illegal practices by agreeing to approve the .XXX TLD, agreeing to the terms

5   of the ICM/ICANN contract, eliminating competition for .XXX registry services,

6   and agreeing with ICM to refrain from adopting any other measures to prevent

7   anti-competitive conduct in the .XXX registry.  Both ICM and ICANN knew and

8   intended that their actions would restrain trade, and harm competition, businesses,

9   and consumers, through (among other things) causing higher prices, decreased

10  innovation and more limited services than would exist in a competitive market, as

11  more particularly averred below.

12       **A.**   **Unreasonable Pricing For And Restrictions Upon Permanent**

13              **Blocking**

14       73.   ICM incurs very little cost for permanently blocking names from the

15  .XXX TLD.  For that reason, ICM has determined that it will permanently block,

16  entirely on its own accord and at no charge, certain celebrity and other names from

17  .XXX use or registration except by the actual celebrity or name owner.

18  Nevertheless, ICM is charging other name owners (through registrars) supra-

19  competitive, monopoly prices for permanent name blocking services.  More

20  particularly, subject to certain restrictions described below, ICM has sold through

21  approved registrars, and in exchange for a one-time fee of about $150, the

22  permanent right to block use of names in the .XXX TLD.  For example, by paying

23  a registrar which in turn pays ICM about a $150 fee, Mercedes Benz could have

24  purchased the right to preclude anyone from operating a "MercedesBenz.xxx"

25  website.  The approximately $150 price charged by ICM for such permanent

26  blocking is far higher than that which would exist in a competitive market, and so

27  constitutes an unreasonable restraint on trade and also harms competition.

74.     ICM is not only charging these supra-competitive prices for the permanent blocking services it does sell, but (in an apparent effort to maximize its monopoly profits) has unreasonably limited the sale of such permanent blocking. For example, ICM has refused to sell permanent blocking to address so-called "typo-squatting." Typo-squatting is the practice of registering close variants or misspelling of another's name, e.g. someone other than Mercedes Benz registering "Mercedez Benz" instead of "Mercedes Benz." Typo-squatters hope that consumers may accidentally misspell or slightly mis-recall the intended name and thus be diverted from the name holder's website to the typo-squatter's website. Name owners must often register or block all possible misspellings or name variants in order to prevent confusion and name dilution through typo-squatting and similar activities.

75.     However, ICM would only sell trademark owners the permanent right to block the *exact* trademark. It would not sell them the right to block other closely-related names as necessary to prevent typo-squatting or similar misconduct. The ICM policies also precluded permanent blocking even of exact names if included in a longer domain-name string. For example, ICM would have permitted Mercedes Benz to purchase the right to permanently block "MercedesBenz.XXX" but not to purchase the right to permanently block "sexinaMercedesBenz.XXX." Before entering the contract with ICM, ICM disclosed to ICANN that ICM planned not to allow blocking of address typosquatting.

76.     ICM's policies, of which ICM largely made ICANN aware before ICANN entered into a registry contract with ICM, also impose other unreasonable and anti-competitive restrictions on the purchase of permanent blocking. More specifically:

(a)     Members of the adult entertainment community may not purchase permanent blocking.

1      (b)    Permanent blocking is limited to registered trademark owners, and

2  does not extend to owners of other name rights (e.g., domain names used in other

3  TLDs).

4      (c)    Permanent blocking is not available to those with pending but not yet

5  final trademark registrations.

6      (d)    Companies purchasing affirmative registrations for operating active

7  .XXX websites under certain names may not purchase permanent blocking of other

8  names.

9      (d)    ICM limited the sale of permanent blocking rights to an

10  approximately two month, pre-operation "Sunrise" period, now expired.  Thus, no

11  one can any longer purchase permanent blocking.

12      (f)    Any party purchasing a defensive or blocking registration of a name

13  in .XXX is permanently barred from translating that name into an affirmative

14  registration for use as an operating website displaying content.

15      77.    A name holder precluded by ICM policies from buying required

16  permanent blocking services has few and inadequate options.  Name holders

17  unable to buy permanent blocking services for a one-time fee may instead purchase

18  annual registrations, for an annual fee, of names or near names.  These annual

19  registrations can be used defensively in either of two ways.  First, the owner may

20  create a standard "non-resolving" message that will be received by those who

21  attempt to access the name in .XXX.  For example, Mercedes Benz could annually

22  register its name and then configure its "MercedesBenz.xxx" web address so that

23  those trying to reach that site would receive a "no such page" or similar message.

24  Second, certain owners could create a "redirection" site that automatically redirects

25  those who reach the .XXX site to an active site in another TLD.  For example,

26  YouPorn could configure its site so that any web user seeking "YouPorn.xxx"

27  would instead be redirected to the pre-existing and active "YouPorn.com" site.

Mitchell
Silberberg &
Knupp LLP

4461541.2

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1   However, under ICM's policies, only members of the adult entertainment

2   community may purchase such a redirecting site.

