WILMER CUTLER PICKERING
HALE AND DORR LLP
Andrea Weiss Jeffries (SBN: 183408)
andrea.jeffries@wilmerhale.com
Bethany Stevens (SBN: 245672)
bethany.stevens@wilmerhale.com
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
+1 (213) 443-5300
+1 (213) 443-5400

J. Beckwith Burr (*pro hac vice*)
becky.burr@wilmerhale.com
Ali M. Stoeppelwerth (*pro hac vice*)
ali.stoeppelwerth@wilmerhale.com
Perry A. Lange (*pro hac vice*)
perry.lange@wilmerhale.com
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
+1 (202) 663-6000
+1 (202) 663-6363

Attorneys for Defendant
ICM Registry, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANWIN LICENSING, INTERNATIONAL S.A.R.L. and DIGITAL PLAYGROUND, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>ICM REGISTRY, LLC, d/b/a .XXX; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS; and DOES 1-10<br><br>Defendants. | Case No. CV 11-9514-PSG (JCGx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ICM REGISTRY, LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>Date:   July 30, 2012<br>Time:   1:30 p.m.<br>Place:  Courtroom 880<br><br>Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 2

        A.      The Parties.................................................................................................. 2

        B.      The DNS And Operation Of TLDs ......................................................... 3

        C.      Approval Of The .XXX TLD.................................................................... 4

        D.      The Alleged Relevant Market ................................................................. 6

        E.      The Alleged Antitrust Claims ................................................................. 6

III.    LEGAL STANDARD ......................................................................................... 8

IV.     ARGUMENT........................................................................................................ 9

        A.      Plaintiffs Have Not Established Antitrust Injury ................................ 9

        B.      Plaintiffs Fail To Allege An Unlawful Agreement
                Between ICM And ICANN.................................................................... 14

                1.      No Agreement On the .XXX TLD Approval
                        Process ......................................................................................... 14

                2.      No Agreement To "Allow" Purportedly
                        Anticompetitive Acts or Pricing ................................................ 16

                3.      No Agreement On Restricting Other
                        Adult-Content TLDs .................................................................... 17

        C.      None Of The Challenged Practices Constitutes
                Anticompetitive Or Predatory Conduct .............................................. 17

                1.      Purported Absence of Competitive Bidding............................. 18

                2.      "Supracompetitive" Prices and Service "Restrictions" ............... 19

                3.      "Lobbying Efforts" and "Litigation Tactics" .............................. 21

        D.      The Nature Of The Remedy Plaintiffs Seek Also
                Supports Dismissal.................................................................................. 24

V.      CONCLUSION .................................................................................................. 25

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

# TABLE OF AUTHORITIES

Federal Cases

*49er Chevrolet, Inc. v. General Motors Corp.*,
    803 F.2d 1463 (9th Cir. 1986) ............................................................. 16

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ............................................................... 19

*Alvarez v. Chevron Corp.*,
    656 F.3d 925 (9th Cir. 2011) ........................................................... 9, 14

*American Ad Management, Inc. v. General Telephone Co. of California*,
    190 F.3d 1051 (9th Cir. 1999) .............................................................. 10

*Apple Inc. v. Samsung Electronics Co.*,
    No. 11-01846, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ..................... 14-15

*Ashcroft v. Iqbal*,
    556 U.S. 662, 173 L. Ed. 2d 868, 129 S. Ct. 1937 (2009) ..................... 8, 9, 13

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990) ............................... 9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 167 L. Ed. 2d 929,
    127 S. Ct. 1955 (2007) .......................................... 8, 9, 13, 14, 15, 23

*Bonin v. Calderon*,
    59 F.3d 815 (9th Cir. 1995) .............................................................. 25

*Brantley v. NBC Universal, Inc.*,
    ___ F.3d ___, No. 09-56785, 2012 WL 1071257
    (9th Cir. Mar. 30, 2012) ........................................................ 13, 19, 21

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F.2d 261 (7th Cir. 1984) .............................................................. 20

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ........................................................ 15, 17

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986) ............................... 13

*Carpet Group International v. Oriental Rug Importers Ass'n*,
    256 F. Supp. 2d 249 (D.N.J. 2003) ........................................................ 8

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) .............................................................. 10

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ........................................................ 16, 18, 20

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

*Columbia River People's Utility District v. Portland General Electric Co.*,
   217 F.3d 1187 (9th Cir. 2000) ................................................................. 20

*Compliance Marketing, Inc. v. Drugtest, Inc.*,
   No. 09-01241, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ............................. 15

*Davis v. AT&T Wireless Services, Inc.*,
   No. 11-02674, 2012 WL 692413 (C.D. Cal. Mar. 1, 2012) ............................. 13

*Digital Sun v. Toro Co.*,
   No. 10-04567, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ......................... 10

*Discon Inc. v. NYNEX Corp.*,
   86 F. Supp. 2d 154 (W.D.N.Y. 2000) ........................................................ 12

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961) ................................. 22, 23

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986) ................................................................. 22

*Four Corners Nephrology Associates v. Mercy Medical Center of Durango*,
   582 F.3d 1216 (10th Cir. 2009) .............................................................. 24

*Glen Holly Entertainment Inc. v. Tektronix Inc.*,
   352 F.3d 367 (9th Cir. 2003) ................................................................. 13

*Greco v. Verizon Communications, Inc.*,
   No. 03-00718, 2005 WL 659200 (S.D.N.Y. Mar. 22, 2005) ........................... 24

*In re Late Fee & Over-Limit Fee Litigation*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ...................................................... 15

*In re Webkinz Antitrust Litigation*,
   695 F. Supp. 2d 987 (N.D. Cal. 2010) ...................................................... 13

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation*,
   ___ F. Supp. 2d ___, No. 09-02074, 2011 WL 3555610
   (C.D. Cal. Aug. 11, 2011) ...................................................................... 9

*Juster Associates v. City of Rutland, Vermont*,
   901 F.2d 266 (2d Cir. 1990) .................................................................. 11

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................. 8, 14, 15, 16, 17

*Kinderstart.com LLC v. Google, Inc.*,
   No. 06-02057, 2006 WL 3246596 (N.D. Cal. July 13, 2006) ......................... 10

*Kottle v. Northwest Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998) ............................................................... 23

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) ....................................................... 21, 23

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

*Lucas Automobile Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) ............................................................... 13

*McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*,
No. 08-00080, 2008 WL 2437739 (D. Haw. June 17, 2008) ............................. 9

*McGlinchy v. Shell Chemical Co.*,
845 F.2d 802 (9th Cir. 1988) ......................................................... 8, 23

*MetroNet Services Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ........................................... 8, 19, 21, 24

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998) ....................... 10, 14

*National Society of Professional Engineers v. United States*,
435 U.S. 679, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978) .......................... 18

*Nero AG v. MPEG LA, L.L.C.*,
No. 10-03672, 2010 WL 4366448 (C.D. Cal. Sept. 14, 2010) ..................... 23

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
555 U.S. 438, 172 L. Ed. 2d 836, 129 S. Ct. 1109 (2009) ............. 19, 21, 24, 25

*Paladin Associates, Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ......................................................... 8

*Pool Water Products v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ....................................................... 10

*Rutman Wine Co. v. E. & J. Gallo Winery*,
829 F.2d 729 (9th Cir. 1987) ..................................................... 17, 23

*Salehpoor v. Shahinpoor*,
358 F.3d 782 (10th Cir. 2004) ....................................................... 16

*Security Fire Door Co. v. County of Los Angeles*,
484 F.2d 1028 (9th Cir. 1973) ................................................... 19, 22

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ......................................................... 23

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
No. 09-00560, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ......................... 15

*State Oil Co. v. Khan*,
522 U.S. 3, 139 L. Ed. 2d 199, 118 S. Ct. 275 (1997) ........................... 16

