Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
Kate Wallace (State Bar No. 234949)
kwallace@JonesDay.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2300
Telephone:   (213) 489-3939
Facsimile:   (213) 243-2539

Attorneys for Defendant
INTERNET CORPORATION FOR
ASSIGNED NAMES AND NUMBERS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANWIN LICENSING INTERNATIONAL S.A.R.L., a Luxembourg limited liability company (s.a.r.l.), and DIGITAL PLAYGROUND, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ICM REGISTRY, LLC, d.b.a. .XXX, a Delaware limited liability corporation, INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California non-profit public benefit corporation, and DOES 1-10,<br><br>Defendants. | Case No. CV11-9514 PSG (JCGx)<br><br>Assigned for all purposes to The Honorable Philip S. Gutierrez<br><br>**DEFENDANT INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial Notice and [Proposed] Order Filed Concurrently Herewith]<br><br>Date:       July 30, 2012<br>Time:       1:30 p.m.<br>Courtroom:   880 Roybal Federal Bldg. |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT**, pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Internet Corporation for Assigned Names and Numbers ("ICANN") will and hereby does move the Court to dismiss the Plaintiffs' First Amended Complaint.  This motion shall be heard on July 30, 2012, at 1:30 p.m., or as soon thereafter as it may be heard, in the courtroom of the Honorable Philip S. Gutierrez, United States District Judge, United States District Court, 880 Roybal Federal Building, 255 East Temple Street, Los Angeles, California 90012.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that ICANN cannot, as a matter of law, be liable under the antitrust laws with respect to the conduct alleged in the First Amended Complaint because ICANN does not engage in "trade or commerce."  This motion is further made on the grounds that ICANN's conduct, as alleged in the First Amended Complaint, was unilateral, not bilateral, and thus outside the purview of Sections 1 or 2 of the Sherman Act (Plaintiffs' First, Second and Third Causes of Actions).  Moreover, Plaintiffs' Third Cause of Action for conspiracy to attempt to monopolize is facially defective because no such cause of action exists.  Finally, Plaintiffs fail adequately to allege a relevant product market, as required for both their Section 1 and Section 2 antitrust claims (Plaintiffs' First, Second and Third Causes of Actions).

ICANN's motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the complete files and records in this action, including Plaintiffs' First Amended Complaint, oral argument of counsel, and such other and further matters as this Court may consider.

///

///

///

1         This motion is made following the conference of counsel pursuant to L.R.

2    7-3 which took place on April 25, 2012.

3    Dated:    May 8, 2012                    JONES DAY

4                                            By:    /s/ Jeffrey A. LeVee
                                                 Jeffrey A. LeVee
5
                                            Attorneys for Defendant INTERNET
6                                            CORPORATION FOR ASSIGNED
                                            NAMES AND NUMBERS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ICANN'S MOTION TO DISMISS FAC
CASE NO. CV11-9514 PSG (JCGx)

1

# TABLE OF CONTENTS

2

Page

3

I.   INTRODUCTION ................................................................................. 1

4

II.   FACTUAL BACKGROUND ................................................................ 3

A.   Background on the Internet's Domain Name System .......................... 3

5

B.   Background on ICANN ...................................................................... 3

6

C.   ICANN's Expansion of the Domain Name System ............................. 7

7

D.   Summary of Plaintiffs' Claims .......................................................... 8

III.   ARGUMENT ...................................................................................... 9

8

A.   Plaintiffs' Allegations Against ICANN Fail Because ICANN's Conduct Does Not Involve Trade Or Commerce ................................. 9

9

1.   The Legislative History Of The Sherman Act Makes Clear It Was Not Intended To Reach Noncommercial Conduct .................................................................................. 10

10

2.   Courts Have Consistently Declined To Extend The Antitrust Laws To Noncommercial Conduct Undertaken By Non-Profit Organizations .................................................. 11

11

12

3.   The Decisions At Issue Here Are At The Core Of ICANN's Charitable (Noncommercial) Mission For The Public's Benefit ...................................................................... 13

13

14

B.   ICANN's Decision To Award The Right To Operate The .XXX TLD To ICM Was Unilateral, Not Bilateral, And Therefore Cannot Support Plaintiffs' Section 1 Or Section 2 Claims ................. 18

15

16

C.   Plaintiffs' Third Claim Is Facially Defective Because The Sherman Act Does Not Create A Cause Of Action For Conspiracy To Attempt To Monopolize .......................................... 20

17

18

D.   Plaintiffs Fail To Define A Relevant Product Market ...................... 21

19

1.   The .XXX Defensive Registration Market Is Not A Properly Defined Relevant Market ........................................ 22

20

2.   The Market For Affirmative Registrations In Adult Content TLDs Does Not Yet Exist And Thus Is Not A Viable Relevant Market ...................................................... 23

21

22

IV.   CONCLUSION .................................................................................. 25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Alabama v. Blue Bird Body Co.*,
  71 F.R.D. 606 (M.D. Ala. 1976) ........................................................................21

*Alvarez v. Chevron Corp.*,
  656 F.3d 925 (9th Cir. 2011) ............................................................................15

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. Of Podiatric Surgery, Inc.*,
  185 F.3d 606 (6th Cir. 1999) ............................................................................18

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ........................................................................................18

*Apex Hosiery Co. v. Leader*,
  310 U.S. 469 (1940) ............................................................................11, 12, 14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................25

*Big Bear Lodging Ass'n v. Snow Summit Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ..........................................................................21

*Carpet Group Int'l v. Oriental Rug Importers*,
  256 F. Supp. 2d 249 (D.N.J. 2003) ...................................................................21

*Chase v. Northwest Airlines Corp.*,
  49 F. Supp. 2d 553 (E.D. Mich. 1999) ..............................................................19

*Coalition for ICANN Transparency Inc. v. VeriSign*,
  611 F.3d 495 (9th Cir. 2010) ............................................................................22

*Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc'y of United States*,
  50 F.3d 710 (9th Cir. 1995) ................................................................12, 13, 16

*Donnelly v. Boston Coll.*,
  558 F.2d 634 (1st Cir. 1977) ............................................................................17

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
  312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...............................................................20

*Formula One Licensing B.V. v. Purple Interactive Ltd.*,
  No. C00-2222-MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ...............22

*FTC v. Lundbeck*,
  650 F.3d 1236 (8th Cir. 2011) ..........................................................................25

*FTC v. Superior Court Trial Lawyers' Ass'n*,
  493 U.S. 411 (1990) ........................................................................................17

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975) ............................................................................ 15

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  514 F. Supp. 2d 683 (E.D. Pa. 2007)................................................... 20

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) ................................................................. 11, 12, 14

*Lewis v. Grinker*,
  965 F.2d 1206 (2d Cir. 1992) ............................................................. 11

*Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and
  Secondary Schs., Inc.*,
  432 F.2d 650 (D.C. Cir. 1970)............................................................. 17

*Missouri v. Nat'l Org. for Women*,
  620 F.2d 1301 (8th Cir. 1980) ....................................................... 16, 17

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ........................................................................... 17

*Nat'l Org. for Women, Inc. v. Scheidler*,
  968 F.2d 612 (7th Cir. 1992) .............................................................. 13

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ..................................................21, 22, 24

*NLRB v. United Food & Commercial Workers Union*,
  484 U.S. 112 (1987) ........................................................................... 11

*Parker v. Brown*,
  317 U.S. 341 (1943) ........................................................................... 11

