THOMAS P. LAMBERT (SBN 50952)
tpl@msk.com
JEAN PIERRE NOGUES (SBN 84445)
jpn@msk.com
KEVIN E. GAUT (SBN 117352)
keg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiffs
Manwin Licensing International S.à.r.l.
and Digital Playground, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – ROYBAL FEDERAL BUILDING

| | |
|---|---|
| MANWIN LICENSING INTERNATIONAL S.A.R.L., a Luxemburg limited liability company (s.à.r.l.); and DIGITAL PLAYGROUND, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ICM REGISTRY, LLC, d/b/a .XXX, a Delaware limited liability corporation; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit public benefit corporation; and Does 1-10,<br><br>Defendants. | Case No.  CV11- 9514 PSG (JCGx)<br><br>The Honorable Philip S. Gutierrez<br><br>**PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)**<br><br>Date:        July 30, 2012<br>Time:        1:30 p.m.<br>Location:    Courtroom 880 |

Mitchell
Silberberg &
Knupp LLP

# **TABLE OF CONTENTS**

**Page(s)**

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ...................................................................................... 1

III.   THE CLAIMS AGAINST ICANN ......................................................... 3

IV.    ICANN IS NOT IMMUNE FROM THE ANTITRUST LAWS ................... 5

    A.     The Applicable Facts ................................................................... 5

    B.     Non-Profit, Charitable Entities Are Not Exempt ........................ 6

    C.     ICANN's Plainly Commercial Activities .................................... 9

    D.     ICANN Would Be Liable For Conspiring With ICM In Any Event ...................................................................................... 11

    E.     ICANN's Authorities Do Not Support Any Exemption ............ 11

V.     PLAINTIFFS ADEQUATELY ALLEGE CONCERTED ACTIVITY ......................................................................................... 14

VI.    PLAINTIFFS ADEQUATELY ALLEGE ANTITRUST MARKETS ............................................................................................ 15

    A.     Standards For Pleading Antitrust Markets ................................ 15

    B.     Plaintiffs Adequately Plead The Defensive Market ................. 16

    C.     Plaintiffs Adequately Plead The Affirmative Registration Market ......................................................................................... 19

        1.     Serious Risk Of Monopoly ............................................... 20

            a.     Network Effects ...................................................... 20

            b.     Legislation .............................................................. 21

            c.     Impediments to Competing Adult TLDs ................. 21

        2.     These Risks Are Sufficient for Injunctive Relief ............. 22

            a.     Injunctive Relief Authorities .................................. 22

            b.     Antitrust Authorities .............................................. 22

VII.   PLAINTIFFS' THIRD CLAIM IS SUFFICIENT ................................ 24

VIII.  CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alabama v. Blue Bird Body Co.*,
    71 F.R.D. 606 (M.D. Ala. 1976) .......................................................................25

*Allen Bradley Co. v. Local Union No. 3*,
    325 U.S. 797, 89 L. Ed. 1939, 65 S. Ct. 1533 (1945) ........................................11

*Alvarez v. Hill*,
    518 F.3d 1152 (9th Cir. 2008) ...........................................................................24

*American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*
    456 U.S. 556, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982) ..........................6, 9, 10

*Apex Hosiery Co. v. Leader*,
    310 U.S. 469, 60 S. Ct. 982, 84 L. Ed. 1311 (1940) .........................................12

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ....................15

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) ......................................................................7, 19

*Brown Shoe Co. v. United States*,
    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) ......................................16

*Cal. State Council of Carpenters v. Associated Gen'l Contractors, Inc.*,
    648 F.2d 527 (9th Cir. 1980) .............................................................................11

*Carpet Group Int'l v. Oreintal Rug Importers*,
    256 F. Supp. 2d 249 (D.N.J. 2003)....................................................................25

*Chapman v. Pier 1 Imps.(U.S.), Inc.*,
    631 F.3d 939 (9th Cir. 2011) .............................................................................22

*Coalition for ICANN Transparency v. VeriSign*,
    631 F.3d 1025 (9th Cir. 2010)........................................................1, 3, 4, 13, 19

*Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010)...............................................................14

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) ...................................24

*Crull v. GEM Ins. Co.*,
  58 F.3d 1386 (9th Cir. 1995) ...........................................................................24

*Dedication & Everlasting Love to Animals v. Human Soc'y of the United States*,
  50 F.3d 710 (9th Cir. 1995) .............................................................................11

*DocMagic, Inc. v. Ellie Mae, Inc.*,
  745 F. Supp. 2d 1119 (N.D. Cal. 2010)......................................................16, 21

*Donnelly v. Boston Coll.*,
  558 F.2d 634 (1st Cir. 1977) ............................................................................13

*Farmer v. Brennan*,
  511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ...............................22

*Formula One Licensing B.V. v. Purple Interactive Ltd.*,
  No. C00-222-MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001).................19

*Found. for Interior Design Educ. v. Savannah Coll*,
  73 F. Supp. 2d 829 (W.D. Mich. 1999).............................................................14

*Foundation for Interior Design Educ. Research v. Savannah College of Art & Design*,
  244 F.3d 521 (6th Cir. 2001) ............................................................................13

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ..........................................................................23

*FTC v. Lundbeck*,
  650 F.3d 1236 (8th Cir. 2011) ..........................................................................24

*FTC v. Superior Court Trial Lawyers Assn.*,
  493 U.S. 411, 110 S. Ct. 768, 107 L. Ed. 2d 851 (1990) ...................................6

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975) ....................9, 10, 12, 13

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hamilton Chap. of Alpha Delta Phi, Inc. v. Hamilton College*,
128 F.3d 59 (2d Cir. 1997) .......................................................................... 14, 11

*Hennessey v. National Collegiate Athletic Ass'n*,
564 F.2d 1136 (11th Cir. 1977).......................................................................... 13

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
627 F.2d 919 (9th Cir. 1980) ............................................................................. 23

*In re Mushroom Direct Purchaser Antitrust Litig.*,
514 F. Supp. 2d 683 (E.D. Pa. 2007)................................................................. 25

*Jung v. Association of American Medical Colleges*,
300 F. Supp. 2d 119 (D.D.C. 2004) .................................................................. 12

*L.A. Meat & Provision Drivers Union v. United States*,
371 U.S. 94, 83 S. Ct. 162, 9 L. Ed. 2d 150 (1962) .......................................... 11

*LiveUniverse, Inc. v. Myspace, Inc.*,
No. CV 06–6994 AHM, 2007 WL 6865852 (C.D. Cal. June 4, 2007).............. 21

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) ........................................................................... 22

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ............................................................................. 22

*Marjorie Webster Jr. College, Inc. v. Middle States Ass'n.*,
432 F.2d 650 (D.C. Cir 1970) ............................................................................ 12

*Missouri v. Nat'l Org. for Women*,
620 F.2d 1301 (8th Cir. 1980) ........................................................................... 12

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886, 102 S. Ct. 3409, 77 L. Ed. 2d 1215 (1982) ................................ 12

*Nat'l Org. For Woman, Inc. v. Scheidler*,
968 F.2d 612 (7th Cir. 1992) ............................................................................. 12

*NCAA v. Board of Regents*,
468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) ........................................ 6

iv

Mitchell
Silberberg &
Knupp LLP

4537427.11/43277-00011.1

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Newcal v. IKON*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................... 15, 16, 19

*Paladin Assocs. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................... 4, 23, 24

*Proctor v. Gen. Conference of Seventh-Day Adventists*,
    651 F. Supp. 1505 (N.D. Ill. 1986) ..................................................................... 13

*Salco Corp. v. General Motors Corp., Buick Motor Div.*,
    517 F.2d 567 (10th Cir. 1975) ............................................................................ 23

*Seirus Innovative Accessories, Inc. v. Cabela's Inc.*,
    No. 09-CV-102H (WMC), 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ........ 19

*Selman v. Harvard Med. Schl.*,
    494 F. Supp. 603 (S.D.N.Y. 1980) ..................................................................... 13

*Smith v. Network Solutions*,
    135 F. Supp. 2d 1159 (N.D. Ala. 2001) ........................................................ 18, 19

*Spectrum Sports v. McQuillan*,
    506 U.S. 447, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993) .................................. 23

*Tanaka v. Univ. of South. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ............................................................................ 19

