THOMAS P. LAMBERT (50952)
  tpl@msk.com
JEAN PIERRE NOGUES (84445)
  jpn@msk.com
KEVIN E. GAUT (117352)
  keg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs
Manwin Licensing International S.a.r.l.
and Digital Playground, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION - ROYBAL FEDERAL BUILDING

| | |
|---|---|
| MANWIN LICENSING INTERNATIONAL S.A.R.L., a Luxemburg limited liability company (s.a.r.l.); and DIGITAL PLAYGROUND, INC., a California corporation,<br><br>   Plaintiffs,<br><br>  v.<br><br>ICM REGISTRY, LLC, d/b/a .XXX, a Delaware limited liability corporation; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California nonprofit public benefit corporation; and DOES 1-10,<br><br>   Defendants. | CASE NO. CV11-9514 PSG (JCGx)<br><br>The Honorable Philip S. Gutierrez<br><br>**PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICM REGISTRY, LLC TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>Date:  July 30, 2012<br>Time:  1:30 p.m.<br>Location: Courtroom 880 |

Mitchell
Silberberg &
Knupp LLP

4637682.10

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................1

II.   FACTUAL ALLEGATIONS ...............................................................1

III.  PLAINTIFFS' CLAIMS AND *VERISIGN* ......................................3

IV.   ARGUMENT .....................................................................................7
      A.   Plaintiffs Adequately Allege Antitrust Injury........................7
            1.   Plaintiffs' Allegations and Standing............................7
            2.   ICM's Meritless Arguments .........................................9
      B.   Plaintiffs Adequately Allege Concerted Conduct..............12
            1.   Plaintiffs' Allegations .............................................13
            2.   Defendants' Meritless Arguments ............................16
      C.   Plaintiffs Adequately Allege Predatory Conduct..............18
            1.   The Predatory Agreements and Other Conduct.......19
            2.   ICM's Meritless Arguments ......................................19
      D.   Plaintiffs' Requested Relief Does Not Support Dismissal .................22

Mitchell
Silberberg &
Knupp LLP

4637682.10

i

PLAINTIFFS' OPPOSITION TO MOTION BY DEFENDANT ICM REGISTRY, LLC TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

<span style="text-align:center">C<small>ASES</small></span>

*Alaska Airlines v. United Airlines*,
   948 F.2d 536 (9th Cir. 1991) .................................................................... 20

*Allied Tube & Conduit Corp. v. Indian Head*,
   486 U.S. 492, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988) ............................. 5, 6

*American Ad Mgmt., Inc. v. General Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ................................................................ 8, 10

*American Tobacco Co. v. United States*,
   328 U.S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946) ..................................... 18

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
   No. 11-CV-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ........... 18

*Atlantic Richfield v. USA Petroleum*,
   495 U.S. 328, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990) ............................... 10

*Barrous v. BP P.L.C.*,
   No. 10-CV-2944-LHK, 2010 WL 4024774 (N.D. Cal. Oct. 13, 2010) ............. 14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ............................... 18

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982) ................................... 9

*Bushie v. Stenocord Corp.*,
   460 F.2d 116 (9th Cir. 1972) .................................................................... 19

*California Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972) ..................................... 22

*California v. American Stores Co.*,
   495 U.S. 271, 110 S. Ct. 1853, 109 L. Ed. 2d 240 (1990) ............................... 23

*Calnetics Corp. v. Volkswagen of America, Inc.*,
   532 F.2d 674 (9th Cir. 1976) .................................................................... 16

*Chase v. Northwest Airlines*,
   49 F. Supp. 2d 553 (E.D. Mich. 1999) ....................................................... 17

*City of Vernon v. Southern California Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ........................................................................ 16

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
    690 F.2d 1240 (9th Cir. 1982) ........................................................................ 22

*Coalition for ICANN Transparency v. VeriSign,*
    611 F.3d 495 (9th Cir. 2010) ... 1, 3, 4, 6, 7, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) ................................................................... 21, 22

*Four Corners Nephrology Assocs. v. Mercy Medical Ctr. of Durango,*
    582 F.3d 1216 (10th Cir. 2009) ..................................................................... 25

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) ........................................................................ 20

*Glen Holly Entm't, Inc. v. Tektronix Inc.,*
    352 F.3d 367 (9th Cir. 2003) ................................................................ 9, 10, 12

*Greco v. Verizon Commun's, Inc.,*
    No. 03-00718, 2005 WL 659200 (S.D.N.Y. Mar. 22, 2005) ........................... 25

*Harkins Amusement Enters., Inc. v. General Cinema Corp.,*
    850 F.2d 477 (9th Cir. 1988) ........................................................................ 20

*In re Cardizem CD Antitrust Litigation,*
    332 F.3d 896 (6th Cir. 2003) ........................................................................ 15

*In re Graphics Processing Units Antitrust Litig.,*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................ 18

*In re K-Dur Antitrust Litig.,*
    338 F. Supp. 2d 517 (D.N.J. 2004) ............................................................... 24

*In re Morrison,*
    No. 05-45926, 2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009) .............. 22

*In re Remeron Antitrust Litig.,*
    335 F. Supp. 2d 522 (D.N.J. 2004) ............................................................... 25

*In re TFT–LCD (Flat Panel) Antitrust Litig.,*
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ........................................................ 18

*Juster v. City of Rutland,*
    901 F.2d 266 (2d Cir. 1990) ................................................................. 10

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) .............................................................. 18

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.,*
    140 F.3d 1228 (9th Cir. 1998) ................................................................ 8

*Mayle v. Felix,*
    545 U.S. 644, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) ................... 22

*Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., Inc.,*
    611 F. Supp. 415 (C.D. Cal. 1985) ......................................................... 9

*MetroNet Services Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004) .............................................................. 25

*Monaco v. Bear Stearns Residential Mortg. Corp.,*
    554 F. Supp. 2d 1034 (C.D. Cal. 2008) ................................................ 14

*Moore v. Jas. H. Matthews & Co.,*
    473 F.2d 328 (9th Cir. 1972) ................................................................ 19

*National Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978) ............ 15, 20, 23

*Nelson v. Monroe Reg'l Med. Ctr.,*
    925 F.2d 1555 (7th Cir. 1991) ................................................................ 8

*Pac. Bell Tel. Co. v. Linkline Commun's, Inc.,*
    555 U.S. 438, 129 S. Ct. 1109, 172 L. Ed. 2d 836 (2009) ................... 25

*Pool Water Prods. v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001) ......................................................... 8, 10

*Rickards v. Canine Eye Registration,*
    704 F.2d 1449 (9th Cir. 1983) .............................................................. 17

*SAS v. Puerto Rico Tel. Co.,*
    48 F.3d 39 (1st Cir. 1995) .................................................................... 12

*Security Fire Door Co. v. County of L.A.,*
    484 F.2d 1028 (9th Cir. 1973) ........................................................ 20, 21

iv

*Selehpoor v. Shahinpoor*,
  358 F.3d 782 (10th Cir. 2004) ............................................................. 15

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
  373 F. Supp. 2d 631 (S.D. W. Va. 2005) ........................................... 25

*Stanislaus Food Prods. Co. v. USS-POSCO Industries*,
  No. CVF 09-0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3,
  2010) ................................................................................................... 20

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) ............................................................. 21

*Suzuki Western v. Outdoor Sports*,
  126 F. Supp. 2d 40 (D. Mass. 2001) ................................................. 17

*Swift & Co. v. United States*,
  196 U.S. 375, 25 S. Ct. 276, 49 L. Ed. 518 (1905) ........................... 15

*United States v. Glaxo Group, Ltd.*,
  410 U.S. 52, 93 S. Ct. 861, 35 L. Ed. 2d 104 (1973) ....................... 23

*United States v. United Shoe Mach. Co.*,
  391 U.S. 244, 88 S. Ct. 1496, 20 L. Ed. 2d 562 (1968) ................... 23

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ................................................................. 7

*Verizon Commun's Inc. v. Trinko*,
  540 U.S. 398, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004) ............ 24, 25

STATUTES

15 U.S.C.
  § 1 ..................................................................... 3, 5, 6, 15, 16, 19
  § 2 ................................................. 1, 3, 5, 6, 18, 19, 20, 21, 22
  § 26 ............................................................................... 8, 23

Federal Rules of Civil Procedure,
  Rule 12(b)(6) ........................................................................... 5
  Rule 54(c) ............................................................................. 24

