1   Jeffrey A. LeVee (State Bar No. 125863)
    jlevee@JonesDay.com
2   Kate Wallace (State Bar No. 234949)
    kwallace@JonesDay.com
3   JONES DAY
    555 South Flower Street
4   Fiftieth Floor
    Los Angeles, CA  90071.2300
5   Telephone:   (213) 489-3939
    Facsimile:   (213) 243-2539
6
7   Attorneys for Defendant
    INTERNET CORPORATION FOR
    ASSIGNED NAMES AND NUMBERS
8

9                  UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12  MANWIN LICENSING                     Case No. CV11-9514 PSG (JCGx)
    INTERNATIONAL S.A.R.L., a
13  Luxembourg limited liability         Assigned for all purposes to
    company (s.a.r.l.), and DIGITAL      The Honorable Philip S. Gutierrez
14  PLAYGROUND, INC., a California
    corporation,                         **DEFENDANT INTERNET**
15                                       **CORPORATION FOR ASSIGNED**
                                         **NAMES AND NUMBERS' REPLY**
16              Plaintiffs,              **MEMORANDUM IN SUPPORT OF**
                                         **ITS MOTION TO DISMISS**
17        v.                            **PLAINTIFFS' FIRST AMENDED**
                                         **COMPLAINT PURSUANT TO**
18  ICM REGISTRY, LLC,                  **FEDERAL RULE OF CIVIL**
    d.b.a. .XXX, a Delaware limited     **PROCEDURE 12(b)(6)**
19  liability corporation, INTERNET
    CORPORATION FOR ASSIGNED            [Response to Plaintiffs' Opposition to
20  NAMES AND NUMBERS, a                Request for Judicial Notice Filed
    California non-profit public benefit Concurrently Herewith]
21  corporation, and DOES 1-10,
                                         Date:        July 30, 2012
22              Defendants.             Time:        1:30 p.m.
                                         Courtroom:   880 Roybal Federal Bldg.
23

24

25

26

27

28
                                         ICANN'S REPLY ISO MTD FAC
                                         CASE NO. CV11-9514 PSG (JCGx)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................... 1

II.   THE ANTITRUST LAWS DO NOT APPLY TO ICANN'S NON-
      COMMERCIAL ACTIVITIES ....................................................... 1

      A.    The Sherman Act Only Applies to Competition-Reducing
            Conduct in Trade or Commerce .......................................... 1

      B.    Plaintiffs' Argument Based on ICANN's Non-Profit Status Is a
            Straw Man ........................................................................... 3

      C.    Plaintiffs' Contention That ICANN Engages in Commercial
            Activities Is Unsupported by Their Allegations and Authorities ........ 4

      D.    ICANN Cannot Be Liable Under the Antitrust Laws for ICM's
            Independent Conduct .......................................................... 5

III.  ICANN'S UNILATERAL CONDUCT IS NOT ACTIONABLE ................. 6

IV.   PLAINTIFFS HAVE NOT ALLEGED PROPERLY DEFINED
      RELEVANT MARKETS ................................................................ 6

      A.    Plaintiffs' "Defensive Registration" Market Is Not an
            Appropriately Defined Product Market ................................ 7

      B.    Plaintiffs' Allegation of an "Incipient" Market for Affirmative
            Registrations Is Impermissibly Speculative ......................... 9

            1.    Plaintiffs Fail to Allege Facts Supporting the Dissipation
                  of Substitutable Products ........................................ 10

            2.    The Availability of Injunctive Relief Does Not Make Up
                  For Plaintiffs' Failure to Allege a Significant Risk of
                  Future Monopolization ............................................ 11

V.    PLAINTIFFS' THIRD CAUSE OF ACTION MUST BE
      DISMISSED, REGARDLESS OF ITS LABEL ..................................... 12

VI.   CONCLUSION ........................................................................... 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen Bradley Co. v. Local Union No 3*,
   325 U.S. 797, 65 S. Ct. 1533, 89 L. Ed. 1939 (1945) .......................................... 6

*Am. Society of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982) .................................... 5

*Apex Hosiery Co. v. Leader*,
   310 U.S. 469, 60 S. Ct. 982, 84 L. Ed. 1311 (1940) ....................................... 1, 2

*Bell Atlantic v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ......................... 6, 7, 9

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ................................................................................. 4

