Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

| Present: | The Honorable Philip S. Gutierrez, United States District Judge | | |
|---|---|---|---|
| Wendy K. Hernandez | | Not Present | n/a |
| Deputy Clerk | | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (In Chambers) Order GRANTING in Part and DENYING in Part the Motions to Dismiss

Before the Court are Defendants' motions to dismiss. Dkts. # 29, 30. The Court finds the matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); L.R. 7-15. After considering the supporting and opposing papers, the Court GRANTS in part and DENIES in part the motions to dismiss.

I.   Background

It is necessary to begin with a brief overview of the functioning of the internet in order to understand the specific allegations in this case. The internet is an international network of interconnected servers and computers. *FAC* ¶ 13.[1] Each computer or host server connected to the internet has a unique identity that is established by an Internet Protocol address ("IP address"). *FAC* ¶ 16. An IP address consists of four numbers between 0 and 255 that are separated by periods. *Id.* The IP address ensures that users are directed to the computer or host server for the particular website that they intend to visit. *Id.* Because strings of numbers are difficult to remember, the Domain Name System ("DNS") was introduced to allow users to identify a computer using alphanumeric domain names, such as "YouPorn.com." *FAC* ¶ 17. Within each domain name, the letters to the right of the last period indicate the Top Level

---

[1] For purposes of these motions to dismiss, the Court accepts Plaintiff's allegations as true. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

Link to docs # 29 & 30
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

Domain ("TLD").  *Id*.  For example, in the domain name "YouPorn.com," the TLD is ".com." *Id*.

  Most TLDs with three or more characters are referred to as generic TLDs.  *FAC* ¶ 19. Generic TLDs can be sponsored or unsponsored.  *FAC* ¶ 20.  A sponsored, generic TLD is a specialized TLD that has a sponsor, usually an entity representing a narrower group or industry. *Id*.  The sponsor makes policy decisions for the sponsored TLD.  *Id*.  For example, the sponsored TLD ".museum" is operated for the benefit of museums, museum associations, and museum professionals.  *Id*.  There are currently twenty-two generic TLDs, fourteen of which are sponsored TLDs.  *FAC* ¶ 21.

  Each TLD is operated by an assigned organization, referred to as a registry operator or registry.  *FAC* ¶ 22.  Operating responsibilities include overseeing the sale and allocation of domain names in the TLD and maintaining a database directory.  *Id*.  Registries, in turn, authorize separate companies called registrars to directly sell the TLD domain names to businesses or consumers owning and using those names in the TLD.  *Id*.  Registries then collect fees from registrars, usually on an annual basis.  *Id*.

  In 1998, the Internet Corporation for Assigned Names and Numbers ("ICANN") was created to operate the DNS.  *FAC* ¶ 6.  ICANN is a non-profit public benefit corporation.  *Id*. ICANN's duties include determining what new TLDs to approve, choosing registries for existing or newly approved TLDs, and contracting with the registries to operate the TLDs.  *FAC* ¶ 25. According to its Articles of Incorporation, ICANN was established "for the benefit of the Internet industry as a whole."  *FAC* ¶ 27.  In its founding documents, ICANN has further agreed that it would appropriately consider the need for market competition and the protection of rights in names and other intellectual property when approving TLDs and registries.  *FAC* ¶ 29. ICANN earns fees from approving new TLDs, new registry operators, and new registrars.  *FAC* ¶ 32.  ICANN also charges registries and registrars fixed annual fees as well as per-transaction fees (e.g., registries and registrars pay ICANN a certain amount of money for every domain name registered).  *Id*.

  In about 2000, Defendant ICM Registry, LLC ("ICM") first applied to ICANN for approval of a new .XXX TLD, intended primarily for adult content.  *FAC* ¶ 34.  ICANN rejected the application, finding there was no unmet need for the .XXX TLD and that some segments of the adult online content industry opposed establishing a .XXX TLD.  *Id*.  ICM applied for approval of the .XXX TLD again in 2004.  *FAC* ¶ 35.  This time ICM applied as a sponsored

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

TLD. *Id.* ICM proposed an organization named the International Foundation for Online Responsibility ("International Foundation") as the sponsoring organization for the .XXX TLD. *FAC* ¶ 36. ICM claimed that the International Foundation represented a significant portion of the adult entertainment community. *Id.* However, the International Foundation was in fact created by ICM for the sole purpose of attempting to gain approval for the .XXX TLD and the International Foundation did not actually represent any significant portion of the adult entertainment community. *Id.* ICANN once again rejected the application for a .XXX TLD. *FAC* ¶ 37.