3        78.   ICM currently charges registrars $60 in recurring annual fees for such

4   "non-resolving" or "redirecting" defensive registrations. Thus, in about three

5   years, these annual fees will in the aggregate be more than the already excessive

6   one-time approximately $150 permanent blocking fee charged by ICM. That is

7   true even if ICM does not in future years raise the annual registration fees, which

8   ICM reserves the right to do. ICM has in fact limited sales of permanent blocking

9   services with the very intent of forcing name owners to purchase more expensive

10  annual registrations for defensive purposes. The annual fees charged by ICM for

11  defensive registrations are many times higher than those which would exist in a

12  competitive market and thus harm competition and restrain trade. Moreover, those

13  purchasing annual registrations, even for certain defensive purposes, are forced by

14  ICM to agree to comply with policies of IFFOR, the allegedly independent

15  "sponsoring" organization for the .XXX TLD. Many registrants do not wish to be

16  subject to IFFOR policies. These restrictions also would not exist in a competitive

17  market.

18       79.   Those name holders not willing or able to purchase annual

19  registrations for defensive purposes may need to engage in costly legal efforts to

20  prevent improper exploitation of their names in .XXX. Such expensive legal

21  procedures are not a reasonable substitute for defensive registrations.

22       80.   Holders of valuable names may need to defensively register or

23  permanently block many dozens of near-name variants. Businesses owning

24  multiple trademarks or domain names may need to purchase many hundreds or

25  thousands of permanent blocking rights or other defensive registrations. The

26  charges imposed by ICM for permanent blocking services and other defensive

27  registrations are thus huge and extremely significant in the aggregate. They create

Mitchell
Silberberg & 28
Knupp LLP

4461541.2

34

1    a "deadweight" economic loss and cost increase that would not exist but for the

2    .XXX TLD and its anti-competitive registry practices.

3         81.    By thus unreasonably restricting and pricing the purchase of blocking

4    services or defensive registrations, ICM has created an unjustified and

5    unreasonable restraint on trade and has harmed competition.

6         82.    The huge problem and expense posed by the need for defensive

7    registrations in .XXX imposes unreasonable "deadweight" economic and market

8    costs and burdens exceeding any perceived benefit of the TLD. The establishment

9    of the XXX TLD is therefore alone anti-competitive and in restraint of trade. In

10   fact, ICM sought approval of the .XXX TLD in no small part to extract monopoly

11   profits from otherwise unnecessary defensive registrations. Stuart Lawley, the

12   Chairman and Chief Executive Officer of ICM, has expressly recognized that he

13   expects most businesses registering in .XXX to already have operating websites

14   showing the same content and under the same Second Level Domain name, but in

15   another TLD. This confirms that Lawley expects most registrations in .XXX to be

16   defensive (and thus unnecessary but for .XXX). Also, other sTLDs do not sell

17   permanent "blocking" registrations to those who are not part of the sponsored

18   community. That .XXX sells such services underscores that .XXX is designed to

19   create and, then exploit in an anti-competitive manner, a unique need for defensive

20   registrations.

21        83.    Numerous businesses have legitimately complained about the .XXX

22   defensive registration practices. For example:

23        (a)    Hustler President Michael Klein has stated: "[I]t appears that

24   the .XXX TLD will do nothing but drive up costs to the adult community and will

25   force us to fight infringement on yet another front…. [N]or will…we be shaken

26   down by ICM." Quoted in *xBiz* (July 12, 2011) at http://www.xbiz.com/news/

27   136179.

28

Mitchell
Silberberg &
Knupp LLP

4461541.2

35

1      (b)    "Porn and mainstream businesses alike complain they are being forced

2  to buy domain names they don't want, don't need and won't use – and compare the

3  process to a hold-up. … 'Many feel they're being blackmailed to protect their

4  brands,' said Kristina Rosette, a trademark lawyer at the law firm Covington &

5  Burlington." Quoted in *Reuters* (August 15, 2011), "Businesses in U.S. Complain of

6  .xxx Shakedown," at http://www.reuters.com/article/2011/08/15/us-internet-xxx-

7  idUSTRE77E5W920110815.

8      (c)    "What's bugging many businesses about the new porn domain is that

9  they're being forced to cough up $200 or so to protect their brands from being

10  exploited by smut peddlers.  In fact, initial returns in the UK indicate that four of

11  five businesses that have pre-registered for the XXX domain have no relationship to

12  the porn industry.  Furthermore, ICM, which administers the domain, told Reuters

13  that [it received] 900,000 'expressions of interest' from companies who want to pre-

14  register their trademarks to block porn purveyors from using the brands in a XXX

15  domain name ....  Failure to block a domain at this stage of the process can be costly

16  in the long run for a brand.  That's because challenging a domain that's been

17  awarded to someone can take months to resolve – months that the brand's image

18  may be tarnished by an association with adult content – and, of course, thousands of

19  dollars in legal fees...."   Quoted in *PCWorld* (August 16, 2011), "XXX Pricing Set

20  by GoDaddy: Businesses Bellyache About Domain Extortion" at

21  http://www.pcworld.com/businesscenter/article/238167/xxx_pricing_set_by_go_dad

22  dy_businesses_bellyache_about_domain_extortion.html.