*Stearns Airport Equipment Co. v. FMC Corp.*,
170 F.3d 518 (5th Cir. 1999) ......................................................... 22

*Telesaurus VPC, LLC v. Power*,
623 F.3d 998 (9th Cir. 2010) ......................................................... 9

**Wilmer Cutler Pickering Hale and Dorr LLP**
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) ................................................................ 9

*United Mine Workers of America v. Pennington*,
    381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965) .............................. 22, 23

*United States ex rel. Lee v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) .............................................................. 11

*Universal Grading Service v. eBay, Inc.*,
    No. 09-02755, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ............................... 13

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398, 157 L. Ed. 2d 823, 124 S. Ct. 872 (2004) ...................... 20, 24, 25

*Vizio, Inc. v. Funai Electric Co.*,
    No. 09-00174, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010).......................... 20

*Walgreen Co. v. AstraZeneca Pharmaceuticals L.P.*,
    534 F. Supp. 2d 146 (D.D.C. 2008) ..................................................... 20

<u>Federal Statutes</u>

Federal Rule of Procedure 12(b)(6) ......................................................... 2


<u>Other Authority</u>

2A Phillip E. Areeda et al., *Antitrust Law* (3d ed. 2007) ............................... 9

3A Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* (2d ed. 2002) ............... 8

**Wilmer Cutler Pickering Hale and Dorr LLP**
**350 South Grand Ave., Suite 2100**
**Los Angeles, CA 90071**

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

# I.    INTRODUCTION

Even though it is their second try, Plaintiffs' First Amended Complaint fails to state a claim and should be dismissed.  The Amend Complaint is (like the original Complaint) nothing more than a transparent attempt to use the antitrust laws to eliminate a new internet platform for adult content—.XXX—that Plaintiff Manwin perceives as posing unwelcome competition to its dominant .com adult-entertainment empire.[1]  Indeed, Plaintiffs' various antitrust theories not only fail to allege the requisite elements of Plaintiffs' claims for relief, they are also internally inconsistent.  For example, Plaintiffs contend that ICM and ICANN were *conspiring* to eliminate competition for the establishment of adult-oriented TLDs and .XXX registry services, notwithstanding the Amended Complaint's detailed recitation of the long and frustrating history of ICM's efforts to secure approval for the .XXX Top-Level Domain Name ("TLD"),[2] including  repeated ICANN rejections of its application and the apparent absence of interest from any other bidders.  Similarly, the Amended Complaint makes clear that Plaintiffs' real concern is with the competition to their .com websites that may be posed by rivals offering adult content via .XXX domain names—a business in which neither ICM nor ICANN participates.  But this is not a concern of the antitrust laws, which have long been held to protect the competitive process and *not* the profit streams of individual firms.

The proposed remedy for these purported violations further exposes the baselessness of Plaintiffs' claims and their ulterior motives in bringing this action.  Unable to show any damages from the challenged conduct, Manwin and Digital Playground instead seek sweeping, inconsistent and unsupportable injunctive relief

---

[1]      Am. Compl. ¶ 4.  Plaintiff Manwin recently announced the acquisition of Plaintiff Digital Playground.  *See* Rhett Pardon, *Manwin Acquires Digital Playground*, XBIZ Newswire (Jan. 17, 2012 1:30 PM), http://newswire.xbiz.com/view.php?id= 143303.

[2]      Within each internet domain name, the alphanumeric field to the far right of the period is the TLD.  Am. Compl. ¶ 20.  In addition to the newly-established .XXX, other examples of TLDs include .com and .org.  *Id.* ¶ 2.

1   "[e]njoining the .XXX TLD altogether," voiding the ICM-ICANN contract "and/or"

2   imposing price and other restrictions on the offering of registry services.  Am. Compl.

3   ¶ 109.  Plaintiffs make such requests even though they cannot identify any authority

4   obliging ICANN to insist on competitive bidding or contractual price constraints in

5   contracts for new TLDs and in the face of clear Supreme Court precedent cautioning

6   against the recognition of antitrust claims that would effectively require courts to

7   specify terms of dealing between private parties.

8        Unfortunately for Plaintiffs, under the Supreme Court's most recent formulation

9   of the pleading standard in antitrust cases, they must do more than merely assert the

10  existence of Sherman Act violations to get past a Rule 12(b)(6) motion.  Given the

11  absence of factual allegations plausibly suggesting the existence of antitrust injury,

12  standing, any unlawful ICM-ICANN agreement, or even unilateral anticompetitive

13  conduct, the Amended Complaint must be dismissed.[3]

## II.    FACTUAL BACKGROUND

### A.    The Parties

16       Plaintiff Manwin Licensing International, S.à.r.l. ("Manwin") is a business

17  headquartered in Luxembourg that "owns and licenses the trademarks and domain

18  names used for many of the most popular adult-oriented websites," including

19  YouPorn.com ("YouPorn"), the single most popular free adult video website on the

20  Internet.  Am. Compl. ¶¶ 1, 4.  Instead of creating content themselves, YouPorn and

21  other Manwin companies primarily operate so-called "tube" websites that "offer free

22  user-generated and searchable adult content."  *Id.* ¶ 1.

23       Plaintiff Digital Playground, Inc. ("DP"), recently acquired by Manwin, is a

24  California corporation possessing "one of the world's largest high definition libraries

---

[3]    ICM also adopts and incorporates by reference Section III.D. of the
Memorandum of Points and Authorities in support of ICANN's Motion to Dismiss
("ICANN Br."), which demonstrates Plaintiffs' failure to plead a relevant market.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

of original adult content," which it makes "available through its websites, including digitalplayground.com." *Id. ¶ 5.*

Defendant Internet Corporation for Assigned Names and Numbers ("ICANN") is a non-profit, California corporation that "was created in 1998, in response to a policy directive of the United States Department of Commerce ("DOC"), to administer the [Domain Name System]" ("DNS"). *Id. ¶ 6.* Pursuant to a series of agreements with DOC, ICANN was assigned overall authority to manage the DNS and charged with "determining what new TLDs to approve, choosing registries for existing or newly approved TLDs, and contracting with the registries to operate the TLDs." *Id. ¶ 25.* As part of its bylaws and agreements with DOC, ICANN is obligated to consider competition issues in approving TLDs and registries and receives input from national governments (including the U.S. government) through the Government Advisory Committee.

Defendant ICM Registry, LLC ("ICM") is a Delaware corporation headquartered in Florida that acts pursuant to a 2011 contract with ICANN as the registry for the .XXX TLD. *Id. ¶ 7.* ICM does not compete with Manwin or DP in the operation of adult-oriented websites.

### B. The DNS And Operation Of TLDs

Each computer or host server connected to the Internet has a unique numerical identity—its Internet Protocol address ("IP address"). Am. Compl. ¶ 16. Because these lengthy numeric strings of numbers contained in IP addresses are hard to remember, the DNS was introduced to allow individual users to use "domain names" —catchy alphanumeric strings, such as "YouPorn.com." as pointers to the underlying IP address. *Id. ¶ 17.*

The TLD in "YouPorn.com" is ".com"—most TLDs with three or more characters are referred to as "generic" TLDs ("gTLDs") and can either be "sponsored or unsponsored." *Id. ¶¶ 19, 20.* A sponsored TLD ("sTLD") is one "that has a sponsor, usually an organization representing by consensus the narrower industry,

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

interest group, or community most affected by or interested in the particular TLD," as well as providers of products or services to that community. *Id.* ¶ 20. Under the ICANN rules governing sTLD applications submitted in response to ICANN's December 15, 2003 Request for Proposals for sTLDs, the sponsored community must be "precisely defined" and authority for policy-making must be delegated to a "sponsoring organization." *Id.* ¶¶ 20, 35.