*Proctor v. Gen. Conference of Seventh-Day Adventists*,
  651 F. Supp. 1505 (N.D. Ill. 1986) ..................................................... 17

*Rickards v. Canine Eye Registration Found., Inc.*,
  704 F.2d 1449 (9th Cir. 1983) ............................................................ 19

*Reno v. ACLU*,
  521 U.S. 844 (1997) ............................................................................. 3

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
  No. 09-CV-102H (WMC), 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ........ 23

*Selman v. Harvard Med. Schl.*,
  494 F. Supp. 603 (S.D.N.Y 1980) ....................................................... 14

*Smith v. Network Solutions, Inc.*,
  135 F. Supp. 2d 1159 (N.D. Ala. 2001) ............................................... 22

**TABLE OF AUTHORITIES**
(continued)

Page

*Suzuki of W. Mass., Inc. v. Outdoor Sports Expo., Inc.*,
  126 F. Supp. 2d 40 (D. Mass. 2001) .................................................................. 19

*Swift & Co. v. United States*,
  196 U.S. 375 (1905) ............................................................................................ 12

*Tanaka v. Univ. of South. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ..................................................................... 21, 22

*United States v. Continental Can Co.*,
  378 U.S. 441 (1964) ............................................................................................ 24

*Weber v. Nat'l Football League*,
  112 F. Supp. 2d 667 (N.D. Ohio 2000) ........................................................ 22, 23

*Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*,
  550 F. Supp. 960 (N.D. Ill. 1982) ...................................................................... 20

**STATUTES**

15 U.S.C. § 1 ........................................................................................ 8, 9, 18, 19

15 U.S.C. § 2 ............................................................................................... passim

Cal. Civ. Proc. Code § 425.16 ............................................................................... 1

**OTHER AUTHORITIES**

20 Cong. Rec. 1458-59 ......................................................................................... 10

21 Cong. Rec. 2562 (1890) .................................................................................. 10

2D Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* .......................... 10, 16

Robert H. Bork, *Legislative Intent and the Policy of the Sherman Act*, 9 J.L.
  & Econ. 7, 31-33 (1966) .................................................................................... 10

1   
2   

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

By their First Amended Complaint ("FAC")[1], Plaintiffs improperly invoke the antitrust laws in an attempt to stave off potential competition that their .COM websites—websites that include "the single most popular free adult video website on the Internet" (FAC ¶ 1)—may face from the operation of .XXX, a new Internet platform for adult content.  But the Internet Corporation for Assigned Names and Numbers ("ICANN"), a non-profit public benefit corporation, does not sell Internet domain names, it does not register Internet domain names, and it is not an Internet pornographer.   In fact, ICANN does not make or sell anything, it does not participate in <u>any</u> market, and its Bylaws expressly forbid it from participating in any of the "markets" referenced in the FAC.  Yet ICANN somehow finds itself as a named defendant in an antitrust case, accused of restraining trade.

ICANN's activities in administering the domain name system ("DNS") cannot violate the antitrust laws as a matter of law.  From the moment ICANN was formed to this day, one of ICANN's core values has been to <u>create</u> competition within the Internet's DNS.  The creation of competition cannot give rise to an antitrust complaint, which dooms Plaintiffs' attack on ICANN's decision to help create that competition.  Specifically, the conduct at issue here is ICANN's decision to award ICM the authority to proceed with the new ".XXX" top level domain (TLD) registry.[2]  That decision, which ICANN made <u>unilaterally</u>, did not violate

[1] Plaintiffs filed their initial complaint on November 16, 2011.  Dkt. # 1.  Defendants moved to dismiss Plaintiffs' Complaint on January 20, 2012.  Dkt. #s 18, 20.  Defendant ICM further moved to strike Plaintiffs' state law causes of action pursuant to California Code of Civil Procedure, Section 425.16.  Dkt. # 21.  Instead of opposing Defendants' motions, Plaintiffs opted to withdraw their Complaint and subsequently filed the First Amended Complaint (Dkt. # 26) that is the subject of ICANN's instant motion to dismiss.

[2] Within each Internet domain name, the alphanumeric field to the right of the last period or "dot" is the TLD.  FAC ¶ 19.  In addition to the newly-established .XXX, other examples of TLDs include .COM and .ORG.  *Id*. at ¶ 2.  The entity responsible for operating a particular TLD database (which includes all of the registrations in that particular TLD) is called the "registry operator" or "registry."  *Id*. at ¶ 22.

the antitrust laws.  Indeed, far from evidencing coordinated action, ICANN approved the .XXX TLD only following years of ICANN rejections of ICM proposals (and a variety of adversary proceedings within the ICANN dispute resolution structure), as Plaintiffs concede.

Antitrust defendants must be market participants that at least have the capacity to conspire to set prices or monopolize markets; they must be involved in the trade or commerce that is the subject of the lawsuit.  By contrast, ICANN does not (and cannot under its Bylaws) participate in any way in any of the markets that may exist that involve the DNS, or TLD registries or registrars;[3] ICANN's decision to allow the creation of a new TLD such as .XXX is not an action that could result in a finding that ICANN has restrained trade or conspired to monopolize a market.

The dispute between Plaintiffs and ICM (not ICANN) is a garden-variety business dispute that does not appear to implicate the antitrust laws.  This, as described below, explains why Plaintiffs have not identified any viable antitrust product market, let alone a product market that could be dominated in any respect by ICM.  Plaintiffs claim to be upset with the manner in which ICM is operating the new .XXX registry.  But what Plaintiffs are really complaining of is the potential competition that their market-dominant pornographic websites (websites that will continue to operate irrespective of anything ICM might do) may face from the operation of .XXX.  An increase in competition cannot violate the antitrust laws, but even if the way ICM has decided to operate the new .XXX registry could somehow raise legitimate antitrust concerns, that does not and cannot create antitrust exposure for ICANN.

This action should be dismissed against ICANN at the Rule 12 stage because ICANN cannot—as a matter of law—be liable under the antitrust laws with respect

---

[3] Registries (or Registry Operators) (like ICM) generally do not deal directly with prospective domain name owners or "registrants" (like Plaintiffs) themselves—instead, generally separate companies called registrars accredited by ICANN sell TLD domain name registrations to registrants.  FAC ¶ 22.

1   to the matters alleged in the FAC.

2   **II.    FACTUAL BACKGROUND**

3       **A.    Background on the Internet's Domain Name System.**

4           The Internet is succinctly described as "an international network of

5   interconnected computers." *Reno v. ACLU*, 521 U.S. 844, 849, 117 S. Ct. 2329,

6   2334, 138 L. Ed. 2d 874, 884 (1997). Each computer connected to the Internet has

7   a unique identity, established by its unique Internet Protocol address ("IP address").

8   FAC ¶ 16. An IP address consists of a series of numbers. *Id*. Because those

9   numbers are hard to remember, the founders of the Internet created the Domain

10  Name System ("DNS") to allow those numbers to be converted into names such as

11  "icann.org" or "uscourts.gov." *Id*. at ¶ 17. In these examples, ".ORG" and ".GOV"

12  are known as the "Top Level Domain" or "TLD." *Id*. at ¶ 19. The letters

13  immediately to the left of the last "period" or "dot" are known as the Second Level

14  Domain (icann or uscourts); the letters to the left of the Second Level Domain are

15  known as the Third Level Domain (for example, the "cacd" in the website to the

16  Central District's main Internet page located at cacd.uscourts.gov). *Id*.

17          TLDs can either be "unsponsored" or "sponsored." *Id*. at ¶ 20. Commonly

18  known "unsponsored" TLDs are ".COM" and ".NET"; there are no restrictions as

19  to who can acquire a domain name registration in "unsponsored" TLDs. *See*

20  *generally id*. By contrast, a "sponsored" TLD is operated by an organization that

21  has a sponsor that is typically an entity representing a narrower group or industry,

22  such as ".MUSEUM" which is operated for the benefit of museums throughout the

23  world and is not available to persons who are not in the museum industry.