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .............................................................................. 16

*Thurman Indus. Inc. v. Pay 'N Pak Stores Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ............................................................................ 16

*U.S. v. Brown University in Providence in State of R.I.*,
    5 F.3d 658 (3d Cir. 1993) ............................................................................ 6, 7, 9

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004)............................................................. 16

*Veizaga v. National Bd. for Respiratory Therapy*,
    No. 75 C 3430, 1977 WL 1354 (N.D. Ill. Jan. 27, 1977)................................. 13

Mitchell
Silberberg &
Knupp LLP

4537427.11/43277-00011.1

v

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,
    156 F.3d 535 (4th Cir. 1998) ........................................................................ 7, 11

*Weber v. National Football League*,
    112 F. Supp. 2d 667 (N.D. Ohio 2000) .......................................................... 19

*Webkinz Antitrust Litig.*,
    695 F. Supp. 2d 987 (N.D. Cal. 2010) ............................................................ 15

*Welch v. American Psychoanalytic Ass'n*,
    No. 85 Civ. 1651 (JFK), 1986 WL 4537 (S.D.N.Y. Apr. 4, 1986) .................... 12

*Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*,
    550 F. Supp. 960 (N.D. Ill. 1982) .................................................................. 25

## STATUTES

15 U.S.C.
    § 1 ......................................................................................... 3, 4, 5, 6, 10, 14
    § 2 ....................................................................................................... 4, 23, 25
    § 16 ..................................................................................................................... 22
    § 26 ..................................................................................................................... 22

Federal Rules of Civil Procedure
    Rule 12 .............................................................................................................. 14
    Rule 12(b)(6) ................................................................................................... 15

## OTHER AUTHORITIES

P. E. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* (2012) ................................................. 6, 7, 8, 12

von Kalinowski, Sullivan & McGuirl,
    *Antitrust Laws and Trade Regulation* (2d ed. 2012) .......................... 4, 15, 23, 25

*Cyber Safety for Kids Act of 2006*, S. 2426, 109th Cong. (2006) ......................... 21

John Blevins, *Death Of The Revolution: The Legal War On Competitive Broadband Technologies*, 12 Yale J. L. & Tech. 85, 128 (2009) ...................... 20

DOC/NTIA Statement of Policy on the Management of Internet Names and Addresses, 63 Fed. Reg. 31,741, 31,747 (June 5, 1998) .................................... 10

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Family Privacy and Security Act of 2002*, S. 2137, 107th Congress (2002)...........21

Wright & Miller, *et al.*, *Federal Practice & Procedure* (2012)..............................22

Stefan Bechtold, *Governance In Namespaces*,
    36 Loy. L.A. L. Rev. 1239, 1273-1274 (2003) ....................................................21

Marina Lao, *Reclaiming A Role For Intent Evidence In Monopolization
    Analysis*, 54 Am. U. L. Rev. 151, 182-183 (2004)..............................................20

Mitchell
Silberberg &
Knupp LLP

4537427.11/43277-00011.1

## I.     INTRODUCTION

ICANN created a new international for-profit .XXX pornography market, sold ICM the rights to operate the market, and agreed in exchange to receive a substantial share of hundreds of millions of dollars in expected .XXX sales at illegal above-market prices.  ICANN now claims it conducted these activities solely as a "charity" insulated from commerce and the antitrust laws.  The argument is plainly meritless, and ICANN's other arguments fare no better.  For example, ICANN argues that Plaintiffs' alleged product markets are improper because limited to a few specific trademarks or domain names.  In fact, those markets include thousands of disparate domain names and are not limited to trademarks at all, let alone any specific ones.  Moreover, ICANN's market arguments rely exclusively on cases expressly rejected by the dispositive Ninth Circuit authority, *Coalition for ICANN Transparency v. VeriSign*, 631 F.3d 1025 (9th Cir. 2010) ("*VeriSign*").  More broadly, the *VeriSign* case, which ICANN ignores, expressly defines the antitrust restraints on ICANN's powers to approve registry contracts, concerns exactly analogous facts, and approves all Plaintiffs' antitrust theories asserted here.

## II.     BACKGROUND

Defendant the Internet Corporation for Assigned Names and Numbers ("ICANN") has sole responsibility for (and a monopoly over) the internet "domain name system" or "DNS," without which the internet cannot operate.  First Amended Complaint ("FAC"), ¶¶ 3, 25, 31.  The DNS ensures that each web site has a unique domain name and that internet users will reach the intended destination when entering that site's name into their web browsers.  FAC, ¶¶ 13-22.  ICANN also has sole responsibility for and a monopoly over approving new Top Level Domain names ("TLDs"), such as .com., .org, or .net, and the "registry" companies which operate each TLD.  FAC, ¶¶ 3, 25, 31.  For technical reasons of computer architecture, only one registry can operate each TLD.  FAC, ¶ 22.

Mitchell
Silberberg &
Knupp LLP

1
PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1   Years ago, defendant ICM Registry LLC ("ICM") began seeking ICANN's
2   approval of the new .XXX TLD, intended for adult website content. After ICANN
3   rejected ICM's efforts, ICM embarked on a years-long coercive campaign, alleged
4   in great detail in the complaint, to exhaust ICM's resources and soften its
5   resistance. The campaign included fraudulent claims of support for .XXX,
6   "stacking" adult industry meetings, offering improper inducements to decision
7   makers, and sham lawsuits. FAC, ¶¶ 3(e), 34-51.

8   ICM's plan worked. After first tiring ICANN with its campaign, ICM then
9   offered an enticing alternative. ICM would stop the predatory conduct, and pay
10  ICANN millions of dollars in fees, if ICANN would award ICM the registry
11  contract on favorable terms. FAC, ¶¶ 48-51. ICANN did agree. The favorable
12  terms included that .XXX would face no competing bids for the initial or renewal
13  registry contracts; that ICANN would agree to initial anticompetitive .XXX sales
14  prices and terms and delegate to ICM unchecked powers to set future such
15  anticompetitive prices and terms; and that ICANN would not approve competing
16  TLDs intended for adult content. FAC, ¶¶ 3(e)-(f), 56-58, 72, 76, 84-86, 96, 104-
17  105, 114-116.

18  As the result of these anticompetitive agreements, ICM has sold .XXX
19  registry services at monopoly prices and subject to output restrictions (described in
20  detail in the complaint) that would not exist in a competitive market. FAC, ¶¶ 72-
21  88. ICM will thus profit handsomely. ICM's President Stuart Lawley says that
22  ICM expects annual profits of $200 million from .XXX. FAC, ¶ 3(g). Lawley also
23  says that he "has sold nine premium .XXX domain names for $100,000 or more,
24  which is unparalleled in any other domain launch." FAC, ¶ 84. As Lawley
25  confirmed, "this was always going to be a very lucrative arrangement." FAC, ¶
26  3(g). ICANN shares in these profits through ICM's agreement to pay enhanced
27  registry fees. FAC, ¶ 56(a).

28

Mitchell
Silberberg &
Knupp LLP

2

Much of this lucre comes from "defensive" registrations.  Owners of trademarks (or of domain names in different TLDs) must pay ICM fees to block others from using those (or confusingly similar) marks or names to designate .XXX websites.  FAC, ¶¶ 3(a)-(d), 60-65, 76-78.  The need for such defensive registrations is particularly acute in .XXX.  Owners of names associated with adult content face a risk of customer confusion and diversion to sites with similar names in a TLD specifically designated for (and with identity letters universally connoting) adult content.  *Id*.  Owners of names not associated with adult content have a particular wish to avoid that association in .XXX.  FAC, ¶¶ 3(a)-(d), 62.

The need for .XXX defensive registrations thus affects all businesses, and has been broadly decried as a "shake down."  *See*, *e.g.*, FAC, ¶ 83(b) ("porn and mainstream businesses alike complain they are being forced to buy [.XXX] domain names they do not want … and compare the process to a hold up"), ¶ 83(c).  In fact, ICM sought ICANN's approval for the .XXX TLD in large part for the very purpose of first creating and then exploiting a new market for .XXX defensive registrations – a market that would not otherwise exist, serves no independent purpose, and imposes a huge tax or "deadweight loss" on commerce and the economy.  FAC, ¶¶ 3(c), 82.