OTHER AUTHORITIES

P. E. Areeda & H. Hovenkamp, *Antitrust Law:An Analysis Of Antitrust
  Principles And Their Application* (2012) ............................... 9, 23, 24

von Kalinowski, Sullivan & McGuirl,
*Antitrust Laws And Trade Regulation* (2d Ed. 2012).......................4, 7, 8, 19, 21

W. Holmes & M. Mangiaracina, *Antitrust Law Handbook* (2011)..........................9

E.W. Kintner, et al., 2-9 *Federal Antitrust Law* (2012) .............................................9

Froomkin and Lemley, *ICANN and Antitrust*,
2003 U. Ill. L. Rev. 1, 72-73 (2003)...................................................................5

D.R. Coquillette, *et al.*, *Moore's Federal Practice – Civil* (2012) .........................24

# I.     INTRODUCTION

ICM altogether ignores the dispositive Ninth Circuit authority and Plaintiffs' *actual* allegations, instead attacking strawmen.  In *Coalition for ICANN Transparency v. VeriSign*, 611 F.3d 495, 499-500 (9th Cir. 2010) ("*VeriSign*"), the Ninth Circuit held that a registry violates the Sherman Act by colluding with ICANN to eliminate competition for the registry contract.  Plaintiffs allege here in factual detail what *VeriSign* found sufficient, and then some.  For example, ICM argues that Plaintiffs allege no harm to competition or antitrust injury.  In fact, Plaintiffs expressly allege what *VeriSign* recognized as the classic such harm and injury, "higher prices resulting from competitive restraints," in particular the restraints from Defendants' agreements to eliminate competition for the .XXX registry contract.  *VeriSign*, 611 F.3d at 504.

ICM also argues that Plaintiffs have alleged only unilateral conduct.  That argument utterly ignores Plaintiffs' detailed allegations of Defendants' *agreements* to award ICM the original and renewal registry contracts without competition; to charge above market .XXX prices and impose other anticompetitive .XXX sales restrictions; and to preclude other adult-oriented TLDs.  Finally, ICM argues that Plaintiffs fail to allege predatory acts, as necessary for certain Sherman Act Section 2 claims.  However, Defendants' anticompetitive agreements constitute just such predatory acts, and Plaintiffs also allege other coercive conduct precisely like that found sufficient in *VeriSign*.

# II.    FACTUAL ALLEGATIONS

Defendant the Internet Corporation for Assigned Names and Numbers ("ICANN") has sole responsibility for (and a monopoly over) the internet "domain name system" or "DNS," without which the internet cannot operate.  First Amended Complaint ("FAC"), ¶¶ 3, 25, 31.  The DNS insures that each web site has a unique domain name and that internet users will reach the intended destination when entering that site's name into their web browsers.  FAC, ¶¶ 13-

1

22.  ICANN also has sole responsibility for and a monopoly over approving new Top Level Domain names ("TLDs"), such as .com., .org, or .net, and the "registries" to operate each TLD.  FAC, ¶¶ 3, 6, 25, 31.  For technical reasons of computer architecture, only one registry can operate each TLD.  FAC, ¶ 22.

Years ago, defendant ICM Registry LLC ("ICM") began seeking ICANN's approval of the new .XXX TLD, intended for adult website content.  After ICANN rejected ICM's efforts, ICM embarked on a years-long coercive campaign, alleged in great detail in the complaint, to exhaust ICM's resources and soften its resistance.  The campaign included fraudulent claims of support for .XXX, "stacking" adult industry meetings, offering improper inducements to decision makers, and sham lawsuits.  FAC, ¶¶ 3(e), 34-51.

ICM's plan worked.  After first tiring ICANN with its campaign, ICM then offered an enticing alternative.  ICM would stop the predatory conduct, and pay ICANN millions of dollars in fees, if ICANN would award ICM the registry contract on favorable terms.  FAC, ¶¶ 48-51.  ICANN did agree.  The favorable terms included that .XXX would face no competing bids for the initial or renewal registry contracts; that ICANN would agree to initial anticompetitive .XXX sales prices and terms and delegate to ICM unchecked powers to set future such prices and terms; and that ICANN would not approve competing TLDs intended for adult content.  FAC, ¶¶ 3(e)-(f), 56-58, 72, 76, 84-86, 96, 104-105, 114-116.

As the result of these anticompetitive agreements, ICM has sold .XXX registry services at monopoly prices and subject to output restrictions (described in detail in the complaint) that would not exist in a competitive market.  FAC, ¶¶ 72-86.  ICM will thus profit handsomely.  ICM's President Stuart Lawley says that ICM expects annual profits of $200 million from .XXX.  FAC, ¶ 3(g).  Lawley also says that he "has sold nine premium .XXX domain names for $100,000 or more, which is unparalleled in any other domain launch."  FAC, ¶ 84.  As Lawley confirmed, "this was always going to be a very lucrative arrangement."  FAC, ¶

2

3(g).  ICANN shares in these profits through ICM's agreement to pay enhanced registry fees.  FAC, ¶ 56(a).

Much of this lucre comes from "defensive" registrations.  Owners of trademarks (or of domain names in different TLDs) must pay ICM fees to block others from using those (or confusingly similar) marks or names to designate .XXX websites.  FAC, ¶¶ 3(a)-(d), 60-64, 76-78.  The need for such defensive registrations is particularly acute in .XXX.  Owners of names associated with adult content face a risk of customer confusion and diversion to sites with similar names in a TLD specifically designated for (and with identity letters universally connoting) adult content.  *Id*.  Owners of names not associated with adult content have a particular wish to avoid that association in .XXX.  FAC, ¶ 63.

The need for .XXX defensive registrations thus affects all businesses, and has been broadly decried as a "shake down."  *See, e.g*., FAC, ¶¶ 83(b) ("porn and mainstream businesses alike complain they are being forced to buy [.XXX] domain names they don't want . . . and compare the process to a hold up"), 83(c).  In fact, ICM sought .XXX approval in large part for the very purpose of first creating and then exploiting a new market for .XXX defensive registrations – a market that would not otherwise exist, serves no independent purpose, and imposes a huge tax or "deadweight loss" on commerce and the economy.  FAC, ¶¶ 3(c), 82.

ICM also seeks, through ICANN's agreement not to approve other adult content TLDs and other conduct, to create a second monopoly – a monopoly in .XXX for "affirmative registrations" of domain names intended for websites displaying new adult content rather than for defensive "blocking" purposes.  FAC, ¶¶ 66-69.  For reasons explained in detail in the complaint, there is a dangerous risk that effort will succeed.  *Id.*

## III.   PLAINTIFFS' CLAIMS AND *VERISIGN*

Plaintiffs, who maintain free and subscription websites for adult content, allege a Sherman Act Section 1 claim in the market for defensive .XXX

registrations.  This claim satisfies all required elements: (a) concerted conduct (agreements between ICM and ICANN to award and renew the .XXX TLD registry contract without competition, and to impose above-market prices and sales terms); (b) which unreasonably restrains trade (by suppressing competition and the resulting above-market prices and sales restrictions); and (c) antitrust injury (unfavorable prices and sales terms that would not exist in a competitive market).  *See* 1-11 von Kalinowski, Sullivan & McGuirl, *Antitrust Laws And Trade Regulation* § 11.02 (2d ed. 2012) ("von Kalinowski") (listing elements); FAC, ¶¶ 3(a), 3(f), 48-51, 53-58, 71-88, 99-100.

Plaintiffs also allege all required elements for four claims asserting monopolization, conspiracy to monopolize, or attempted monopolization in both alleged markets: (a) a monopoly or dangerous probability of monopoly (ICM's complete monopoly in the defensive registration market, and dangerous probability in the affirmative registration market); (b) predatory practices (ICM's coercive campaign and the anticompetitive agreements); and (c) intent (and, depending upon the claim, conspiracy) to monopolize.  *See* 2-25 von Kalinowski, *supra*, at §§ 25.02, 26.01 (listing elements); FAC, ¶¶ 38-51, 53-58, 60-70, 72-88, 101-139.