*Bronx Legal Servs. v. Legal Servs. for New York City*,
   No. 02 Civ. 6199(GBD), 2003 WL 145558 (S.D.N.Y. Jan. 17, 2003) ............ 2, 5

*Cal. State Council of Carpenters v. Associated Gen. Contractors of Cal.,
   Inc.*,
   648 F.2d 527 (9th Cir. 1980) .................................................................................... 6

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) ............................................................................... 7, 8

*Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc'y of
   United States, Inc.*,
   50 F.3d 710 (9th Cir. 1995) ..................................................................................... 2

*DocMagic, Inc. v. Ellie Mae, Inc.*,
   745 F. Supp. 2d 1119 (N.D. Cal. 2010) .............................................................. 11

*Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*,
   123 F.3d 301 (5th Cir. 1997) .............................................................................. 9, 12

*Fraser v. Major League Soccer, L.L.C.*,
   284 F.3d 47 (1st Cir. 2002) .................................................................................. 12

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ............................................................................. 12

*FTC v. Superior Court Trial Lawyers Assn.*,
   493 U.S. 411, 110 S. Ct. 768, 107 L. Ed. 2d 851 (1990) ..................................... 3

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975) ....................................... 5

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980) ............................................................................... 12

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ................................................................ 7

*L.A. Meat & Provision Drivers Union v. United States*,
   371 U.S. 94, 102, 83 S. Ct. 162, 9 L. Ed. 2d 150 (1962) ...................... 6

*LiveUniverse, Inc. v. MySpace, Inc.*,
   No. CV 06-6994 AHM (RZx), 2007 WL 6865852, at *8 (C.D. Cal. June
   4, 2007). ................................................................................................ 11

*NCAA v. Bd. of Regents*,
   468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) ........................ 4

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .............................................................. 11

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .............................................................. 12

*Salco Corp. v. General Motors Corp., Buick Motor Div.*,
   517 F.2d 567 (10th Cir. 1975) .............................................................. 12

*Smith v. Network Solutions, Inc.*,
   135 F. Supp. 2d 1159 (N.D. Ala. 2001) ............................................... 8

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993) .......... 10, 11, 12

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) .............................................................. 10

*United States v. Brown Univ.*,
   5 F. 3d 658 (3d Cir. 1993) ..................................................................... 5

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,
   156 F.3d 535 (4th Cir. 1998) ................................................................. 5

*Weber v. Nat'l Football League*,
   112 F. Supp. 2d 667 (N.D. Ohio 2000) ............................................... 8

STATUTES

15 U.S.C. § 1 .................................................................................................. 1

15 U.S.C. § 2 .................................................................................................. 1

OTHER AUTHORITIES

IB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 262a ...................... 3

IIIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 809 ...................... 12

ICANN'S REPLY ISO MTD FAC
CASE NO. CV11-9514 PSG (JCGx)

## I.   INTRODUCTION

Plaintiffs are the registrants of domain names for some of the most popular adult content websites on the Internet.  As registrants, Plaintiffs purchase from registrars (or their agents) the right to operate domain names.  Registrars offer domain name registration services pursuant to agreements with the operators of various Internet registries such as .COM or .NET.

Co-defendant ICM is a registry operator that has been authorized by ICANN, the non-profit organization that administers portions of the DNS, to operate the .XXX TLD.  Although Plaintiffs are three steps removed from ICANN, and although ICANN does not (and is not permitted by its bylaws to) sell domain name registrations, Plaintiffs contend that ICANN's unilateral decision to increase competition in the market for domain names by authorizing the introduction of the .XXX TLD restrains trade and will lead (one day) to ICM's monopolization of two relevant markets (although neither is a properly defined antitrust market).  But in reality, Plaintiffs are seeking to employ the antitrust laws to preserve their dominant position in the "market" for adult content websites because their ultimate goal is revocation of the .XXX TLD, not modifications to its terms of operation.

In opposing ICANN's motion to dismiss, Plaintiffs dramatically misstate ICANN's arguments regarding the applicability of the Sherman Act to non-commercial activities, attempt to redefine their flawed relevant market allegations, and ask the Court to adopt an impermissibly broad interpretation of Section 2 conspiracy doctrine.  Plaintiffs' FAC is fatally flawed and must be dismissed without leave to amend.