After the 2004 rejection, ICM embarked on a campaign to persuade ICANN to approve the .XXX TLD. *FAC* ¶ 39. One facet of this campaign concerned entities that ICM allowed to preregister for .XXX domain names. *Id.* These entities only registered in order to protect their names from being misappropriated if the .XXX TLD came into existence. *Id.* ICM promised these entities that it would not claim that these registrations showed support for the proposed .XXX TLD. *Id.* However, ICM then misrepresented to ICANN that these preregistrations showed support for the .XXX TLD. *Id.* In addition, ICM offered various inducements to other organizations to support the .XXX TLD, generated fake comments online supposedly showing support for the .XXX TLD, submitted misleadingly edited videos and photos from an adult entertainment conference to falsely suggest there was limited opposition to the .XXX TLD, and touted support from adult entertainment celebrities without disclosing that these celebrities were employed by ICM or otherwise receiving benefits from ICM. *Id.*

As a result of ICM's misleading campaign, in 2005 ICANN preliminarily authorized its president and general counsel to begin negotiating with ICM to establish the .XXX TLD. *FAC* ¶ 40. After this announcement, certain governmental organizations, including the United States Department of Commerce and Department of State, voiced their opposition to the creation of a .XXX TLD. *FAC* ¶ 41. In response, ICM made an intentionally overbroad and baseless Freedom of Information Act request for documents regarding the .XXX TLD from these federal agencies. *FAC* ¶ 42. ICM eventually filed a lawsuit over the Freedom of Information Act request. *Id.* Despite the pressure from ICM, ICANN decided in 2006 to stop preliminary negotiations and again reject the proposed .XXX TLD. *FAC* ¶ 43.

In 2008, ICM filed an Independent Review Proceeding, challenging ICANN's rejection of the .XXX TLD. *FAC* ¶ 44. The Independent Review Proceeding is a non-binding, quasi-arbitral process established by ICANN to resolve disputes concerning ICANN's activities. *Id.* In the Independent Review Proceeding, ICM asserted that ICANN had approved the .XXX TLD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

in 2005 and could not then reconsider that decision. *Id.* In the proceedings, ICM again made false statements about the level of support for the .XXX TLD. *FAC* ¶ 45. A three member panel presided over the proceeding. *FAC* ¶ 46. The panel did not judge whether ICM had advanced misleading or fraudulent evidence of support for the .XXX TLD, nor did the panel consider antitrust or other competition issues related to the .XXX TLD. *Id.*

In 2010, the majority of the panel, over a dissent, issued a non-binding decision that ICANN had determined ICM met the sponsorship criteria for the .XXX TLD in 2005, and could not thereafter properly reopen the issue. *Id.* ICANN then publicly mulled whether to accept the majority decision of the panel or to reject it. *FAC* ¶ 47. ICM threatened to sue ICANN and its board of members if ICANN did not adopt the panel's decision. *Id.* ICANN then agreed to approve the .XXX TLD and sign a registry contract for ICM to operate the .XXX TLD. *FAC* ¶ 48.

The registry contract allegedly contains several anti-competitive and monopolistic provisions. These include a lack of price caps or restrictions of any kind on the prices ICM can charge for .XXX registry services. *FAC* ¶ 56. This is in contrast to other registry contracts executed by ICANN for other TLDs which contain express price caps. *Id.* Before the .XXX registry contract was executed, ICM informed ICANN of the higher-than-market prices ICM would be charging. *Id.* Rather than dispute the institution of the non-competitive prices, ICANN agreed to profit from these prices. *Id.* Under the registry contract, ICANN receives an enhanced fee from .XXX domain name registrations. *Id.* This fee is greater than fees charged for most other TLDs. *Id.*

The registry contract lasts for a minimum of ten years and provides that it "shall" be renewed subject to an obligation to negotiate certain terms in good faith. *Id.* This virtually unlimited term of the contract will prevent any competitive bidding for renewal of the contract and will thus insulate ICM from market restraints or any threat of competition in .XXX registry services. *Id.* The contract also contains provisions which ICM itself proclaims will preclude ICANN from approving any other TLDs designated for adult content, such as ".sex" or ".porn." *Id.*

In November 2011, Plaintiffs Manwin Licensing International S.A.R.L. ("Manwin") and Digital Playground, Inc. ("Digital Playground") (collectively "Plaintiffs") filed this action against Defendants ICANN and ICM (collectively "Defendants"). Manwin owns and licenses one of the largest portfolios of adult-oriented website domain names and trademarks in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

world. *FAC* ¶ 4. Digital Playground is a leader in adult-oriented film making and interactive formats. *FAC* ¶ 5.