23      **B.**   **Monopolistic Pricing For Affirmative Registrations**

24      84.    ICM has reserved to itself, and sold at above-market, supra-

25  competitive prices, the rights to register in the .XXX TLD for affirmative use

26  particularly desirable so-called "premium names."  These sales at above-market

27  prices have harmed competition and unreasonably restrained trade.  An ICM press

28  release dated October 6, 2011 noted as follows: "ICM has now sold nine premium

1  .XXX domain names for $100,000 or more, which is unparalleled in any other

2  domain launch and reports that there are many other similar deals in progress.

3  'Domain names in most other TLDs typically sell for 1-10% of the value of their

4  .com equivalent. The .XXX names are already selling for 30-40% and we are just

5  getting started,' said [ICM Chairman Stuart] Lawley." ICM also announced a

6  $1.65 million sale for a collection of .XXX domain names, and a $500,000 sale for

7  a single .XXX domain name. It reported the latter to be "the highest price ever

8  paid for a domain name in any extension pre-launch. This is also the 5th highest

9  sale price of any domain name sold in 2011 and one of the top 30 most expensive

10  domain names sold in the last 3 years . ..." ICANN knew that ICM would, and

11  agreed to allow ICM to, engage in this practice.

12       85.   ICM is also selling its other affirmative registration services at above-

13  market, supra-competitive prices generating monopolistic profits. ICM is currently

14  charging registrars $60 annually for the registrations used for affirmative purposes,

15  the same amount it charges for annual defensive registrations. That is ten or more

16  times the annual registration rates for other TLDs currently used for affirmative

17  registrations of adult content, with insufficient cost justifications for the

18  differences. These excessive charges also harm competition and unreasonably

19  restrain trade. ICANN knew that ICM would, and agreed to allow ICM to, charge

20  such above market prices.

21      **C.**   **Other Unreasonable Restrictions On The Sale of Registry Services**

22       86.   ICM has conditioned the sale of .XXX registry services on

23  registrants' agreement to unreasonable and anti-competitive terms and conditions.

24  For example, ICM has required that all .XXX registrants and those who purchase

25  permanent blocking waive and release certain claims against ICM, purportedly

26  including antitrust claims. ICM has also required that those purchasing certain

27  premium .XXX services agree in exchange to refrain from disparaging ICM or the

28  .XXX TLD. These terms and conditions constitute an unreasonable restraint on

1 | trade and harm competition.  ICANN knew that ICM would, and agreed to allow

2 | ICM to, impose such anti-competitive terms.

3 | **D.     Harm to Competition**

4 | 87.    All these anti-competitive practices harm competition in a number of

5 | ways.  For example, the contractual restrictions that either prohibit or increase the

6 | cost of entry by other adult content TLDs reduce competition to ICM in delivering

7 | affirmative registration services.  Moreover, ICM's contractual right to perpetual

8 | renewal of its registry contract will reduce or eliminate efforts by competitors to

9 | bid to operate .XXX in a more innovative, beneficial and affordable manner, and

10 | its agreement with ICANN to prevent the establishment of other adult-oriented

11 | TLDs will bar competitors from attempting to establish competitive adult-oriented

12 | TLDs such as .sex or .porn.  In addition, faced with above market prices for

13 | affirmative and/or defensive .XXX registrations, adult content providers and

14 | distributors, and related service providers, may opt not to enter the affirmative

15 | registration market.  Competition is also harmed by the need to incur unnecessary

16 | above-market prices, and uncompetitive service terms, in the market for

17 | affirmative and defensive registrations.  Among other things, increasing costs for

18 | service and content providers will make it more difficult for them to compete with

19 | entrenched industry participants who have the scale necessary to cover these

20 | elevated expenses.

21 | **E.     Harm to Consumers**

22 | 88.    All these anti-competitive practices also harm consumers.  Businesses

23 | which pay higher than competitive prices for .XXX registry services, or who

24 | receive lower quality .XXX registry services than would exist in a competitive

25 | market, react in a manner that harms consumers.  They will either charge

26 | consumers higher prices for using websites or other services, offer less desirable

27 | websites or other services and experiences, or altogether forego offering websites

28 | or other services that they would offer if .XXX registry services were competitive.

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

# VIII. INTERSTATE COMMERCE

89.    Plaintiffs are informed and believe that the actions of ICM and ICANN averred above have a substantial effect on both interstate and international commerce because (among other reasons): (a) thousands of permanent blocking services or annual registrations intended for defensive purposes have been purchased in the .XXX TLD by market participants located throughout the fifty United States and in countries throughout the world; (b) the need for such services or registrations has a direct, substantial, and reasonably foreseeable effect on commerce, trade, and competition throughout the fifty United States and in countries throughout the world; (c) thousands of affirmative registrations have been purchased in the .XXX TLD, by market participants located throughout the fifty United States and in countries throughout the world; and (d) ICM and ICANN have shared the revenues generated from the sale of both affirmative and blocking registration services in the .XXX TLD at supra-competitive prices.