The DNS correlates IP addresses with user-friendly domain names by reference to an authoritative TLD database. In order to ensure universal address resolution, only one "particular assigned organization" can be designated to "operat[e] each TLD." *Id.* ¶ 22. The entity responsible for operating a particular TLD database is called the "registry operator" or "registry" and its responsibilities include "overseeing the sale and allocation of domain names in the TLD." *Id.* Registries (like ICM) do not generally deal directly with prospective domain name owners or "registrants" (like Plaintiffs) themselves—instead they authorize separate ICANN-accredited "registrars" to sell TLD domain names to the ultimate businesses or consumers. *Id.* Registries charge registrars on a per name basis, but registrars set and collect the fees paid by registrants to register domain names within particular TLDs. *Id.* Both registries and registrars pay fees to ICANN on a quarterly basis. *Id.* No registrars are named as defendants in the Amended Complaint.

### C.    Approval Of The .XXX TLD

Pursuant to ICANN's public invitation to submit applications for new gTLDs, ICM first sought approval of an .XXX TLD intended for adult-oriented content almost twelve years ago. Am. Compl. ¶ 34. Although a limited number of new TLD applications were approved at that time, ICM's application was not selected. *Id.* ICM re-applied to operate an adult-themed TLD in 2004, in response to ICANN's issuance of a second, open public RFP—this time for sponsored TLDs. *Id.* ¶ 35. According to the Amended Complaint, ICM then embarked on a "lobbying" campaign designed to persuade ICANN that it had met ICANN's criteria for identifying a defined

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1   sponsorship community that supported and would benefit from .XXX.  *Id.* ¶¶ 39, 40.[4]

2   Nevertheless, once again, ICM's application was not selected.  *Id.* ¶ 37.  Although the

3   RFP was open to all, at no point does the Amended Complaint indicate that there were

4   any other applicants seeking approval for .XXX or for any other TLDs devoted to

5   adult-oriented content.  A year later, apparently persuaded by the merits of ICM's

6   arguments, ICANN "took the preliminary step of authorizing its President and General

7   Counsel" to begin negotiations for a registry agreement governing ICM's operation of

8   the .XXX TLD.  *Id.* ¶ 40.  Following this, however, ICANN came under pressure from

9   entities opposing the creation of an .XXX TLD (including DOC) and rejected the

10  proposed registry agreement in May 2006.  *Id.* ¶ 43.  ICM then followed ICANN's

11  dispute resolution procedures and filed a request for reconsideration, but, far from

12  accommodating its alleged co-conspirator, "ICANN again rejected the .XXX TLD" in

13  March 2007.  *Id.*

14          Convinced that its position was legally sound, in June 2008, ICM pursued its

15  rights under the ICANN Bylaws to file an Independent Review Proceeding ("IRP")—

16  a non-binding quasi-arbitral process established by ICANN—contending that

17  ICANN's 2006 and 2007 rejections of ICM's proposal, proposed contract, and

18  ultimately the .XXX TLD were improper reversals of its decision to begin

19  negotiations with ICM in June 2005.  *Id.* ¶ 44.  In February 2010, the majority of the

20  IRP vindicated ICM's position, issuing a Declaration that ICANN had in June 2005

21  determined that ICM met the sponsorship criteria and could not reopen the issue

22  consistent with its Bylaws.  *Id.* ¶ 46.  While ICANN was still considering whether to

23  adopt the IRP's decision, ICM allegedly threatened litigation to enforce its rights if

24  ICANN again rejected its application.  *Id.* ¶ 47.  In March 2011, ICANN finally

25  signed a contract making ICM its registry for .XXX.  *Id.* ¶ 48.

26

27  _____
    [4]     ICM chose the International Foundation for Online Responsibility ("IFFOR")
28  as its "sponsoring" organization for the .XXX sTLD.  Such a sponsor is an ICANN
    requirement for all sTLDs.  Am. Compl. ¶¶ 35, 36.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

### D.     The Alleged Relevant Market

The Amended Complaint contends there are two separate relevant markets at issue in this case.  The first is for so-called "defensive registrations"—the registration of names previously registered in other TLDs in .XXX.  Am. Compl. ¶ 60.  Purchases of these sorts of registration services "are not intended to make use of a registered name for [operating an] .XXX website with new content, but only to prevent or block such use by others."  *Id.*  Such defensive registrations are allegedly necessary in order to "preclude others from registering and using the owners' names in .XXX" and prevent the loss of business and customer confusion that might result.  *Id.* ¶¶ 3(a), 62.  ICM is alleged to have a "monopoly" in this market because there purportedly are no reasonable substitutes for blocking the use of a single domain name in the .XXX TLD.  *Id.* ¶ 61.

Plaintiffs also contend there is a second, "incipient" relevant market for "affirmative registrations" of names within TLDs connoting adult content.  *Id.* ¶ 66.  Affirmative registrations are intended to make use of a domain name for the purpose of identifying websites showing new, adult-oriented content.  *Id.*  Despite the fact that .XXX fully launched on December 6, 2011, and, by their own admission, YouPorn.com "is the world's most popular source for free adult-oriented streaming videos" (Am. Compl. ¶ 4), Plaintiffs contend there is a "serious danger" that ICM "will *establish* and monopolize" this purportedly distinct market.  *Id.* at ¶ 66 (emphasis added).

### E.     The Alleged Antitrust Claims

Notwithstanding the 11-year gap between ICM's first application for .XXX and its ultimate approval, the multiple rejections of the .XXX TLD in the interim, and the fact that ICM had to re-apply and pursue both a reconsideration request and an independent review before ICANN signed the .XXX registry agreement, Plaintiffs contend that there is an ICM-ICANN conspiracy violative of both §§ 1 and 2 of the Sherman Act that encompasses the following, allegedly anticompetitive, conduct:

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

(1) the approval of the .XXX TLD; (2) the approval of ICM as the .XXX registry, and of the contract with ICM;  (3) an ICM/ICANN contract that does not contain restrictions on ICM pricing of registry services; (4) ICANN acquiescence in ICM's charging allegedly "supracompetitive" prices for defensive registrations, limiting the availability of permanent blocking and requiring registrants to adhere to IFFOR policies; and (5) payment to ICANN by ICM of annual fees pursuant to a purportedly unlawful "revenue-sharing" agreement.  Am. Compl. ¶ 96.  The same alleged conduct thus is the predicate for both conspiracy claims related to the purported ".XXX permanent blocking and defensive registration market," although ICM's "litigation tactics" in pressuring ICANN to approve its application are asserted to be additional "predatory acts" for purposes of the § 2 conspiracy-to-monopolize claim.  *Id.* ¶ 106.

Next, Plaintiffs purport to assert a novel "conspiracy to *attempt* to monopolize" § 2 claim, again against both ICM and ICANN, with respect to the so-called "incipient market for the affirmative registration of domain names in the .XXX TLD."  *Id.* ¶ 112 (emphasis added).