24  *Id*. .XXX is a "sponsored" TLD.

25          **B.    Background on ICANN.**

26          Prior to ICANN's formation in 1998, the United States government, via

27  contractual arrangements with third parties, operated the DNS. *Id*. at ¶ 23. ICANN

28  was formed in 1998 as part of the U.S. Government's commitment to "privatize"

the Internet so that the administration of the DNS would be in the hands of those entities that actually used the Internet as opposed to governments.  *Id.* at ¶ 25. ICANN signed its first agreement with the Department of Commerce (DoC) in 1998.  Since that time, ICANN has signed subsequent agreements with the DoC that have conferred upon ICANN the authority and responsibility to coordinate the DNS in the public interest by, among other things, promoting competition and consumer choice in the DNS marketplace.  In addition, ICANN has entered into agreements with the registry operators for TLDs.  *Id.*

Consumers do not contact registries directly in order to register a domain name.  Instead, consumers (or "registrants") may obtain the contractual right to use second-level domain names through companies known as "registrars."  *Id.* at ¶ 22. ICANN operates the accreditation system that has produced an extremely competitive registrar marketplace, with over a thousand accredited registrars. Registrants buy domain name registrations through these registrars (or their agents), which in turn register those names with the appropriate TLD registry.  *Id.*

ICANN's Articles of Incorporation ("Articles") provide that it shall be a non-profit public benefit corporation organized under California law to be operated "exclusively for charitable, educational, and scientific purposes within the meaning of § 501(c)(3) of the Internal Revenue Code of 1986 . . . ."  *See* ICANN's Request for Judicial Notice ("RJN"), filed concurrently herewith, Ex. A, Art. 3.  Article 3 of the Articles further provides:

> In furtherance of the foregoing purposes, and in recognition of the fact that the Internet is an international network of networks, owned by no single nation, individual or organization, the Corporation shall, except as limited by Article 5 hereof, pursue the charitable and public purposes of lessening the burdens of government and promoting the global public interest in the operational

1
2
3
4
5
6
7
8
9
10
11
12
13

> stability of the Internet by (i) coordinating the assignment
> of Internet technical parameters as needed to maintain
> universal connectivity on the Internet; (ii) performing and
> overseeing functions related to the coordination of the
> Internet Protocol ("IP") address space; (iii) performing
> and overseeing functions related to the coordination of the
> Internet domain name system ("DNS"), including the
> development of policies for determining the
> circumstances under which new top-level domains are
> added to the DNS root system; (iv) overseeing operation
> of the authoritative Internet DNS root server system; and
> (v) engaging in any other related lawful activity in
> furtherance of items (i) through (iv).

14    *Id.* (emphasis added); *see also* FAC ¶ 27.

15        Article 4 of the Articles provides:

16
17
18
19
20
21
22
23
24
25

> 4. The Corporation shall operate for the benefit of the
> Internet community as a whole, carrying out its activities
> in conformity with relevant principles of international law
> and applicable international conventions and local law
> and, to the extent appropriate and consistent with these
> Articles and its Bylaws, through open and transparent
> processes that enable competition and open entry in
> Internet-related markets. To this effect, the Corporation
> shall cooperate as appropriate with relevant international
> organizations.

26    RJN, Ex. A at Art. 4.

27        Section 1 of ICANN's Bylaws sets forth ICANN's overall mission.

28    Specifically, ICANN:

ICANN'S MOTION TO DISMISS FAC
CASE NO. CV11-9514 PSG (JCGx)

1    1. Coordinates the allocation and assignment of the

2     three sets of unique identifiers for the Internet,

3     which are:  (a) Domain names (forming a system

4     referred to as "DNS"); (b) Internet protocol ("IP"

5     addresses and autonomous system ("AS") numbers;

6     and (c) Protocol port and parameter numbers.

7    2. Coordinates the operation and evolution of the

8     DNS root name server system.

9    3. Coordinates policy development reasonably and

10     appropriately related to these technical functions.

11 RJN, Ex. B at Art. I, § 1.

12  Article II, Section 2 of the Bylaws restricts ICANN's activities as follows:

13   ICANN <u>shall not act as a Domain Name System Registry</u>

14   <u>or Registrar</u> or Internet Protocol Address Registry in

15   competition with entities affected by the policies of

16   ICANN.  Nothing in this Section is intended to prevent

17   ICANN from taking whatever steps are necessary to

18   protect the operational stability of the Internet in the event

19   of financial failure of a Registry or Registrar or other

20   emergency.

21 *Id*. at Art. II, § 2 (emphasis added).

22  To summarize:

23    1. ICANN is a non-profit public benefit corporation

24     organized under California law.

25    2. ICANN's primary purpose is to coordinate the

26     operation of the DNS.

27    3. ICANN's Bylaws prohibit it from operating as an

28     Internet registry or registrar.  ICANN does not

1    sell anything or make anything; its functions

2    are noncommercial and in support of the public

3    interest.

4    **C.    ICANN's Expansion of the Domain Name System.**

5    As noted above, one of ICANN's core values in support of its mission is to

6    create competition within the DNS. *See* RJN, Ex. A at Art. 4 ("The Corporation

7    shall operate . . . through open and transparent processes that enable competition

8    and open entry in Internet-related markets."); RJN, Ex. B at Art. I, § 2.6

9    ("Introducing and promoting competition in the registration of domain names

10   where practicable and beneficial in the public interest.").  In furtherance of this

11   mission, in 2000, ICANN accepted applications for new TLDs—any entity was free

12   to apply—and ultimately approved seven new TLDs.  FAC ¶ 34 (also alleging that

13   ICANN rejected ICM's application for the .XXX TLD in 2000).  Plaintiffs did not

14   apply for a new TLD in the 2000 round.

15   In 2004, ICANN again accepted applications—again from anyone who

16   wanted to apply—but this time only for sponsored TLDs. *Id*. at ¶ 35.  ICM

17   submitted an application for .XXX to be a sponsored TLD.  Plaintiffs did not.

18   ICM's application became the subject of considerable controversy between ICM

19   and ICANN, with ICANN rejecting the application in March 2007.  ICM then

20   initiated an Independent Review Process ("IRP") proceeding—a special proceeding

21   to review decisions of the ICANN Board of Directors that is available pursuant to

22   ICANN's Bylaws.[4]  ICM claimed that ICANN had approved the application

23   for .XXX in June 2005, and ICANN claimed that it had not made a final decision

24   on, and ultimately rejected, ICM's application. *Id*. at ¶ 44.  Following a hearing in

25   2009, the IRP Panel declared 2-1 that ICANN had, in fact, awarded ICM the .XXX

26   _____

[4]  ICANN's Bylaws provide that "[a]ny person materially affected by a
decision or action by the Board that he or she asserts is inconsistent with the
Articles of Incorporation or Bylaws may submit a request for independent review of
that decision or action."  RJN, Ex. B at Art. IV, § 3.2.  The IRP proceeding that
follows is a non-binding proceeding.