ICM also seeks, through ICANN's agreement not to approve other adult content TLDs and other conduct, to create a second monopoly – a monopoly in .XXX for "affirmative registrations" of domain names intended for websites displaying new adult content rather than for defensive "blocking" purposes.  FAC, ¶¶ 66-69.  For reasons explained in detail below and in the FAC, there is dangerous risk that will succeed.  *Id.*

## III.   THE CLAIMS AGAINST ICANN

Plaintiffs allege three antitrust claims against ICANN: (a) that ICANN and ICM combined to unreasonably restrict trade in the .XXX defensive registration market, in violation of Sherman Act Section 1 (first claim); (b) that ICANN and

Mitchell
Silberberg &
Knupp LLP

3

1  ICM conspired to monopolize the market for .XXX defensive registrations, in

2  violation of Sherman Act Section 2 (second claim); and (c) that ICANN and ICM

3  conspired to attempt to monopolize a market for affirmative .XXX registrations, in

4  violation of Sherman Act Section 2 (third claim).

5       To state a claim under Section 1 of the Sherman Act, a plaintiff must allege

6  (1) concerted activity involving more than one actor; (2) an unreasonable restraint

7  of trade; (3) an injury to competition; and (4) an effect on interstate or foreign

8  commerce.  1-11 von Kalinowski, Sullivan & McGuirl, *Antitrust Laws and Trade*

9  *Regulation* § 11.02 (2d ed. 2012) ("von Kalinowski); *VeriSign*, 611 F.3d at 503.

10  To state a claim under Section 2 of the Sherman Act for conspiracy to monopolize,

11  a plaintiff must allege (1) a combination or conspiracy, (2) an overt act in support

12  of the combination/conspiracy, (3) an effect on a substantial amount of interstate

13  commerce, and (4) a specific intent to monopolize.  2-26 von Kalinowski, *supra*, §

14  26.02; *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir.

15  2003).

16       The adequacy of Plaintiffs' allegations in specialized TLD markets is

17  governed by the dispositive *VeriSign* case.   611 F.3d at 501-07.  Plaintiffs discuss

18  *VeriSign* at length in their opposition to ICM's motion, filed simultaneously with

19  ICANN's motion.  In brief, however, *VeriSign* is remarkably similar to this case.

20  *VeriSign* held that antitrust violations are stated by allegations that ICANN and a

21  registry operator have colluded to suppress competition for the award of a TLD

22  registry contract or to set above-market TLD prices.  *VeriSign* also held that

23  coercive campaigns by registries to induce ICANN's collusion are themselves

24  predatory and actionable under the Sherman Act.  *Id.* at 505-06.  Plaintiffs allege

25  all the very elements that *VeriSign* found sufficient to state antitrust claims in a

26  TLD market.

27       ICANN's motion studiously ignores *VeriSign*, and implicitly concedes that

28  Plaintiffs have pleaded most of the elements required for each cause of action

Mitchell
Silberberg &
Knupp LLP

4

1  against it.  ICANN's motion is limited to four narrow issues.  ICANN argues that:

2  (1) it is immune from the antitrust laws as a non-profit alleged charity; (2)

3  Plaintiffs have not pleaded concerted conduct for their Section 1 claim; (3)

4  Plaintiffs have not properly defined relevant markets for their claims; and (4)

5  Plaintiffs' third claim fails because there can be no conspiracy to attempt to

6  monopolize.  As demonstrated below, each arguments fails.

7  **IV.   ICANN IS NOT IMMUNE FROM THE ANTITRUST LAWS**

8       **A.   <u>The Applicable Facts</u>**

9       The internet is "an essential engine in all domestic and international

10  commerce."  FAC, ¶ 2.  The intensely commercial internet could not operate

11  without the DNS or TLDs, which ICANN has monopoly power to control and

12  approve.  FAC, ¶ 31.  ICANN profits from exercising its powers, including by

13  receiving annual fees for each domain name registered in TLDs which ICANN has

14  approved.  *Id*.  ICANN received $59 million in such fees and similar revenues in

15  2009, $65 million in 2010, and $68 million in 2011.  *Id*.

16       ICANN specifically agreed to approve and so ***created*** the new .XXX TLD

17  market, intended to host for-profit adult and pornographic content.  *See, e.g.*, FAC,

18  ¶¶ 2, 3(f), 51.  ICANN also sold ICM the right be become the .XXX registry.

19  FAC, ¶¶ 3(e), 49-51.  ICANN has the power to approve the prices charged by ICM

20  and other TLDs, and agreed to ICM's initial above-market price of $60 per annual

21  .XXX domain name registration.  FAC, ¶¶ 3(e), 54, 56, 58, 85.  ICANN also

22  delegated to ICM all its future .XXX pricing authority, expecting ICM to set future

23  even more anticompetitive future prices and sales terms.  FAC, ¶¶ 56, 58, 65(a),

24  (c), 72, 85.

25       In exchange for ICANN's agreements selling ICM the right to operate the

26  .XXX TLD and to issue .XXX domain names, ICM agreed to pay ICANN annual

27  fees for each .XXX domain name registered.  Those fees are expected to earn

28

Mitchell
Silberberg &
Knupp LLP

1  ICANN many millions of dollars.  *See, e.g.,* FAC ¶¶ 3(e), 51, 56(a), 73, 78, 85,
2  105(e).
3      Despite thus creating, controlling, and selling the rights to operate an
4  extremely active commercial market for internet pornography, from which ICANN
5  will receive millions of dollars in fees for domain names sold, ICANN argues that
6  it is a solely charitable institution, operating outside commerce and immune from
7  the antitrust laws.  As explained below, the argument plainly fails.

8      **B.    Non-Profit, Charitable Entities Are Not Exempt**

9      Nonprofit entities like ICANN are not exempt from antitrust laws.  *NCAA v.*
10 *Board of Regents*, 468 U.S. 85, 101, 104 S. Ct. 2948, 2960, 82 L. Ed. 2d 70, 84
11 (1984) ("[t]here is no doubt that the sweeping language of [Sherman Act] § 1
12 applies to nonprofit entities); *American Soc. of Mechanical Engineers, Inc. v.*
13 *Hydrolevel Corp.*, 456 U.S. 556, 576, 102 S. Ct. 1935, 1948, 72 L. Ed. 2d 330, 346
14 (1982) ("*ASME*") ("it is beyond debate that nonprofit organizations can be held
15 liable under the antitrust laws"); 1B-2D P. E. Areeda & H. Hovenkamp, *Antitrust*
16 *Law: An Analysis Of Antitrust Principles And Their Application*, ¶ 261 (2012)
17 ("*Areeda*") ("the courts hold that a firm's nonprofit status confers no exemption
18 from the antitrust laws").
19     Nor are organizations exempt from antitrust law merely because they act
20 with charitable purpose or intent.  "Social justifications" do not excuse restraint of
21 trade.  *See FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 427, 110 S.
22 Ct. 768, 777, 107 L. Ed. 2d 851, 869 (1990) (*"Trial Lawyers"*) (Sherman Act
23 applies to lawyer's boycott "[n]o matter how altruistic the motives"; "it is not our
24 task to pass upon the social utility or political wisdom" of alleged antitrust
25 conduct); *U.S. v. Brown University in Providence in State of R.I.*, 5 F.3d 658, 666
26 (3d Cir. 1993) ("*Brown*") (antitrust laws apply "regardless of whether MIT's
27 motive is altruism"); *NCAA*, 468 U.S. at 101 n.23 ("it is nevertheless well settled
28 that good motives will not validate an otherwise anticompetitive practice"); 1B-2D

Mitchell
Silberberg &
Knupp LLP

6
PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1   Areeda, *supra*, ¶ 262a (antitrust laws apply, despite charitable purpose, in part
2   because "parsing of motives seems needlessly complicated and indeterminate").
3        While neither non-profit status nor charitable purpose provides antitrust
4   immunity, there is a "narrowly circumscribed" antitrust exemption for "non-
5   commercial ***transactions."***  *See Brown*, 5 F.3d at 666 (emphasis added); *see also*
6   *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir.) ("We
7   emphasize that the dispositive inquiry is whether the ***transaction*** is commercial,
8   not whether the ***entity*** engaging in the transaction is commercial") (emphasis in
9   original) , *cert. denied*, 526 U.S. 1066, 119 S. Ct. 1458, 143 L. Ed. 2d 544 (1998);
10  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 n.5 (9th Cir.
11  1999) ("A nonprofit organization that engages in commercial activity … is subject
12  to federal antitrust laws").
13       Professor Areeda aptly explains these principles, starting with the
14  irrelevance of non-profit status:

15              A firm's nonprofit status is merely one form of
16              organization that actors voluntarily choose…  Antitrust
17              law is ordinarily indifferent to which form of
18              organization the parties choose…  Furthermore, the
19              absence of "profit" is no guarantee of eleemosynary
20              intent or practice.  Profit can appear not only in the form
21              of dividends but also in the form of salaries and
22              perquisites.  Moreover, nonprofit organizations may be
23              subject to the same incentives and temptations that for-
24              profit firms are.  They must pay employees, suppliers,
25              and bondholders. …  [M]any business incentives,
26              including most incentives to engage in anticompetitive
27              activity, can motivate profit and nonprofit firms alike.