These claims break no new ground and are plainly sufficient under the dispositive *VeriSign* decision.  In *VeriSign*, an organization of domain name owners sued VeriSign, the registry for the .com TLD, under the Sherman Act. 611 F.3d at 500-01.  The plaintiff alleged that VeriSign and ICANN entered into a 2006 .com registry agreement permitting VeriSign to charge above-market prices for domain name registrations, and without competing bids from other registry operators.  *Id.*  The plaintiff alleged that VerSign procured this agreement by first "engag[ing] in improper and predatory conduct, including financial pressure, vexatious litigation and negative press coverage" against ICANN.  *Id.* at 501. VeriSign then allegedly offered to pay ICANN a "multi-million dollar fee" and to stop its coercive conduct, in exchange for "favorable terms in the 2006.com

4

1   contract," including "terms doing away with any competition for the next

2   [renewal] contract." *Id.*

3       The district court granted VeriSign's Rule 12(b)(6) motion.  The Ninth

4   Circuit reversed, holding that the plaintiff had stated a claim for the .com market

5   under both Section 1 and Section 2.  The Ninth Circuit emphasized the unique

6   aspects of TLD registry markets, first noting "it is not disputed that there can only

7   be one operator for each domain registry at any one time.  Therefore, the only

8   viable competition can take place in connection with obtaining a new contract after

9   expiration of the old one." *Id.* at 499.  The Ninth Circuit also noted that ICANN is

10  a "private standards-setting body" with "no public accountability" and the sole

11  power to approve TLDs.  *Id.* at 506-07.

12       The Court noted that, as a result, a registry operator should expect to "face

13  antitrust liability for persuading a private company [ICANN] in a position of

14  power to grant it control over a [TLD] market.'" *Id.* at 507, *quoting from* Froomkin

15  and Lemley, *ICANN and Antitrust*, 2003 U. Ill. L. Rev. 1, 72-73 (2003).  The Ninth

16  Circuit then noted that a registry operator which attempted to "control ICANN's

17  operations in its own favor," should also expect antitrust exposure under cases like

18  *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 108 S. Ct. 1931, 100

19  L. Ed. 2d 497 (1988), which imposed antitrust liability "on the basis of improper

20  coercion of a standards-setting body" like ICANN.  *Id.* at 506-07.

21       Under the special circumstances of TLD markets, the Ninth Circuit found

22  that the plaintiff had stated Section 1 claims based upon each of two allegations,

23  that ICANN and VeriSign had conspired: "[1.] to set artificially high prices for

24  VeriSign's services and[; 2.] to ensure that VeriSign would receive successor

25  contracts with ICANN without having to go through a competitive bidding

26  process." *Id.* at 502.

27       Upholding the Section 1 claim based on the second allegation, the Ninth

28  Circuit specifically held that "concerted action between co-conspirators to

5

1    eliminate competitive bidding for a contract is an actionable harm to competition."

2    *Id.* at 502. The Ninth Circuit also found that the plaintiff had adequately "alleged

3    that consumers are harmed by this anti-competitive restraint" because the lack of

4    competition would result in "higher prices for registration of domain names, and

5    potentially lower quality services." *Id.* at 503. It also found sufficient the

6    plaintiff's allegation that ICANN was "economically motivated to conspire with

7    VeriSign because VeriSign agreed to share its monopoly profits with ICANN and

8    to cease its predatory behavior." *Id* at 503.

9       Upholding the Section 1 claim based on the first allegation of above-market

10   prices, the Ninth Circuit found sufficient the plaintiff's allegations that "VeriSign

11   and ICANN undertook concerted action to restrain trade by imposing prices higher

12   than market rate." *Id.* at 504. And the court noted that "harm to consumers in the

13   form of higher prices resulting from competitive restraints has long been held to

14   constitute an actual injury to competition in the Section 1 context." *Id.*

15       The Ninth Circuit also held that the plaintiff had stated a Section 2 claim

16   based upon allegations of VeriSign's predatory activity "aimed at coercing ICANN

17   to perpetuate VeriSign's role as exclusive regulator of the .com domain name

18   market by awarding VeriSign the 2006 .com agreement without any competitive

19   bidding, and by agreeing to the terms that favored VeriSign." *Id.* at 506.

20       Here, Plaintiffs' complaint contains all the key allegations in *VeriSign* plus

21   others: agreements to award and renew the .XXX registry contract without

22   competitive bids (FAC, ¶¶ 3(f), 54, 55, 56(c), 58, 72); agreements to above-market

23   sales prices (and output restrictions) from which ICANN would profit (FAC, ¶¶ 51,

24   54, 56, 57, 75-76, 84-85, 87); and agreements to preclude other adult content TLDs

25   (FAC, ¶¶ 3(g), 56(d), 68); all procured (as in *VeriSign*) first through the stick of

26   coercion followed by the carrot of financial inducements. FAC, ¶¶ 39, 42, 44-57.[1]

27

28   [1] *VeriSign* gave the plaintiff leave to amend separate claims concerning the .net
     TLD. Unlike the registry agreement for the .com market, the registry agreement

1 **IV.   ARGUMENT**

2     **A.   <u>Plaintiffs Adequately Allege Antitrust Injury</u>**

3     By twisting beyond recognition Plaintiffs' straightforward and detailed

4 allegations of classic antitrust harm and injury, ICM incorrectly argues that

5 Plaintiffs fail to meet those Sherman Act elements.

6         **1.   Plaintiffs' Allegations and Standing**

7     Defendants harmed competition in the market for .XXX TLD registry

8 services by, through their agreements, suppressing or eliminating competing bids

9 for the original and renewal registry contracts.  The result was (and Defendants

10 also agreed to) unfavorable prices and sales terms that would not exist in a

11 competitive market.  FAC, ¶¶ 54-58, 71-86.  *VeriSign* makes absolutely clear that

12 such conduct constitutes harm to competition and antitrust injury in TLD markets.

13 *VeriSign* held that, by alleging lack of competitive bidding for the .com TLD,

14 plaintiffs had "alleged that competition itself ha[d] been eliminated.…  This is

15 precisely the type of allegation required to state injury to competition."  611 F.3d

16 at 503.  *VeriSign* also confirmed that the resulting "higher prices for registration of

17 domain names, and potentially lower quality services" constitute harm to

18 competition and antitrust injury.  *Id.*

19     What *VeriSign* holds is classic antitrust law.  Purchasers who sue for

20 suppliers' above market prices, output restrictions, or lower quality services,

21 resulting from impermissible combinations or agreements, establish harm to

22 competition and antitrust injury.  *See, e.g.,* 1-12, von Kalinowski, *supra,* § 12.03

23 ("Whether a restraint has had an actual adverse impact on competition is

24 determined by considering evidence of increased prices, reduced output or

25 decreased quality."); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir.

26 2003) (stunting of product innovation and output by restrictions imposed by credit

27 

28 for the .net TLD had been awarded through competitive bidding, leaving questions
whether the plaintiff had stated a claim for that market.  611 F.3d at 504, 507.

card companies on their member banks constituted harm to competition); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (antitrust laws redress "acts that harm 'allocative efficiency and raise[] the price of goods above their competitive level or diminish[] their quality'"), *quoting American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999), and *citing Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) (antitrust injury "means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws").

Plaintiffs may seek injunctive relief against such antitrust injuries even though they have not yet purchased .XXX services.  Standing for injunctive relief against antitrust violations requires only "threatened loss or damage."  15 U.S.C. § 26.  *See also Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) ("an antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual one"); 1-3 von Kalinowski, *supra*, § 3.04 ("private parties [have] the right to sue for and obtain injunctive relief against threatened violations of the Sherman and Clayton Acts or against a contemporary violation likely to continue or recur").

Plaintiffs have adequately alleged such threatened injury.  FAC, ¶¶ 72-92.  Plaintiffs have not yet purchased any .XXX services because of the above-market prices and unreasonable sales restrictions resulting from lack of competition.  FAC, ¶ 90.  For example, ICM has refused to sell permanent defensive name blocking for a one-time fee to adult entertainment companies like Plaintiffs, and has imposed other restrictions on defensive registrations.  FAC, ¶ 76.  ICM has also required that purchasers release claims as a condition of purchasing .XXX registry services.  FAC, ¶ 86.  These restrictions would not exist in a competitive market.  FAC, ¶ 72.  Unless Plaintiffs can purchase defensive blocking services on reasonable prices and terms, they will suffer diversion of profits to others who use their names (or confusingly similar names) for .XXX websites.  FAC, ¶¶ 90-92.