## II.   THE ANTITRUST LAWS DO NOT APPLY TO ICANN'S NON-COMMERCIAL ACTIVITIES.

### A.   The Sherman Act Only Applies to Competition-Reducing Conduct in Trade or Commerce.

Plaintiffs do not dispute that the Sherman Act only applies to "trade or commerce."  15 U.S.C. §§ 1, 2; *see also Apex Hosiery Co. v. Leader*, 310 U.S. 469,

493, 60 S. Ct. 982, 84 L. Ed. 1311 (1940) (noting that the Sherman Act was enacted to address the "suppression of competition in the marketing of goods and services"). Yet, the FAC does not (and could not) allege that ICANN engages in trade or commerce by marketing or selling anything.[1]  Rather, the FAC acknowledges that ICANN fulfills its "charitable and public purposes" by administering the DNS for the benefit of all Internet users.  FAC ¶ 27.  Although ICANN receives fees from registry operators, Plaintiffs acknowledge that those fees fund ICANN's mission, which is essential to the functioning of the Internet.  *Id.* ¶¶ 27, 31.  To the extent Plaintiffs contend ICANN provides services in its administration of the DNS, they do not allege those services differ based on the fees received from registry operators. *Id.* ¶¶ 31-32.  All registry operators obtain the same benefits from ICANN's administration of the DNS—the right to operate as a registry operator subject to various terms and conditions—irrespective of the amount of fees they provide.  The bargained-for exchange essential to a commercial transaction is absent.

ICANN's reliance on fees to carry out its charitable operations is no different than the Humane Society's solicitation of contributions to fund its operations.  *See Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc'y of United States, Inc.*, 50 F.3d 710 (9th Cir. 1995); *see also Bronx Legal Servs. v. Legal Servs. for New York City*, No. 02 Civ. 6199(GBD), 2003 WL 145558, at *4 (S.D.N.Y. Jan. 17, 2003) (distribution of funds to charitable organization is not a "business or commercial exchange").  As the Ninth Circuit explained in *DELTA*, the critical inquiry in determining the nature of a non-profit's activities is not whether the non-profit receives funds, but whether its receipt of those funds involves trade or commerce.  50 F.3d at 714.  Although the Humane Society undeniably provides services as part of its charitable operations, and a donor may even benefit from those services, the Humane Society's solicitation of a donor's contribution does not

---

[1] Although Plaintiffs' opposition brief repeatedly states that ICANN "sold" the right to operate the registry for the .XXX TLD, this characterization is contradicted by the FAC's allegations.  *See infra* Part II.C.

1  constitute trade or commerce because there is no specific exchange of money for
2  goods or services.  The funds merely support the Humane Society's charitable
3  operations.   Likewise, because ICANN does not provide any goods or services
4  specific to ICM in exchange for the fees it stands to collect in the future, does not
5  commercially benefit from those funds, and merely uses the funds to carry out its
6  mission, ICANN's actions do not constitute trade or commerce.

7         Further, a transaction is commercial only "when the antitrust defendants are
8  likely to receive direct economic benefit as a result of any <u>reduction in competition</u>
9  in the market in which the target firm or firms operate."  IB Phillip E. Areeda &
10 Herbert Hovenkamp, *Antitrust Law* ¶ 262a, at 177 (emphasis added).  Plaintiffs
11 allege (correctly) that ICANN stands to collect fees on a per-registration basis.
12 FAC ¶ 56(a).  Thus, ICANN's collection of fees is tied to <u>growth</u> in domain name
13 registrations in the .XXX TLD.  The only way ICANN could benefit from its action
14 is if competition among adult content website operators like Plaintiffs <u>increases</u>.
15 Because any funds ICANN may derive from the operation of the .XXX TLD will
16 not be based on a reduction in competition, ICANN's conduct is not commercial.

17        **B.    Plaintiffs' Argument Based on ICANN's Non-Profit Status Is a**
18             **Straw Man.**

19        Plaintiffs' lead argument in opposition to ICANN's motion to dismiss is that
20 ICANN is not exempt from the antitrust laws on the basis of its status as a
21 charitable, non-profit organization.  Opp. at 6-9.  But ICANN never claimed an
22 organizational exemption.  *See* Opening Br. at 13:9-10 (a "non-profit organization
23 … may engage in commercial activity, and this activity will then be subject to the
24 Sherman Act").  To the contrary, ICANN argued that the antitrust laws do not apply
25 to "<u>noncommercial conduct</u> undertaken by a non-profit organization, which is what
26 Plaintiffs' allegations describe about ICANN."  *Id.* at 11:21-22 (emphasis added).
27 Thus, Plaintiffs attack a position ICANN never advocated, which explains why
28 most of their authorities on this point have no application here.  *See, e.g.*, *FTC v.*

ICANN'S REPLY ISO MTD FAC
CASE NO. CV11-9514 PSG (JCGx)

1    *Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 427, 110 S. Ct. 768, 107 L. Ed.