Plaintiffs assert five causes of action, alleging various violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 ("Section 1" and "Section 2" of the "Sherman Act"). *FAC* ¶¶ 93-139. Plaintiffs assert three causes of action against both Defendants: a Section 1 claim for conspiracy in restraint of trade; a Section 2 claim for conspiracy to monopolize; and a Section 2 claim for conspiracy to attempt to monopolize. *FAC* ¶¶ 93-121. Plaintiffs also assert two causes of action solely against ICM: a Section 2 claim for monopolization; and a Section 2 claim for attempted monopolization. *FAC* ¶¶ 122-139.

Defendants move to dismiss the First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Dkts. # 29, 30.

II.     Legal Standard

        a.      Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a cause of action if the plaintiff fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). In evaluating the sufficiency of a complaint under Rule 12(b)(6), courts should be mindful that the Federal Rules of Civil Procedure generally require only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required to survive a Rule 12(b)(6) motion to dismiss, a complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)). Rather, the complaint must allege sufficient facts to support a plausible claim for relief. *See id.*

In evaluating a Rule 12(b)(6) motion, the court must engage in a two-step analysis. *See id.* at 1950. First, the court must accept as true all non-conclusory, factual allegations made in the complaint. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Based upon these allegations, the court must draw all reasonable inferences in favor of the plaintiff. *See Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009).

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

Second, after accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim for relief. *See Iqbal*, 556 U.S. at 679. Despite the liberal pleading standards of Rule 8, conclusory allegations will not save a complaint from dismissal. *See id.*

    b.    Elements of Sherman Act Claims

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a Section 1 claim, a plaintiff must show (1) concerted action among two or more independent entities, (2) an unlawful restraint of trade, and (3) antitrust injury. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. For a Section 2 monopolization claim, a plaintiff must establish (1) possession of monopoly power by defendant in a relevant market, (2) predatory conduct, and (3) causal antitrust injury. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). A conspiracy to monopolize claim requires (1) the existence of a combination or conspiracy to monopolize, (2) an overt act in furtherance of the conspiracy, (3) the specific intent to monopolize, and (4) causal antitrust injury. *Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). And an attempted monopolization claim requires (1) specific intent to control prices or destroy competition, (2) predatory or anticompetitive conduct, (3) a dangerous probability of success, and (4) causal antitrust injury. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).

III.    Discussion

Defendants move on various grounds to dismiss the First Amended Complaint. ICM requests dismissal of all five causes of action for failure to allege (1) an antitrust injury, (2) a conspiracy between ICM and ICANN to restrain trade or monopolize a relevant market, and (3) anticompetitive or exclusionary conduct by ICM. For its part, ICANN argues for dismissal because (4) ICANN does not engage in trade or commerce, (5) ICANN acted unilaterally and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

did not conspire with ICM, (6) Plaintiffs fail to identify relevant markets, and (7) the Third Cause of Action for conspiracy to attempt to monopolize does not exist under the Sherman Act.

The Court will address these seven arguments for dismissal in turn. Ultimately, the Court finds, with two exceptions, that the First Amended Complaint adequately pleads antitrust claims. The first exception is the Third Cause of Action for "conspiracy to attempt to monopolize," which is not a recognized cause of action. Second, the Court finds insufficient the allegations of a relevant market for affirmative registrations of names within TLDs connoting or intended exclusively or predominately for adult content. The insufficiency of this market requires the dismissal of the Third and Fifth Causes of Action.