# IX.    PLAINTIFFS' STANDING AND INJURY

90.    Both YouPorn and Digital Playground have extensive trademarks, domain names, and/or websites intended for and associated with adult content. It is necessary for Plaintiffs to defensively register or permanently block their respective domain names and trademarks in the .XXX TLD in order to protect their business interests and property. They have been unable to do so due to the anti-competitive conduct averred in this Complaint. For example, YouPorn and Digital Playground have been barred by .XXX policies from buying necessary permanent blocking rights. Also, ICM policies have required that any .XXX registrants sign releases of certain claims. Plaintiffs therefore could not defensively register in any fashion without purportedly waiving their rights under the antitrust laws, including their claims asserted in this lawsuit. If Plaintiffs could defensively register (as it is necessary for them to do), they will suffer antitrust injury and incur losses and

1   injury from the monopoly and anti-competitive prices charged by ICM and from

2   ICM's other anti-competitive restrictions on the sale of defensive registry services.

3       91.    If Defendants succeed in creating a monopoly for TLDs intended

4   largely or predominately for adult-oriented content, Plaintiffs will need to

5   affirmatively register domain names and do business in .XXX.  Plaintiffs are thus

6   at risk of suffering antitrust injury and losses and damage  from the anti-

7   competitive prices and sales restrictions imposed by ICM in the sale of affirmative

8   registration services.  Also, Plaintiffs have been precluded from purchasing .XXX

9   affirmative registration services by the same anti-competitive practices – such as

10  conditioning registration on the signing of a release – which preclude them from

11  defensively registering in .XXX.  But for those anti-competitive practices,

12  Plaintiffs would seriously consider choosing to affirmatively register in .XXX, and

13  would then be subject to the anti-competitive pricing and other anti-competitive

14  sales practices imposed by ICM in the market for affirmative .XXX registrations.

15      92.    For the reasons averred above, Plaintiffs have suffered and are

16  threatened with antitrust injury from, and seek injunctive relief against, both: (a)

17  the anti-competitive practices (such as requiring releases) that have prevented them

18  from defensively or affirmatively registering in .XXX, and (b) the monopoly prices

19  and other anti-competitive sales practices in which ICM has engaged in both the

20  affirmative and defensive registration markets.  Because they have been unable to

21  register in .XXX due to the anti-competitive conduct averred above, Plaintiffs have

22  also incurred losses (or are at imminent risk of incurring loss) in the value of and

23  business income from their trademarks, domain names and web businesses.  Other

24  persons have and will register .XXX domain names similar to Plaintiffs'

25  trademarks and domain names.  This has caused or will cause diversion of business

26  away from Plaintiffs, harm to Plaintiffs' name rights, and loss of Plaintiffs'

27  business income.  Also, Plaintiffs have not earned profits which they might

28  otherwise have earned from affirmative .XXX registrations.

Mitchell
Silberberg &
Knupp LLP

4461541.2

40

# FIRST CLAIM FOR RELIEF

## Against All Defendants

### Contract, Combination Or Conspiracy in Restraint of Trade Under Section 1 Of The Sherman Antitrust Act, 15 U.S.C. § 1

### (.XXX Permanent Blocking And Defensive Registration Market)

93.    Plaintiffs incorporate each of the averments set forth above.

94.    For purposes of this cause of action, and as averred in greater detail in paragraphs 60-65 above, the relevant market is defined as the market for permanent blocking and other defensive registrations in the .XXX TLD.

95.    For purposes of this cause of action, the relevant geographic market is the United States and the world.

96.    Plaintiffs are informed and believe that ICM and ICANN combined, conspired and agreed to at least the following anti-competitive practices:

(a)    Approving the .XXX TLD without competition from any other adult-content TLD, as more particularly averred in paragraph 55 above.

(b)    Approving ICM as the registry for the .XXX TLD, and approving the ICANN/ICM contract, without permitting any competition for .XXX TLD registry services, as more particularly averred in paragraph 55 above.

(c)    Entering into terms of the ICM/ICANN contract for .XXX registry services without providing that ICM would be subject to price caps or other limitations restraining ICM from engaging in unreasonable pricing and other unreasonable sales practices, as more particularly averred in paragraph 56 above.

(d)    Permitting ICM to engage in anti-competitive practices in providing permanent blocking and defensive registrations in the .XXX TLD, including, as more particularly averred above, charging prices for such services that are significantly higher than would exist in a competitive market; limiting such services in a manner that would not exist in a competitive market; and imposing restrictions on such services that would not exist in a competitive market.

Mitchell
Silberberg &
Knupp LLP
4461541.2

1       (e)     Agreeing to share and sharing the revenues derived from ICM's

2  exploitation of its monopoly over .XXX defensive registrations.

3       97.     Plaintiffs are informed and believe that by so combining, conspiring

4  and agreeing, ICM and ICANN have engaged in anti-competitive processes,

5  acquired and perpetuated a monopoly for ICM, unreasonably restrained trade, and

6  harmed competition in the above-defined geographic and product market, to the

7  detriment of businesses and consumers and in violation of Section 1 of the

8  Sherman Antitrust Act, 15 U.S.C. section 1, including because as result of their

9  conduct as more particularly averred above:

10      (a)     The approval of the .XXX TLD has imposed enormous "deadweight"

11  permanent blocking and defensive registration costs unjustified by any consumer

12  or other benefits of the .XXX TLD.