Finally, Plaintiffs assert against ICM alone (1) a § 2 claim for monopolization of the purported .XXX defensive registration market and (2) a § 2 claim for attempted monopolization of the yet-to-be-established "market" for affirmative registrations in "TLDs intended for adult content."  Am. Compl. ¶¶ 123, 125, 132, 134.  Both of these are predicated on allegedly predatory tactics undertaken by ICM to pressure ICANN into approving the ICM/ICANN contract and, with respect to the attempted monopolization claim, Plaintiffs also rely on the imagined provision in that contract precluding ICANN from approving other adult-oriented TLDs.  *Id.* ¶¶ 126, 136.  The injunctive relief sought for all these § 2 claims is almost identical to what is requested for their § 1 claim; *i.e.*, enjoining .XXX altogether, voiding and requiring rebid of the ICM/ICANN registry contract, and imposition of price and service constraints on the provision of both defensive and affirmative .XXX registration services.  *Id.* ¶¶ 99, 109, 120, 129.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

## III.   LEGAL STANDARD

In order to make out their Sherman Act § 1 claim, Plaintiffs must allege facts showing (1) concerted action among two or more independent entities, (2) an unlawful restraint of trade, and (3) antitrust injury.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047, 1051 (9th Cir. 2008).  For their § 2 monopolization claim, Plaintiffs must establish (1) possession of monopoly power by ICM in a relevant market, (2) predatory conduct, and (3) causal antitrust injury.  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).  Alleging a conspiracy to monopolize requires (1) the same concerted action showing necessary to make out a § 1 claim, (2) an overt act in furtherance of the conspiracy, (3) a specific intent to monopolize, and (4) antitrust injury.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  Finally, the elements of attempted monopolization are:  (1) specific intent to destroy competition; (2) predatory or anticompetitive conduct; (3) a dangerous probability of achieving "monopoly power;" and (4) causal antitrust injury. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).[5]

Relying on recent Supreme Court guidance,[6] the Ninth Circuit has outlined the following process for testing the sufficiency of a complaint's factual allegations:

> [W]e begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  We disregard threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.  After eliminating such unsupported legal conclusions, we identify well-pleaded factual allegations, which we

---

[5]    There is no cognizable claim for "conspiracy to *attempt* to monopolize" under § 2 of the Sherman Act.  *See Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249, 285 (D.N.J. 2003); *see also*, 3A Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 809, at 392-93 (2d ed. 2002) ("[c]ourts have correctly held that § 2 states no such offense").  Plaintiffs' Third Claim For Relief should accordingly be dismissed on that basis alone.

[6]    *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 167 L. Ed. 2d 929, 127 S. Ct. 1955 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 173 L. Ed. 2d 868, 129 S. Ct. 1937 (2009).

---

DEF. ICM'S MEM. IN SUPPORT OF ITS MOT. TO DISMISS PLS.' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)          CV 11-9514-PSG (JCGx)

8

assume to be true, and then determine whether they plausibly give rise to an entitlement to relief.

*Alvarez v. Chevron Corp.*, 656 F.3d 925, 930-31 (9th Cir. 2011) (quoting *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010)); *see also In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, ___ F. Supp. 2d ___, No. 09-02074, 2011 WL 3555610, at *4 (C.D. Cal. Aug. 11, 2011) (Rule 8 "'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions'") (quoting *Iqbal*, 129 S.Ct. at 1950).

In evaluating "plausibility," courts must consider whether the non-conclusory facts alleged by the plaintiff make misconduct more likely than an "obvious alternative explanation." *Twombly*, 550 U.S. at 567.  As described below, none of Plaintiffs' claims survives this test.

## IV.   ARGUMENT

### A.   Plaintiffs Have Not Established Antitrust Injury

Any private plaintiff seeking to state a claim for violation of § 1 or § 2 of the Sherman Act must plausibly allege that it has suffered "antitrust injury."  *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-44, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990).  "This requirement ensures that otherwise routine disputes between business[es] … do not escalate to the status of an antitrust action." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998).  Because antitrust injury typically "'depends less on the plaintiff's proof than on the logic of its complaint and its theory of injury[,]'" it is "'well-suited to pre-discovery disposition.'" *McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*, No. 08-00080, 2008 WL 2437739, at *4 (D. Haw. June 17, 2008) (quoting 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 337d, at 95 (3d ed. 2007)).

The Ninth Circuit has enunciated a four-part definition of antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

intended to prevent." *American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  As a practical matter, "plaintiff must show how defendant's anticompetitive conduct harms both competition and plaintiff." *Digital Sun v. Toro Co.*, No. 10-04567, 2011 WL 1044502, at *4 (N.D. Cal. Mar. 22, 2011).

Manwin and DP cannot hope to meet this standard.  Here is what they allege to be the principal, imminently threatened "antitrust injury" resulting from their purported inability to register in .XXX:  (1) the "diversion of business away from Plaintiffs, harm to Plaintiffs' name rights, and loss of Plaintiffs' business income" that will allegedly occur with "the probable registration of similar names by others in .XXX"; and (2) "profits which [Plaintiffs] might otherwise have earned from affirmative .XXX registrations."  Am. Compl. ¶ 92.

The first problem with these allegations is that, at best, they describe hypothetical harm to Plaintiffs themselves and not, as the Supreme Court requires, to the competitive process or consumer welfare.  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) (recognizing the "Supreme Court's long and consistent adherence to the principle that the antitrust laws protect the process of competition, and not the pursuits of any particular competitor"); *see also Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (shift of business from plaintiff to other competitors "does not directly affect consumers and therefore does not result in antitrust injury"); *Kinderstart.com LLC v. Google, Inc.*, No. 06-02057, 2006 WL 3246596, at *8 (N.D. Cal. July 13, 2006) (allegations of "lost revenue, loss of returning and new web traffic, and loss of goodwill" are "insufficient to show that [plaintiff] has suffered an antitrust injury").

Indeed, Plaintiffs concede that their supposed injuries arise from the *possibility* (since none has apparently yet occurred) of *increased*, rather than reduced, competition—*i.e.*, "diversion of business away from Plaintiffs'" websites to similar .XXX domains, and lost profits they might otherwise earn due to affirmative

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

DEF. ICM'S MEM. IN SUPPORT OF ITS MOT. TO DISMISS PLS.' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)     CV 11-9514-PSG (JCGx)

10

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

registrations in .XXX.  Am. Compl. ¶ 92.  Such speculative "harm" is categorically not antitrust injury.  *See, e.g.*, *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 270 (2d Cir. 1990) (affirming dismissal for lack of antitrust injury because real estate developer-plaintiff's "claim [was] designed to enhance barriers to entry of new competitors, a result that would stand antitrust law on its head").

The second problem is that Plaintiffs' own allegations make clear that, even if they were to occur, these purported "injuries" would not be due to any unlawful conduct on the part of ICM or ICANN.  Despite their general assertions of having been unable to register in .XXX because of anticompetitive conduct by ICM, a close review of the Amended Complaint reveals that what Plaintiffs are really complaining about is the fact that they lost the opportunity to purchase the least expensive defensive registry options offered by ICM because *they missed the deadline*.  The Amended Complaint concedes that, consistent with ICM's unprecedented commitment to safeguard the rights of intellectual property owners, during a two-month "Sunrise" period ICM "sold through approved registrars … the permanent right to block use of names in the .XXX TLD" for "a one-time fee of about $150."  Am. Compl. ¶¶ 73, 76.  Plaintiffs admit that this option was available to all registered trademark owners, *id.* ¶ 76, which they suggest they are,[7] yet do not allege they ever sought to purchase permanent blocking rights.[8]  Plaintiffs also concede that they have never sought to affirmatively register in .XXX.  Am. Compl. ¶ 91 (contending only

---

[7]     *See, e.g.*, Am. Compl. ¶ 4 ("Manwin owns and licenses one of the largest portfolios of premium adult-oriented website domain names and trademarks").

[8]     Plaintiffs list other purported restrictions on purchases through the Sunrise program (Am. Compl. ¶¶ 74-76), most of which they have invented (*e.g.*, unavailability of rights to members of the adult entertainment community and requirements to adhere to IFFOR policies).  *See* .XXX Launch Plan and Related Policies, *available at* http://www.icm.xxx/launch/plan/.  The Court can take judicial notice of the policies.  *See United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (court can "consider unattached evidence on which the complaint 'necessarily relies' if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document.") (citation omitted).  But, in any event, Plaintiffs never attribute their failure to seek permanent blocking rights to any of these limitations.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1    that if it weren't for defendants' allegedly anticompetitive practices, "Plaintiffs would

2    *seriously consider* choosing to affirmatively register in .XXX") (emphasis added).