27

28

sponsored TLD in June 2005 and should not have "changed its mind" thereafter. *Id*. at 46. ICANN's Board accepted certain portions of that declaration, and in March 2011, voted to approve the .XXX TLD. ICANN thereafter entered into a registry agreement with ICM. *Id*. at ¶ 48.

As noted, there were no restrictions in 2000 or 2004 as to who could submit an application for a TLD. Neither of the Plaintiffs asserts that it has ever filed an application for any TLD.

### D.     Summary of Plaintiffs' Claims.

Plaintiffs assert three antitrust claims against ICANN and ICM and an additional two against ICM in its sole capacity. The thrust of the claims is that Plaintiffs do not like the way in which ICM is rolling out the .XXX TLD, claims that have little to do with ICANN. Plaintiffs allege that ICANN conspired with ICM and agreed to approve the .XXX TLD "without competition from any other adult-content TLD" in violation of Section 1 of the Sherman Act. FAC ¶ 96(a) (Plaintiffs' First Cause of Action). Plaintiffs further allege that ICANN conspired with ICM in "permitting" ICM to operate the .XXX TLD in an anticompetitive manner. *Id*. at ¶ 96(d).

Plaintiffs' second cause of action alleges that ICANN conspired with ICM to have ICM monopolize the market for "permanent blocking and other defensive registrations in the .XXX TLD." *Id*. at ¶ 102. And Plaintiffs' third cause of action alleges that ICANN conspired with ICM to attempt to have ICM monopolize "the incipient market for the affirmative registration of domain names in the .XXX TLD and in any other potential future TLDs having names connoting (or intended predominately for) adult content." *Id*. at ¶ 112. As explained below, ICANN does not participate in either "market," and these are not proper antitrust product markets in all events.[5]

---

[5] Plaintiffs' fourth and fifth causes of action are asserted only against ICM and allege that ICM has unlawfully monopolized and attempted to monopolize the foregoing two alleged product markets, respectively. *Id*. at ¶¶ 123-128 (Fourth Cause of Action for monopolization of the market for "permanent blocking and

If Plaintiffs' claims were permitted to move beyond this motion to dismiss, ICANN would demonstrate that the claims against ICANN are false.  One of ICANN's core values in support of its mission is to <u>create</u> competition, and the introduction of the .XXX TLD is expected to do just that.  Indeed, the thrust of the FAC is that Plaintiffs are concerned that registrants of domain names in .XXX will create competition for Plaintiffs' online adult entertainment sites operating through existing domain names in other TLDs (such as .COM).  Plaintiffs also object to the fact that ICM is the only operator of a registry that has been established exclusively to serve online adult entertainment providers.  However, the notion that substituting any other entity as the .XXX registry operator would change the competitive landscape is clearly wrong; whether ICM, Manwin or another, there would still be a single operator of the .XXX registry.

More relevant for purposes of this motion is that none of Plaintiffs' antitrust claims against ICANN is viable:  (1) ICANN does not engage in "trade or commerce," and therefore cannot, as a matter of law, be liable under the antitrust laws with respect to the conduct alleged; (2) ICANN's conduct, as alleged in the FAC, was unilateral, not bilateral, and thus cannot support Plaintiffs' Sherman Act Section 1 or 2 claims against ICANN; (3) the Sherman Act does not recognize a cause of action for conspiracy to attempt to monopolize; and (4) Plaintiffs' relevant market definitions are facially untenable.

## III.   ARGUMENT

### A.   Plaintiffs' Allegations Against ICANN Fail Because ICANN's Conduct Does Not Involve Trade Or Commerce.

By its terms, the Sherman Act only applies to agreements in restraint

---

(continued…)

other defensive registrations in the .XXX TLD"); *id*. at ¶¶ 131-139 (Fifth Cause of Action for attempted monopolization of the incipient market for "affirmative registration of domain names in the .XXX TLD").

(Section 1) or monopolization (Section 2) "of trade or commerce."  15 U.S.C. §§ 1, 2.  ICANN's conduct does not involve trade or commerce.  As a result, Plaintiffs' claims against ICANN must be dismissed in their entirety.

### 1.   The Legislative History Of The Sherman Act Makes Clear It Was Not Intended To Reach Noncommercial Conduct.

As explained herein, ICANN's decisions to approve the .XXX TLD and to enter into a registry agreement with ICM for the operation of the .XXX TLD go to the very heart of ICANN's charitable, noncommercial purpose in overseeing and coordinating the DNS.  While ICANN receives fees pursuant to its registry and registrar agreements, those fees help fund ICANN's work as a public charity and do not render ICANN's work commercial in nature.  ICANN does not seek commercial benefit, profit, or competitive advantage from the fees it collects.  In short, ICANN's conduct as alleged in the FAC is entirely noncommercial.

The legislative history of the Sherman Act demonstrates that Congress did not intend to subject noncommercial operations of non-profit institutions to antitrust scrutiny.  Senator Sherman repeatedly stressed that the Act would target "business combination" rather than noncommercial organizations such as the "Farmers' Alliance."  21 Cong. Rec. 2562 (1890); *see also id.* at 2658-59 (the Act is targeted at "combination(s) or arrangement(s) made to interfere with interstate commerce . . . .").  And he explicitly disavowed an interpretation of the bill that would regulate "a combination, not of a business character," that might have incidental effects on trade or commerce.  20 Cong. Rec. 1458-59.  This history explains the intention of Congress, embodied in the "trade or commerce" requirement, to limit the Act's reach to conduct that is fundamentally commercial, and to exclude conduct that is motivated solely by noncommercial objectives.[6]

---

[6] Judge Bork has observed that the "trade or commerce" limitation in the Sherman Act was intended to eliminate noncommercial conduct from the purview of the Act based on the understanding in 1890 that, given the restrictions placed on federal power by the Commerce Clause, Congress did not have the constitutional authority to regulate noncommercial activity.  Robert H. Bork, *Legislative Intent and the Policy of the Sherman Act*, 9 J.L. & Econ. 7, 31-33 (1966); *see also* 2D

It is a core principle of statutory interpretation that courts should identify the intent of the drafters and apply the statute consistent with that intent. *See, e.g., NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S. Ct. 413, 421,  98 L. Ed. 2d 429 (1987) ("On a pure question of statutory interpretation, our first job is to try to determine congressional intent . . . ."); *Lewis v. Grinker*, 965 F.2d 1206, 1215 (2d Cir. 1992) ("[W]e can never forget that what we are searching for is Congressional intent.").  The Sherman Act is no exception, and the Supreme Court repeatedly has relied on the principle of original intent in applying the Act's "trade or commerce" limitation. *See, e.g., Parker v. Brown*, 317 U.S. 341, 351, 63 S. Ct. 307, 313, 87 L. Ed. 315, 326 (1943) ("There is no suggestion of a purpose to restrain state action in the Act's legislative history.  The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only 'business combinations.'") (citations omitted); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489, 60 S. Ct. 982, 990, 84 L. Ed. 1311, 1321 (1940) (In determining whether it applies to union activity, the Sherman Act should be interpreted "in the light of its legislative history and of the particular evils at which [it] was aimed.").  In short, in passing the Sherman Act, Congress did not intend to reach noncommercial conduct.

### 2. Courts Have Consistently Declined To Extend The Antitrust Laws To Noncommercial Conduct Undertaken By Non-Profit Organizations.

The Supreme Court has confirmed that the antitrust laws were intended to regulate commercial activity, not noncommercial conduct undertaken by a non-profit organization, which is what Plaintiffs' allegations describe about ICANN. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 214 n.7, 79 S. Ct. 705, 710 n.7, 3 L. Ed. 2d 741, 746 n.7 (1959); *Apex Hosiery Co.*, 310 U.S. at 493.