28

Mitchell
Silberberg &
Knupp LLP

7

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1   1B-2D Areeda, *supra*, ¶ 261a.  Professor Areeda also explains why charitable

2   purpose does not matter:

3   　　　　Nonprofits may seek monopoly profits and cause

4   　　　　competitive injury even when acting for purely

5   　　　　eleemosynary purposes.  For example, the Sisters of

6   　　　　Mercy may own a nonprofit hospital and a soup kitchen

7   　　　　and conclude that while all patrons of the soup kitchen

8   　　　　are needy, not all patients at the hospital are.  As a result,

9   　　　　they may seek monopoly profits for the hospital in order

10   　　　　to subsidize the activities of the soup kitchen.  If this

11   　　　　completely charitable set of intentions is accompanied by

12   　　　　power and exclusionary practices on the part of the

13   　　　　hospital, its patients have suffered competitive injury

14   　　　　notwithstanding the Sisters' good motives.

15   *Id*.  For such reasons, "it is the nature of the activity," *i.e.*, whether the activity is

16   objectively commercial, and not non-profit status or subjective charitable motive,

17   which establishes the applicability of antitrust law.  *Id*.

18   　　　Most of ICANN's arguments are thus flatly irrelevant.  It does not matter, as

19   ICANN contends, that it is non-profit, that it has some overall charitable or public

20   benefit mission or intent, or that it uses all its revenue for laudable purposes or to

21   fund its purportedly beneficial operations.  All these claims are subject to serious

22   challenge,[1] but would not insulate ICANN from antitrust liability even if true.  The

23

_____

24   [1] ICANN says its alleged "charitable purpose" is to run the internet.  But the
internet itself is fundamentally an engine for commercial profit-making activities.

25   ICANN also ***argues*** that all its profits are used for charitable purposes.  ICANN
Mot., 16:3-11.  Plaintiffs believe otherwise and could, if required, allege that

26   ICANN in significant part serves the other kinds of non-charitable purposes
described by Professor Areeda.  ICANN would hardly be the first non-profit using

27   its status for less than entirely selfless ends.  If that ever became an issue,
discovery would have to resolve how "charitable" ICANN in fact may be.

28

Mitchell
Silberberg &
Knupp LLP

8

1    only issue is whether Plaintiffs challenge commercial *activity* by ICANN.  As

2    explained below, they indisputably do.

3         **C.    ICANN's Plainly Commercial Activities**

4         At minimum, "commercial" transactions subject to the antitrust laws include

5    the purchase or sale of products or services for money.  The Supreme Court made

6    this clear in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787, 95 S. Ct. 2004,

7    2013, 44 L. Ed. 2d 572, 585 (1975) (non-profit bar association subject to the

8    antitrust laws in setting prices for land title examinations; "the examination of a

9    land title is a service; the exchange of such a service for money is 'commerce'").

10   *Accord Brown,* 5 F.3d at 666 ("The exchange of money for services, even by a

11   nonprofit organization, is a quintessential commercial transaction.") (citations

12   omitted).

13        Here, Plaintiffs allege just such commercial activities.  ICANN created the

14   .XXX for-profit commercial market; sold ICM the right to operate the .XXX TLD

15   and to issue .XXX domain names; and obtained in exchange a portion of the

16   proceeds from each domain name sale made by ICM.  ICANN also made

17   agreements insulating the ICM registry contract from competition and imposing

18   prices and output restrictions in the market for .XXX registry services.  *See, e.g*.,

19   FAC, ¶¶ 48-58, 71-86.  Not a single case exempts such intrinsically commercial

20   activities from the antitrust laws.

21        Indeed, activities far short of ICANN's intensely commercial conduct trigger

22   antitrust liability.  For example, *Goldfarb* found a state bar association subject to

23   antitrust laws for merely participating in setting fees for legal services, even though

24   (unlike ICANN) the association received no share of those fees.  421 U.S. at 791-

25   792.  And in *ASME*, 456 U.S. at 576, the Court found a non-profit standard setting

26   body subject to antitrust laws because its technical standards ruling affected sales

27   of engineering services, even though the body did not profit from those sales.

28   *ASME* concluded:  "Since the antitrust violation in this case could not have

Mitchell
Silberberg &
Knupp LLP

9

1  occurred without ASME's codes and ASME's method of administering them, it is

2  not unfitting that ASME be liable for the damages arising from that violation."

3  456 U.S. at 576.

4         More broadly, the Supreme Court in *Goldfarb* made clear there is a

5  presumption against finding transactions impliedly exempt from the antitrust laws

6  as non-commercial:

7              The language of § 1 of the Sherman Act, of course,

8              contains no exception.  "Language more comprehensive

9              is difficult to conceive."  And our cases have repeatedly

10             established that there is a heavy presumption against

11             implicit exemptions.  The Sherman Act "[o]n its face…

12             shows a carefully studied attempt to bring within the Act

13             every person engaged in business whose activities might

14             restrain or monopolize commercial intercourse among

15             the states."

16  421 U.S. at 787-88 (citations omitted).  The Court then concluded that the Bar

17  Association defendant was not exempt because "the activities of lawyers play an

18  important part in commercial intercourse, and [] anticompetitive activities by

19  lawyers may exert a restraint on commerce."  *Id.* at 788.

20        What was true in *ASME* and *Goldfarb* is also true here.  Even absent its sale

21  of .XXX operating rights and direct participation in ICM's domain name sales

22  proceeds, ICANN's "activities" would "play an important part in commercial

23  intercourse," and the alleged antitrust violations "could not have occurred" without

24  it.[2]

25

26  [2] The Department of Commerce, with whom ICANN has contracted to operate the
    DNS (FAC, ¶ 25), has also confirmed that antitrust law applies to ICANN.
27  DOC/NTIA Statement of Policy on the Management of Internet Names and
    Addresses, 63 Fed. Reg. 31,741, 31,747 (June 5, 1998) ("Applicable antitrust law
28  [as applied to ICANN] will provide accountability to and protection for the

(…continued)

Mitchell
Silberberg &
Knupp LLP

10

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

**D.     ICANN Would Be Liable For Conspiring With ICM In Any Event**

All Plaintiffs' claims against ICANN are based on its conspiracies with ICM.  Even if ICANN could argue that its own activities were non-commercial, or otherwise exempt from the antitrust laws, it still would be liable for conspiring with ICM in *its* admittedly commercial activities.  Unlike ICANN, some organizations (such as labor unions) have actual statutory antitrust exemptions.  But even such "an organization that would otherwise be exempt from the labor laws loses its exemption by conspiring with a nonexempt party." *Virginia Vermiculite*, 156 F.3d at 541.  *See also, e.g., Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 809-10, 89 L. Ed. 1939, 1948, 65 S. Ct. 1533, 1540 (1945) (union liable for conspiring with non-exempt party); *L.A. Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 100-01, 83 S. Ct. 162, 165-166, 9 L. Ed. 2d 150, 154-155 (1962) (same); *Cal. State Council of Carpenters v. Associated Gen'l Contractors, Inc.*, 648 F.2d 527, 534 (9th Cir. 1980) (same), *rev'd on other grounds by*, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).