8

1   But if they do purchase defensive registrations, Plaintiffs will be harmed by (and

2   lose profits due to) ICM's improper sales restrictions and above-market prices.  *Id.*

3   Plaintiffs will also be harmed if forced to pay ICM's above-market prices for

4   affirmative .XXX registrations, or by missing business opportunities while

5   dissuaded from purchasing such registrations due to ICM's unreasonable prices

6   and sales restrictions.[2]  *Id.*

### 2.   ICM's Meritless Arguments

8   In light of this threatened harm and Plaintiffs' allegations of classic antitrust

9   injury, ICM's arguments are easily rebutted.

10   <u>First</u>, ICM argues that Plaintiffs' above-described risks of customer

11   diversion and of other lost profits are not antitrust injury.  ICM Mot., 10:5-21.

12   ICM ignores that Plaintiffs allege other classic antitrust injury: higher prices and

13   output restrictions resulting from anticompetitive conduct.  But the lost business

14   and profits in fact are themselves additional (albeit not required) antitrust injury.

15   They are the expected result of anticompetitive prices or illegal output restrictions.

16   A business which, because of anticompetitive acts in the supplier market, has to

17   pay more for services than it should will earn less and suffer antitrust injury.  *See*

18   W. Holmes & M. Mangiaracina, *Antitrust Law Handbook* § 9:7 (2011) ("[C]ourts

---

[2] Plaintiffs need not purchase even to make damage rather than injunctive relief claims; it is enough that Plaintiffs will suffer harm from refusing to submit to the anticompetitive conduct.  *See Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) ("actionable antitrust injury [is not limited] to situations where the purchaser/ consumer has made or intends to make purchases in the relevant market …."); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 481, 102 S. Ct. 2540, 2549, 73 L. Ed. 2d 149, 162 (1982) (plaintiff could sue for above-market psychiatrist prices despite not paying for or purchasing psychiatric services); *Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., Inc.*, 611 F. Supp. 415, 426 (C.D. Cal. 1985) ("it would appear that one who refuses to purchase has suffered sufficiently direct injury to challenge a tying arrangement"); 2A-3 P. E. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* ¶ 397 (2012) ("Areeda") ("Purchasers are not the only potential victims of antitrust violations.  Those who are excluded (or foreclosed) from participating in a market suffer some economic injury."); E.W. Kintner, *et al.*, 2-9 *Federal Antitrust Law* § 9.4 (2011) ("those consumers who choose not to buy at the higher price lose the value associated with a good they could have purchased at a competitive price").

9

1   have found the requisite antitrust injury for standing where the plaintiff's injuries

2   have consisted of such things as reduced profits or other monetary loss from

3   having to pay supracompetitive prices[.]").

4          Similarly, profits lost due to a supplier's anticompetitive output restrictions

5   constitute antitrust injury.  *See, e.g.*, *Glen Holly Entm't*, 352 F.3d at 373-74

6   (plaintiff's lost profits due to supplier's anticompetitive output reduction

7   agreement constitute antitrust injury); *American Ad Mgmt.*, 190 F.3d at 1057 ("loss

8   of [sales] commissions" due to suppliers' anticompetitive sales restrictions

9   constitute antitrust injury).[3]  Here, Plaintiffs' threatened harm from lost profits thus

10  not only constitutes antitrust injury but also confers standing for injunctive relief.

11         <u>Second</u>, ICM contends that Plaintiffs really complain about increased

12  competition in the downstream market to sell viewers adult website content, and

13  that ICM does "not participate" in that "market for adult web sites."  ICM Mot.,

14  10:25-11:2.  But Plaintiffs do not complain about competition – increased or

15  otherwise – in the downstream market.  They complain instead about lack of

16  competition in markets for the supply of services needed by those who, like

17  Plaintiffs, compete in that downstream market or other markets.  FAC, ¶¶ 60-70.

18  Plaintiffs very specifically complain about lack of competition in: (1) the market to

19  supply defensive .XXX registrations needed to prevent illegitimate misuse of

20

21  _____
    [3] None of ICM's cases supports any counterargument.  Most hold only that
    businesses suing their ***competitors*** do not suffer antitrust injury when they lose
22  sales because of the competitors' aggressive price ***cutting*** or similar practices.  In
    such competitor cases, the lost profits are the result of ***increased*** rather than
23  decreased competition, and so are not a concern of the antitrust laws.  *See, e.g,*
    *Atlantic Richfield v. USA Petroleum*, 495 U.S. 328, 337-38, 340, 110 S. Ct. 1884,
24  1891, 109 L. Ed. 2d 333, 346 (1990) ("cutting prices to capture business from
    competitors is the very essence of competition" and so not generally actionable)
25  (internal citation omitted); *Pool Water*, 258 F.3d at 1035 ("a decrease in profits
    from a reduction in a competitor's prices … is not an antitrust injury" because such
26  lower prices "benefit consumers" and do not "threaten competition"); *Juster v. City
    of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990) (plaintiff has no antitrust claim for
27  "increased competition and reduced profits" due to competitor's agreement with
    third party).  The situation is far different where, as here, purchasers (not
28  competitors) claim they lost profits because their suppliers raised (not lowered)
    prices due to decreased (not increased) competition.

1    Plaintiffs' and others' name rights (including name rights held by businesses

2    having nothing to do with adult content); and (2) the "affirmative" market to

3    supply the right to host .XXX websites with new content, which rights Plaintiffs

4    and others may need to compete in the downstream adult market.  FAC, ¶¶ 60-70.

5    ICM not only *participates* in both these markets, it is the *sole supplier* in each.

6         Third, ICM argues that Plaintiffs have really harmed themselves because

7    they failed to buy one-time defensive blocking rights within the limited two-month

8    sales period.  ICM Mot., 11:9-19.  Plaintiffs ignore that ICM in fact refused, *at any*

9    *time*, to sell one-time blocking rights to adult industry participants like Plaintiffs.

10   FAC, ¶ 76(a).  Moreover, the two-month limitation is itself an actionable output

11   restriction resulting from the lack of competition for .XXX TLD registry services.

12   FAC, ¶¶ 72, 76.  In any event, as explained above, Plaintiffs are not obligated to

13   buy ICM's overpriced and improperly restrictive services in order to seek

14   injunctive relief for ICM's patent Sherman Act violations.[4]

15        Fourth, ICM says that certain defensive registration rights are still available

16   for sale.  ICM Mot.,12:3-5.  How that precludes antitrust claims is unexplained and

17   inexplicable.  A supplier is not insulated from antitrust liability simply because it

18   continues to make illegal sales at above-market prices and under improper output

19   or sales restrictions.[5]  ICM, of course, cites no contrary authority.

20   _____

21   [4] ICM also argues that the release it requires purchasers to sign – and which is not
     properly before the Court – (*see* Plaintiffs' Opposition to ICM's Request for
     Judicial Notice) does not waive antitrust claims.  ICM Mot., 12:20-25, n. 9.

22   However, that is certainly a reasonable construction of the release; discovery will
     have to settle the issue.  *See* ICM Registry-Registrant Agreement, § I(11)

23   (registration requires "waiving claims that you might otherwise have against [ICM
     and its affiliates] based on the laws of [any jurisdiction other that the State of

24   Florida]"); *id.* § V(5) ("You acknowledge and agree that [ICM and its affiliates]
     shall have no liability of any kind … resulting from the proceedings and processes

25   relating to [a variety of .XXX] … processes.").

26   [5] Again relying on documents not properly before the Court, ICM argues that it did
     not require purchasers of "purely defensive" registrations to comply with IFFOR

27   requirements.  ICM Mot., 12:20-25, n. 9.  In fact, Plaintiffs correctly allege that
     ICM required persons who register in .XXX for "certain defensive purposes" (*i.e.*,

28   creating a .XXX site that redirects to an active site in another TLD) to comply with
     IFFOR policies.  FAC, ¶¶ 77-78.  *See* ICM Registry-Registrant Agreement,

11

Finally, ICM argues that Plaintiffs' allegations about harm to consumers in downstream markets – *i.e.*, to viewers of adult content or to those who purchase products from non-adult businesses forced to purchase overpriced defensive registrations – do not establish antitrust injury.  ICM Mot., 13:13-22.  However, Plaintiffs are themselves consumers of ICM's services, and their own harm adequately establishes antitrust injury.  *See Glen Holly Entm't,* 352 F.3d at 372 ("Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.") (internal citation omitted); *SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995) ("the presumptively 'proper' plaintiff is a customer who obtains services in the threatened market").  In any event, *VeriSign* confirms that allegations of consumer harm just like Plaintiffs' are sufficient.  *See* 611 F.3d at 504 ("Harm to consumers in the form of higher prices resulting from competitive restraints has long been held to constitute actual injury to competition….").[6]

## B.   Plaintiffs Adequately Allege Concerted Conduct

Both Defendants argue that Plaintiffs have alleged only unilateral conduct.  The argument simply and surprisingly ignores Plaintiffs' detailed allegations of quintessential concerted conduct – the written ICM/ICANN registry contract and predicate agreements replete with anticompetitive terms.