2    2d 851 (1990) (for-profit business motivation distinguished lawyers' illegal

3    combination from collective boycotts to achieve noncommercial purposes); *NCAA*

4    *v. Bd. of Regents*, 468 U.S. 85, 100 n.22, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)

5    (noting that NCAA did not rely on its nonprofit character as a basis for seeking

6    reversal); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 n.5

7    (9th Cir. 1999) (addressing boycott by association of for-profit ski resorts).

8
9
### C.    Plaintiffs' Contention That ICANN Engages in Commercial Activities Is Unsupported by Their Allegations and Authorities.

10    Plaintiffs contend ICANN engaged in commercial activities by "creating the

11    .XXX for-profit commercial market" and selling ICM a right to operate .XXX and

12    issue domain names in that TLD in exchange for a portion of the proceeds from the

13    sale of each domain name.  Opp. at 9:13-19 (citing FAC ¶¶ 48-58, 71-86).  But this

14    misstates Plaintiffs' own pleadings (and the truth). The FAC repeatedly alleges that

15    registry operators (including ICM) and registrars sell various services (*see* FAC ¶¶

16    3(c), 3(e), 3(g), 22, 55, 56, 65, 73-75, 76(d), 78, 82, 84-86), but nowhere does it

17    allege that ICANN sold anything, be it a "right" or any specific goods or services.[2]

18    In fact, ICANN does not sell anything.  As ICANN's Bylaws make clear, the

19    fees collected from registry operators are used solely to recover the costs of

20    administering the DNS.  Just as the accreditation process for registrars is funded

21    through application and accreditation fees paid by registrars, the registry application

22    process and administration of the DNS is funded through fees paid by registries.

23    Absent such fees, ICANN would have little source of funds and could not

24    accomplish its public, charitable purpose.

25    Plaintiffs do not cite any authority for the proposition that the collection of

26    _____

      [2] Paragraph 53 of the FAC alleges that ICANN's basic administration of the
27    DNS, functions that are essential to the functioning of the Internet and are provided
      to all registry operators, is conducted in exchange for fees from ICM.  But this
28    ignores that the same "services" are provided to all registry operators, regardless of
      whether any fees are collected from the operator or the amount of those fees.

1  fees by a non-profit entity, and the non-profit's use of those fees to carry out its

2  mission, constitutes commercial activity under the Sherman Act.  Instead, Plaintiffs

3  rely on a handful of cases that concern <u>restraints</u> on commerce—the fixing of prices

4  for certain legal services by attorneys, *see Goldfarb v. Virginia State Bar*, 421 U.S.

5  773, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975), a for-profit company's exploitation of

6  its role in a standard-setting organization to harm a direct competitor, *see Am.*

7  *Society of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S. Ct. 1935,

8  72 L. Ed. 2d 330 (1982), and the role of universities in collectively determining the

9  amount of financial aid a student would receive to offset the student's payment of

10  tuition to a university in exchange for educational services, *see United States v.*

11  *Brown Univ.*, 5 F. 3d 658 (3d Cir. 1993).  In each of these cases, there was no

12  question as to the existence of commerce or the restraint thereon.[3]

**D.     ICANN Cannot Be Liable Under the Antitrust Laws for ICM's
         Independent Conduct.**

15      Plaintiffs contend that, even if ICANN's activities are noncommercial, it is

16  subject to the antitrust laws because "'an organization that would otherwise be

17  exempt from the labor [or antitrust] laws loses its exemption by conspiring with a

18  nonexempt party.'"  Opp. at 11:7-9 (quoting *Virginia Vermiculite, Ltd. v. W.R.*

19  *Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998)).  But, as explained above, ICANN

20  does not claim an organizational exemption.  Instead, it relies on the established

21  principle that the antitrust laws do not apply to noncommercial activities.