    a.    <u>ICANN's Involvement in Trade or Commerce</u>

By its terms, the Sherman Act applies to monopolies or restraints of "trade or commerce." 15 U.S.C. §§ 1, 2. The identity of a defendant as a nonprofit or charitable organization does not immunize that organization from antitrust liability. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.22 (1984) ("There is no doubt that the sweeping language of § 1 [of the Sherman Act] applies to nonprofit entities."). To the contrary, nonprofit organizations that act in trade or commerce may be subject to the Sherman Act. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 n.5 (9th Cir. 1999) ("A nonprofit organization that engages in commercial activity . . . is subject to federal antitrust laws."). Rather than focusing on the legal character of an organization, an antitrust inquiry focuses on whether the transactions at issue are commercial in nature. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co. – Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) ("We emphasize that the dispositive inquiry is whether the *transaction* is commercial, not whether the *entity* engaging in the transaction is commercial."). "Courts classify a transaction as commercial or noncommercial based on the nature of the conduct in light of the totality of surrounding circumstances." *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 666 (3rd Cir. 1993). In any circumstance, "[t]he exchange of money for services . . . is a quintessential commercial transaction." *Id.*

The Court finds the transactions between ICANN and ICM described in the First Amended Complaint are commercial transactions. ICANN established the .XXX TLD. *FAC* ¶ 49. ICANN granted ICM the sole authority to operate the .XXX TLD. *FAC* ¶ 48. In return, ICM agreed to pay ICANN money. *FAC* ¶ 53. This is "quintessential" commercial activity and it falls within the broad scope of the Sherman Act. Even aside from collecting fees from ICM under the contract, ICANN's activities would subject it to the antitrust laws. In *Goldfarb v. Va.*

Case 2:11-cv-09514-PSG-JCG   Document 40   Filed 08/14/12   Page 8 of 17   Page ID #:821

Link to docs # 29 & 30
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

*State Bar*, the Supreme Court concluded that an attorney bar association was not exempt from the Sherman Act even where the bar association made no pecuniary gain from its alleged conduct. 421 U.S. 773, 788 (1975). The bar association could be liable because it played "an important part" in commerce and its anticompetitive activities could exert a restraint in commerce. *Id.* As in *Goldfarb*, ICANN's activities play an important role in the commerce of the internet and ICANN's actions could exert a restraint on that commerce.[2]

In arguing it is not subject to antitrust laws in this matter, ICANN leans heavily on the Ninth Circuit's decision in *Dedication & Everlasting Love to Animals v. Humane Soc'y of the United States, Inc.*, 50 F.3d 710 (9th Cir. 1995) ("*DELTA*"). In *DELTA*, the Ninth Circuit held "[f]idelity to the language of the statute and its interpretation by the Supreme Court forbids extension of the Sherman Act to charitable fundraising never envisaged as trade by the common law." *Id.* at 713. Thus, the activity of the Humane Society in soliciting donations was not trade or commerce under the Sherman Act. *Id.* at 714. ICANN's reliance on *DELTA* fails because the activities of ICANN set forth in the First Amended Complaint are not solicitations of donations. Instead, ICM is contractually obligated to pay ICANN fees for each registration of a .XXX domain name. *FAC* ¶ 53. Neither *DELTA*, nor any other case cited by ICANN, stands for the proposition that the payment of contractually agreed upon fees is not commercial activity within the Sherman Act.

---

[2] A case that will be frequently discussed in this order, *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010), is also instructive on this point. *VeriSign* did not require the Ninth Circuit to decide whether ICANN's activities were commercial, because ICANN was not a defendant in the action when it came before the Ninth Circuit. However, in analyzing whether the plaintiff had stated a conspiracy to restrain trade, the Ninth Circuit described ICANN's half of the conspiracy thus: "Beyond ICANN's decision not to use competitive bidding to reach the .com agreement, [plaintiff] has also alleged that ICANN was economically motivated to conspire with VeriSign because VeriSign agreed to share its monopoly profits with ICANN and to cease its predatory behavior, which had put ICANN in financial jeopardy." *Id.* at 503. Insofar as ICANN was the other half of the alleged conspiracy in *VeriSign* – a conspiracy that closely parallels the conspiracy alleged in the present matter – there is little doubt ICANN could have been liable for the allegations in *VeriSign*. *See also Virginia Vermiculite*, 156 F.3d at 541 (describing how even labor unions exempt from the Sherman Act may be liable for anticompetitive conspiring with non-exempt parties).

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

ICANN also spends much time recounting its charitable purpose and arguing that it only collects fees to carry out this charitable purpose. *ICANN Mot.* 13:18-18:8. However, these arguments are irrelevant to an analysis of whether ICANN's activities are commercial. *See Virginia Vermiculite*, 156 F.3d at 541 (holding it was "not necessary" that the nonprofit defendant "have shared [its co-conspirator's] alleged anticompetitive motive in entering into a proscribed restraint," but rather, it was sufficient that the nonprofit defendant, "regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects"); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 573-74 (1982) (holding that whether a nonprofit's agents acted to benefit the nonprofit was irrelevant to antitrust liability because the "anticompetitive practices of [the nonprofit's] agents are repugnant to the antitrust laws even if the agents act without any intent to aid [the nonprofit]").