13      (b)     Prices in the market for permanent blocking and defensive

14  registrations in the .XXX registry are far above those that would exist in a

15  competitive market.

16      (c)     Services in the market for permanent blocking and defensive

17  registrations in the .XXX registry are subject to anti-competitive limitations and

18  restrictions that would not exist in a competitive market.

19      98.     Plaintiffs are informed and believed that ICANN and ICM knew and

20  intended that the result of their anti-competitive and illegal actions would be to

21  acquire and perpetuate a monopoly, unreasonably restrain trade, and harm

22  competition, businesses, and consumers, as more particularly averred above.

23      99.     Because of the anti-competitive and illegal actions by ICANN and

24  ICM in unreasonable restraint of trade and which harm competition, Plaintiffs are

25  entitled to preliminary and permanent injunctive relief.  Such relief should include

26  an order, for example:

27      (a)     Enjoining the .XXX TLD altogether;

1    (b)    That the .XXX registry contract be openly rebid or rewritten to

2    introduce competition for .XXX registry services; and/or

3    (c)    Imposing reasonable price constraints and service requirements on

4    permanent blocking services and other defensive registrations in the .XXX TLD.

5    100.    Under this cause of action, Plaintiffs also are entitled to recovery of

6    their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

7

8                    **SECOND CLAIM FOR RELIEF**

9                    **Against All Defendants**

10   **Combination or Conspiracy to Monopolize Under Section 2 Of The Sherman**

11                   **Antitrust Act, 15 U.S.C. § 2**

12      **(.XXX Permanent Blocking And Defensive Registration Market)**

13   101.    Plaintiffs incorporate each of the averments set forth in paragraphs 1-

14   92 above.

15   102.    For purposes of this cause of action, and as averred in greater detail in

16   paragraphs 60-65 above, the relevant market is defined as the market for

17   permanent blocking and other defensive registrations in the .XXX TLD.

18   103.    For purposes of this cause of action, the relevant geographic market is

19   the United States and the world.

20   104.    Plaintiffs are informed and believe that ICM and ICANN have

21   knowingly, intentionally and willfully combined, conspired and acted to have ICM

22   acquire and perpetuate a complete monopoly in that geographic and product

23   market, holding one hundred percent of the market share.

24   105.    Plaintiffs are informed and believe that ICM and ICANN engaged in

25   at least the following anti-competitive practices in order to permit ICM to acquire

26   and perpetuate that complete monopoly:

27   (a)    Approving the .XXX TLD without competition from any other adult-

28   content TLD, as more particularly averred in paragraph 55 above.

1        (b)     Approving ICM as the registry for the .XXX TLD, and approving the

2   ICANN/ICM contract, without permitting any competition for .XXX TLD registry

3   services, as more particularly averred in paragraph 55 above.

4        (c)     Entering into terms of the ICM/ICANN contract for .XXX registry

5   services without providing that ICM would be subject to price caps or other

6   limitations restraining ICM from engaging in unreasonable pricing and other

7   practices, as more particularly averred in paragraph 56 above.

8        (d)     Permitting ICM to engage in anti-competitive practices in providing

9   permanent blocking and defensive registrations in the .XXX TLD, including (as

10   more particularly averred in, for example, paragraphs 73-83 and 86 above),

11   charging prices for such services that are significantly higher than would exist in a

12   competitive market; limiting such services in a manner that would not exist in a

13   competitive market; and imposing restrictions on such services that would not exist

14   in a competitive market.

15        (e)     Agreeing to share and sharing the revenues derived from ICM's

16   exploitation of its monopoly over .XXX defensive registrations.

17        106.   Plaintiffs are also informed and believe that ICM willfully acquired

18   that monopoly through additional predatory acts and practices, including but not

19   limited to those groundless, misleading, harassing and oppressive acts and tactics

20   more particularly averred above, which pressured and coerced ICANN into

21   agreeing and permitting ICM to acquire and perpetuate the monopoly.

22        107.   Plaintiffs are informed and believe that by agreeing, combining and

23   conspiring to permit ICM to acquire and perpetuate the monopoly, ICM and

24   ICANN have unreasonably restrained trade, and harmed competition in the above-

25   defined geographic and product market, to the detriment of businesses and

26   consumers and in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C.

27   section 2, including because as result of their conduct as more particularly averred

28   above):

Mitchell
Silberberg &
Knupp LLP

4461541.2

44

1    (a)    The approval of the .XXX TLD has imposed enormous "deadweight"

2 permanent blocking and defensive registration costs unjustified by any consumer

3 or other benefits of the .XXX TLD.

4    (b)    Prices in the market for permanent blocking and defensive

5 registrations in the .XXX registry are far above those that would exist in a

6 competitive market.

7    (c)    Services in the market for permanent blocking and defensive

8 registrations in the .XXX registry are subject to anti-competitive limitations and

9 restrictions that would not exist in a competitive market.