3        In fact, the Amended Complaint acknowledges that defensive blocking rights

4    for Plaintiffs' domain names, whether or not those names are trademarked—are *still*

5    *available*—just on an annual, rather than permanent, basis.  *Id.* ¶ 77.  Plaintiffs'

6    quarrel with this option is that the purchase of annual blocking rights is more

7    expensive (at $60 per year) and that those purchasing annual services are supposedly

8    "forced by ICM to agree to comply with policies of IFFOR," ICM's sponsoring

9    organization, and to "waive and release" claims against ICM, "purportedly including

10   antitrust claims."  *Id.* ¶¶ 78, 86.

11       The second and third of these allegations are pure fiction[9] and the first plainly

12   does not qualify as antitrust injury.  Plaintiffs, of course, do not claim to have actually

13   paid the annual fee, and even if they had, their unsupported assertion that the fee is

14   "supracompetitive" is insufficient to support an inference of market-wide

15   anticompetitive harm.  *See Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 163

16   (W.D.N.Y. 2000) (conclusory assertion of supracompetitive pricing insufficient to

17   establish an antitrust injury).[10]

18       Perhaps recognizing their inability to pursue this action based on imagined

19   future losses to their businesses alone, Manwin and DP also try to suggest that some

---

[9]     A registrant can choose to request a purely defensive registration—where the registered domain name would not "resolve" (*i.e.*, display only "an NX [non-existent] domain" error)—without complying with "onerous" IFFOR requirements like agreeing not to display or advertise child abuse images.  *See* .XXX Launch Plan and Related Policies, *available at* http://www.icm.xxx/launch/plan/.  These policies are directly referenced in the Amended Complaint.  Similarly, ICM's agreement with registrants is a matter of public record (referenced in the Amended Complaint) and nowhere requires the waiver or release of any antitrust claims—the only requirement is that any claims a registrant has against ICM be brought in state or federal courts in Florida, where ICM is headquartered.  *See* .XXX Registry-Registrant Agreement, *available at* http://icmregistry.com/policies/registry-registrant-agreement.

[10]    The same is true for Plaintiffs' allegations with respect to affirmative registrations.  There is no indication in the Amended Complaint that Manwin or DP ever sought to affirmatively register any domain name in .XXX—instead they merely make summary assertions that the $60 annual fee is somehow "above-market".  Am. Compl. ¶ 85.

---

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

harm to consumers may result from Plaintiffs' failure to obtain less expensive registry services from ICM. *See* Am. Compl. ¶ 88 (contending that higher prices for .XXX registrations may lead businesses to "charge consumers higher prices for using websites" or "offer less desirable [or fewer] websites"). Putting aside Plaintiffs' admissions that their websites are free, and it is consumers, not they, who generate the content, *id.* ¶ 1, these bare assertions of broader injury cannot salvage their antitrust claims. *See Brantley v. NBC Universal, Inc.*, ___ F.3d ___, No. 09-56785, 2012 WL 1071257, at *3 (9th Cir. Mar. 30, 2012) (a plaintiff has sufficiently pled antitrust injury only if it meets the standards set out in *Twombly* and *Iqbal*); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010) (granting motion to dismiss where plaintiffs "summarily assert[ed] that consumers have been harmed, but [did] not allege facts" supporting the assertions). Moreover, as courts in this Circuit have made clear, any purported harm to consumers of websites offering adult content cannot qualify as antitrust injury in this case, because neither ICM nor ICANN competes with Manwin and DP in that market. *See Universal Grading Serv. v. eBay, Inc.*, No. 09-02755, 2012 WL 70644, at *9 (N.D. Cal. Jan. 9, 2012) (dismissing antitrust claim where plaintiffs failed to allege antitrust injury in the market where the defendant allegedly had market power); *Davis v. AT&T Wireless Servs., Inc.,* No. 11-02674, 2012 WL 692413, at *2 (C.D. Cal. Mar. 1, 2012) (dismissing complaint because plaintiffs and defendants were not participants in the same market and thus "[p]laintiffs fail to allege the required antitrust injury") (citing *Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003)).[11]

---

[11]    Having failed to make out the antitrust-injury element of their claims, Plaintiffs also lack standing to proceed with this case. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 nn.5-6, 113, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986) (antitrust injury is necessary, but not sufficient, to establish antitrust standing). And even if antitrust injury could somehow be shown, the indirect and entirely conjectural nature of plaintiffs' alleged harm would still preclude a finding of antitrust standing. *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (even if antitrust injury has been established, courts must also consider the "directness of the injury" and the "speculative measure of the harm" in deciding whether plaintiffs have standing).

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

**B.  Plaintiffs Fail To Allege An Unlawful Agreement Between ICM And ICANN**

Plaintiffs' Sherman Act § 1 claim and § 2 conspiracy-to-monopolize claims also fail because the conduct that the Amended Complaint principally alleges—an eleven-year (ultimately successful) effort by ICM, using dispute resolution procedures established by ICANN Bylaws, to obtain approval for the .XXX TLD and a contract to operate the registry—simply does not describe, as it must, a plausible conspiracy between ICM and ICANN "intended to harm or restrain trade or commerce … [and] which actually injures competition." *Kendall*, 518 F.3d at 1047; *see also NYNEX*, 525 U.S. 139 ("[u]nless [the agreement] harmed the competitive process, [it] did not amount to a conspiracy to monopolize").  Because the Amended Complaint contains only "facts" describing unilateral conduct and allegations directly contradicted by the ICM/ICANN registry contract, coupled with "a few stray statements speak[ing] directly of agreement … [that] are merely legal conclusions," Plaintiffs have not met their pleading burden.  *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 564); *see also Alvarez*, 656 F.3d at 930-31.

1.  No Agreement On the .XXX TLD Approval Process

The Amended Complaint contains no facts supporting its assertion that ICM and ICANN *conspired* to "[a]pprov[e] the .XXX TLD without competition from any other adult-content TLD" or to "[a]pprov[e] ICM as the registry for the .XXX TLD" without competition from other registries.  Am. Compl. ¶ 96(a) and (b).  Indeed, Plaintiffs allege that "*ICANN* did not solicit, approve, or consider any adult-content TLDs other than .XXX[,] *ICANN* entertained no competitive bids … [and] *ICANN* had no process for" approving the .XXX domain without approving ICM as the registry.  *Id.* ¶ 55 (emphases added).  Even if these allegations accurately set forth the process by which ICANN ultimately approved the ICM .XXX proposal (which they do not), all they describe is *unilateral* conduct by ICANN, which does not state a § 1 or § 2 conspiracy claim.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-01846, 2011

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

WL 4948567, at *7 (N.D. Cal. Oct. 18, 2011) (dismissing § 1 claim because allegation that defendant acted unilaterally "to restrain trade is not the equivalent of an allegation that [defendant] … conspired with other[s]"); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-01241, 2010 WL 1416823, at *16 (D. Colo. Apr. 7, 2010) (dismissing conspiracy to monopolize claim for lack of agreement).  Merely asserting that ICANN "agreed, combined, and conspired" with ICM during the .XXX approval process— which is all the Amended Complaint does, however repeatedly, (*see, e.g.*, Am. Compl. ¶¶ 50, 51, 55)—is no substitute for "plead[ing] the necessary evidentiary facts" suggesting a conspiracy.  *Kendall*, 518 F.3d at 1048; *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (boilerplate recitation of a "conspiracy" coupled only with allegations of unilateral action is insufficient to withstand motion to dismiss § 1 claim).

Moreover, there are no allegations suggesting that ICANN closed the process to other adult TLDs or .XXX proposals—the object of the supposed agreement.  Am. Compl. ¶ 55.  Given that ICANN repeatedly *rejected* or resisted ICM's .XXX TLD applications for more than a decade (*id*. ¶¶ 34-43), ICANN's purported failure to "solicit" or "entertain" *alternative* .XXX proposals during that time cannot plausibly suggest a preceding agreement to anoint ICM as the .XXX registry.  Rather, the "obvious alternative explanation" is that ICANN was acting independently of ICM when it considered (and several times rejected), ICM's applications.[12]  *Twombly*, 550 U.S at 567 (allegations as consistent with independent action as with agreement do not suggest a conspiracy).