---

(continued…)

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*  ¶ 262 ("The drafters [of the Sherman Act] never intended to condemn properly defined noncommercial activities.").

Indeed, antitrust claims have been rejected even where noncommercial activity has some incidental effect on commerce.

In *Apex Hosiery Co. v. Leader*, the United States Supreme Court held that the Sherman Act does not regulate labor union strikes aimed at blocking interstate shipments of products. 310 U.S. at 512-13. The Court explained that "[t]he history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that 'business competition' was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition." *Id*. at 493 n.15. "The Court in *Apex* recognized that the Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives." *Klor's*, 359 U.S. at 214 n.7; *see also Swift & Co. v. United States*, 196 U.S. 375, 398 (1905) (the term commerce is a "practical" conception, "drawn from the course of business").

The Ninth Circuit has likewise held that noncommercial activities of non-profit organizations are not subject to the antitrust laws. In *Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc'y of United States*, 50 F.3d 710 (9th Cir. 1995), DELTA, an animal rights group, alleged that the Humane Society had unlawfully attempted to maintain monopoly power over the animal rescue "market" by instigating governmental disciplinary action against DELTA and causing service providers to discriminate against DELTA. *Id*. at 711. The Ninth Circuit held that the solicitation of contributions by a non-profit organization (contributions that would financially support the non-profit organization's activities) was indisputably not "trade or commerce" and thus the defendant's actions were not encompassed by the Sherman Act. *Id*. at 712. The court observed that:

> Not every aspect of life in the United States is to be
> reduced to such a single-minded vision of the ubiquity of
> commerce. If self-serving activity is necessarily

1          commercial, the Sherman Act embraces everything from a

2          church fair to the solicitation of voluntary blood donors.

3          On this basis, every engagement or marriage would be a

4          restraint of trade, subject to and defensible only by

5          application of the rule of reason . . . .  From its donations

6          Humane Society derives reputation, prestige, money for

7          its officers; it does not engage in trade or commerce; and

8          so no Sherman Act claim against it was stated by DELTA.

9  *Id*. at 714.  Accordingly, while a "non-profit organization, it is true, may engage in

10  commercial activity, and this activity will then be subject to the Sherman Act,"

11  when non-profit entities engage in wholly noncommercial activities, such conduct

12  "do[es] not constitute trade in the sense of the common law," and is thus exempt

13  from antitrust liability.  *Id*. at 713; *see also Nat'l Org. for Women, Inc. v. Scheidler*,

14  968 F.2d 612, 620-21 (7th Cir. 1992) (The Sherman Act "did not intend to reach

15  every activity that might affect business," but rather "was intended to prevent

16  business competitors from making restraining arrangements for their own economic

17  advantage."), *rev'd on other grounds*, 510 U.S. 249 (1994).

18

19
           **3.**     **The Decisions At Issue Here Are At The Core Of
ICANN's Charitable (Noncommercial) Mission For
The Public's Benefit.**

20       Plaintiffs' claims against ICANN focus on two alleged "restraints":

21  (1) ICANN's approval of the .XXX TLD; and (2) ICANN's decision to enter into a

22  registry agreement with ICM for the operation of the .XXX TLD.  Neither of these

23  decisions involves commercial activity.  Instead, each goes to the heart of ICANN's

24  charitable, noncommercial purpose.

25       As Plaintiffs acknowledge, ICANN is engaged in "charitable and public"

26  activities intended to "lessen[] the burdens of government and promot[e] the global

27  public interest in the operational stability of the Internet."  FAC ¶ 27; *see also* RJN,

28  Ex. A at Art. 3.  In particular, ICANN has "overall authority to manage the DNS,"

including "determining what new TLDs to approve, choosing registries for existing or newly approved TLDs, and contracting with the registries to operate the TLDs," activities that governmental agencies or scientific institutions had previously performed.  FAC ¶¶ 23-25; *see also id.* at ¶ 27 (describing ICANN's charitable and public work as "performing and overseeing functions related to coordination of the internet domain name system ('DNS'), including … determining the circumstances under which new top-level domains are added to the DNS root system") (citing Article 3, ICANN's Articles).  ICANN is a non-profit organization created to perform these functions solely for the public benefit, not for any commercial purpose.  *Id* at ¶ 6 (describing ICANN's creation for the public purpose of administering the DNS).  Such activities are inherently noncommercial.

ICANN's decision to approve the .XXX TLD falls squarely within ICANN's public "duties" to "determine[] what new TLDs to approve … and contract[] with the registries"—here, ICM—"to operate the [new] TLD[]."  FAC ¶ 25.  The decision to approve the .XXX TLD—and the ensuing contract with ICM to operate the .XXX registry—were plainly not "business and commercial transactions" covered by the Sherman Act (*Apex Hosiery*, 310 U.S. at 493) because they did not arise from "commercial objectives" on ICANN's part, only wholly public and charitable ones (*Klor's*, 359 U.S. at 214 n.7).  *See also Selman v. Harvard Med. Schl.*, 494 F. Supp. 603, 621 (S.D.N.Y 1980) (antitrust laws only govern "restraints to free competition in business and commercial transactions which tend[] to restrict production, raise prices or otherwise control the market") (quoting *Apex Hosiery*, 310 U.S. at 493).  ICANN is itself barred from acting as a TLD registry or registrar (unless an emergency required it to protect the operational stability of the Internet), so it would not engage in the commercial activities fostered by the exercise of its public duties.  *See* RJN, Ex. B at Art. II, § 2 ("ICANN shall not act as a Domain Name System Registry or Registrar or Internet Protocol Address Registry in competition with entities affected by the policies of ICANN.").

1    While Plaintiffs baldly assert that ICANN approved the .XXX registry

2    contract because "ICM promised ICANN significant financial payments, likely to

3    amount to millions of dollars, under the .XXX registry contract" (FAC ¶ 51[7]), that

4    allegation does not describe a commercial motive.  ICANN would receive fees, as

5    Plaintiffs concede, regardless of who the registry operator is.  FAC ¶ 22 ("The

6    registries for the TLDs in turn pay fees to ICANN, periodically (e.g., quarterly) on

7    a per-registration or per-renewal basis.").[8]  The conclusory allegation that ICANN

8    charges ICM an "enhanced fee for each .XXX domain name registration" that is

9    "larger than the per-registration fees ICANN charges for most other TLDs" does

10   not bolster Plaintiffs' argument.  FAC ¶ 56(a).  This conclusory allegation, wholly

11   unsubstantiated by a single supporting fact, should not be accepted as true for

12   purposes of ICANN's Rule 12 motion.  *Alvarez v. Chevron Corp.*, 656 F.3d 925,

13   930-31 (9th Cir. 2011) (conclusory allegations "are not entitled to the assumption

14   of truth").  And for good reason:  it is highly misleading.  ICANN charges ICM

15   "US$2.00 for each annual increment of an initial or renewal … domain name

16   registration during the calendar quarter to which the Registry-Level Transaction

17   Fee pertains."  RJN, Ex. C at § 7.2(c).  ICANN charges the exact same amount (i.e.,

18   a US$2.00 Registry-Level Transaction Fee) to other registry operators, including

19   Employ Media and Tralliance Corporation to operate the .JOBS and .TRAVEL

20   registries, respectively.  RJN, Exs. D at § 7.2(c) and E at § VII(c).  These fees help

21   fund ICANN's work as a public charity and do not describe commercial activity for

22   Sherman Act purposes.

23   Indeed, if Plaintiffs were correct, any decision by ICANN to approve a new

---

[7] *See also* FAC ¶ 32 ("ICANN earns fees from approving new TLDs, new
registry operators, and new registrars.").