**E.     ICANN's Authorities Do Not Support Any Exemption**

None of ICANN's authorities support any antitrust exemption.  For example, *Dedication & Everlasting Love to Animals v. Human Soc'y of the United States*, 50 F.3d 710, 712 (9th Cir. 1995) ("*DELTA*"), held a non-profit animal protection organization did not engage in commerce by making "solicitations of contributions" (*i.e.*, seeking donations) rather than by selling services or creating commercial markets, like ICANN.[3]

---

(…continued)
international Internet community.  Legal challenges and lawsuits can be expected within the normal course of business for any enterprise and the new corporation [ICANN] should anticipate this reality.") (*quoted at FAC, ¶ 26*).

[3] Unlike true charities such as the one at issue in *Delta*, almost all ICANN's income comes from the sale of services, not charitable donations.  FAC, ¶¶ 32-33.

ICANN cites other cases about charities or other organizations exercising First Amendment rights to promote the rights of women, minorities, or workers through strikes or boycotts of businesses inimical to such causes.[4]  While those boycotts impacted the commerce of targeted businesses, none of the boycotting charities were, like ICANN, selling or profiting from the sale of the affected goods or services.  Professor Areeda notes the critical distinction:

> The most sensible rule is a strong presumption that a boycott or other claimed antitrust violation is "economic," or commercial, when the antitrust defendants are likely to receive direct economic benefit as a result of any reduction in competition in the market in which the target firm or firms operate.  Non-immunity is virtually a foregone conclusion when the immediate consequence of the restraint is to enlarge the profits of those who engaged in it.

1B-2D Areeda, *supra*, ¶ 262a.  Even more unavailing is ICANN's citation to *Marjorie Webster Jr. College, Inc. v. Middle States Ass'n.*, 432 F.2d 650, 654 (D.C. Cir 1970).  *Marjorie Webster* established a blanket antitrust exemption for "educational accreditation institution[s]."  *Id.*  In *Goldfarb*, the Supreme Court held such blanket exemptions improper, and *Marjorie Webster* is no longer good law on that point.[5]  ICANN's other cited cases are equally inapposite, addressing such

---

[4] *See, e.g., Nat'l Org. For Woman, Inc. v. Scheidler*, 968 F.2d 612, 615 (7th Cir. 1992), *rev'd on other grounds by*, 510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 1993); *Missouri v. Nat'l Org. for* Women, 620 F.2d 1301, 1302 (8th Cir.), *cert. denied*, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 49 (1980); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889, 102 S. Ct. 3409, 3413, 77 L. Ed. 2d 1215, 1221 (1982); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 481-82, 60 S. Ct. 982, 985-86, 84 L. Ed. 1311, 1316 (1940).

[5] *See, e.g., Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119, 170 (D.D.C. 2004) (In *Goldfarb*, "the Supreme Court expressly eliminated any blanket exception to the antitrust laws for professional educational entities, learned professions, and professional associations"); *Welch v. American*

(…continued)

Mitchell Silberberg & Knupp LLP

12

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1  plainly non-commercial activities as university admissions criteria[6] or hand-carried

2  door-to-door evangelical dissemination of religious literature[7] – not the creation of

3  commercial markets, sale of TLD operating rights, or sharing profits from the sales

4  of domain name registrations.

5         Finally, ICANN argues that it would receive fees regardless of whether ICM

6  or instead another company were the .XXX registry. ICANN Mot., 15:4-5. That

7  only confirms that the TLD approval process is intrinsically commercial: fees for

8  ICANN are always generated.[8] ICANN also says it did not charge higher fees for

9  the .XXX registry contract than in other TLDs. *Id.* at 15:14-20. That is factually

10  disputed,[9] but in any event irrelevant to the "commerce" issue.[10] Whether ICANN

11

12  (…continued)
   *Psychoanalytic Ass'n,* No. 85 Civ. 1651 (JFK), 1986 WL 4537, *7 (S.D.N.Y. Apr.
13  4, 1986); *Foundation for Interior Design Educ. Research v. Savannah College of
   Art & Design,* 244 F.3d 521, 530 (6th Cir. 2001); *Hennessey v. National Collegiate
14  Athletic Ass'n,* 564 F.2d 1136, 1148 -1149 (11th Cir. 1977) ("a close reading,
   however, of the Supreme Court's decision in *Goldfarb . . .* supports the view that
15  such a blanket exclusion cannot be accepted"); *Veizaga v. National Bd. for
   Respiratory Therapy,* No. 75 C 3430, 1977 WL 1354, *2 (N.D. Ill. Jan. 27, 1977)
16  ("*Goldfarb* makes it clear, if it was not clear before, that there is no such total
   exemption.").

17  [6] *See, e.g., Selman v. Harvard Med. Schl.,* 494 F. Supp. 603, 621 (S.D.N.Y.), *aff'd
   without opinion,* 636 F.2d 1204 (2d Cir. 1980); *Donnelly v. Boston Coll.,* 558 F.2d
18  634, 635 (1st Cir.), *cert. denied,* 434 U.S. 987, 98 S. Ct. 618, 54 L. Ed. 2d 483
   (1977).
19
   [7] *Proctor v. Gen. Conference of Seventh-Day Adventists,* 651 F. Supp. 1505, 1523-
20  24 (N.D. Ill. 1986).

21  [8] Nor does the claim that ICANN would have received fees from another .XXX
   registry operator disprove anticompetitive conduct. The antitrust violation is not
22  solely a question of *who* wins the registry contract. It is a question of whether the
   contract *terms* are anticompetitive. As *VeriSign* found, absent competition for the
23  registry contract, the terms may (and here do) impose prices or output restrictions
   that would not exist in a competitive market. 611 F.3d at 502-504.

24  [9] Plaintiffs alleged that ICANN's .XXX fees are "larger than the per-registration
   fees ICANN charges for *most* other TLDs, and is several times larger than the per-
25  registration fee charged by ICANN to any registry for any other TLD that permits
   adult-content websites." FAC, ¶ 56(a) (emphasis added). Improperly relying on
26  contracts not before the Court on this motion (*see* Plaintiffs' Opposition to
   Defendant ICANN's Request for Judicial Notice), ICANN argues that it receives
27  comparable fees for two TLDs that *do not* allow adult-content websites (.JOBS and
   .TRAVEL) but does not dispute that the .XXX fees are higher than most other
28  ICANN fees. ICANN Mot., 15:14-20. More importantly, Plaintiffs also allege,
                                                                    (…continued)

                                          13

1   sold for a little or a lot, it sold (and engaged in other commercial activities) and

2   thus is subject to antitrust law.

3   **V.     PLAINTIFFS ADEQUATELY ALLEGE CONCERTED ACTIVITY**

4          ICANN makes arguments similar to ICM's that Plaintiffs have failed to

5   allege concerted activity, as required for their Section 1 claims.  Plaintiffs address

6   those arguments at length in their opposition to ICM's motion.  *See* Plaintiffs' Opp.

7   to ICM Mot., Section IV(B).  To avoid unnecessary repetition, Plaintiffs

8   incorporate that discussion here.

9          Briefly summarizing, however, ICANN's arguments ignore Plaintiffs'

10  allegations setting forth Defendants' lengthy interactions, negotiations, and

11  agreements in establishing the .XXX TLD and making ICM its registry operator.

12  Those arguments even ignore the express anticompetitive terms in the ***written***

13  .XXX registry contract.  FAC, ¶¶ 54-58.  Collectively, those allegations establish

14  that Defendants agreed to suppress competition for the initial and renewal registry

15  contract; to set the initial anticompetitive .XXX prices and sales restrictions and to

16  delegate to ICM the power to set future even more monopolistic prices and sales

17  policies; and to refrain from approving new adult-content TLDs that might

18

19

_____

20  (…continued)
    and ICANN cannot dispute on this motion, that the fees paid to ICANN by ICM
21  are in any event "enhanced" and above-market.  FAC, ¶ 3(g).