---

§§ V(5) and VII ("Sponsored Community" definition) (requiring any person who registers a resolving domain name to comply with IFFOR policies).  More broadly, though, ICM does not and cannot dispute on this motion most of the alleged sales restrictions nor the alleged above-market prices.  *See* FAC, ¶¶ 72-86 (detailing restrictions).  Any ***one*** of these is sufficient to constitute classic antitrust injury.  ICM's (in fact meritless) nit-picking about a few of the many alleged sales output restrictions thus proves nothing.

[6] Plaintiffs alleged such consumer harm in detail.  *See* FAC, ¶ 88.  ICM asserts that Plaintiffs' downstream customers will not be harmed because all Plaintiffs' web content is free.  ICM Mot.,13:5.  Not so.  Some such content is free; other content must be purchased.  *See* FAC, ¶ 1.  Moreover, even the quality of free services will be reduced to reflect higher costs from ICM's anticompetitive pricing.  *See* FAC, ¶ 88.  Finally, again, downstream consumers harmed by ICM's anticompetitive conduct are in any event not limited to viewers of adult content.  Such consumers also include purchasers from non-adult businesses which must buy overpriced .XXX defensive registrations.  *See* FAC, ¶¶ 62, 88.

12

1          **1.      Plaintiffs' Allegations**

2          Plaintiffs make detailed allegations of Defendants' concerted agreement to

3    the following anticompetitive terms:

4          a.      *Suppressing competition*.  In *VeriSign*, plaintiff alleged that

5    VeriSign's registry agreement, providing for its renewal absent adjudicated and

6    uncured defaults by VeriSign, illegally restrained competition.  611 F.3d at 500.

7    The plaintiff alleged that this "presumptive renewal provision" had the effect of

8    "reducing or eliminating competition for successor contracts," and that "a

9    competitive rebid [was] essential to protect competition."  *Id.* at 501-02.  The

10   Ninth Circuit overruled the trial court's holding that these allegations were too

11   "conclusory and speculative," instead finding these allegations *alone* sufficient to

12   state Section 1 and 2 claims.  *Id.* at 502-503.  Plaintiffs here make similar

13   allegations.  Here, too, the registry contract has a "presumptive renewal provision":

14   it "*shall* be renewed" absent termination for an adjudicated breach of ICM's

15   (largely technical obligations) that remains uncured for a substantial period.  *See*

16   FAC, ¶¶ 3(f), 56(c), 87; Registry Agreement, §§4.2, 6.1, Ex. 1 to Plaintiffs'

17   Request for Judicial Notice ("PRJN"), pp. 10, 12.  And as in *VeriSign*, Plaintiffs

18   have expressly alleged that the parties understood that these provisions "would

19   almost certainly never be invoked," thus ensuring an absence of competitive

20   renewal bidding.[7]  FAC, ¶ 56(d); *VeriSign*, 611 F.3d at 502.

21         Moreover, Defendants agreed, as a predicate of the written contract, that not

22   only would the renewal contract be awarded to ICM without competition, so would

23   the *initial* contract term.  FAC, ¶¶ 55, 58, 72.  That is hardly surprising.  ICM did

24   _____

25   [7] The contract does condition renewal on negotiation of terms "reasonably
     acceptable to ICANN, taking into account the terms in other existing registry
     agreements with respect to similarly situated TLDs."  Registry Agreement, § 4.2,
26   PRJN, Ex. 1, p. 10.  But as Plaintiffs allege, this provision is ambiguous and
     illusory – for example there will be no other "similarly situated" adult TLDs
27   because of ICANN's agreement not to approve any – and this provision is not an
     adequate substitute for actual renewal contract competition.  FAC, ¶¶ 3(f), 56(c),
28   58, 72.

                                        13

1   not engage in its prolonged predatory campaign just so that ICANN would open

2   the registry contract to competitive bidding.  Approval of the .XXX TLD had no

3   value to ICM unless ICM also procured the registry contract.  Indeed, ICM sought

4   in its IRP award of the .XXX contract without competitive bid.  FAC, ¶¶ 44-47, 55.

5   Defendants' agreement to award the ***initial*** .XXX registry contract without bidding

6   is as anticompetitive as the presumptive written renewal terms.

7         b.    *Precluding other adult content TLDs*.  The registry contract provides

8   that .XXX is intended to "provide on-line, sexually-oriented Adult Entertainment,"

9   and that any future TLDs approved by ICANN should be "clearly differentiated

10   from existing TLDs" like .XXX.[8]  Ex. 1 to PRJN, p. 69 (Part 1(a)) and p. 82

11   (Part 7).  Though this provision is not stated with crystal clarity (as to be expected

12   with conspirators reluctant to publicly confirm their scheme), ICM's President

13   Stewart Lawley has (as Plaintiffs allege) admitted that this term was intended to

14   ensure that .XXX would remain the only adult content TLD.  FAC, ¶¶ 3(g), 56(d),

15   68, 87.

16         c.    *Setting and delegating authority for sales prices and terms*.  ICANN

17   has complete monopoly power to approve and set sales terms and prices for

18   registry services.  FAC, ¶¶ 25, 31, 32.  ICANN has used that power to set price

19

---

20   [8] ICANN's request for judicial notice fails to attach the entire registry contract,
which is attached to the PRJN.  The registry contract incorporates an Appendix S.

21   Registry Contact, § 1.3, Ex. 1 to PRJN, pgs. 69-86.  Appendix S provides: "7 TLD
Differentiation. …[O]ne of the criteria included in the [TLD] application process

22   [has been] that ***a new TLD be "clearly differentiated from existing TLDs.***  [In
approving new TLDs, ICANN,] ***shall take into consideration … any***

23   ***objections[of] interested third parties***."  Appendix S, PRJN, Ex. 1, p. 82 (emphasis
added).  Based on Lawley's oral admission and subject to confirming discovery,

24   that provision may reasonably be construed as an agreement that ICM as a "third
party" may object to TLDs intended for adult content, *i.e.*, may object to TLDs ***not***

25   sufficiently different from .XXX.  *Monaco v. Bear Stearns Residential Mortg.
Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) ("A motion to dismiss cannot

26   be granted against a complaint to enforce an ambiguous contract . . . capable of
two or more reasonable interpretations.") (internal citations and quotation marks

27   omitted.); *accord Barrous v. BP P.L.C.*, No. 10-CV-2944-LHK, 2010 WL
4024774, *4 (N.D. Cal. Oct. 13, 2010) ("'[w]here the [contract] language 'leaves

28   doubt as to the parties' intent,' the motion to dismiss must be denied.") (internal
citations omitted).

caps or other sales restrictions in many registry contracts.  FAC, ¶ 54.  Here, instead, ICANN in the .XXX registry contract specifically "delegates" to ICM all ICANN's "pricing" and other sales authority.[9]  Plaintiffs allege, in terms just like those found sufficient in *VeriSign*, that this delegation was made so that ICM could charge monopoly prices from which both ICANN and ICM would benefit.  FAC, ¶¶ 3(e), 56(a).  *Cf. VeriSign*, 611 F. 3d at 503 ( "plaintiff has also alleged that ICANN was economically motivated to conspire …. because VeriSign agreed to share its monopoly profits…").  Moreover, Plaintiffs allege that, as a predicate to the express delegation, ICM specifically told ICANN about – and ICANN agreed to – ICM's initial above market $60 annual registration fee and intended anticompetitive sales restrictions.  FAC, ¶¶ 56(a), 58, 72, 75, 84-85, 96.