22      *Virginia Vermiculite* is inapposite.  In that case, the Fourth Circuit did not

23  conclude that the non-profit at issue lost an "exemption" from the antitrust laws by

24  conspiring with a non-exempt party.  It concluded that the non-profit was "subject

25  to the antitrust laws … because the transaction [at issue] was essentially

26  commercial." *Virginia Vermiculite,* 156 F.3d at 541.  Plaintiff's remaining

---

[3] Contrary to Plaintiffs' contention (Opp. at 14 n.10), courts may determine
whether alleged transactions are "non-commercial" at the pleading stage. *See, e.g.,*
*Bronx Legal Servs.*, 2003 WL 145558, at *4.

1   authorities each address the labor exemption, which is not claimed here.[4]  Because

2   ICANN does not claim an organizational exemption, and because its conduct was

3   noncommercial, it cannot be liable for ICM's independent conduct.

4   **III.   ICANN'S UNILATERAL CONDUCT IS NOT ACTIONABLE.**

5          To the extent Plaintiffs address ICANN's argument that the FAC fails to

6   allege concerted activity, they merely summarize their allegations regarding the

7   contract establishing ICM's right to operate the .XXX TLD.[5]  But Plaintiffs do not

8   (and cannot) contest that ICANN unilaterally approved ICM as the registry operator

9   for that TLD.  FAC ¶ 25.  Nor do Plaintiffs dispute that all of the allegedly anti-

10  competitive conditions placed on the registration of names in the .XXX TLD were

11  undertaken unilaterally by ICM.  *See* FAC ¶¶ 56(a) & (b), 73-86.  Indeed, the fact

12  that ICANN decided not to impose certain restrictions on ICM's operations reflects

13  an <u>absence</u> of agreement, not concerted activity.

14  **IV.   PLAINTIFFS HAVE NOT ALLEGED PROPERLY DEFINED
         RELEVANT MARKETS.**
15

16         Plaintiffs imply that the standard for pleading a relevant market is lower than

17  that established by *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955,

18  167 L. Ed. 2d 929 (2007).  Opp. at 15-16 (ignoring *Twombly* in reciting standards

19  for pleading a relevant market).  But a complaint must be dismissed if the factual

---

[4] Further, in each of the labor cases relied upon by Plaintiffs, the party relying on the labor exemption sought to further its commercial goals, bringing its conduct squarely within the Sherman Act's reach.  *See Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 801, 65 S. Ct. 1533, 89 L. Ed. 1939 (1945) (addressing whether "labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise thing which that Act prohibits"); *L.A. Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 102, 83 S. Ct. 162, 9 L. Ed. 2d 150 (1962) (observing that the defendants "were sellers of commodities, who became 'members' of the union only for the purpose of bringing upon power to bear in the successful enforcement of the illegal combination in restraint of" trade); *Cal. State Council of Carpenters v. Associated Gen. Contractors of Cal., Inc.*, 648 F.2d 527, 533 (9th Cir. 1980) (declining to apply exemption "to anticompetitive conduct involving groups of businessman").

[5] Plaintiffs incorporate by reference their opposition to ICM's motion on this point.  Opp. at 14:5-7.  ICANN does the same with respect to ICM's reply brief.

1   allegations do not "raise a right to relief above the speculative level." *Twombly*,

2   550 U.S. at 555.  This is no less true for relevant market allegations than any other

3   aspect of an antitrust complaint.  *See Coalition for ICANN Transparency, Inc. v.*

4   *VeriSign, Inc.*, 611 F.3d 495, 509 (9th Cir. 2010) (remanding to take into account

5   *Twombly*);[6] *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir.

6   2010) ("the complaint's relevant market allegations fall short of what *Twombly*

7   requires").  Plaintiffs' alleged relevant markets fail to meet that test.

8        **A.**   **Plaintiffs' "Defensive Registration" Market Is Not an**
9                **Appropriately Defined Product Market.**

10        The implausibility of Plaintiffs' "defensive registration" market is apparent

11   from their opposition.  Plaintiffs argue that to "prevent misuse of its name in .XXX

12   … Mercedes Benz must defensively register that name in .XXX."  Opp. at 16:27-

13   17:1.  Likewise, the only way to block the "YouPorn" domain name in the .XXX

14   TLD is to register that specific name in the .XXX TLD.  *Id.*  While Plaintiffs admit

15   that a relevant product market is defined solely by "reasonable substitutes" (*id.* at

16   16:6), Plaintiffs fail to recognize that since mercedesbenz.xxx and youporn.xxx are

17   not reasonably interchangeable for blocking purposes (according to their

18   allegations), there can be no general market for defensive registration of domain

19   names in the .XXX TLD that includes both names or any others in the same market

20   (*e.g.*, bmw.xxx and mercedesbenz.xxx are not substitutes either).