Accordingly, ICANN may be held liable under the Sherman Act for the actions alleged in the First Amended Complaint.

  b. <u>Relevant Markets</u>

An antitrust plaintiff must "identify the markets affected by [a defendant's] alleged antitrust violations." *Big Bear Lodging Ass'n v. Snow Summit Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999). The plaintiff must allege "both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). A relevant market "can be broadly characterized in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products or services." *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 507 (9th Cir. 2010) (quotation marks omitted). A relevant market must "encompass the product at issue as well as all economic substitutes for the product." *Newcal*, 513 F.3d at 1045 (9th Cir. 2008). The validity of a relevant market is subject to factual inquiry and proof, but a court may dismiss allegations of a relevant market if the definition is "facially unsustainable." *Id.*

Plaintiffs allege two different relevant markets.

  1. <u>Defensive Registration Market</u>

The first market is for blocking services and defensive registrations in the .XXX TLD. *FAC* ¶ 60. Plaintiffs allege owners of trademarks, owners of domain names in other TLDs, and

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

owners of other name rights purchase domain names in the .XXX TLD for "defensive or blocking purposes." *Id.* In other words, these owners seek to prevent others from using their names in the .XXX TLD. *Id.* These owners may wish to protect their names from loss of goodwill, prevent consumer confusion, or prevent association with adult entertainment. *FAC* ¶¶ 60, 62. There is no reasonable substitute for these defensive registration services, because the only way to block a name in the .XXX TLD is to register a name in the .XXX TLD. *FAC* ¶ 61.

ICANN argues this is not an appropriately defined market. *ICANN Mot.* 22:1-23:12. ICANN contends the market fails because there is no market for all .XXX defensive registrations. Rather, each .XXX domain name would be its own individual market. Each name owner would only be seeking to purchase the rights to block that individual name from being used as a .XXX website name. In support of this argument, ICANN primarily relies on two, out-of-circuit, district court cases. *See Weber v. Nat'l Football League*, 112 F. Supp. 2d 667 (N.D. Ohio 2000); *Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159 (N.D. Ala. 2001).

The Court finds this argument is foreclosed by *VeriSign*. In *VeriSign*, the plaintiff alleged a market of "expiring domain names." *VeriSign*, 611 F.3d at 501. "Expiring domain names are names that have fallen back, or are about to fall back into the registry database as a result of non-renewal by their current owners." *Id.* The defendant argued this market was insufficient because each expiring domain name would be its own market, and there was no such thing as a market for all expiring domain names. *Id.* at 507. In evaluating this argument, the Ninth Circuit considered the same out-of-circuit, district court cases raised by ICANN. *Id.* at 508. The Ninth Circuit rejected these cases. *Id.* The Ninth Circuit held the plaintiff had properly alleged a market of all expiring domain names, not just those a particular consumer would like to acquire. *Id.* Similarly, here Plaintiffs allege a market of all defensive registrations in the .XXX TLD, not just individual registrations. *FAC* ¶ 60.

Accordingly, Plaintiffs have adequately pled a relevant market for defensive registrations.

    2.    <u>Affirmative Registration Market</u>

The second market described by Plaintiffs is for affirmative registrations of names within TLDs connoting or intended exclusively or predominately for adult content. *FAC* ¶ 66. "There is a serious danger that ICM will establish and monopolize such a distinct market because of the unique association of the 'XXX' name with adult content and the resulting self-reinforcing

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

pattern that will arise from that association with adult content." *Id.* Plaintiffs posit that through "network effects" the .XXX TLD could attract more and more providers of adult content and consumers of adult content, until a point is reached when .XXX is the exclusive purveyor of adult content on the internet.[3] *Id.* Plaintiffs also allege that the registry agreement between ICM and ICANN has provisions making it unlikely that any other TLD connoting adult content will be approved. *FAC* ¶ 68. In addition, ICANN has allegedly adopted new rules and procedures that will effectively block new entrants into this market by allowing governmental objectors to veto any new adult-oriented TLDs. *FAC* ¶ 70. Lastly, Plaintiffs assert that Congress has previously considered, and may consider again, legislation that would force all adult content on the internet into the .XXX TLD. *FAC* ¶ 68.