10    108.    Plaintiffs are informed and believed that ICANN and ICM knew and

11 intended that the result of their anti-competitive and illegal actions would be to

12 acquire and perpetuate a monopoly for ICM, unreasonably restrain trade, and harm

13 competition, businesses, and consumers, as more particularly averred above.

14    109.    Because of the anti-competitive and illegal actions by ICANN and

15 ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such

16 relief should include an order, for example:

17    (a)    Enjoining the .XXX TLD altogether;

18    (b)    That the .XXX registry contract be openly rebid or rewritten to

19 introduce competition for .XXX registry services; and/or

20    (c)    Imposing reasonable price constraints and service requirements on

21 blocking services and other defensive registrations in the .XXX TLD.

22    110.    Under this cause of action, Plaintiffs also are entitled to recovery of

23 their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1     **THIRD CLAIM FOR RELIEF**

2     **Against All Defendants**

3     **Combination or Conspiracy to Attempt to Monopolize Under Section 2 Of**

4     **The Sherman Antitrust Act, 15 U.S.C. § 2**

5     **(Market For Registration In TLDs Intended For Adult Content)**

6     111.   Plaintiffs incorporate each of the averments set forth in paragraphs 1-

7     92 above.

8     112.   For purposes of this cause of action, and as averred in greater detail in

9     paragraphs 66-69 above, the relevant product market is defined as the incipient

10    market for the affirmative registration of domain names in the .XXX TLD and in

11    any other potential future TLDs having names connoting (or intended

12    predominately for) adult content.

13    113.   For purposes of this cause of action, the relevant geographic market is

14    the United States and the world.

15    114.   Plaintiffs are informed and believe that ICM and ICANN have

16    knowingly, intentionally and willfully combined, conspired and acted to permit

17    ICM to attempt to acquire monopoly power within a separate geographic and

18    product market for affirmative registrations in TLDs intended for adult content.

19    115.   Plaintiffs are informed and believe that ICM has a dangerous

20    probability of acquiring monopoly power in that incipient geographic and product

21    market, as more particularly averred above.

22    116.   Plaintiffs are informed and believe that ICM and ICANN have

23    engaged in at least the following anti-competitive practices in order to permit ICM

24    to attempt to acquire monopoly power in that incipient separate geographic and

25    product market:

26    (a)   Approving the .XXX TLD without competition from any other adult-

27    content TLD, as more particularly averred in paragraph 55 above.

Mitchell
Silberberg &
Knupp LLP

28

4461541.2

1   (b)   Approving ICM as the registry for the .XXX TLD, and approving the

2   ICANN/ICM contract, without permitting any competition for .XXX TLD registry

3   services, as more particularly averred in paragraph 55 above.

4   (c)   Entering into terms of the ICM/ICANN contract for .XXX registry

5   services without providing that ICM would be subject to price caps or other

6   limitations restraining ICM from engaging in unreasonable pricing and other

7   practices, as more particularly averred in paragraph 56 above.

8   (d)   Encouraging and/or exploiting impediments to other competitors in

9   any market for TLDs intended for adult content, including by entering into a

10   contract provision which deters ICANN from approving such TLDs and exploiting

11   and by encouraging or exploiting the other factors averred in paragraphs 66-69

12   above which prevent competition in any such market.

13   (e)   Permitting ICM to engage in anti-competitive practices in providing

14   affirmative registration services in the .XXX TLD, including (as more particularly

15   averred above), charging prices for such services that are significantly higher than

16   would exist in a competitive market, and imposing restrictions on such services

17   that would not exist in a competitive market.

18   (f)   Agreeing to share and sharing the revenues derived from ICM's

19   exploitation of its monopoly over .XXX affirmative registrations.

20   117.   Plaintiffs are also informed and believe that ICM has further

21   attempted to willfully acquire such monopoly power in the above-described

22   incipient product and geographic market through additional predatory acts and

23   practices, including but not limited to those misleading acts and vexatious and

24   oppressive litigation tactics more particularly averred above, which pressured and

25   coerced ICANN into conspiring and participating in the efforts to acquire

26   monopoly power.

27   118.   Plaintiffs are informed and believe that by attempting to willfully

28   acquire monopoly power for ICM in the above-described incipient product and

Mitchell
Silberberg &
Knupp LLP
4461541.2

47

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL

1  geographic market, ICM and ICANN may already have, and if ICM successfully

2  acquires monopoly power, ICM and ICANN will have, unreasonably restrained

3  trade, and harmed competition, to the detriment of businesses and consumers and

4  in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. section 2,

5  including because as result of their conduct:

6      (a)    Prices for affirmative registrations in that market are or will become

7  higher than those that would exist in a competitive market, as more particularly

8  averred above.

9      (b)    Services for affirmative registrations in that market are or will become

10  subject to anti-competitive limitations and restrictions that would not exist in a

11  competitive market, as more particularly averred above.

12      (c)    Innovation by new market entrants will be discouraged or eliminated.

13      (d)    Such conduct has harmed or will harm consumers as more particularly

14  averred above.