---

[12]     Even if ICM and ICANN had agreed in 2004 that only ICM would be considered for the .XXX registry, that act occurred well outside of the four year statute of limitations for the Sherman or Cartwright Acts, and cannot be a basis for Plaintiffs' 2012 Complaint.  *See Stanislaus Food Products Co. v. USS-POSCO Indus.*, No. 09-00560, 2010 WL 3521979, at *17 (E.D. Cal. Sept. 3, 2010) (statute began to run once competition was eliminated).  Of course, the fact that ICANN rejected ICM's proposal *three more times* after the agreement was supposedly entered into (*see* Am. Compl. ¶¶ 37, 43), squarely contradicts, and therefore renders implausible, the notion that there was any such agreement in the first place.  *See In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963 (N.D. Cal. 2007) (dismissing conspiracy claim).

2.   No Agreement To "Allow" Purportedly Anticompetitive Acts or Pricing

Plaintiffs' allegations that ICANN and ICM "enter[ed] into terms" for the .XXX registry contract "without providing that ICM would be subject to price caps or other limitations" (Am. Compl. ¶¶ 96(c), 105(c) (referring to Am. Compl. ¶ 56)), or that ICANN allegedly "[p]ermitt[ed] ICM to engage in anti-competitive practices" (Am. Compl. ¶¶ 96(d), 105(d)), do not support Sherman Act § 1 or conspiracy to monopolize claims either.

Agreements between two independent entities to *set* prices—including maximum prices—or to fix other terms of trade may be subject to challenge under § 1 of the Sherman Act.  *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 139 L. Ed. 2d 199, 118 S. Ct. 275 (1997) (vertical price-fixing subject to review under § 1); *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc. ("CFIT")*, 611 F.3d 495, 503-04 (9th Cir. 2010) ("pricing provisions" in agreement between ICANN and VeriSign subject to review under § 1).  Here, all that the supporting allegations describe is the *absence* of an agreement between ICM and ICANN regarding price or other registry service terms.[13]  *See, e.g.*, Am. Compl. ¶ 56(a), (b) (alleging that "[t]he ICM/ICANN contract contains *no* price caps or other restrictions of any kind on what *ICM* can charge" and "leaves *ICM* with broad discretion … [on] the nature, quality and scope of .XXX registry services") (emphases added).  Elsewhere, the Amended Complaint describes purely unilateral conduct.  *See*, *e.g.*, *id.* ¶¶ 73-83, 84-86 (purporting to describe ICM's practices and policies for .XXX, but barely mentioning ICANN).[14]

---

[13]   The fact that ICM and ICANN agreed on the fees ICANN would charge *ICM*, (Am. Compl. ¶ 56(a)), does not, as a matter of law, describe an agreement between them about what fees ICM would assess registrars.  *See 49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986).  Nor does labeling the arrangement a "revenue-sharing" agreement (*see* Am. Compl. ¶¶ 96(e), 105(e)), render it unlawful. As Plaintiffs concede, ICANN imposes similar fees on *every* gTLD and sTLD.  *Id.* ¶¶ 22, 32.

[14]   Nor is there any basis to infer a conspiracy between ICANN and ICM to commit "anticompetitive acts" based merely on an allegation that ICANN "permitted" them to occur (Am. Compl. ¶ 96(d)).  *Kendall*, 518 F.3d at 1048; *see also Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) ("[t]hat individual [defendants]

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

### 3.      No Agreement On Restricting Other Adult-Content TLDs

Finally, Plaintiffs' contention that ICANN and ICM violated § 2 of the Sherman Act with respect to the purported affirmative registration relevant market hinges on the allegation that they "enter[ed] into a contract provision which deters ICANN from approving" alternative adult content sTLDs.  Am. Compl. ¶¶ 116(d), 134.  The fact that neither Plaintiff's original or Amended Complaint contains a citation to this supposed provision is not surprising—*because there isn't one*.[15]  Thus, even if Plaintiffs could establish the other elements of their conspiracy-to-monopolize claim (which they cannot[16]), it still would have to be dismissed because of their manifest failure to adduce any allegations credibly suggesting an unlawful agreement.

### C.      None Of The Challenged Practices Constitutes Anticompetitive Or Predatory Conduct

Another, independent ground for dismissing the Amended Complaint is the absence of any factual allegations plausibly suggesting anticompetitive or predatory conduct.  All of Plaintiffs' antitrust claims are predicated on the following purportedly "anti-competitive practices:"  (1) ICANN's approval of the .XXX TLD, and of ICM as its registry, without insisting on competitive bidding, and (2) ICM's charging

---

[15] failed to take action against other [defendants] does not evidence agreement and concerted action ...  [I]naction … does not necessarily indicate an agreement to act in concert.").  And here again, baldly asserting, *ad nauseum*, that "ICANN knew that ICM would, and agreed to allow ICM to, engage in this practice" (Am. Compl. ¶ 84), or "charge such above market prices" (*id*. ¶ 85), or  "impose such anti-competitive terms" (*id*. ¶ 86), does not carry Plaintiffs' burden to plead facts actually *evidencing* an agreement to do any of those things.  *Kendall*, 518 F.3d at 1048; *Car Carriers*, 745 F.2d at 1107.

[15] *See* .XXX Registry Agreement, *available at* http://www.icann.org/en/tlds/ agreements/xxx/.  The Court can take judicial notice of the ICANN/ICM contract because it is directly referenced in the Complaint and is central to Plaintiffs' claims.  *See supra* note 8.

[16] *See supra* Section IV.A. (explaining why plaintiffs have not adequately alleged antitrust injury) and ICANN Br. at III.D. (refuting the notion that "registration in TLDs Intended for Adult Content" can constitute a relevant market).  Moreover, apart from impermissible summary assertions, there are no allegations in the Amended Complaint capable of establishing that ICM and ICANN had a specific intent to monopolize any market.  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987)(conclusory allegation of specific intent insufficient).

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

---

1    allegedly supracompetitive prices for registry services and imposing certain

2    restrictions on the availability of its services.  Am. Compl. ¶¶ 96, 105, 116.[17]  In

3    addition, the § 2 claims are also based on ICM's alleged "lobbying efforts" and

4    "litigation tactics," which purportedly "pressured and coerced ICANN into permitting

5    ICM to acquire and perpetuate the monopoly."  *Id.* ¶¶ 42, 106; *see also id.* ¶¶ 117,

6    126, 136.[18]

        1.    <u>Purported Absence of Competitive Bidding</u>

7            Plaintiffs suggest that ICANN's failure both to "solicit" or "consider any adult-

8    content TLDs other than .XXX" and/or to "entertain[]" any competitive bids for the

9    .XXX registry contract constitutes anticompetitive conduct for purposes of all of its

10   Sherman Act claims.  Am. Compl. ¶ 55, 58.  Such allegations, however, ignore the

11   fact that whenever ICANN has considered new TLDs it has issued an RFP open to all

12   interested parties.  *See* ICANN Br. at 7.  Moreover, there is no indication in the

13   Amended Complaint that another party (such as Plaintiffs) ever expressed interest to

14   ICANN in seeking approval for an adult-content TLD or later becoming the .XXX

15   registry—so if ICANN did not "entertain[]" alternative bids for the .XXX registry

16   contract, it is presumably because no one tried to submit one.  Am. Compl. ¶ 55.

17           The fact that ICANN did not, as Plaintiffs now suggest they should have, insist

18   on multiple applications for every proposed TLD cannot qualify as predatory conduct.