[8] Nor does the fact that ICANN receives fees pursuant to its registry
agreements mean that ICANN is engaged in commercial activity.  Because the fees
ICANN receives are intended only to cover the costs of operation, they are not
received in exchange for any commercial services.  *See Goldfarb v. Virginia State
Bar*, 421 U.S. 773, 787-88, 95 S. Ct. 2004, 2013, 44 L. Ed. 2d 572, 585 (1975)
(exchange of money must be for a service to constitute "'commerce' in the most
common usage of that word").

registry operator would involve a commercial motive, regardless of the fees collected, and regardless of the fact that one of ICANN's core missions is to expand the number of gTLD registries to facilitate competition in the DNS. ICANN uses the fees that it collects to carry out its missions. ICANN conducts its activities so they are essentially self-funding, on the principle of cost recovery. For example, the accreditation process for registrars is funded through application and accreditation fees paid by those registrars. Likewise, the registry application and contracting process must be self-funding. Put another way, Plaintiffs' allegation does nothing more than describe the mechanism by which ICANN's public charity work is funded. FAC ¶ 22. Indeed, ICANN does not seek commercial benefit, profit, or competitive advantage from the fees it collects.[9] Accordingly, Plaintiffs' allegations do not describe commercial activity for Sherman Act purposes because they do not describe ICANN "receiv[ing] direct economic benefit as a result of any reduction in competition in the market." 2D Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 262a (describing rule courts generally apply to distinguish non-profits' commercial and noncommercial conduct) (emphasis added); *see also Delta*, 50 F.3d at 714 (alleged restraint involving charitable donations was not commercial even though such donations benefited the charity by supporting its activities). Indeed, any fees generated to ICANN come from an increase in competition, which appears to be the crux of Plaintiffs' actual concerns.

The absence of any economic motivation in its decisions to grant or not grant the right to operate a TLD—whether to ICM or anyone else—demonstrates that ICANN is not involved in "trade or commerce" for purposes of the antitrust laws. In *Missouri v. Nat'l Org. for Women*, the Eighth Circuit held that the Sherman Act

---

[9] Nor does Plaintiffs' allegation that, for 2009-2011, "ICANN's financial statements show that 'contributions' to ICANN …were approximately 2% of ICANN's total revenues" (FAC ¶ 33) establish a commercial purpose. Any money ICANN receives that is not based in contract is considered a "contribution." Whether called a "fee" or a "contribution", all of the money ICANN receives is used to fund ICANN's charitable work, work from which ICANN derives no commercial benefit.

did not forbid a boycott of Missouri convention facilities organized by women's groups to protest that State's failure to ratify the proposed Equal Rights Amendment to the U.S. Constitution.  Despite the substantial adverse effects of the boycott on commercial activities in Missouri, the court found that the objective of the challenged conduct "is not one of profit motivation" and that "the crux of the issue is that NOW was politically motivated to use a boycott."  *Missouri v. Nat'l Org. for Women*, 620 F.2d 1301, 1312, 1314 (8th Cir. 1980), *cert. denied*, 449 U.S. 842 (1980); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913-15, 102 S.Ct  3409, 3425-27, 73 L. Ed. 2d 1215, 1236-38 (1982) (Supreme Court refused to apply the Sherman Act to a buyers' boycott motivated by social rather than commercial goals, despite the fact that the boycott was intended to have adverse economic effect); *Proctor v. Gen. Conference of Seventh-Day Adventists*, 651 F. Supp. 1505, 1524 (N.D. Ill. 1986) (The Sherman Act does not apply to alleged restraints imposed by religious organizations upon the sale of their religious literature because "Congress intended the Sherman Act to apply to business combinations with commercial objectives."); *Donnelly v. Boston Coll.*, 558 F.2d 634, 635 (1st Cir.), *cert. denied*, 434 U.S. 987 (1977) (observing that an antitrust challenge to exclusionary admissions criteria established by a group of law schools seemed "otherwise deficient since defendants' law school activities do not have 'commercial objectives.'"); *see also  Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs., Inc*., 432 F.2d 650, 655 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 965 (1970) (absence of commercial motive behind accreditation decision makes it "an activity distinct from the sphere of commerce"); *cf. FTC v. Superior Court Trial Lawyers' Ass'n*, 493 U.S. 411, 426, 110 S. Ct. 768, 107 L. Ed. 851 (1990) (for-profit business motivation distinguished lawyers' illegal combination from lawful collective boycotts undertaken to achieve noncommercial purposes, where the participants seek "no special advantage for themselves") (citing *Claiborne Hardware Co.*, 458 U.S. at 912).

Here, ICANN seeks no special advantage for itself.  Instead, ICANN's decisions to approve the .XXX TLD and to enter into a registry agreement with ICM for the operation of the .XXX TLD go to the very heart of ICANN's charitable, noncommercial purpose in overseeing and coordinating the DNS—and, specifically, were in furtherance of ICANN's core values in support of its mission to create competition within the DNS.  The absence of commercial purpose or motive to increase profits behind ICANN's decision to grant ICM the right to operate a new TLD is fatal to Plaintiffs' claims.

**B.     ICANN's Decision To Award The Right To Operate The .XXX TLD To ICM Was Unilateral, Not Bilateral, And Therefore Cannot Support Plaintiffs' Section 1 Or Section 2 Claims.**

Plaintiffs' conspiracy claims should also be dismissed because Plaintiffs challenge ICANN's wholly unilateral decisions regarding the process for considering sTLD applications and awarding ICM the right to operate the .XXX TLD, not bilateral conduct prohibited by the provisions of the Sherman Act invoked by Plaintiffs.  *See* FAC ¶¶ 93-100 (alleging a conspiracy between ICANN and ICM to restrain trade in violation of Section 1 of the Sherman Act); ¶¶ 101-110 (alleging a conspiracy between ICANN and ICM to monopolize in violation of Section 2 of the Sherman Act); ¶¶ 111-121 (alleging a conspiracy between ICANN and ICM to attempt to monopolize in violation of Section 2 of the Sherman Act).  For a claim to be actionable under Section 1, Plaintiffs must identify a "conspiracy" or other concerted activity—Section 1 claims may not be predicated on wholly unilateral conduct.  15 U.S.C. § 1.  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. Of Podiatric Surgery, Inc*., 185 F.3d 606, 619 (6th Cir. 1999) ("In order to have a § 1 violation, there must be an agreement, as § 1 does not encompass unilateral conduct, no matter how anticompetitive.").  Plaintiffs must also identify concerted action in support of their Section 2 claims.  15 U.S.C. § 2; *see also American Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 66 S. Ct. 1125, 1138-39, 90 L.Ed 1575, 1593-94 (1946) (the gravamen of a combination or

conspiracy to monopolize is the agreement to commit the objectionable conduct).

Here, Plaintiffs assert that:  (1) ICANN's approval of ICM as the .XXX registry operator; and (2) ICANN's supposed failure to impose certain restrictions on ICM's operations under the .XXX registry constitute antitrust conspiracies. What is actually alleged in the FAC, however, is unilateral conduct by ICANN with respect to the first assertion, and an absence of an agreement with respect to the second.  Accordingly, neither set of allegations can form the basis for Section 1 or Section 2 liability as to ICANN.