22  [10] In any event, whether transactions are "non-commercial" for antitrust purposes
    is a factual issue that cannot be decided on this Rule 12 motion.  *See, e.g.,*
23  *Hamilton Chap. of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 66 (2d
    Cir. 1997) (Rule 12 motion could not resolve factual dispute whether university's
24  alleged "educational" purpose in requiring students to live in dorms was instead a
    pretext for a commercial decision (subject to antitrust law) to raise money by
25  making students buy more dorm services); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d
    126, 142 n.13 (E.D.N.Y. 2010) (on Rule 12 motion and based on allegations of
26  complaint, "court cannot conclude . . . that the alleged conduct did not have a
    substantial effect on interstate commerce"); *Found. for Interior Design Educ. v.*
27  *Savannah Coll*, 73 F. Supp. 2d 829, 835 (W.D. Mich. 1999) (court must accept
    commercial transaction allegations as true in Rule 12 motion), *aff'd*, 244 F.3d 521
28  (6th Cir. 2001).

1   compete with .XXX.  FAC, ¶¶ 3(e)-(f), 56-58, 72, 76, 84-86, 96, 104-105, 114-

2   116.

3   **VI.   PLAINTIFFS ADEQUATELY ALLEGE ANTITRUST MARKETS**

4        ICANN argues, incorrectly, that Plaintiffs have failed adequately to allege

5   their defensive or affirmative registration markets.

6        **A.    Standards For Pleading Antitrust Markets**

7        The standards for pleading antitrust markets are well established.  As stated

8   in *Newcal v. IKON*, 513 F.3d 1038, 1045 (9th Cir. 2008), *cert. denied*, 557 U.S.

9   903, 129 S. Ct. 2788, 174 L. Ed. 2d 290 (2009):

10                  There is no requirement that these [market] elements of

11                  the antitrust claim be pled with specificity.  An antitrust

12                  complaint therefore survives a Rule 12(b)(6) motion

13                  unless it is apparent from the face of the complaint that

14                  the alleged market suffers a fatal legal defect.  And since

15                  the validity of the "relevant market" is typically a factual

16                  element rather than a legal element, alleged markets may

17                  survive scrutiny under Rule 12(b)(6) subject to factual

18                  testing by summary judgment or trial.

19   *Id.* (internal citations omitted); *accord, e.g., Webkinz Antitrust Litig.*, 695 F. Supp.

20   2d 987, 993-95 (N.D. Cal. 2010) (market definition sufficiently alleged unless

21   "facially unsustainable.");  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846,

22   2012 WL 1672493, *4 (N.D. Cal. May 14, 2012) ("[A]n antitrust complaint

23   survives a Rule 12(b)(6) motion that attacks the definition of the relevant market

24   unless it is apparent from the face of the complaint that the alleged market suffers a

25   fatal legal defect."); 2-24 von Kalinowski, *supra*, § 24.01 ("Ordinarily, the

26   determination of the relevant market must await completion of discovery.").

27        Markets are determined by the "reasonable interchangeability of use or the

28   cross-elasticity of demand between the product itself and substitutes for it."  *Brown*

Mitchell
Silberberg &
Knupp LLP

1   *Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523-24, 8 L. Ed. 2d

2   510, 535 (1962).  *See also Thurman Indus. Inc. v. Pay 'N Pak Stores Inc.,* 875 F.2d

3   1369, 1375 n.1 (9th Cir. 1989) (*Brown Shoe* factors "are essential to market

4   analysis under the Sherman Act"); *Newcal*, 513 F. 3d at 1045 (adopting *Brown*

5   *Shoe* standard).  Thus, Plaintiffs need only plausibly plead a market that includes

6   all reasonable substitute products or services.  *See DocMagic, Inc. v. Ellie Mae,*

7   *Inc.*, 745 F. Supp. 2d 1119, 1136 (N.D. Cal. 2010) ("DocMagic's factual

8   allegations describe the alleged market, the product which this market provides,

9   and the competitors and customers in the market.  These factual allegations are

10   sufficient to plausibly support the existence of a market in which reasonably

11   interchangeable DPS vendors compete.") (internal citations omitted).

12      Significantly, that a supplier may raise prices above cost without purchasers

13   substituting other products is evidence of a separate market and lack of cross-

14   elasticity of demand.  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d

15   991, 1002 (9th Cir. 2008); *United States. v. Oracle Corp*., 331 F. Supp. 2d 1098,

16   1112 (N.D. Cal. 2004) ("The product market is expanded until the hypothetical

17   monopolist could profitably impose a [small but significant and nontransitory price

18   increase].").

19      As explained below, Plaintiffs more than meet these standards for pleading

20   their defensive and affirmative registration markets.

21   **B.   Plaintiffs Adequately Plead The Defensive Market**

22      As Plaintiffs allege in detail, there is no reasonable substitute for defensive

23   or "blocking" registrations in .XXX.  FAC, ¶¶ 60-64.  Blocking trademarks or

24   domain names in other TLDs will not prevent the use of those same names by

25   others in the .XXX TLD.  FAC, ¶¶ 3(d), 56, 62.  For example, blocking use of the

26   "Mercedes Benz" name in the .travel TLD will not prevent use of that name in the

27   .XXX TLD.  To prevent misuse of its name in .XXX (and a likely undesired

28   association with adult content), Mercedes Benz must defensively register that name

Mitchell
Silberberg &
Knupp LLP

16

1   in .XXX.  FAC, ¶ 61.  Again, the need for defensive registrations in .XXX is

2   particularly acute because of its association with adult content.  FAC, ¶ 62.  There

3   were more than 80,000 defensive registrations in .XXX during a special early-sale

4   "Sunrise" period alone, and an estimated 80% of the more than 200,000 total

5   .XXX domain name sales to a later date were defensive.  FAC, ¶ 3(c).

6         This lack of substitutability makes defensive registration services in .XXX a

7   separate market.  FAC, ¶¶ 60-65.  As a further indication of such a separate market,

8   ICM has been able to charge above-market prices for .XXX services.  FAC, ¶¶

9   3(g), 73, 78.  Purchasers have not been able to respond to ICM's price gouging by

10  buying other equivalent products, because there are none.  FAC, ¶ 61.  Although

11  not required to do so, Plaintiffs have also expressly alleged that economic reports

12  by ICANN itself, which will be supplemented by Plaintiffs' own experts'

13  testimony, support the existence of a .XXX defensive registration market.  FAC, ¶

14  64.[11]

15        These allegations more than satisfy Plaintiffs' obligation to plead a

16  defensive registration market.  ICANN challenges these allegations exclusively by

17  arguing that Plaintiffs' defensive registration market improperly consists of a

18  single or a few domain names or trademarks.  ICANN Mot., 22-23.  The argument

19  is obviously wrong.  Plaintiffs' defensive registration market includes a great

20  diversity and number of .XXX domain names – more than 80,000 from the early-

21  sales Sunrise period alone – which must be "blocked" in order to avoid confusion

22  or dilution.  And those needing to defensively purchase .XXX domain names

23  encompass widely disparate industries, not limited to the adult entertainment

24  industry.  Indeed, often those without adult content associations – such as certain

25

26

27  [11] ICANN argues that one of the alleged reports does not expressly support the
    concept of a separate defensive registration market.  Plaintiffs strongly disagree.
28  In any event, the matter will have to be resolved through expert testimony.

Mitchell
Silberberg &
Knupp LLP

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1    celebrities or children's character names – have the most serious need for .XXX

2    registrations.  FAC, ¶ 62.

3           The defensive registration market also does not consist of and is not defined

4    by particular trademarks, or even limited to trademarks at all.  Those needing

5    defensive registrations include not a few but many trademark owners, as well as

6    the owners of other un-trademarked name rights, such as un-trademarked domain

7    names and other names rights.  FAC, ¶ 60 (market includes "owners of trademarks,

8    domain names in other TLDs, or of other name rights").[12]

9           ICANN's argument is not only factually incorrect, but relies exclusively on

10   cases easily distinguished and expressly rejected by the Ninth Circuit in *VeriSign*.

11   For example, ICANN relies predominately on *Smith v. Network Solutions*, 135 F.

12   Supp. 2d 1159, 1168-69 (N.D. Ala.), *aff'd without opinion*, 29 Fed. Appx. 575

13   (11th Cir. 2001).  The *Smith* court ruled that an antitrust market could not be

14   defined as those domain names that had "expired," *i.e.*, domain names for which

15   the original purchaser had stopped paying and so which had become available for

16   re-sale.  *Id.*  That was because there was allegedly an ability to substitute between

17   domain names which had expired and those which had not.