Defendants argue that the express delegation is an "absence of agreement" rather than an agreement.  The distinction is false.  An agreement delegating power or to refrain from competitive conduct is as actionable as an agreement to affirmative anticompetitive conduct.  *See, e.g.*, *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-96, 98 S. Ct. 1355, 1365-1368, 55 L. Ed. 2d 637, 650-653 (1978) (agreement to refrain from submitting competitive bids for engineering services violates Section 1); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 906-909 (6th Cir. 2003) (agreement to refrain from marketing products violated Sherman Act); *Swift & Co. v. United States*, 196 U.S. 375, 400-401, 25 S. Ct. 276, 281, 49 L. Ed. 518 (1905) (agreement to refrain from bidding at auction violates Section 1).[10]

---

[9] *See* Registry Agreement, §1.3, PRJN, Ex. 1, p. 1. ("ICANN hereby **delegates** to [ICM] the power to develop policies for the TLD consistent with … Appendix S."); Appendix S, Part 2, PRJN, Ex. 1, p. 70 (ICM shall have "delegated authority [*i.e.*, authority from ICANN] to develop policy for the sTLD [i.e. .XXX] in the following areas: …3(c) **pricing.**"  The delegated authorities also include other sales terms.  *Id.*

[10] ICM's sole citation on this issue is not contrary.  *Selehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004), merely held, on summary judgment, that no conspiracy between a university and professor could be implied from the

15

1    Moreover, the distinction makes no sense.  *VeriSign* criticized ICANN for

2    succumbing to VeriSign's pressure to set a capped above-market price.  This

3    express delegation is worse.  It sets no cap at all, with the intent that ICM will set

4    (and share with ICANN) future even higher and unchecked monopoly prices.

5    FAC, ¶¶ 56(a), 58.  Finally, and in any event, Plaintiffs expressly allege that the

6    parties agreed to the specific initial anticompetitive $60 annual registration fee and

7    sales restrictions.  FAC, ¶¶ 56, 58(a), 72, 75, 84-85, 96.  As a result, even if the

8    antitrust laws required agreement on specific price (which they do not), Plaintiffs

9    have alleged such agreement.  *Id*.

10                    **2.    Defendants' Meritless Arguments**

11    Defendants' attacks on the allegations of this concerted conduct fail.

12    <u>First</u>, Defendants argue that, as a matter of law, there can be no conspiracy

13    because ICANN resisted ICM's coercive efforts for years before succumbing.

14    ICM Mot., 15:13-22; ICANN Mot., 1:21-2:4.  But that initial resistance is hardly

15    inconsistent with conspiracy.  Plaintiffs allege that, just as in *VeriSign*, the

16    registry's coercive behavior weakened ICANN's resistance, which was then finally

17    and later overcome through money and a promise to stop.  *See VeriSign*, 611 F.3d

18    at 501; FAC, ¶ 51.  In other words, the initially unsuccessful stick made ICANN

19    more compliant for the ultimately successful carrot.  And even if ICANN was a

20    reluctant conspirator, it is a conspirator nonetheless.  *See*, *e.g.*, *City of Vernon v.*

21    *Southern California Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) ("[A]

22    conspiracy to monopolize may exist even where one of the conspirators

23    participates involuntarily or under coercion."); *Calnetics Corp. v. Volkswagen of*

24    *America, Inc.,* 532 F.2d 674, 682 (9th Cir. 1976) (same).

25    <u>Second</u>, Defendants argue that there could be no conspiracy because ICANN

26    permitted open applications in 2000 and 2004 for new sponsored TLDs.  ICM

27    ───────────────────────────────

28    university's failure after the fact to punish the professor's alleged unilateral theft of
      a student's research.

1   Mot., 18:8-17; ICANN Mot., 7:5-8:7.  But permitting applications for a variety of

2   TLDs, having myriad sponsoring organizations and intended for quite diverse

3   pursuits, does not create competition for the specific .XXX TLD registry contract,

4   which is the only contract for an exclusively adult-content TLD.  Defendants do

5   not deny that there was no competition for the .XXX contract.  And Plaintiffs

6   complain about the agreement to preclude competition for the .XXX contract, not

7   about competition for approval among other potential TLDs.

8        <u>Third</u>, Defendants cite *Rickards v. Canine Eye Registration*, 704 F.2d 1449,

9   1453 (9th Cir. 1983), which held, on summary judgment, that suppliers may refuse

10   to sell to dealers not meeting sales prices or policies "unilaterally made [by the

11   supplier]," and "based on considerations of quality control and liability."[11]

12   ICANN Mot., 19:19-27.  But Plaintiffs' allegations are not that ICANN as the

13   supplier ***unilaterally*** set any prices or sales policies and then forced ICM to

14   comply.  Quite the opposite, Plaintiffs allege that ICANN did not want .XXX.

15   ICM then pushed and ICANN eventually succumbed by agreeing to above-market

16   pricing and other policies which benefitted both Defendants.  *VeriSign* (and other

17   authorities) expressly hold such ***agreements*** actionable.

18        <u>Fourth</u>, Defendants argue that because ICANN holds the exclusive power to

19   approve registries, it could not have ***agreed*** to approve them.  ICANN Mot., 19:19-

20   22.  But that makes no sense.  A party like ICANN can of course agree with

21   another party to exercise those powers in an anticompetitive way, and that is

22   exactly what ICANN did here and in *VeriSign*.

23

24

---

25   [11] Defendants' other cites to the same effect are *Chase v. Northwest Airlines*,
49 F. Supp. 2d 553, 564 (E.D. Mich. 1999) (no conspiracy where "dealer or
26   distributor involuntarily complies with producer's [unilaterally set] sales policies to
avoid termination of his product source"); *Suzuki Western v. Outdoor Sports*,
27   126 F. Supp. 2d 40, 46 (D. Mass. 2001) (summary judgment case; no conspiracy
for supplier's "unilaterally adopted" sales policy where supplier "had no motive to
28   enter into a conspiracy").

1   <u>Finally</u>, ICM argues that Plaintiffs have not pleaded concerted conduct with

2   sufficient detail.  ICM Mot., 14:11-16.  But the express provisions in the written

3   registry contract are expressly alleged and not in dispute.  FAC, ¶¶ 52-58.  As for

4   the predicate agreements, Plaintiffs need do no more than plead facts sufficient to

5   provide "plausible grounds to infer," or "to suggest" that an agreement may have

6   been made.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955,

7   1965, 167 L. Ed. 2d 929, 940 (2007).[12]  Here, for example, ICM's extensive

8   pressure for a no-bid initial contract, the eventual written agreement, and the

9   absence of bidding in fact make the no-bid agreement plausible, as it did in

10  *VeriSign*.  *See also In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d

11  1179, 1183 (N.D. Cal. 2009) ("Contrary to defendants' suggestions, neither

12  *Twombly* nor the Court's prior order requires elaborate fact pleading."); *In re*

13  *Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal.

14  2007) (plaintiffs need not plead "specific back-room meetings between specific

15  actors at which specific decisions were made").

16  **C.    Plaintiffs Adequately Allege Predatory Conduct**

17         Again ignoring Plaintiffs' actual allegations, ICM incorrectly argues that

18  Plaintiffs fail to allege any Section 2 "anticompetitive or predatory conduct."  ICM

19  Mot., 17:11-23:28.[13]

---

20  [12] None of ICM's cases are contrary.  *Apple Inc. v. Samsung Electronics Co., Ltd.*,
21  No. 11-CV-01846-LHK, 2011 WL 4948567, *7 (N.D. Cal. Oct. 18, 2011)
    (plaintiff need only plead some "evidence that tends to exclude the possibility of
22  independent action"; no conspiracy where parties did not agree but rather one party
    lied to and misled another); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051-52
23  (9th Cir. 2008) (dismissing claim ***after discovery*** for failing to provide any
    evidence supporting conspiracy as oppose to mere independent parallel action by
24  competitors).  Many of ICANN's cases address mere independent but parallel
    conduct by competitors.  They do not address ***written*** agreements (and other long
25  interactions) between the alleged conspirators, specific motives for agreement, and
    the other circumstances making the predicate agreements plausible here.

26  [13] Moreover, Plaintiffs' claim for conspiracy to monopolize does not require
    predatory conduct, but only one or more overt "[a]cts done to give effect to the
27  conspiracy [that] may be in themselves wholly innocent."  *American Tobacco Co.*
    *v. United States*, 328 U.S. 781, 809, 66 S. Ct. 1125, 1139, 90 L. Ed. 1575, 1594
28  (1946).