21           [6] Plaintiffs argue that *VeriSign* is somehow "dispositive" here (Opp. at 4:17)
22   but disregard the fundamental distinctions between that case and this one, including
   the critical fact that the *VeriSign* plaintiff <u>dropped ICANN as a defendant</u>.  611 F.3d
23   at 501.  Thus, the Ninth Circuit had no occasion to consider whether ICANN
   engaged in commercial activities.  Further, the only properly pled conspiracy
24   allegations in that case involved the renewal of a contract without bidding.  *Id.* at
   505 (affirming dismissal of .net allegations because bidding was not foreclosed).
25   Here, Plaintiffs acknowledge that the .XXX TLD contract was entered after ICM
   alone sought to operate that TLD.  FAC ¶ 49.  Finally, the *VeriSign* plaintiff alleged
26   relevant markets that were materially different from those Plaintiffs allege here.
   *See* 611 F.3d at 508-10.  In short, the Ninth Circuit never passed upon the questions
27   raised by this motion.  Far from "studiously ignor[ing]" *VeriSign* (Opp. at 4:27),
   ICANN references that case where it has explanatory power.  But it rejects
28   Plaintiffs' suggestion that a different case with different parties and different facts
   is in any way dispositive of this motion or the propriety of the FAC.

1    As a result, Plaintiffs' allegations amount to a contention that each individual

2    domain name in the .XXX TLD is itself a relevant antitrust market, a notion courts

3    have repeatedly rejected.  *See VeriSign*, 611 F.3D at 508 ("[A] market should not be

4    defined in terms of a single domain name."); *Smith v. Network Solutions, Inc.*, 135

5    F. Supp. 2d 1159, 1169 (N.D. Ala. 2001) ("Taken to its logical conclusion,

6    Plaintiff[s'] argument [incorrectly] implies that each individual domain name is a

7    relevant market unto itself"); *Weber v. Nat'l Football League*, 112 F. Supp. 2d 667,

8    673-74 (N.D. Ohio 2000) (alleged market comprised of "the demand for the domain

9    names 'jets.com' and 'dolphins.com'" is not appropriately defined).[7]

10    Plaintiffs' reliance on *VeriSign* is accordingly misplaced.  There, the Ninth

11    Circuit acknowledged the possibility that expiring domain names could constitute a

12    relevant market because, <u>as a class</u>, those names were valued differently from

13    domain names that had never before been registered.  *VeriSign*, 611 F.3d at 508.

14    But unlike the defensive registration market alleged here, the value of an expiring

15    domain name was not based on the specific name desired; rather, it was based on

16    the general property of having been used previously, with the attendant history of

17    established web traffic and advertising support.  *Id.* at 509.  Any domain name

18    within the market of expiring domain names, however, was reasonably

19    interchangeable with any other domain name in that market.

20    Here, Plaintiffs attempt to differentiate defensive registrations from other

21    registrations on the basis that <u>particular names</u> require unique protection.  Plaintiffs

22    allege that there is no substitute for the defensive registration of any single name in

23    the .XXX TLD, even within that TLD.  Plaintiffs' other response is to observe that

24    there would be a very large number of these non-interchangeable defensive domain

25    names in the market they posit.  Opp. at 17-18.  That is simply beside the point—

26    ───────────────
[7] Contrary to Plaintiffs' contention, *VeriSign* did not "reject" *Smith*.  Opp. at
18.  The Ninth Circuit distinguished *Smith* on the basis that the *VeriSign* plaintiffs'
27    allegations were not based on a "particular" plaintiff's desires, but on a broad
market of reasonably interchangeable names.  611 F.3d at 508.  That is not what
28    Plaintiffs allege here, and thus they fail to state a claim under *Verisign* or *Smith*.

1    whether there are ten or ten million (trademarked or not), none of the potential

2    defensive domain names is a substitute for the others, which means there is no

3    single "defensive registration" market in which they all exist.  Plaintiffs' claims

4    based on the "defensive registration" market must be dismissed.