The Court finds Plaintiffs have failed to adequately plead the affirmative registration market. Plaintiffs have not alleged why other currently operating TLDs are not reasonable substitutes to the .XXX TLD for hosting adult entertainment websites. To the contrary, Plaintiffs allege that Manwin's own website YouPorn.com is the most popular free adult video website on the internet. *FAC* ¶ 1. It thus appears from the face of the First Amended Complaint that an adult content website registered in the .com TLD is an adequate economic substitute for an adult content website registered in the .XXX TLD. Thus, because the relevant market also includes .com domain names, Plaintiffs have not only failed to include all substitute products in their relevant market, but they have failed to allege that Defendants have or will have market power in this greater market. *See Newcal*, 513 F.3d at 1044-45 (the relevant market must include all substitute products and defendant must have market power in the relevant market).

In opposition, Plaintiffs argue that although there may be current substitutes to the .XXX TLD, there may not be such substitutes in the future because of legislation or network effects. *Plts. ICANN Opp.* 19:10-24:5. However, Plaintiffs point to no authority for the proposition that they may adequately allege a market that does not include substitute products that presently exist, merely because Plaintiffs allege those substitute products may disappear in the future. Indeed, this proposition would entirely negate the requirement that an antitrust plaintiff describe

---

[3] In more detail, Plaintiffs argue: "Viewers looking for adult content will gravitate toward the .XXX because the letters uniquely connote such content. The more such users gravitate to .XXX, the more suppliers of such content will want to attract those potential customers by displaying on that TLD. The additional suppliers will in turn attract even more viewers, which will then attract even more suppliers, and so on in a self-reinforcing pattern eventually resulting in a monopoly of adult sites on .XXX*.*" *Plts. ICANN Opp.* 20:12-18.

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

a relevant market that includes all substitute products. *See Newcal*, 513 F.3d at 1045 ("[T]he relevant market must include the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.") (quotation marks omitted).

The only authority Plaintiffs do rely on are cases where threatened antitrust injuries warranted prospective injunctive relief. *Id.* at 22:1-24:5. The proposition that an antitrust plaintiff may pursue injunctive relief for incipient harm to a relevant market, is not the same as the proposition that an antitrust plaintiff need not include substitute products in the definition of a relevant market. Therefore, the Court finds Plaintiffs' description of a relevant market for affirmative registrations is insufficiently pled.

The affirmative registration market is asserted in support of the Third Cause of Action for conspiracy to monopolize under Section 2 of the Sherman Act and the Fifth Cause of Action for attempt to monopolize under Section 2 of the Sherman Act. *FAC* ¶¶ 112, 132. Both an attempt to monopolize and a conspiracy to monopolize claim require allegations of a relevant market. *See Newcal*, 513 F.3d at 1052, n.3 (holding, in a case involving attempt to monopolize and conspiracy to monopolize claims, that "[t]he 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act"); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) ("To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market."). Accordingly, the Third and Fifth Causes of Action are dismissed, with leave to amend.

   c. <u>Antitrust Injury</u>

The Ninth Circuit has identified four requirements for an antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Plaintiffs allege that Defendants harmed competition in the market for .XXX TLD registry services by suppressing or eliminating competing bids for the original .XXX TLD registry contract and any renewals of that contract. *FAC* ¶¶ 54-55. The resulting no-bid contract contains unfavorable prices and sales terms that Plaintiffs allege would not exist in a competitive market. *FAC* ¶¶ 73-88. Under the Ninth Circuit's *VeriSign* decision, these are adequate

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

allegations for antitrust injury. In *VeriSign*, the plaintiff alleged very similar harm to competition through a conspiracy to eliminate competitive bidding for a domain registry contract and a conspiracy to limit competition for renewal of the contract. *VeriSign*, 611 F.3d at 502. The elimination of "competition itself" is "precisely the type of allegation required to state an injury to competition." *Id.* In addition, the Ninth Circuit held that allegations of "higher prices for registration of domain names, and potentially lower-quality services" were sufficient to plead harm under the Sherman Act. *Id.* at 503. In accord with *VeriSign*, the Court finds Plaintiffs have adequately stated antitrust injuries.