15      119.    Plaintiffs are informed and believed that ICANN and ICM knew and

16  intend that the result of their anti-competitive and illegal actions would or will be

17  to acquire and perpetuate monopoly power for ICM, unreasonably restrain trade,

18  and harm competition, businesses, and consumers, as more particularly averred

19  above.

20      120.    Because of the anti-competitive and illegal actions by ICANN and

21  ICM, Plaintiffs are entitled to preliminary and permanent injunctive relief.  Such

22  relief should include an order, for example:

23      (a)    Enjoining the .XXX TLD altogether;

24      (b)    That the .XXX registry contract be rebid or rewritten to introduce

25  competition; and/or

26      (c)    Imposing reasonable price constraints and service requirements on

27  affirmative registrations in the .XXX TLD.

28

121.   Under this cause of action, Plaintiffs also are entitled to recovery of their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

## FOURTH CLAIM FOR RELIEF

### Against ICM Registry LLC

**Monopolization Under Section 2 of The Sherman Act, 15 U.S.C. § 2**

**(.XXX Permanent Blocking And Defensive Registration Market)**

122.   Plaintiffs incorporate each of the averments set forth in paragraphs 1-92 above.

123.   For purposes of this cause of action, and as averred in greater detail in paragraphs 60-65 above, the relevant market is defined as the market for permanent blocking and other defensive registrations in the .XXX TLD.

124.   For purposes of this cause of action, the relevant geographic market is the United States and the world.

125.   Plaintiffs are informed and believe that ICM has acted willfully to acquire and perpetuate a complete monopoly in that geographic and product market, holding one hundred percent of the market share.

126.   Plaintiffs are informed and believe that ICM engaged in at least the following anti-competitive practices in order to acquire and perpetuate that complete monopoly:

(a)    Improperly and unlawfully pressuring and coercing ICANN into approving the ICM/ICANN contract for .XXX registry services without providing that ICM would be subject to price caps or other limitations restraining ICM from engaging in unreasonable pricing and other practices, as more particularly averred above.

(b)    Additional predatory acts and practices, including but not limited to those baseless, misleading, harassing, and oppressive acts and tactics more particularly averred baseless, misleading, harassing, and oppressive acts and tactics

Mitchell
Silberberg &
Knupp LLP
4461541.2

49

1  more particularly averred above, which pressured and coerced ICANN into
2  knowingly and intentionally permitting ICM to acquire and perpetuate the
3  monopoly described above.

4      127.   Plaintiffs are informed and believe that by willfully acquiring and
5  perpetuating the monopoly, ICM has unreasonably restrained trade, and harmed
6  competition in the above-defined geographic and product market, to the detriment
7  of businesses and consumers and in violation of Section 2 of the Sherman Antitrust
8  Act, 15 U.S.C. section 2, including because as result of their conduct as more
9  particularly averred above):

10      (a)   The approval of the .XXX TLD has imposed enormous "deadweight"
11  permanent blocking and defensive registration costs unjustified by any consumer
12  or other benefits of the .XXX TLD.

13      (b)   Prices in the market for permanent blocking and defensive
14  registrations in the .XXX registry are far above those that would exist in a
15  competitive market.

16      (c)   Services in the market for permanent blocking and defensive
17  registrations in the .XXX registry are subject to anti-competitive limitations and
18  restrictions that would not exist in a competitive market.

19      128.   Plaintiffs are informed and believed that ICM knew and intended that
20  the result of its anti-competitive and illegal actions would be to acquire and
21  perpetuate for ICM a monopoly, unreasonably restrain trade, and harm
22  competition, businesses, and consumers, as more particularly averred above.

23      129.   Because of the anti-competitive and illegal actions by ICM, Plaintiffs
24  are entitled to preliminary and permanent injunctive relief.  Such relief should
25  include an order, for example:

26      (a)   Enjoining the .XXX TLD altogether;
27      (b)   That the .XXX registry contract be openly rebid or rewritten to
28  introduce competition for .XXX registry services; and/or

Mitchell Silberberg & Knupp LLP
4461541.2

1        (c)    Imposing reasonable price constraints and service requirements on

2    blocking services and other defensive registrations in the .XXX TLD.

3        130.   Under this cause of action, Plaintiffs also are entitled to recovery of

4    their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

5

6    ### FIFTH CLAIM FOR RELIEF

7    ### Against ICM Registry LLC

8    **Attempted Monopolization Under Section 2 of**

9    **The Sherman Antitrust Act, 15 U.S.C. § 2**

10   **(Market For Registration In TLDs Intended For Adult Content)**

11       131.   Plaintiffs incorporate each of the averments set forth in paragraphs 1-

12   92 above.

13       132.   For purposes of this cause of action, and as averred in greater detail in

14   paragraphs 66-69 above, the relevant product market is defined as the incipient

15   market for the affirmative registration of domain names in the .XXX TLD and in

16   any other potential future TLDs having names connoting (or intended

17   predominately for) adult content.

18       133.   For purposes of this cause of action, the relevant geographic market is

19   the United States and the world.