19   The antitrust laws do not require competitive bidding,[19] and Plaintiffs have not pointed

20

21   ───────────────

[17]      As noted in the preceding section, there are no plausible allegations suggesting
22   that any of this purported conduct resulted from an unlawful agreement between ICM
     and ICANN.  This discussion explains why none of these practices, undertaken
23   unilaterally, could qualify as exclusionary or anticompetitive if engaged in by a single
     firm.
24   [18]      In connection solely with their § 2 claim relating to the so-called "affirmative
     registration" market, Plaintiffs also cite a purported ICM/ICANN "contract provision"
25   which they say may "deter[] ICANN from approving [other] TLDs" intended for adult
     content.  Am. Compl. ¶ 116.  As explained *supra* p. 17, there is no such provision in
26   the ICM/ICANN registry contract.
     [19]      *See, e.g., National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-
27   96, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978) ("[t]he Sherman Act does not require
     competitive bidding"); *CFIT*, 611 F.3d at 503 ("competitive bidding is not required
28   before entering into an exclusive licensing agreement … [s]o long as the agreement is

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1   to any DOC or other regulatory authority that mandated ICANN to go beyond the

2   open application process and require submissions from additional parties.[20]

3       2.  "Supracompetitive" Prices and Service "Restrictions"

4     Plaintiffs' next category of so-called "anticompetitive practices" really boils

5   down to a complaint about three things:  ICM prices for affirmative and defensive

6   registration services, restrictions on the availability of permanent blocking rights and

7   the requirement that those who choose to register a domain name in .XXX that

8   "resolves" (*i.e.*, directs the internet user to a website with content, instead of a page

9   with an error message) agree to abide by the policies of IFFOR, ICM's sponsoring

10   organization.  *See* Am. Compl. ¶¶ 73-78, 85.  None of this conduct remotely qualifies

11   as an antitrust violation, because it is not conduct that forecloses or excludes

12   competition.  *See Brantley*, 2012 WL 1071257, at *3, *6-7 (to violate § 1 conduct

13   must reduce competition between parties to an agreement or foreclose the parties'

14   rivals); *see also MetroNet*, 383 F.3d  at 1130 (§ 2 claim requires exclusionary

15   conduct).

16     With respect to ICM's prices, even if there were a basis other than Plaintiffs'

17   conclusory assertions to suggest they were elevated relative to some relevant

18   benchmark (which there is not, *see supra* pp. 12-13), charging "high" prices alone has

19   never been found anticompetitive or predatory.  *See, e.g.*, *Pacific Bell Tel. Co. v.*

20   *Linkline Commc'ns, Inc.*, 555 U.S. 438, 447-48, 172 L. Ed. 2d 836, 129 S. Ct. 1109

21   (2009); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir.

22

23   the result of independent business judgment"); *Security Fire Door Co. v. County of L.A.*, 484 F.2d 1028, 1031 (9th Cir. 1973) ("[e]ven a direct contract …, without any

24   pretense of putting the job out to bid …, would not in itself have constituted a restraint of trade").

25   [20] On the contrary, the Amended Complaint acknowledges that ICANN exercises its authority to approve new TLDs and choose registries pursuant to a series of

26   agreements with DOC, but does not suggest those agreements contain any competitive bid requirement.  Am. Compl. ¶¶ 25, 26.  Moreover, even if such a provision existed,

27   its breach by ICANN would not constitute an antitrust violation.  *See Security Fire Door*, 484 F.2d at 1031 (even a municipality's violation of a competitive bid statute

28   would not contravene the Sherman Act).

*Wilmer Cutler Pickering Hale and Dorr LLP*
*350 South Grand Ave., Suite 2100*
*Los Angeles, CA 90071*

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1991).  In fact, the Supreme Court has recently emphasized that even the charging of *monopoly* prices is "not unlawful; it is an important element of the free-market system."[21]

Plaintiffs concede that there can only be one registry for each TLD.  Am. Compl. ¶ 22; *see also CFIT*, 611 F.3d at 499.  Given this fact, pricing for ICM registry services was never going to be "competitive" in the sense of multiple .XXX registries vying for the business of firms interested in purchasing .XXX domain or blocking services.[22]  Accordingly, any pricing power ICM may have as a result of being the only .XXX registry would have existed regardless of what firm ICANN chose as the operator and therefore cannot constitute predatory conduct.[23]  *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266-67 (7th Cir. 1984) ("[f]rom the standpoint of antitrust law, … it is a matter of indifference [which firm] exploits a monopoly" through charging high prices); *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000) (same); *Vizio, Inc. v. Funai Elec. Co.*, No. 09-00174, 2010 WL 7762624, at *4 (C.D. Cal. Feb. 3, 2010)  ("lawful shift of market power from the hands of one company to another" is not anticompetitive, even if it results in the charging of higher prices).

---

[21]     *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 157 L. Ed. 2d 823, 124 S. Ct. 872 (2004) (explaining that "[t]he opportunity to charge monopoly prices … is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth").

[22]     As the Amended Complaint admits, however, there are multiple *registrars* competing to provide registry services to such firms, and it is they, and not ICM, that set the prices registrants like Manwin and DP would pay.  Am. Compl. ¶ 22.

[23]     Of course, here the allegations do not even relate to an existing "monopoly" or current Internet offerings at all, but rather involve the creation of an entirely new platform for adult content (proposed by ICM), which *expands* the number of TLD alternatives for consumers and creators of adult content alike.  *See* Am. Compl. ¶ 31 (asserting that ICANN has the power to create "new product markets resulting from the formation of TLDs").  As such, neither ICM's nor ICANN's conduct in establishing or operating .XXX can be "exclusionary" or "predatory" in the antitrust sense.  *See, e.g., Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 151 (D.D.C. 2008) ("here there is no allegation that [defendant] eliminated any consumer choices.  Rather, [defendant] added choices.  It introduced a new [product] to compete with already-established [products]").

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

Plaintiffs' complaints about ICM's prices fail for the additional reason that there is no allegation that its fees were set at a level that would result in the "sacrifice of short-term profits for long-term gain from the exclusion of competition." *See MetroNet*, 383 F.3d at 1134. Both the Supreme Court and Ninth Circuit have made clear that "[a]s a general rule," all firms, even monopolists, "are free to choose the parties with whom they will deal, as well as the *prices, terms, and conditions* of that dealing." *Linkline*, 555 U.S. at 448 (emphasis added); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008). Exceptions to this rule are extremely narrow—*i.e.*, allegations that the defendant has "unilateral[ly] terminat[ed] [ ] a voluntary and profitable course of dealing"—and nowhere established in this Amended Complaint. *LiveUniverse*, 304 F. App'x at 556 (citation and internal quotation marks omitted).

These precedents also doom any suggestion that ICM's restrictions on the availability of permanent blocking rights or implementation of IFFOR policies are anticompetitive or predatory, because even if Plaintiffs' allegations are true (they are not), such conduct does not, and is not alleged to, reduce *competition* for .XXX registry services, much less those services across all TLDs. *Brantley*, 2012 WL 1071257, at *3, *6-7. In any event, contrary to Plaintiffs' allegations, firms seeking only defensive registry services from ICM (which is all Manwin and DP allege they want), do not have to implement IFFOR policies.[24]

### 3. "Lobbying Efforts" and "Litigation Tactics"

In addition to the so-called "anticompetitive practices" described above, Plaintiffs contend that ICM engaged in a variety of purportedly "predatory" lobbying efforts and "litigation tactics" designed to pressure ICANN to approve .XXX as an sTLD and ICM as its registry. Am. Compl. ¶¶ 39, 40, 47, 106. Specifically, Plaintiffs complain about: (1) ICM efforts "[l]eading to and after the rejection of its 2004

---

[24]   *See supra* note 9.