First, ICANN's approval of ICM as the .XXX registry operator could not result from an agreement with ICM (or anyone else).  Plaintiffs admit that ICANN unilaterally recommends registry operators.  *See* FAC ¶ 25 ("ICANN's duties include determining what new TLDs to approve, choosing registries for existing or newly approved TLDs, and contracting with the registries to operate the TLDs.") (emphasis added).  Moreover, the factual allegations in the FAC confirm that ICANN acted unilaterally with respect to its process for considering and eventually approving the .XXX sTLD application and registry contract.  *See* FAC ¶¶ 50, 51, 55 (purporting to allege facts about ICANN's process and what ICANN did or did not do in approving the .XXX proposal).

Under such circumstances, ICANN's decision to approve ICM to operate the .XXX TLD and enter into a registry contract with ICM are unilateral actions outside the purview of Section 1's bar on agreements in restraint of trade and Section 2's prohibition on conspiracies to monopolize.  *See, e.g., Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1453 (9th Cir. 1983) (affirming dismissal of Section 1 claim against non-profit organization on ground that challenged decision of accepting only certain kinds of examination information from veterinarians was "unilaterally made," despite plaintiff's allegations of contacts with independent entities).[10]  ICANN's implementation of its exclusive

---

[10] *See also Suzuki of W. Mass., Inc. v. Outdoor Sports Expo., Inc.*, 126 F. Supp. 2d 40, 45-48 (D. Mass. 2001) (deeming unilateral the implementation of

1    power to approve ICM to operate the .XXX TLD and the terms of ICM's operation

2    through execution of a registry agreement is unilateral conduct.

3           Second, the claim that ICANN conspired with ICM because ICANN did not

4    mandate that the .XXX registry agreement include provisions that might restrict

5    ICM's operation of the .XXX registry fails for the same reasons.  The FAC only

6    alleges unilateral actions by ICM under its authority as the duly appointed registry,

7    not an agreement with ICANN.  *See* FAC ¶¶ 56(a) and (b), 73-83, 84-86 (alleging

8    actions undertaken by ICM as registry operator, which conduct occurred after the

9    .XXX registry agreement was executed).

10   **C.    Plaintiffs' Third Claim Is Facially Defective Because The Sherman
             Act Does Not Create A Cause Of Action For Conspiracy To
11           Attempt To Monopolize.**

12          The Court should dismiss Plaintiffs' Third Claim because there is no cause of

13   action under the Sherman Act for an alleged conspiracy to attempt to monopolize.

14   *See* FAC ¶¶ 111-121.  Section 2 of the Sherman Act "prohibits three separate

15   offenses:  monopolization, attempted monopolization, and conspiracy to

16   monopolize."  *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F.

17   Supp. 2d 379, 395 (E.D.N.Y. 2004); *see also* 15 U.S.C. § 2.[11]  Consistent with the

18   language of the statute, courts routinely hold that Section 2 "does not provide for a

19   conspiracy to attempt to monopolize claim."  *In re Mushroom Direct Purchaser*

20   *Antitrust Litig.*, 514 F. Supp. 2d 683, 702 (E.D. Pa. 2007) (dismissing claims); *see*

21   *also Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F. Supp.

22   960, 967 (N.D. Ill. 1982) ("The court also notes that while section 2 of the Sherman

23   _____

     (continued…)

24   priority dealer rule through entering contracts with individual boat dealers); *Chase v.*
     *Northwest Airlines Corp.*, 49 F. Supp. 2d 553, 560-65 (E.D. Mich. 1999) (deeming
25   unilateral the implementation of ticket-sale policy through agreements with travel
     agents).
26

27          [11] Section 2 of the Sherman Act provides:  "Every person who shall
     monopolize, or attempt to monopolize, or combine and conspire with any other
     person or persons, to monopolize any part of trade of commerce ... shall be guilty of
28   a felony…."  15 U.S.C. § 2.

Act creates causes of action for attempts to monopolize and conspiracies to monopolize, it does not create a cause of action based on an alleged conspiracy to attempt to monopolize."); *Alabama v. Blue Bird Body Co.*, 71 F.R.D. 606, 609 (M.D. Ala. 1976) ("Defendants have also pointed out that 15 U.S.C. § 2 does not create a cause of action for conspiracy to attempt to monopolize.  The Court agrees…."), *aff'd in part, rev'd in part*, 573 F.2d 309 (5th Cir. 1978); *Carpet Group Int'l v. Oriental Rug Importers*, 256 F. Supp. 2d 249, 285 (D.N.J. 2003) (rejecting attempted monopolization claims based on concerted action, stating that "Plaintiffs are seeking to charge Defendants with conspiring to attempt to monopolize.  The Sherman Act states no such offense.") (citation omitted).  Accordingly, Plaintiffs' Third Cause of Action is facially defective and must be dismissed.

### D.     Plaintiffs Fail To Define A Relevant Product Market.

Finally, each cause of action is defective for the additional reason that the FAC "fail[s] to identify an appropriately defined product market." *Tanaka v. Univ. of South. Cal.,* 252 F.3d 1059, 1063 (9th Cir. 2001); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (same relevant market requirement applies to conspiracy, monopolization and attempted monopolization claims).

Plaintiffs' pleadings must "identify the markets affected by Defendants' alleged antitrust violations." *Big Bear Lodging Ass'n v. Snow Summit Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999); *Newcal*, 513 F.3d at 1044 ("plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market").  To do so, the FAC must describe a product market that "encompass[es] the product at issue as well as all economic substitutes for the product." *Id.* at 1045. Neither the alleged market for "permanent blocking and other defensive registrations in the .XXX TLD" (FAC ¶ 94) (".XXX defensive registration market"), nor the "incipient" "market for affirmative registrations in TLDs intended for adult content" (*Id.* at ¶¶ 112, 114) ("adult content TLD market"), passes this test.

1.   **The .XXX Defensive Registration Market Is Not A Properly Defined Relevant Market.**

According to the FAC, "there is no reasonable substitute for [.XXX "defensive"] registration"—*i.e.,* registration of a .XXX domain name to "prevent or block [its] use by others" (FAC ¶¶ 60-61)—because registering that name under a different TLD (such as .COM or .NET) does not prevent use of the .XXX domain with the same name. *Id.* at ¶ 61.  That conclusory allegation does not describe a relevant market of .XXX defensive registrations; on the contrary, it suggests that each individual domain name in .XXX is <u>itself</u> a relevant market, a proposition that is directly contrary to other court decisions (and completely counterintuitive in all events).[12] *See Smith v. Network Solutions, Inc.,* 135 F. Supp. 2d 1159, 1169 (N.D. Ala. 2001) (rejecting proposed market definition because "[t]aken to its logical conclusion, Plaintiff[s'] argument implies that each individual domain name is a relevant market unto itself"); *Coalition for ICANN Transparency  Inc. v. VeriSign ("CFIT"),* 611 F.3d 495, 508 (9th Cir. 2010) ("we agree … that a market should not be defined in terms of a single domain name").

The result should be the same here.  As the Ninth Circuit has made clear, individual consumers' "strictly personal preference[s]" cannot define the boundaries of a relevant market as a matter of law.[13] *Tanaka,* 252 F.3d at 1063; *Formula One Licensing B.V. v. Purple Interactive Ltd.*, No. C00-2222-MMC, 2001 WL 34792530, at *3 (N.D. Cal. Feb. 6, 2001) (dismissing claims because plaintiff "defined a product market in terms of one or more trademarks").