18          The *Smith* holding did not address, has nothing to do with, and in no manner

19   undermines Plaintiffs' market definition limited to defensive registrations and not

20   expired domain names.  In any event, *Smith* does not state the law in the Ninth

21   Circuit even for markets consisting of expired domain names.  *VeriSign* expressly

22   discussed and declined to follow *Smith*, holding that the *VeriSign* plaintiff **could**

23   allege a market in the .com TLD for expired domain names.  611 F.3d at 508-09.

24   _____

25   [12] In a footnote, ICANN suggests that litigation over conflicting domain names is a
     "substitute" for defensive registration of those names.  ICANN Mot., 22:27-28.
26   Plaintiffs expressly allege what is obvious anyway:  "Those name holders not
     willing or able to purchase annual registrations for defensive purposes may need to
27   engage in costly legal efforts to prevent improper exploitation of their names in
     .XXX.  Such expensive legal procedures are not a reasonable substitute for
28   defensive registrations."  FAC, ¶ 79.

Mitchell
Silberberg &
Knupp LLP

18

1   ICANN also relies on *Weber v. National Football League*, 112 F. Supp. 2d

2   667, 673-74 (N.D. Ohio 2000), which held only that an antitrust market could not

3   consist of only two specific domain names, "jets.com" and "dolphins.com." *Id.*

4   *VeriSign* distinguished *Weber* on the grounds that the market for expired domain

5   names in the .com TLD consisted of more than two domain names. 611 F. 3d at

6   508. So too here. The defensive registration market consists of thousands of

7   domain names.

8   ICANN's other cases similarly do nothing to undermine Plaintiffs' properly

9   alleged and defined defensive registration market.[13]

10   **C.   Plaintiffs Adequately Plead The Affirmative Registration Market**

11   By virtue of ICANN's approval of .XXX, ICM currently has a monopoly in

12   TLDs that have a name connoting or intended primarily for adult content. FAC, ¶¶

13   3(d), 67. Plaintiffs allege that ICM and ICANN are attempting to create a

14   monopoly making .XXX, as a practical matter, the only TLD hosting adult content

15   websites. FAC, ¶¶ 66-67. ICANN attacks this "affirmative registration" market

16   definition solely because it does not include all ***currently*** substitutable products.

17   ICANN Mot., 23-25. Plaintiffs admit, as ICANN argues, that distributors of adult

18   content can ***currently*** host websites not just in .XXX but also in .com or other

19

20   [13] Most of ICANN's cases simply hold that a plaintiff's market failed to include
reasonably substitutable products. *See Tanaka v. Univ. of South. Cal.*, 252 F.3d

21   1059, 1063-64 (9th Cir. 2001) (alleged market for college soccer players in Los
Angeles was defective because plaintiff admitted that competition for college

22   soccer players extended well beyond Los Angeles); *Big Bear Lodging Ass'n*, 182
F.3d at 1104-05 (plaintiff failed to allege that lodging in nearby areas was not a

23   reasonable substitute for defined market of lodging within the city of Big Bear);
*Seirus Innovative Accessories, Inc. v. Cabela's Inc.,* No. 09-CV-102H (WMC),

24   2010 WL 6675046, *3 (S.D. Cal. Apr. 20, 2010) (hats, helmets, and scarves could
substitute for balaclavas). Unlike in these cases, and as explained above,

25   Plaintiffs' defined market includes all reasonable substitutes. ICANN also cites
*Formula One Licensing B.V. v. Purple Interactive Ltd.*, No. C00-222-MMC, 2001

26   WL 34792530, *3 (N.D. Cal. Feb. 6, 2001). Like *Weber*, that case merely holds
that a relevant product market should not be limited to a few specific trademarks.

27   Finally, ICANN cites *Newcal, supra*, which actually supports Plaintiffs. *Newcal*
found a market definition based on a single brand of products to be sufficient under

28   the applicable pleading standards. 513 F.3d at 1046.

Mitchell
Silberberg &
Knupp LLP

19

TLDs.  What Plaintiffs allege, however, is a real and significant threat that such substitutability will soon no longer be true.

### 1.    Serious Risk Of Monopoly

Specifically, Plaintiffs allege all the following to demonstrate that there is a dangerous probability that .XXX will become a monopoly for affirmative registration services for adult content websites.

### a.    Network Effects

Under this economic phenomenon, the more persons use a particular communication site or process, the more dominant and valuable it becomes, and the greater the risk the site becomes a monopoly.  Plaintiffs have expressly alleged how network effects would work here to create a .XXX monopoly for affirmative registrations of adult content websites.  FAC, ¶ 66.  Viewers looking for adult content will gravitate toward the .XXX because the letters uniquely connote such content.  The more such users gravitate to .XXX, the more suppliers of such content will want to attract those potential customers by displaying on that TLD. The additional suppliers will in turn attract even more viewers, which will then attract even more suppliers, and so on in a self-reinforcing pattern eventually resulting in a monopoly of adult sites on .XXX.  *Id.*

The network effects phenomenon is not novel and poses a real and widely recognized monopoly risk.  *See, e.g.*, Marina Lao, *Reclaiming A Role For Intent Evidence In Monopolization Analysis*, 54 Am. U. L. Rev. 151, 182-183 (2004) ("network effects describes situations where, the more people use a good or service, the more valuable that good or service is to the consumer. . . ." "network effects tend to 'tip' the market to generate a winner-take-all [monopoly]."); John Blevins, *Death Of The Revolution: The Legal War On Competitive Broadband Technologies*, 12 Yale J. L. & Tech. 85, 128 (2009) ("One result of network effects, then, is that the market can eventually 'tip' into a winner-takes-all monopoly."); Stefan Bechtold, *Governance In Namespaces*, 36 Loy. L.A. L. Rev.

1239, 1273-1274 (2003) ("Namespaces are subject to network effects.  The more users and service providers use a particular namespace, the larger and therefore more valuable the namespace becomes to them."); *DocMagic*, 745 F. Supp. 2d at 1137-38 (recognizing network effect); *LiveUniverse, Inc. v. Myspace, Inc.*, No. CV 06–6994 AHM (RZx), 2007 WL 6865852, \*\*4-7 (C.D. Cal. June 4, 2007), *aff'd*, 304 Fed. Appx. 554 (9th Cir. 2008) (affirming internet-based social networking antitrust market, and accepting related network effect allegations).

### b.      Legislation

Plaintiffs have also alleged the risk of legislation mandating that adult content reside exclusively on .XXX, creating a .XXX monopoly.  FAC, ¶ 68.  Such Legislation has several times been proposed in the past.  *See*, *e.g.*, *Cyber Safety for Kids Act of 2006*, S. 2426, 109th Cong. (2006) (proposing that adult content "shall register … with [.xxx] and operate such website or online service under the new domain."); *Family Privacy and Security Act of 2002*, S. 2137, 107th Congress (2002) (also proposing that adult content register in separate newly created TLD).

### c.      Impediments to Competing Adult TLDs

As explained in detail in Plaintiffs' opposition to ICM's motion, ICM/ICANN have agreed that ICANN will not approve competing adult-oriented TLDs.  FAC, ¶¶ 56(d), 68; Plaintiffs' Opposition to ICM's Motion, Section IV(B)(1).  New ICANN rules partially implement this agreement by making it less likely that additional "controversial" TLD strings – *i.e.*, other TLDs whose names connote adult content – will be approved by ICANN.  FAC, ¶¶ 68, 70.  ICM's President has also recognized that, because of controversy about approving adult-content TLDs, he does not expect any other such TLDs.  FAC, ¶ 68.  All these impediments to establishing other adult-content TLDs also increase the likelihood that ICM will obtain an affirmative registration monopoly in .XXX.  FAC, ¶¶ 66-70.

Mitchell
Silberberg &
Knupp LLP

### 2.   These Risks Are Sufficient for Injunctive Relief

ICANN does not deny that these allegations sufficiently demonstrate a significant risk that .XXX will become a monopoly market for adult content web sites.  Instead, ICANN argues that Plaintiffs cannot sue over for these serious and significant risks until they have actually been realized.  ICANN Mot., 25:9-20.  But the law does not require that Plaintiffs wait to have suffered irremediable injury before seeking injunctive relief.  FAC, ¶¶ 66-70.