18

### 1.     The Predatory Agreements and Other Conduct

Section B above details Defendants' **agreements** to suppress competition for the initial and renewal .XXX registry contracts; to preclude other adult content TLDs; to set initial above-market prices and output restrictions; and to delegate ICANN's sales and pricing authority to ICM for purposes of allowing future even less competitive pricing and sales terms.  ICM ignores these agreements.  *See* ICM Mot., 18:21-23, n. 17.  Why?  Because the law is plain that these anticompetitive agreements **alone** satisfy any requirement for Section 2 predatory conduct.  *See*, *e.g.*, 2-25 von Kalinowski, *supra*, § 25.04 ("It has long been held that a violation of Section 1 of the Sherman Act can form the basis for willful acquisition or maintenance of monopoly power."); *Bushie v. Stenocord Corp.*, 460 F.2d 116, 120-121 (9th Cir. 1972) ("evidence tending to establish a claim or restraint of trade under Section One also tends to establish an attempt to monopolize under Section Two"); *Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328, 332 (9th Cir. 1972) ("The conduct supporting a cause of action for conspiracy under section 1 may also support a claim under section 2.").

In addition to these illegal agreements, Plaintiffs allege ICM's long scheme of coercive conduct intended to suppress competition for the .XXX contract.  FAC, ¶¶ 36, 39, 40, 42, 44-47, 49-51.  Again, *VeriSign* specifically found such conduct predatory for Section 2 purposes.  *See* 611 F.3d at 505-507 (VeriSign's predatory campaign consisted, for example, of "stacking" meetings, hiring "paid bloggers," "planting new stories critical of ICANN," and hiring independent organizations).

### 2.     ICM's Meritless Arguments

ICM's contrary arguments are plainly meritless.

First, ICM claims that the Sherman Act does not **always require** competitive bidding.  ICM Mot., 18:20-28.  But *VeriSign* and ICM's own cited cases nevertheless hold that lack of competitive bidding may, and in particular **agreements** to suppress competitive bidding **do**, constitute predatory conduct.  *See*

19

1     *VeriSign*, 611 F. 3d at 502-503 (while competitive bidding is "not required" by the

2     Sherman Act, its "presence or absence" is a "factor to be considered," and in

3     particular agreements or "concerted action between conspirators to eliminate

4     competitive bidding for a contract is an actionable harm to competition"); *see also*

5     *Harkins Amusement Enters., Inc. v. General Cinema Corp.*, 850 F.2d 477, 487 (9th

6     Cir. 1988) ("Concerted action to eliminate competitive bidding violates the

7     Sherman Act."); *Stanislaus Food Prods. Co. v. USS-POSCO Industries*, No. CVF

8     09-0560 LJO SMS, 2010 WL 3521979, *27 (E.D. Cal. Sept. 3, 2010) ("Conduct

9     that impairs the opportunities of rivals and either does not further competition on

10    the merits or does so in an unnecessarily restrictive way may be deemed" predatory

11    for purposes of Section 2.).[14]

12         <u>Second</u>, ICM argues that by ***unilaterally*** charging higher prices "alone," a

13    monopolist is not engaging in predatory conduct.  ICM Mot., 19:16-20:3.  But

14    *VeriSign* expressly distinguished ICM's authority, *Alaska Airlines v. United*

15    *Airlines*, 948 F.2d 536, 549 (9th Cir. 1991), by noting that, while "an entity cannot

16    be liable for antitrust violations if it simply unilaterally increases it prices,"

17    "concerted action to restrain trade by imposing prices higher than market rate" do

18    violate antitrust laws.  *VeriSign*, 611 F. 3d at 503-504.  *See also, e.g., Freeman v.*

19    *San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003) ("No antitrust

20

---

21    [14] In fact, ICM's own cases hold that lack of competitive bidding, and in particular agreements to same, constitute anti-competitive or predatory conduct where it restrains trade.  *See National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692-96 ("The Sherman Act does not require competitive bidding***; it prohibits unreasonable restraints on competition. Petitioner's ban on competitive bidding prevents all customers from making price comparisons [and so]…this restraint .. must be justified under the Rule of Reason.***") (emphasized text omitted from ICM's quotation); *VeriSign*, 611 F.3d at 503 ("So long as the agreement is the result of independent business judgment, ***is not the result of an intention to restrain trade, or does not actually injure competition***, it is immaterial whether it was secured through a competitive bidding process.") (emphasis added); *Security Fire Door Co. v. County of L.A.*, 484 F.2d 1028, 1031 (9th Cir. 1973) ("Even a direct contract…, without any pretense of putting the job out to bid … , would not in itself have constituted a restraint of trade ***under the Sherman Act if the selection of Guilbert had been made in an atmosphere free from anticompetitive restraints***.") (emphasized text omitted from ICM's quotation).

1   violation is more abominated than the agreement to fix prices.").  Here, Plaintiffs

2   allege just such agreements.

3        Third, ICM argues that Plaintiffs do not allege below-cost predatory

4   conduct.  ICM Mot., 19:10-15.  That is true, but irrelevant.  While **one** form of

5   predatory conduct is below-cost pricing intended to drive competitors out of

6   business, such pricing is of course not the **only** form of Section 2 predatory

7   conduct.  *See*, *e.g.*, 2-25 von Kalinowski, *supra*, § 25.04 (noting great varieties of

8   predatory conduct, including predatory below cost pricing, but also all kinds of

9   other conduct).  Plaintiffs here allege predatory efforts to monopolize through,

10  among other things, the agreements and coercive campaign.

11       Fourth, ICM argues if not ICM, then another single company would obtain

12  the .XXX contract and the monopoly .XXX profits, a result to which antitrust law

13  should be indifferent.  ICM Mot., 20:4-17.  The argument utterly ignores Plaintiffs'

14  allegations.  As in *VeriSign*, Plaintiffs allege that the **terms** of the .XXX contract

15  should be set through (and would benefit from) competition, whether ICM or

16  another entity is the winning bidder.  Plaintiffs seek such competitive pricing and

17  terms, not just a shift of the existing anticompetitive terms to a new registry.  FAC,

18  ¶¶ 99, 109, 120, 129, 139.

19       Fifth, ICM argues that its coercive conduct could not be predatory because it

20  was "entirely unsuccessful."  ICM Mot., 22:8-23.  In fact, just as in *VeriSign*, the

21  registry's efforts were initially unsuccessful but ***ultimately*** successful.  And again,

22  *VeriSign* emphasized that "improper coercion of a standards-setting body" like

23  ICANN is an antitrust violation.  *VeriSign*, 611 F.3d at 506.[15]

---

24  [15]ICM's cases are inapposite.  *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d
25  518, 524, 526 (5th Cir. 1999), and *Security Fire Door*, 484 F.2d at 1031, hold only
    that antitrust law does not prohibit encouraging city specifications favorable to the
26  "virtues" of a supplier's products.  These cases do not authorize Defendants'
    agreements to suppress competition or ICM's coercion.  *See*, *e.g.*, *VeriSign*, 611 F.
27  3d at 507 ("improper coercion of ICANN and attempts to control ICANN's
    operations in its own favor violated Section 2").  *Fishman v. Estate of Wirtz*,
28  807 F.2d 520, 544 (7th Cir. 1986), imposed antitrust liability for trying to limit
    competition for ownership of the Chicago Bulls.  *Fishman* held that while "it was

21

1    <u>Sixth</u>, ICM argues that **certain** of its coercive behavior, in particular its

2    meritless FOIA request, lawsuit, and threat of lawsuits, are protected by *Noerr-*

3    *Pennington*.  But *Noerr-Pennington* does not protect sham or baseless such

4    conduct.  *See, e.g., California Motor Transport Co. v. Trucking Unlimited,*

5    404 U.S. 508, 513, 92 S. Ct. 609, 613, 30 L. Ed. 2d 642, 648 (1972) (explaining

6    sham exception); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,

7    690 F.2d 1240, 1254 (9th Cir. 1982) (same), *overrule on other grounds, Mayle v.*

8    *Felix*, 545 U.S. 644, 658, 125 S. Ct. 2562, 2571, 162 L. Ed. 2d 582, 594-595

9    (2005).  Plaintiffs specifically allege that the specified activities were baseless, and

10   so unprotected.  FAC, ¶¶ 42, 47.[16]  In any event, just as in *VeriSign*, even if **some**

11   of ICM's litigation activities were protected, the remaining "harassing activities

12   that accompanied the litigation" would still be predatory under Section 2.  *See*

13   *VeriSign*, 611 F.3d at 505-06.