5              **B.     Plaintiffs' Allegation of an "Incipient" Market for Affirmative**

6              **Registrations Is Impermissibly Speculative.**

7          "To establish Section 2 violations premised on attempt and conspiracy to

8    monopolize, a plaintiff must define the relevant market."  *Doctor's Hosp. of*

9    *Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997).

10   In the FAC, Plaintiffs attempted to plead an "affirmative registration" market that

11   does not exist.  The FAC alleges ICM is "attempting to establish" such a market,

12   the market's establishment is "likely," and there is a "possibility" the .XXX TLD

13   could "become the exclusive permitted TLD for adult web content."[8]  FAC ¶¶ 66-

14   68.  These allegations are inherently speculative and cannot possibly pass muster

15   under *Twombly*.  Plaintiffs do not cite any cases to the contrary in their opposition.

16         Further, Plaintiffs disregard their allegations that Plaintiff Manwin owns

17   domain names in non-.XXX TLDs "for many of the most popular adult-oriented

18   websites, including YouPorn.com, the single most popular free adult video website

19   on the Internet" (FAC ¶ 1), and that Plaintiff Digital Playground makes "one of the

20   world's largest high definition libraries of original adult content … available

21   through its websites [in non-.XXX TLDs], including digitalplayground.com" (*id.* ¶

22   5).  These allegations are devastating to Plaintiffs' market definition because they

23   acknowledge economic substitutes for "'affirmative registrations' of names …

24   within TLDs connoting … adult content."  *Id.* ¶ 66.

25   _____

26   [8] Plaintiffs also allege that it is "unlikely that other potential TLDs with
     names that could similarly connote adult content, such as .sex or .porn, will be
     established."  FAC ¶ 66.  Notably, in ICANN's recent program soliciting new

27   generic TLDs, a company named Internet Marketing Solutions Limited applied for
     the .SEX TLD.  *See* http://newgtlds.icann.org/en/program-status/application-

28   results/strings-1200utc-13jun12-en.

In fact, Plaintiffs now concede that their "affirmative registration" market definition "does not include all <u>currently</u> substitutable products." Opp. at 19:16-17. This concession is dispositive of the section 2 claims based on an affirmative registration market. *See, e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (rejecting relevant market consisting solely of UCLA women's soccer program where plaintiff conceded she had been recruited by numerous other programs throughout the country). Plaintiffs' vague and conclusory allegations that there is a "threat" that these concededly substitutable products will no longer be available at some point in the future cannot salvage their claim.

**1.     Plaintiffs Fail to Allege Facts Supporting the Dissipation of Substitutable Products.**

While acknowledging that the most popular adult content websites are registered in the .COM TLD, which ICM does not control, Plaintiffs contend they have sufficiently alleged a dangerous probability that ICM will monopolize a market "for affirmative registration services for adult content websites." Opp. at 20:5-6. Plaintiffs do not allege ICM's market power in this future relevant market, and thus their claims can be dismissed on this basis alone. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993) ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."). Plaintiffs' other arguments would not salvage their claim.

First, Plaintiffs' "network effects" argument is entirely speculative. They do not allege facts suggesting that successful adult websites have been registered in the .XXX TLD, that viewers of adult content have begun to substantially gravitate to the .XXX TLD, or that the .COM TLD has lost substantial (or any) adult content. Bald assertions that these things "will" happen is not enough. Indeed, in the two cases Plaintiffs cite, the courts addressed network effects that functioned as a

ICANN'S REPLY ISO MTD FAC
CASE NO. CV11-9514 PSG (JCGx)

1    barrier to entry into a market.  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp.

2    2d 1119, 1138-39 (N.D. Cal. 2010); *LiveUniverse, Inc. v. MySpace, Inc.*, No. CV

3    06-6994 AHM (RZx), 2007 WL 6865852, at *8 (C.D. Cal. June 4, 2007).  Here,

4    Plaintiffs allege that their own .com websites are "the most popular" on the "the

5    Internet", FAC ¶ 1; they cannot plausibly allege that network effects will function

6    as a barrier to entry in registering adult websites in the .COM TLD.[9]

7         Second, Plaintiffs allege that failed legislation from 2002 and 2006 seeking

8    to mandate that adult content reside exclusively on adult content-specific TLDs

9    would reduce substitutes for registration in the .XXX TLD.  But failed legislative

10   efforts cannot be used to support speculation that a future Congress will even

11   introduce similar legislation, let alone a probability that legislation would pass.