Defendants' arguments regarding antitrust injury largely misconstrue the allegations of harm in the First Amended Complaint. Defendants read Plaintiffs' allegations to assert injury from "(1) the 'diversion of business away from Plaintiff, harm to Plaintiffs' name rights, and loss of Plaintiffs' business income' that will allegedly occur with 'the probable registration of similar names by others in .XXX;' and (2) 'profits which [Plaintiffs] might otherwise have earned from affirmative .XXX registrations.'" *ICM Mot.* 10:5-11. As recounted above, the First Amended Complaint alleges other injuries than those recited by Defendants.

Defendants' arguments made in response to Plaintiffs' opposition are no more persuasive. First, Defendants contend that Plaintiffs have conceded that "ICANN's application process for new TLD's (including .XXX) was entirely open." *ICM Reply* 6:19-20. In so arguing, Defendants focus on the establishment of the .XXX TLD itself and ignore the award of the contract to run the .XXX TLD to ICM. This argument misses the thrust of Plaintiffs' pleadings, which allege that there was no competition for the registry contract to operate the .XXX TLD, and that the renewal provisions in the contract ICANN signed with ICM mean there will be virtually no competition in future bidding to operate the .XXX TLD. *FAC* ¶¶ 54-55.

Second, Defendants argue the holding in *VeriSign* was "explicitly based on alleged statements by potential competitors of VeriSign that, if awarded the contract, they would offer registry services at prices well below VeriSign's." *ICM Reply* 6:20-23. This is a misreading of *VeriSign*. While the *VeriSign* court did note that counsel for the plaintiff stated at oral argument before the district court that potential competitors had stated publicly that they would have offered lower prices, the Ninth Circuit did not "explicitly" rely on this statement from oral argument. *VeriSign*, 611 F.3d at 503. To the contrary, in accord with the legal standard for reviewing a motion to dismiss, the Ninth Circuit assessed the pleadings and found them adequate. In any event, there is no requirement that an antitrust plaintiff must identify, at the

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

pleadings stage, specific companies that have made public statements that they would offer lower prices than an antitrust defendant.

The Court finds Plaintiffs have adequately pled antitrust injury.

    d.    <u>Anticompetitive and Predatory Conduct</u>

Plaintiffs assert ICANN and ICM agreed to the following anticompetitive and predatory conduct: suppression of competition for the initial .XXX registry contract and renewal of that contract; preclusion of other adult content TLDs; setting above market prices and output restrictions; and delegating ICANN's sales and pricing authority to ICM for the purpose of allowing ICM to institute even less competitive sales and pricing terms in the future. *FAC* ¶¶ 55-58, 73-82, 84-86.

The Court finds, once again, that these allegations are sufficient under *VeriSign*. While *VeriSign* confirmed that competitive bidding is not required under the Sherman Act, "concerted action between co-conspirators to eliminate competitive bidding for a contract is an actionable harm." *VeriSign*, 611 F.3d at 502. Plaintiffs have alleged just such conduct. Likewise, while unilaterally charging higher prices is not an antitrust violation, "concerted action to restrain trade by imposing prices higher than market rate and under conditions hostile to competition" is an antitrust violation. *Id.* at 504. Plaintiffs have also alleged this type of conduct.

Plaintiffs further allege that ICM mounted a coercive campaign to force ICANN to approve the .XXX TLD and award the registry contract to ICM. *FAC* ¶¶ 34-51. Defendants argue that this conduct cannot have been predatory because the conduct was unsuccessful and also protected by the *Noerr-Pennington* doctrine. *ICM Reply* 5:5-6:1. While even this argument would not negate Plaintiffs' allegations as to competitive bidding, pricing terms, and sales terms, the argument also fails under *VeriSign*. There, the Ninth Circuit held that "Verisign's predatory litigation activity was aimed at coercing ICANN to perpetuate Verisign's role as exclusive regulator of the .com domain name market by awarding Verisign the 2006 .com Agreement without any competitive bidding, and by agreeing to the terms that favored Verisign." *VeriSign*, 611 F.3d at 506.

Plaintiffs have alleged a similar misleading and predatory campaign here. This campaign allegedly included misrepresenting interest from the public in establishing a .XXX TLD, submitting intentionally overbroad and baseless Freedom of Information Act requests to federal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

governmental bodies interested in the .XXX issue, filing a baseless lawsuit against these governmental bodies, and baselessly threatening to sue ICANN. *FAC* ¶¶ 36, 39, 42, 45, 47. At this time, the Court need not parse whether any of these particular activities are protected under the *Noerr-Pennington* doctrine. At the very least, the misrepresentation of support from adult entertainment companies, the generation of fake comments in support of .XXX, the submission of misleadingly edited videos and photos, the non-disclosure that certain celebrity adult entertainment supporters of .XXX were paid by ICM, and the creation of a supposedly independent sponsoring entity that was in fact controlled by ICM, are sufficient allegations to establish improper, anticompetitive conduct under *VeriSign*. *FAC* ¶ 39.