20       134.   Plaintiffs are informed and believe that ICM acted willfully to

21   establish (through the affiliation of .XXX with adult content), and then to acquire

22   monopoly power within, a separate geographic and product market for affirmative

23   registrations in TLDs intended for adult content.  ICM's contract with ICANN

24   contains a provision that deters ICANN from creating any new TLDs with names

25   connoting adult content.  In addition, ICM is currently the only TLD registry with

26   control of a TLD with a name that connotes adult content.  Moreover, ICANN's

27   Applicant Guidebook for any entrants seeking to create new TLDs with names

28   connoting adult content states that a "strong presumption" against the creation of a

Mitchell
Silberberg &
Knupp LLP

4461541.2

1   new TLD will exist in the event of government objections to said TLD and

2   contains other hurdles that will be difficult to clear.  It is thus highly unlikely that

3   ICM will face competition in the incipient market

4       135.   Plaintiffs are informed and believe that ICM has a dangerous

5   probability of acquiring monopoly power in that incipient geographic and product

6   market, as more particularly averred above.

7       136.   Plaintiffs are informed and believe that ICM has engaged in at least

8   the following anti-competitive practices in order to attempt to acquire monopoly

9   power in that incipient separate geographic and product market:

10      (a)    Improperly and unlawfully pressuring and coercing ICANN into

11  approving the ICM/ICANN contract for .XXX registry services without providing

12  that ICM would be subject to price caps or other limitations restraining ICM from

13  engaging in unreasonable pricing and other practices, and expressly prohibiting the

14  creation of new competing TLDs, as more particularly averred above.

15      (b)    Encouraging and/or exploiting impediments to other competitors in

16  any market for TLDs intended for adult content, including by entering into a

17  contract provision which precludes ICANN from approving such TLDs and

18  exploiting and by encouraging or exploiting the other factors averred in paragraphs

19  66-69 above which prevent competition in any such market.

20      (c) Engaging in additional predatory acts and practices, including but not

21  limited to those baseless, misleading, harassing, and oppressive acts and tactics

22  more particularly averred above, which pressured and coerced ICANN into

23  knowingly and intentionally participating in the efforts to acquire for ICM

24  monopoly power.

25      137.   Plaintiffs are informed and believe that by attempting to willfully

26  acquire monopoly power in the above-described incipient product and geographic

27  market, ICM may already have, and if it successfully acquires monopoly power

28  ICM will have, unreasonably restrained trade, and harmed competition, to the

Mitchell
Silberberg &
Knupp LLP
4461541.2

1    detriment of businesses and consumers and in violation of Section 2 of the

2    Sherman Antitrust Act, 15 U.S.C. section 2, including because as result of their

3    conduct, and as more particularly averred above:

4         (a)    Prices for affirmative registrations in that market are or will become

5    higher than those that would exist in a competitive market.

6         (b)    Services for affirmative registrations in that market are or will become

7    subject to anti-competitive limitations and restrictions that would not exist in a

8    competitive market.

9         (c)    Innovative new market entrants will be discouraged or eliminated.

10        (d)    Such conduct has harmed or will harm consumers.

11        138.   Plaintiffs are informed and believed that ICM knew and intended that

12   the result of its anti-competitive and illegal actions would or will be to acquire and

13   perpetuate for ICM monopoly power, unreasonably restrain trade, and harm

14   competition, businesses, and consumers, as more particularly averred above.

15        139.   Because of the anti-competitive and illegal actions by ICM, Plaintiffs

16   are entitled to preliminary and permanent injunctive relief.  Such relief should

17   include an order, for example:

18        (a)    Enjoining the .XXX TLD altogether;

19        (b)    That the .XXX registry contract be rebid or rewritten to introduce

20   competition; and/or

21        (c)    Imposing reasonable price constraints and service requirements on

22   affirmative registrations in the .XXX TLD.

23        (d)    Under this cause of action, Plaintiffs also are entitled to recovery of

24   their attorneys' fees and costs pursuant to 15 U.S.C. section 15(a).

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      For preliminary and permanent injunctive relief as more particularly averred above;

2.      For their costs and attorneys' fees; and

3.      For such other and further relief as the Court deems just and proper.

Dated:  February *12,* 2012              THOMAS P. LAMBERT
                                         JEAN PIERRE NOGUES
                                         KEVIN E. GAUT
                                         MITCHELL SILBERBERG & KNUPP LLP

                                         By: _____
                                             Kevin E. Gaut
                                             Attorneys for Plaintiffs,
                                             Manwin Licensing International S.à.r.l.
                                             and Digital Playground, Inc.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues so triable by right.

Dated:  February *12,* 2012              THOMAS P. LAMBERT
                                         JEAN PIERRE NOGUES
                                         KEVIN E. GAUT
                                         MITCHELL SILBERBERG & KNUPP LLP

                                         By: _____
                                             Kevin E. Gaut
                                             Attorneys for Plaintiffs,
                                             Manwin Licensing International S.à.r.l.
                                             and Digital Playground, Inc.

Mitchell
Silberberg &
Knupp LLP

4461541.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT; DEMAND FOR JURY TRIAL