DEF. ICM'S MEM. IN SUPPORT OF ITS MOT. TO DISMISS PLS.' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)      CV 11-9514-PSG (JCGx)

21

application … to persuade ICANN that ICM and the .XXX TLD met the sponsorship criteria;" (2) FOIA requests and ultimately a lawsuit filed by ICM against the State Department and DOC seeking documents "demonstrating their interest in the .XXX issue"; (3) ICM's 2008 filing of an IRP challenging ICANN's rejection of the .XXX TLD; and (4) "threats of litigation" against ICANN and its Board members if ICANN did not adopt the IRP majority Declaration ruling in ICM's favor.  Am. Compl. ¶¶ 39, 42, 44, 47.

With respect to ICM's purported "lobbying efforts," the Amended Complaint concedes that notwithstanding the application of this purportedly "improper pressure," ICANN *rejected* ICM's .XXX TLD proposal *on three separate occasions*.  Am. Compl. ¶¶ 39, 43.  It is hard to see how, and ICM is aware of no authority suggesting that, entirely unsuccessful efforts to persuade another party can possibly qualify as predatory.  In fact, the case law is clear that even successful attempts to persuade a decisionmaker to grant the petitioner a monopoly do not constitute anticompetitive conduct.  *See*, *e.g.*, *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524, 526 (5th Cir. 1999) (efforts by defendant to "tout[ ] the virtues" of its position to decisionmaking authority amounted to "'simple salesmanship' that enhanced rather than subverted competition on the merits"—even if its arguments "may have been wrong, misleading, or debatable") (citing *Security Fire Door*, 484 F.2d at 1031); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 544 (7th Cir. 1986) (rejecting plaintiffs' assertion that defendants' lobbying of the NBA amounted to "exclusionary conduct … [s]ince only one competitor could win NBA approval, it was not in itself anticompetitive for CPSC to suggest to the NBA that it should be the lucky one").

As for ICM's filing of the IRP, Plaintiffs admit that the panel majority *ruled in ICM's favor*, and, even if it had not, it is difficult to imagine how bona fide efforts to enforce one's rights through a "quasi-arbitral process" can amount to predation.  Am. Compl. ¶ 44, 46.  Finally, the FOIA requests and lawsuits against DOC and the State Department (Am. Compl. ¶ 42) are plainly covered under the *Noerr-Pennington*

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

1    doctrine[25] and thus immune from antitrust scrutiny.  *Kottle*, 146 F.3d at 1059 (this

2    doctrine "sweeps broadly" and its immunity extends to "both state and federal

3    antitrust claims that allege anticompetitive activity in the form of lobbying or

4    advocacy before any branch of either federal or state government").  As for the

5    alleged "litigation threats" and their subsequent resolution, the Ninth Circuit has made

6    clear that pre-litigation communications between private parties, including pre-suit

7    demand letters and threats of litigation, as well as settlement demands, are protected

8    by this immunity.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-36 (9th Cir. 2006) ("the

9    law of this circuit establishes that communications between private parties are

10   sufficiently within the protection of the Petition Clause to trigger the *Noerr-*

11   *Pennington* doctrine," so long as they relate to petitioning activity).

12        Exclusionary or anticompetitive conduct is an indispensable element of any

13   Sherman Act claim.  *See, e.g.*, *Rutman Wine Co*, 829 F.2d at 735 (anticompetitive

14   conduct required for § 1 claims); *Nero AG v. MPEG LA, L.L.C.*, No. 10-03672, 2010

15   WL 4366448, at *4 (C.D. Cal. Sept. 14, 2010) (liability under § 2 of the Sherman Act

16   requires a showing of predatory conduct).  Having failed to make this showing with

17   respect to either ICM or ICANN, Plaintiffs should not be permitted to proceed with

18   this case.  *Nero,* 2010 WL 4366448, at *7 (dismissing § 2 claim where predatory

19   conduct allegations failed to meet the *Twombly* standard); *LiveUniverse*, 304 F. App'x

20   at 556 (same); *Rutman,* 829 F.2d at 735 (dismissing § 1 claim for failure to plausibly

21   allege restraint of trade).[26]

---

22   [25]    The *Noerr-Pennington* doctrine is derived from the Supreme Court's decisions

23   in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5
     L. Ed. 2d 464, 81 S. Ct. 523 (1961) and *United Mine Workers of Am. v. Pennington*,

24   381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965).  *See Kottle v. Northwest
     Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir. 1998).

25   [26]    Plaintiffs' claim against ICM for attempted monopolization of the purported

26   affirmative registration market must also be dismissed because the Amended
     Complaint does not even try to establish the requisite element of specific intent and

27   the allegation of a dangerous probability of success is entirely conclusory (not to
     mention silly, given Plaintiffs' admission that this "market" has not yet been

28   established).  *See, McGlinchy,* 845 F.2d at 811; *see also Rutman Wine Co.*, 829 F.2d
     at 735.

---

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071

**D.      The Nature Of The Remedy Plaintiffs Seek Also Supports Dismissal**

The Supreme Court has emphasized that the nature of relief requested by plaintiffs in an antitrust case is an important consideration in assessing the benefits of judicial intervention. *Trinko*, 540 U.S. at 406, 411-12 (2004); *MetroNet,* 383 F.3d at 1133-34.  In particular, where what is sought would require a factfinder to "'identify[ ] the proper price, quantity, and other terms of dealing,' the Court has determined that '[t]he problem should be deemed irremedia[ble] by antitrust law.'" *Linkline,* 555 U.S. at 452-53 (quoting *Trinko,* 540 U.S. at 408, 415).

Here, the injunctive relief Plaintiffs seek would require this Court to (a) enjoin .XXX altogether; (b) mandate that the .XXX registry contract be voided and "rebid … to introduce competition;" and (c) "[i]mpos[e] reasonable price constraints and service requirements on" blocking services, as well as defensive and affirmative registrations in the .XXX TLD.  Am. Compl. ¶¶ 99, 109, 120, 129, 139.

Plaintiffs' plea for relief thus would manifestly require court involvement in specifying and supervising "terms of dealing" between ICM and its customers, if not a reworking of the existing process by which ICANN, subject to DOC's review, currently selects new TLDs and registries.  Such a task would be particularly difficult (and inappropriate) in this case given the continually evolving competitive conditions in this industry (including the potential entry of new, rival platforms after ICANN's latest gTLD round) and the absence of any reliable benchmarks (*e.g.*, terms employed during a prior course of dealing between the parties).  *See Four Corners Nephrology Assocs. v. Mercy Medical Ctr. of Durango*, 582 F.3d 1216, 1226 (10th Cir. 2009) (dismissing antitrust complaint where, *inter alia,* there was no past course of dealing from which the court could fashion "a judicially manageable remedy"); *Greco v. Verizon Comm'ns, Inc.*, No. 03-00718, 2005 WL 659200, at *4 (S.D.N.Y. Mar. 22, 2005) (applying *Trinko* and ruling against antitrust intervention because "the constantly changing competitive landscape makes it very difficult for a court to set a reasonable price for services").  These factors suggest that the costs of antitrust

enforcement in this case are likely to outweigh any benefits, and provide another basis for dismissal. *Linkline*, 555 U.S. at 452 ("[i]nstitutional concerns also counsel against recognition of … claims" that would require courts 'to act as central planners'") (quoting *Trinko*, 540 U.S. at 408).

## V.    CONCLUSION

Plaintiffs have now had two shots at fashioning a viable antitrust case.  For the foregoing reasons and because further amendment would almost certainly be futile, ICM respectfully moves this Court to dismiss the Amended Complaint in its entirety with prejudice. *See, e.g.*, *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (dismissal without leave to amend appropriate where "amendments would be nothing more than an exercise in futility").

Respectfully Submitted,

Dated:  May 8, 2012

WILMER CUTLER PICKERING
 HALE AND DORR LLP


By:    /s/ Andrea Weiss Jeffries

Andrea Weiss Jeffries

Attorneys for Defendant
ICM Registry, LLC

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071