In *Weber v. Nat'l Football League*, 112 F. Supp. 2d 667 (N.D. Ohio 2000), a professional domain name dealer registered "jets.com" and "dolphins.com" with

---

[12] Moreover, the logical (and flawed) extension of Plaintiffs' allegations is that with the creation of any new TLD, a separate product market for each individual defensive registration in the new TLD is born.

[13] Even if there were a market for .XXX blocking registrations, the FAC itself alleges that there are substitutes for purchasing such registrations—name holders "not willing or able to purchase annual registrations for defensive purposes" can resort to legal action to block use of the names.  FAC ¶ 79.

1   Network Solutions Incorporated ("NSI").  The National Football League ("NFL")
2   attempted to get NSI to transfer the domain names to the New York Jets and the
3   Miami Dolphins.  NSI placed the names on hold and barred the plaintiff from
4   selling them.  The plaintiff sued the NFL, among others, under Section 2 of the
5   Sherman Act, describing the relevant product markets as "the demand for the
6   domain names 'jets.com' and 'dolphins.com.'"  *Id*. at 673.  The court rejected these
7   definitions, reasoning that the infinite number of potential domain names made the
8   proper market "domain names in general."  *Id*. at 673-74.  Because the plaintiff did
9   not allege that the defendants had monopolized this broader market, the court
10  dismissed his claim.  *Id*. at 674.[14]  Here, too, Plaintiffs' allege that individual
11  domain names comprise the relevant market.  Just as in *Weber*, here Plaintiffs'
12  alleged market is not properly defined; Plaintiffs' claims must be dismissed.

13          **2.      The Market For Affirmative Registrations In Adult
                      Content TLDs Does Not Yet Exist And Thus Is Not A
14                    Viable Relevant Market.**

15          Plaintiffs' alleged market for "'affirmative registrations' of names … within
16  TLDs connoting … adult content" (FAC ¶ 66) is facially unsustainable because it is
17  wholly speculative and conclusory.  To start, an antitrust claim should be dismissed
18  where, as here, the plaintiff has not alleged a product market in terms of
19  "reasonable interchangeability" and "economic substitutes."  *Seirus Innovative*
20  *Accessories, Inc. v. Cabela's, Inc.*, No. 09-CV-102H (WMC), 2010 WL 6675046,
21  at *3 (S.D. Cal. Apr. 20, 2010) (granting motion to dismiss Sherman Act claim for
22  failure to plead a relevant market) (citation omitted).  There is no such allegation in

---

24  [14] The assertion in the FAC that "economic studies have recognized a
    separate market for defensive registration" is belied by the very language quoted
25  from the only "study" referenced.  It simply suggests that TLDs might offer
    registrations to both "defensive" and "affirmative" customers at the same
26  "relatively high" prices, which "defensive" customers are more likely to pay
    because they are less "price sensitive."  *See* FAC ¶ 64 (quoting M. Kende,
27  *Assessment of ICANN Preliminary Reports on Competition And Pricing* (April 17,
    2009), *available at* http://forum.icann.org/lists/newgtlds-defensive-
28  applications/pdf7IO9xU1Wke.pdf).   The cited "study" itself contains no support
    for Plaintiffs' purported separate relevant market for defensive registrations. *See id*.

1    the FAC—not even a conclusory one.  *See* FAC  ¶¶ 66-70.  The only allegation

2    Plaintiffs do make is that .XXX is "unique[ly]" associated with adult content, and

3    that this association will be "self-reinforcing" as more adult content is hosted

4    on .XXX domains.  FAC ¶ 66.  That is beside the point; pleading a separate

5    relevant market for adult content registration would require factual allegations

6    suggesting that other gTLDs such as .COM or .NET are not reasonable substitutes

7    for hosting adult content-themed websites, not just that .XXX is different.[15]

8          In fact, Plaintiffs concede that adult content is ubiquitous in other

9    unsponsored TLDs, suggesting that other TLDs provide reasonably interchangeable

10   alternatives for distribution/viewing of this material.  Indeed, "the single most

11   popular free adult video website on the internet" is Plaintiff Manwin's own

12   "YouPorn.com."  FAC ¶ 1.  In fact, the FAC alleges that the "adult entertainment

13   industry"—the presumed consumers of adult content-specific affirmative TLD

14   registrations—not only view other TLDs as reasonable substitutes to .XXX for

15   registering adult-related domain names, but actually prefer other TLDs (such

16   as .COM or .NET) because they are not adult content-specific.  *See, e.g.*, FAC ¶¶ 34,

17   49 (citing concerns by the adult entertainment industry that .XXX addresses could

18   be more easily censored than .COM addresses).  All of this plainly contradicts

19   Plaintiffs' proposed relevant market.  *Newcal*, 513 F.3d at 1045; *United States v.*

20   *Continental Can Co.*, 378 U.S. 441, 449-56, 84 S. Ct. 1738, 1743-47, 12 L. Ed. 953,

21   954-64 (1964) (glass bottles and metal cans are reasonable substitutes for one

22   another even though they have different advantages and disadvantages to

23   customers).

24         Moreover, the FAC does not even contend that there is an <u>existing</u>

25   affirmative adult-content TLD market.  *See* FAC ¶¶ 66-69.  Rather, it merely asserts

26   that ICM is "attempting to establish" a "separate market" for adult-content TLDs.

---

27            [15] According to the FAC, the only unique characteristic that .XXX possesses
28   to distinguish it from other unsponsored TLDs are the three "Xs" in its TLD
     extension.  FAC ¶¶ 66-69.

*Id.*; *see also id.* at ¶¶ 112, 115, 132 (describing this market as "incipient").  Mere predictions about hypothetical, future markets—unsupported by factual allegations in the FAC—cannot sustain Plaintiffs' burden to plead facts defining an <u>actual</u> relevant market.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 , 167 L. Ed. 2d 929, 940 (2007) ("factual allegations must be enough to raise a right to relief above the speculative level"); *see also FTC v. Lundbeck*, 650 F.3d 1236, 1241 n.3 (8th Cir. 2011) (court need not credit a hypothetical relevant market based on conjecture).

Ultimately, the notion that ICM (much less ICANN) is violating the antitrust laws with respect to some new markets associated with the .XXX TLD is absurd.  The .XXX TLD is just now coming into existence with content accessible through domain names that might compete against the Plaintiffs' content accessible through domain names in the .COM TLD (among others).  Plaintiffs are upset about having to compete against the domain names in the .XXX TLD, and thus have filed suit seeking to shut down the entire TLD.  The entire thrust of Plaintiffs' FAC is that domain names in the .XXX TLD <u>will be competing</u> against other names in the world of Internet pornography, which makes a farce out of the notion that any individual TLDs—or even all of the names in the .XXX TLD—could constitute a separate relevant antitrust product market that could be the subject of a viable claim under the Sherman Act.

## IV.   CONCLUSION

The Sherman Act has its limits.  It does not apply to every type of conduct.  The language of the statute is confined to conduct that constitutes "trade or commerce."  The FAC ignores this limitation and must be dismissed.  Dismissal is also appropriate because the FAC fails to identify an appropriately defined product market.  For these and all of the foregoing reasons, Plaintiffs' FAC should be dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:   May 8, 2012          JONES DAY


                              By:    /s/ Jeffrey A. LeVee
                                       Jeffrey A. LeVee

                              Attorneys for Defendant
                              INTERNET CORPORATION FOR
                              ASSIGNED NAMES AND
                              NUMBERS

LAI-3162765v5