### a.   Injunctive Relief Authorities

As a general matter, courts regularly grant injunctions based on threatened injury.  *Chapman v. Pier 1 Imps.(U.S.), Inc.*, 631 F.3d 939, 949 (9th Cir. 2011), *quoting Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct. 1970, 1983, 128 L. Ed. 2d 811, 830 (1994) ("It is well settled that a plaintiff need not 'await the consummation of ***threatened*** injury to obtain prospective relief.'") (emphasis added); *MAI Systems Corp. v. Peak Computer, Inc*., 991 F.2d 511, 520 (9th Cir. 1993) ("As a general rule, a permanent injunction will be granted when liability has been established and there is a ***threat*** of continuing violations.") (emphasis added); *see also* Wright & Miller, *et al*., *Federal Practice & Procedure* § 2942 (2012) ("the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being ***threatened*** by some injury for which he has no adequate legal remedy") (emphasis added).

### b.   Antitrust Authorities

Antitrust authorities also recognize this concept.  In fact, Section 16 of the Clayton Act expressly provides for injunctive relief "against ***threatened*** loss or damage by a violation of the antitrust laws" 15 U.S.C. § 26 (emphasis added); *accord, e.g*., *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc*., 140 F.3d 1228, 1235 (9th Cir. 1998) ("an antitrust plaintiff seeking injunctive relief need only show a ***threatened*** injury, not an actual one") (emphasis in original).

Mitchell
Silberberg &
Knupp LLP

22

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1    In addition, Plaintiffs allege conspiracy to monopolize claims against

2    ICANN and ICM.  FAC, ¶¶ 101-121; *see also* section VI below.  Such claims do

3    not require any pleading or proof of an actual defined and existing market.  *See*,

4    *e.g.*, *Paladin*, 328 F.3d at 1158 ("To prove a conspiracy to monopolize in violation

5    of § 2, Paladin must show four elements: (1) the existence of a combination or

6    conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the

7    specific intent to monopolize; and (4) causal antitrust injury."); *Hunt-Wesson*

8    *Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) ("no particular

9    level of market power … has to be alleged or proved in a conspiracy claim where

10    the specific intent to monopolize is otherwise apparent from the character of the

11    actions taken"), *cert. denied*, 450 U.S. 921, 101 S. Ct. 1369, 67 L. Ed. 2d 348

12    (1981); *Salco Corp. v. General Motors Corp., Buick Motor Div.*, 517 F.2d 567, 576

13    (10th Cir. 1975) ("Specific intent to monopolize is the heart of a conspiracy

14    charge, and a plaintiff is not required to prove what is the 'relevant market.'").

15    Nor does such a claim require a dangerous probability of success.  *Freeman*

16    *v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir.) (for conspiracy to

17    monopolize, "[N]o … 'dangerous probability of success' has to be alleged or

18    proved"), *cert. denied*, 540 U.S. 940, 124 S. Ct. 355, 157 L. Ed. 2d 253 (2003);

19    *Ragu Foods*, 627 F.2d at 926 (same); 2-26 von Kalinowski, *supra*, § 26.02

20    ("attempted monopolization requires a dangerous probability of success, while

21    conspiracy to monopolize does not").

22    These rules recognize that conspiracy presents a significant ***risk*** of harm,

23    which even if not yet realized through actual monopolization of a particular

24    market, should be actionable.  *See Spectrum Sports v. McQuillan*, 506 U.S. 447,

25    459, 113 S. Ct. 884, 892, 122 L. Ed. 2d 247, 259 (1993) (concerted activity

26    "inherently is fraught with anticompetitive risk"); *Copperweld Corp. v.*

27    *Independence Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 2740, 81 L. Ed. 2d

28    628, 642 (1984) (conspiracy to monopolize involves "mergings of resources"

Mitchell
Silberberg &
Knupp LLP

23

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICANN TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

1  creating "anticompetitive potential … sufficient to warrant scrutiny even in the

2  absence of incipient monopoly").

3      Under these authorities, Plaintiffs are entitled to prove the significant **risk**

4  that Defendants will achieve an abusive monopoly – even if not yet realized – and

5  to obtain an appropriate injunction preventing such conduct.[14]

6  **VII.  PLAINTIFFS' THIRD CLAIM IS SUFFICIENT**

7      ICANN argues that Plaintiffs' third claim fails because "there is no cause of

8  action under the Sherman Act for an alleged conspiracy to attempt to monopolize."

9  ICANN Mot., 20:12-21:11.  But this is a mere issue of irrelevant labeling.  In fact,

10  "[t]he pleadings need not identify **any** particular legal theory under which recovery

11  is sought."  *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995) (emphasis

12  added).  Instead, a complaint is sufficient provided **the facts** alleged state a claim.

13  *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (complaint need only state

14  "claims for relief, not causes of action, statutes or legal theories").

15      Here, even if mislabeled, Plaintiffs' third claim plainly states all the required

16  factual elements of a "conspiracy to monopolize" claim, and ICANN does not

17  contend otherwise.  Such a claim does not require allegations of actual monopoly,

18  but may be stated where (as Plaintiffs alleged in their third cause of action)

19  defendants merely intend to monopolize.  *See, e.g., Paladin*, 328 F.3d at 1158 ("To

20  prove a conspiracy to monopolize in violation of § 2, Paladin must show four

21  elements: (1) the existence of a combination or conspiracy to monopolize; (2) an

22  overt act in furtherance of the conspiracy; (3) the specific intent to monopolize;

23

24  [14] ICANN's reliance on *FTC v. Lundbeck*, 650 F.3d 1236, 1241 (8th Cir. 2011), is misplaced.  *Lundbeck* did not involve an alleged significant risk of future
25  monopolization.  Instead, in that case, the FTC asked at trial that the Court analyze the contours of an already **existing** market for pharmaceutical products by
26  hypothesizing that the products were owned by separate companies.  *Id.*  But the products were in fact owned by one company, and the FTC was not contending
27  that the products would be separately owned in the future.  In other words, the FTC presented no evidence that the hypothetical would ever exist, and the hypothetical
28  was therefore irrelevant.

Mitchell
Silberberg &
Knupp LLP

24

1   and (4) causal antitrust injury."); 2-26 von Kalinowski, *supra*, § 26.02 ("The

2   combination or conspiracy provision of Section 2 is aimed at both unsuccessful

3   and concerted action to achieve monopoly power.  It is, consequently, immaterial

4   whether monopoly power is, in fact, ever attained.").

5   The Court should thus either ignore the legally insignificant mislabeling, or

6   permit Plaintiffs to amend the label.  *See Alabama v. Blue Bird Body Co.*, 71

7   F.R.D. 606, 609 (M.D. Ala. 1976) (cited by ICANN, and striking words "attempt

8   to monopolize" from claim labeled as "conspiracy to attempt to monopolize"

9   without dismissing claim), *aff'd in part, rev'd in part*, 573 F.2d 309 (5th Cir.

10  1978).[15]

11  **VIII.  CONCLUSION**

12  The Court should deny ICANN's motion.

13  DATED:  June 8, 2012                 THOMAS P. LAMBERT
14                                       JEAN PIERRE NOGUES
                                         KEVIN E. GAUT
                                         MITCHELL SILBERBERG & KNUPP LLP
15
16
17                                       By: /s/ Kevin E. Gaut
                                             Kevin E. Gaut
18                                           Attorneys for Plaintiffs
19
20
21
22

_____

23  [15] ICANN's other cases dismissed claims for failure to allege required substantive
24  elements, not for mere mislabeling.  *See In re Mushroom Direct Purchaser
    Antitrust Litig.*, 514 F. Supp. 2d 683, 702 (E.D. Pa. 2007) (defendant cooperative
    members not alleged to be seeking monopoly for themselves or to have conspired
25  with third parties to monopolize); *Carpet Group Int'l v. Oreintal Rug Importers*,
    256 F. Supp. 2d 249, 285 (D.N.J. 2003) (allegation only of a "shared monopoly"
26  not of required conspiracy), *overruled in part on different issue by*, 654 F.3d 462
    (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1744; 182 L. Ed. 2d 530 (2012); *Windy City
27  Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 965 (N.D.
    Ill. 1982) (no sufficient allegation of conspiracy).

28  Mitchell Silberberg & Knupp LLP

25