14            **D.    <u>Plaintiffs' Requested Relief Does Not Support Dismissal</u>**

15           Plaintiffs ask the Court to fashion equitable, injunctive relief to remedy the

16   harms to competition.  Generally, Plaintiffs request "such other and further relief

17   as the Court deems just and proper."  FAC, Prayer, ¶ 3.  Specifically, Plaintiffs

18   seek orders that would enjoin the .XXX TLD as currently operated, void the

19   anticompetitive ICM/ICANN agreements, require competitive bidding for a new

20   .XXX registry agreement, or impose reasonable price constraints and service

21   requirements on ICM.  FAC, ¶¶ 99, 109, 120, 129, 139.  ICM argues that "the

22

23
_____

24   not **in itself** anticompetitive for CPSC to suggest to the NBA that it should be the
     lucky one" to own the Bulls (*id.* at 544 (emphasis added)), the defendants' other
25   conduct limited ownership competition and thus violated the antitrust laws.

26   [16] ICM also argues that its IRP was successful and so not predatory.  But the non-
     binding IRP was merely another cog in ICM's efforts to exhaust ICANN's
     resources.  FAC, ¶¶ 44-47.  Moreover, *Noerr-Pennington* does not apply to
27   "private adjudications carried out before a privately selected arbitrator," such as
     the non-binding IRP proceedings.  *In re Morrison*, No. 05-45926, 2009 WL
28   1856064, *3 (Bankr. S.D. Tex. June 26, 2009).

nature of the remedy Plaintiffs seek also supports dismissal." ICM Mot., 24:1. That argument fails, for several reasons.

First, Section 16 of the Clayton Act permits broad remedial relief for antitrust violations under the "same conditions and principles" generally "granted by courts of equity." 15 U.S.C. § 26. In fashioning such relief, the Court's duty is to ensure "complete extirpation" of the anticompetitive conditions. *United States v. United Shoe Mach. Co.*, 391 U.S. 244, 250-252, 88 S. Ct. 1496, 1501, 20 L. Ed. 2d 562, 567 (1968). To accomplish that duty, the "district courts are invested with large discretion to model their judgments to fit the exigencies of the particular case." *United States v. Glaxo Group, Ltd.*, 410 U.S. 52, 63-64, 93 S. Ct. 861, 868, 35 L. Ed. 2d 104, 113 (1973) (internal citations and quotation marks omitted).

The scope and variety of permitted relief is vast.[17] It may include the kinds of relief requested by Plaintiffs. For example, orders requiring divestiture or dissolution, or prohibiting performance of anti-competitive agreements, are sometimes appropriate. *See, e.g.*, *California v. American Stores Co.*, 495 U.S. 271, 281, 283-285, 110 S. Ct. 1853, 1859, 109 L. Ed. 2d 240, 252 (1990); 2-3 Areeda, *supra*, ¶ 325 (discussing permissibility of "an injunction against the [anti-competitive] agreement"). Orders requiring competitive bidding are at times necessary. *See, e.g.*, *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 697 (affirming injunction against agreement to ban competitive bidding). And, orders enforcing reasonable prices are also permissible. *See Glaxo Group*, 410 U.S. at 64 (requiring reasonable prices in Sherman Act case).

---

[17] As stated in 2-3 Areeda, *supra*, ¶ 325: "The content of antitrust decrees is too variable to list, but [includes] decrees that have ordered: defendants to dispose of certain companies; to create a company with appropriate assets and personnel to compete effectively with the defendant; … to provide goods and services to all who wish to buy or just to plaintiffs; to revise the terms on which the defendant buys or sells; to cancel, shorten, or modify outstanding agreements with competitors, suppliers or customers… ."

1    <u>Second</u>, even if after hearing all the evidence, the Court declines to grant the

2    particular injunctions requested by Plaintiffs, the Court should nevertheless fashion

3    another appropriate remedy.  *See* Fed. R. Civ. Pro. 54(c) ("[E]very final judgment

4    shall grant the relief to which the party in whose favor it is rendered is entitled,

5    even if the party has not demanded such relief in the party's pleadings.").

6    <u>Third</u>, and particularly for that reason, dismissal based on Plaintiffs'

7    requested relief is inappropriate at the pleading phase.  Instead, the Court should

8    reserve its equitable discretion to fashion appropriate relief at a later stage.  *See In*

9    *re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 550 (D.N.J. 2004) ("This Court is

10   loathe at this stage … to curtail its broad equity powers to fashion the most

11   complete relief possible . . . [and] dismissal at this stage of the proceedings would

12   be premature."); 10-54 D.R. Coquillette, *et al.*, *Moore's Federal Practice - Civil* §

13   54.70 (2012) ("The demand for judgment is not a part of the pleader's claim for

14   relief, so the fact that the relief requested cannot be awarded does not justify a

15   dismissal of the pleading for legal insufficiency.").

16   <u>Fourth</u>, ICM relies upon *Verizon Commun's Inc. v. Trinko*, 540 U.S. 398,

17   124 S. Ct. 872, 157 L. Ed. 2d 823 (2004), and cases following it.  None of them

18   dismissed an otherwise proper antitrust claim merely because of the requested

19   remedy.  Rather, for policy or other reasons, all found no antitrust liability in the

20   first instance.  For example, in *Trinko*, the Court declined to adopt a novel theory

21   for extending the Sherman Act to a complex regulatory process governing the

22   dismantling of the AT&T telephone monopoly.  The Court found the existing

23   regulatory structure already "designed to deter and remedy anticompetitive harm,"

24   leaving little benefit to extending the antitrust laws, particularly where relief would

25   require burdensome "day-to-day" court oversight and hard economic

26   determinations better suited to the regulatory offices.  *Id.* at 411-15.  *See also* 1A-

27   2C Areeda, *supra*, ¶ 241 ("The [*Trinko*] Court found that…where the regulatory

28   agencies were overseeing competition effectively while the antitrust claim was

24

1   extremely difficult to administer and likely to be counterproductive, application of

2   the antitrust laws was inappropriate.").

3         Here, by contrast, Plaintiffs' claims are not novel, there is no pre-existing

4   "complex [governmental] regime" already regulating competition in the

5   transactions at issue (*see* FAC, ¶ 26),[18] and the appropriate remedy need not

6   require intensive court oversight – it could be as simple as ordering competitive

7   rebids for the .XXX registry contract.  ICM's other cases relying on *Trinko* are

8   similarly inapplicable.  Some are not pleading cases; most rely on factors other

9   than the requested relief (such as a pre-existing regulatory regime); and none

10  dismiss a claim at the pleading stage based on the alleged relief alone.[19]

11
12  DATED: June 8, 2012                    RESPECTFULLY SUBMITTED,

13                                          THOMAS P. LAMBERT
                                            JEAN PIERRE NOGUES
14                                          KEVIN E. GAUT
                                            MITCHELL SILBERBERG & KNUPP LLP
15
16                                          By:/s/ Kevin E. Gaut
17                                               Kevin E. Gaut
                                                 Attorneys for Plaintiffs
18
19
_____

20  [18] Courts commonly distinguish *Trinko* on just that ground.  *See, e.g.*, *Stand Energy
    Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 641 (S.D. W.
21  Va. 2005) (case does not "involve[] the same level of regulatory overlay and
    unique market found in *Trinko*"); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d
22  522, 531 (D.N.J. 2004) ("In the instant case [unlike *Trinko*], there exists no
    regulatory scheme so extensive as to supplant antitrust laws.").

23  [19] *See, e.g.*, *Pac. Bell Tel. Co. v. Linkline Commun's, Inc.*, 555 U.S. 438, 449-451,
    129 S. Ct. 1109, 1119, 172 L. Ed. 2d 836, 845-847 (2009) (citing *Trinko* and
24  refusing to apply novel antitrust theory to acts closely regulated by federal
    communication laws); *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124,
25  1135-36 (9th Cir. 2004) (statutes extensively regulated pricing, making antitrust
    concerns "small"); *Four Corners Nephrology Assocs. v. Mercy Medical Ctr. of
26  Durango*, 582 F.3d 1216, 1226 (10th Cir. 2009) (doctor proved no concerted
    action; in *dicta*, court hypothesized that doctor "might" request an inappropriate
27  complex remedy); *Greco v. Verizon Commun's, Inc.*, No. 03-00718, 2005 WL
    659200, *5 (S.D.N.Y. Mar. 22, 2005) (close regulation of conduct by telephone
28  statutes and regulatory bodies made applying Sherman Act unnecessary).