12        Finally, Plaintiffs' conclusory allegations that ICANN and ICM have agreed

13   that ICANN will not approve competing adult-oriented TLDs are contradicted by

14   the ICANN-ICM contract, which includes no such provision, *see* RJN Ex. C, and

15   the fact that other generic TLDs are still available sources for domain names.

16                    **2.    The Availability of Injunctive Relief Does Not Make Up For
                           Plaintiffs' Failure to Allege a Significant Risk of Future
17                         Monopolization.**

18        Plaintiffs argue that injunctive relief is an appropriate remedy for attempt or

19   conspiracy to monopolize.  That is true, but it does not excuse Plaintiffs' failure to

20   allege a properly-defined relevant market that is in danger of being monopolized.

21   In *Spectrum Sports*, the Supreme Court made clear that attempted monopolization

22   requires allegations and proof of an existing relevant market.  The Ninth Circuit has

23   specifically held that the relevant market requirement "appl[ies] identically under

24   the two different sections of the [Sherman] Act," including to attempted

25   monopolization and conspiracy to monopolize claims.  *Newcal Indus., Inc. v. Ikon*

26   ───────────────────
          [9] Indeed, the FAC nowhere plausibly explains how a start-up TLD launched
27   at the end of 2011 will overcome the massive existing network effects
     favoring .COM to become a monopoly in hosting adult websites, especially when,
28   according to the FAC, the adult content community is against using .XXX and
     hosting on other TLDs is far less expensive.  *See* FAC ¶¶ 43, 49, 66.

1  *Office Solution*, 513 F.3d 1038, 1044 n.3, 1052 (9th Cir. 2008) (holding that "the

2  requirements apply identically to all six of Newcal's claims"); *see also Fraser v.*

3  *Major League Soccer, L.L.C.*, 284 F.3d 47, 67-68 (1st Cir. 2002); *Doctor's Hosp. of*

4  *Jefferson*, 123 F.3d at 311; *see also* IIIB Areeda & Hovenkamp, *supra*, ¶ 809.[10]

5         Further, assuming that a conspiracy to monopolize could properly be pleaded

6  on the basis of specific intent to monopolize alone (*see* Opp. at 23:1-13), Plaintiffs

7  have not alleged any factual allegations that plausibly demonstrate such intent since

8  Plaintiffs concede that affirmative registration of adult content websites in other

9  TLDs (like .COM) is an economic substitute for registration in the .XXX TLD (and

10  have no plausible allegation that they will not remain so).  Opp. at 19:17-20:1.  That

11  is fatal to their argument.

## V.    PLAINTIFFS' THIRD CAUSE OF ACTION MUST BE DISMISSED, REGARDLESS OF ITS LABEL.

14         Plaintiffs concede that their cause of action for "conspiracy to attempt to

15  monopolize" an "affirmative registrations" market is not actionable, but contend

16  that this is simply a matter of mislabeling. Opp. at 24:7-10.  They argue that they

17  intended to plead conspiracy to monopolize, and that their allegations support that

18  cause of action.  Regardless of its label, Plaintiffs' third cause of action does not

19  identify a properly-defined relevant market.  *See supra* Part IV.B.  Accordingly,

20  Plaintiffs have not stated a claim for conspiracy to monopolize.

## VI.   CONCLUSION

22         For the foregoing reasons, the FAC should be dismissed with prejudice.

---

[10] For the contrary position, Plaintiffs rely on authorities that either (a) pre-date *Spectrum Sports* and thus fail to address the Supreme Court's repudiation of prior Ninth Circuit precedent addressing inchoate monopolization claims, *see Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980); *Salco Corp. v. General Motors Corp., Buick Motor Div.*, 517 F.2d 567, 576 (10th Cir. 1975), or (b) did not expressly consider whether a relevant market must be pleaded, *see Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (rejecting conspiracy claim for failure to show antitrust injury); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1155-56 (9th Cir. 2003) (rejecting conspiracy claim for failure to show specific intent to monopolize).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:       June 29, 2012                    JONES DAY


By:   /s/ Jeffrey A. LeVee
            Jeffrey A. LeVee

Attorneys for Defendant
INTERNET CORPORATION FOR
ASSIGNED NAMES AND
NUMBERS

SFI-736053v3

ICANN'S REPLY ISO MTD FAC
CASE NO. CV11-9514 PSG (JCGx)