Therefore, Plaintiffs have sufficiently pled anticompetitive and predatory conduct by Defendants.

  e. <u>Concerted Activity</u>

Furthermore, Plaintiffs sufficiently allege that much of the anticompetitive and predatory conduct set forth above was as a result of concerted activity between ICANN and ICM. *See FAC* ¶¶ 55-58, 73-82, 84-86. Indeed, most of Plaintiffs' allegations rest on a written agreement between the two Defendants. As also set forth above, the *VeriSign* court held that a registry agreement between ICANN and another party that was replete with similar terms as Plaintiffs alleged here, was an adequate basis for antitrust claims under Sections 1 and 2 of the Sherman Act. In accord with *VeriSign*, Plaintiffs have set forth sufficient allegations of concerted activity between ICM and ICANN.

  f. <u>Relief</u>

Defendants argue the nature of the remedy Plaintiffs seek "supports" dismissal of the First Amended Complaint. *ICM Mot.* 24:1-25:4. The relief Plaintiffs seek includes: enjoining the .XXX TLD as it is currently operated, voiding the agreements between ICANN and ICM, requiring a new .XXX registry contract that would be open to competitive bidding, imposing reasonable price constraints and service requirements on ICM, and/or other relief as the Court deems just and proper. *FAC* ¶¶ 99, 109, 120, 129, 139; *FAC* at 54:6.

The Court finds Plaintiffs' requested remedies do not require dismissal. As a general matter, in fashioning relief in antitrust cases "district courts are invested with large discretion to model their judgments to fit the exigencies of the particular case." *United States v. Glaxo Grp.,*

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

*Ltd.*, 410 U.S. 52, 64 (1973). In addition, Federal Rule of Civil Procedure 54(c) requires a court to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The cases cited by Defendants do not hold that otherwise proper antitrust claims should be dismissed because of the requested remedy. *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410-415 (2004) (holding, first, that the allegations failed to establish liability under the Sherman Act and then finding the relief plaintiffs sought "may be . . . beyond the practical ability of a judicial tribunal to control"). Because the Court has found Plaintiffs have stated valid antitrust claims, the proper time to fashion relief will be after Plaintiffs have proven their allegations.

g. Conspiracy to Attempt to Monopolize

Defendants move to dismiss the Third Cause of Action for "Conspiracy to Attempt to Monopolize," because there is no cause of action for a conspiracy to attempt to monopolize. *ICANN Mot.* 20:10-21:11. In opposition, Plaintiffs implicitly concede the argument and request the Court either ignore the labeling of the Third Cause of Action or permit leave to amend the labeling. *Plts. ICANN Opp.* 24:6-25:10. The Court has already held that the Third Cause of Action is dismissed for failure to allege a relevant market. If Plaintiffs choose to amend the Third Cause of Action, they may correct the faulty labeling.

IV. Requests for Judicial Notice

The parties have requested the Court take judicial notice of various documents. Dkts. # 31, 32-2. As the Court finds that none of these documents would affect the disposition of any aspect of the motions to dismiss, the requests for judicial notice are deemed moot.

V. Conclusion

For the foregoing reasons, the motions to dismiss are GRANTED as to the separate market for affirmative registrations of domain names within TLDs connoting or intended exclusively or predominately for adult content. This market is inadequately pled. Accordingly, the Third and Fifth Causes of Action are DISMISSED. The Third Cause of Action is also dismissed because there is no cause of action for "conspiracy to attempt to monopolize." Plaintiffs are GRANTED leave to amend their pleadings. The motions to dismiss are DENIED in all other respects. If Plaintiffs wish to file an amended complaint, they must do so by **September 9, 2012**.

Link to docs # 29 & 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CIVIL MINUTES - GENERAL

| Case No. | CV 11-9514 PSG (JCGx) | Date | August 14, 2012 |
|---|---|---|---|
| Title | Manwin Licensing International S.A.R.L., et al. v. ICM Registry, LLC, et al. | | |

**IT IS SO ORDERED.**

IR for WH