

1 Richard P. Sybert, Bar No. 80731
email rsybert@gordonrees.com
2 Hazel Mae B. Pangan, Bar No. 272657
email hpangan@gordonrees.com
3 GORDON & REES LLP
101 W. Broadway, Suite 1600
4 San Diego, California 92101
tel (619) 696-6700 / fax (619) 696-7124
5
Bret A. Fausett, Bar No. 139420
6 email bret@internet.pro
INTERNET PRO APC
7 4640 Admiralty Way, 5th Floor
Marina Del Rey, California 90292
8 tel (310) 496-5755
9 Attorneys for Defendant and Counterclaimant
ICM REGISTRY, LLC d/b/a .XXX, a Delaware limited liability company
10

FILED
CLERK, U.S. DISTRICT COURT

NOV 15 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13 MANWIN LICENSING INTERNATIONAL ) CASE NO.  CV 11-9514-PSG
S.A.R.L., a Luxembourg limited liability ) (JCGx)
14 company (s.à.r.l.) and DIGITAL PLAY- )
GROUND, INC., a California corporation, ) *Honorable Philip S. Gutierrez*
15                                        )
                        Plaintiffs,       )
16                                        ) **ICM REGISTRY, LLC, d/b/a**
        vs.                               ) **.XXX'S FIRST AMENDED**
17                                        ) **COUNTERCLAIMS**
ICM REGISTRY, LLC, d/b/a .XXX, a          )
18 Delaware limited liability corporation; ) **DEMAND FOR JURY TRIAL**
INTERNET CORPORATION FOR                  )
19 ASSIGNED NAMES AND NUMBERS, a          )
California nonprofit public benefit       )
20 corporation; and Does 1-10,            )
                                          )
21                     Defendants.        )
                                          )
22 ICM REGISTRY, LLC, d/b/a .XXX, a       )
Delaware limited liability corporation,   )
23                                        )
                        Counterclaimant,  )
24                                        )
        vs.                               )
25                                        )
MANWIN LICENSING INTERNATIONAL )
26 S.A.R.L., a Luxembourg limited liability )
company (s.à.r.l.); DIGITAL PLAY-         )
27 GROUND, INC., a California corporation, )
and Does 11-20,                           )
28                                        )
                    Counterdefendants.    )

- 1 -

## COUNTERCLAIMS

Counterclaimant ICM Registry, LLC ("ICM" or "Counterclaimant") for its counterclaims against Counterdefendants Manwin Licensing International S.A.R.L. ("Manwin"), Digital Playground, Inc. ("Digital Playground") and Does 11-20 (collectively "Counterdefendants") alleges the following:

### I.    PARTIES AND JURISDICTION

1.    ICM is informed and believes that Manwin is a Luxembourg limited liability company with its principal place of business in the city of Luxembourg, Luxembourg.

2.    ICM is informed and believes that Digital Playground is a California corporation with its principal place of business in Van Nuys, California.

3.    Counterdefendants Manwin and Digital Playground have submitted to the jurisdiction of this Court by commencing their action for antitrust violations in this judicial district, as set forth in the First Amended Complaint ("FAC").

4.    ICM is a Delaware limited liability company, with its principal place of business in Palm Beach Gardens, Florida.

5.    ICM is unaware of the true names or capacities of the counterdefendants sued under the fictitious names Does 11 through 20, inclusive. ICM is informed and believes that Does 11 through 20, and each of them, either participated in performing the acts averred in these counterclaims or were acting as the agent, principal, alter ego, employee, or representative of those who participated in the acts averred in these counterclaims.  Accordingly, counterdefendants Does 11 through 20 are each liable for all acts averred in these counterclaims.  ICM will amend these counterclaims to state the true names of counterdefendants Does 11 through 20 if and when their identity is discovered.

6.    Jurisdiction of these counterclaims arise under the Sherman Act, 15 U.S.C. §§ 1 and 2, *et seq*. and under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as the Business and Professions Code ("B&PC") of the State of California,

specifically, unfair competition under B&PC § 17000.  Subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1331, and under the principles of supplemental jurisdiction, 28 U.S.C. § 1367(a), with respect to the common law and state counterclaims.  Jurisdiction of the third party claims is also proper under 28 U.S.C. § 1367(a).

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 in that: (a) Counterdefendants Manwin and Digital Playground may be found and transact business in this judicial district and are subject to personal jurisdiction in this judicial district; and (b) a substantial part of the acts, omissions and events giving rise to the claims asserted in this complaint occurred in this judicial district.

## II.    INTRODUCTION

8.    Manwin and Digital Playground have correctly characterized the dispute between the parties as an antitrust dispute, but have mischaracterized who is engaged in the wrongful anti-competitive conduct at issue.  At its core, this case does not involve a monopoly over defensive or affirmative .XXX domain name registrations, but instead involves control over the platforms on and through which the online adult entertainment industry advertises and disseminates its content. Manwin has dominance over these platforms and sees the emergence of the .XXX TLD as a threat to its current monopoly and market power.  When Manwin was unable to buy into .XXX, it sought to thwart it altogether.  It colluded and conspired with Digital Playground (one of the top five porn studios) and others to destroy ICM's commercialization of .XXX because the .XXX TLD poses a potential threat to Manwin's dominance.  Counterdefendants' entire course of conduct, therefore, including the filing and prosecution of their First Amended Complaint, is an illegitimate and illegal attempt to maintain a monopoly and market power.

9.    Because of Manwin's current dominance in search and access to online adult entertainment, purveyors of mainstream adult entertainment content

1   are forced to advertise and release their content through Manwin's platforms.

2   Even well-known and established parties in the adult entertainment industry, such

3   as Playboy Enterprises, Inc. ("Playboy"), have been forced to work through

4   Manwin given the stranglehold that Manwin currently has on the online adult

5   entertainment market.  Manwin has created its monopoly and market power by

6   acquiring and controlling certain major adult entertainment "tube sites" which

7   generally disseminate adult entertainment online for free.  By doing so, it

8   maintains dominance over some of the most highly trafficked online adult

9   entertainment platforms in the industry.  The reason that market share in the "tube

10  sites" affects market share in the online adult entertainment market is complex and

11  warrants some explanation and a brief history of the dissemination of adult

12  entertainment online.

### III.   FACTUAL BACKGROUND

13

14       **A.**   **Manwin's Market Dominance**

15       10.   Manwin's dominance in the adult entertainment industry is due in part

16   to the paradigm shift that has taken place in the online adult entertainment

17   industry.

18       11.   When adult entertainment first emerged on the Internet in the 1990s, it

19   was relatively simple to watch and lucrative to sell.  With very little expense,

20   anyone could put up a web page featuring a list of links to other adult entertain-

21   ment websites.  If an Internet surfer clicked on one of the links, he or she would be

22   directed to a pay site; the pay site would pay the referring site (an "affiliate") a tiny

23   amount for the traffic, and a more substantial amount if the surfer ultimately

24   subscribed to the site. The pay sites would supply affiliates with content snapshots

25   and clips for free.  In this way, the online adult entertainment industry came to

26   consist of a relatively small number of pay sites surrounded by many thousands of

27   affiliates.

28

12.     After the launch of YouTube in 2005, an entirely new platform for disseminating adult entertainment emerged, namely, the "tube" sites.  Sites such as YouPorn, PornoTube and RedTube emerged.  Like YouTube, the porn tubes were flooded with free content, some of it licensed, but much of it pirated from paid sites.  YouPorn, in particular, obtained market dominance through the uploading of copyright-infringing material to its site by its employees and/or contractors.

13.     The tube sites had a new business model.  They made most of their money by maintaining traffic on their sites and selling banner ads.  Consumers migrated *en masse* from the old affiliate sites to free movies on tube sites.  Tube sites became the primary feeder of traffic for adult content sites.  The tube sites fed traffic through banner ads, embedded links, pop-ups, pop-unders and other methods while also maintaining traffic on their own sites.

14.     Today, the online internet traffic for adult entertainment is concentrated in the tube sites.  Sites like Pornhub, Xvideos, YouPorn, and Tube8 attract more users than popular sites such as TMZ and the Wall Street Journal, and are the top adult entertainment websites on the web.

15.     Recognizing this trend, Manwin purchased YouPorn.com in 2011.  Manwin also owns xTube.com, Pornhub.com, Extreme Tube, Sextube, Gaytube and Spankwire and is reported to operate and/or control other "tube" sites that offer free user-generated and searchable adult content.  Manwin recognized that these new platforms were the wave of the future and it could dominate access to online adult entertainment by controlling them; Manwin could reap advertising revenue from the tube sites *and* use these sites to funnel surfers to the paid sites it controlled or to other paid sites from whom it received kick-backs.

16.     Manwin recognized that the true value of these "tube sites" was not the revenue generated by them but the traffic to them.  Since the content on these sites was given away for free, the tube sites in and of themselves were not a huge

moneymaker.  The money to be made from these sites was from the traffic and from controlling the stream of traffic.

17.   In 2010, Manwin had purchased the adult entertainment production company Brazzers (which owns approximately 30 pornographic websites) and now had a conduit to further monetize this asset.  While many in the online adult entertainment industry saw the "tube sites" as the death of adult entertainment (since the tube sites gave away what had traditionally been paid for), Manwin sought to use the tube sites to establish a monopoly by controlling the search and access to adult entertainment.  Manwin purchased many of the major tube sites in an attempt to establish a monopoly and market power over access to online adult entertainment.  Manwin's tube site Youporn.com is ranked #2 among adult enter-tainment sites and is the top ranked tube site on the web as ranked by Alexa.com.

18.   Manwin's market power was highlighted in a 2001 investment report by Raymond Chabot Grant Thornton ("Raymond Chabot"), a large Quebec based accounting and management consulting firm.  Raymond Chabot identified Manwin as "a leading international provider of high quality adult entertainment" and "an uncontested market leader in the online adult entertainment industry with approximately 35 million daily visitors to its various websites."  Moreover, Raymond Chabot identified Manwin as the only adult content website operator of its size conducting significant operations in both free and subscription-based websites.  Manwin's market power has only increased since Raymond Chabot issued the above findings.  Today, Manwin boasts 60 million daily visitors to its various websites.

## B.   Unveiling of .XXX TLD Threatens Competition to Manwin Empire

19.   The approval of the .XXX TLD by the Internet Corporation for Assigned Names and Numbers ("ICANN") and the approval of ICM as the registry operator of the .XXX TLD was a change to the adult entertainment industry that

threatened Manwin's empire.  The commercialization of .XXX would undoubtedly lead to the unveiling of a multitude of new tube sites that would threaten Manwin's dominance over the tube site market.  The tube site market would now include sites in the .XXX TLD that could appear higher than Manwin's tube sites in a query of web search results for explicit sexual content.  For example, Google, Bing, Yahoo or other search engines may factor in the inclusion of the .XXX TLD in their search engine analytics placing websites with the .XXX TLD higher on a list of search results than a similarly situated .COM or .NET TLD.  Since nearly 17% of traffic to Manwin's tube site YOUPORN.com is the direct result of search engine traffic, this could greatly impact Manwin's search engine optimization, or in other words, the exposure Manwin gets from people searching for adult entertainment tube sites via search engines.  This would lead to greater exposure for .XXX tube sites as opposed to .COM tube sites, and would undoubtedly affect Manwin's dominance in the tube site market and the overall market for online adult entertainment.

20.    If .XXX was successfully launched, the lack of .XXX in the URL of Manwin's tube sites could result in a loss of search engine traffic to these tube sites.  In the fall of 2010, Manwin's managing partner expressed these concerns to Greg Dumas ("Dumas") and Claudio Menegatii ("Menegatti"), both ICM consultants.  Specifically, Manwin was concerned that .XXX would endanger Manwin's traffic by impacting Manwin's search engine results and by allowing .XXX registrants to legitimately obtain Manwin's traffic.  Thus, Manwin saw the launch of .XXX as a serious threat to Manwin's tube site empire.

21.    For this reason, Manwin's managing partner, in July 2010, attempted to buy into ICM.  Moreover, Manwin sought to woo ICM by stating that if Manwin joined .XXX, Manwin would make .XXX a success because everything Manwin does becomes the industry leading activity.  When the attempt by Manwin's managing partner to buy into ICM was rebuffed, he resorted to instigating legal

action by and through Manwin in order to prevent ICM from commercializing the .XXX TLD.  Digital Playground's involvement in the suit is likely attributable to Manwin's influence since Manwin appears to have been negotiating the acquisition of Digital Playground prior to initiating this suit and acquired Digital Playground shortly thereafter.  It was reported in gfy.com, an online adult industry bulletin board, that Manwin's managing partner stated that "although it will be hard to stop .XXX completely, maybe we can make it highly unprofitable for them." The timing of Manwin's and Digital Playground's lawsuit is indicative of the true intent of Manwin and Digital Playground to interfere with ICM's prospective business since the filing occurred just a few weeks before the launch of .XXX. Manwin's and Digital Playground's suit was making good on Manwin's threat to Dumas and Menegatti (at a meeting in 2010) and to ICM executives (during business negotiations in 2011) that Manwin would sue ICM to "mess them up." Indeed, during business negotiations in 2011 Manwin informed ICM that if Manwin's demands were not met, Manwin would spend a few million dollars a year for the next few years suing ICM.

22.     On information and belief, Manwin and Digital Playground have colluded to file this lawsuit to delay and/or prevent the commercialization of .XXX by ICM in order to maintain Manwin's current monopoly over search and access to online adult entertainment.

23.     On information and belief, Manwin's acquisition of co-plaintiff Digital Playground after the initiation of this litigation was in furtherance of its improper purpose of maintaining its monopoly and market power and as part of its illegal scheme to restrain trade.

24.     Manwin alleges in its First Amended Complaint herein that this case involves "supracompetitive" pricing of .XXX TLDS detrimental to the adult entertainment domain name market.  However, during ICM's "Sunrise A" period, (the period in which ICM allowed trademark holders and domain name holders in

the adult entertainment industry to apply for advanced registration of a .XXX domain name), ICM offered .XXX domains for an application fee of $162 with annual fees of $62.  Though these prices may be higher than the current registration prices for a .COM domain name, ICM's registration price is actually less than the $100 annual registration fee paid for .COM domain names when they were initially sold back in 1995.  Moreover, ICM's annual registration fees are also less than the .JOBS annual registration fee, which is approximately $125 and the .TRAVEL annual registration fee, which is between $85 and $100; both .JOBS and .TRAVEL were approved by ICANN in the same 2004 sTLD round in which .XXX was approved.

25.    It is important to note that the price of a .XXX TLD reflects the boutique market to which .XXX caters, and the costs necessary to cater to that market.  Ten dollars of each resolving registration goes to support the .XXX sponsoring organization.  Other amounts go to pay for daily malware scans, member verification and other costs unique to both this market and ICM's unique service offerings.

26.    The pricing for .XXX TLDs was also designed to combat the cybersquatting that is rampant in the .COM universe and that destroys fair competition.  Rather than having to register hundreds of domain names in order to prevent cybersquatting, the .XXX TLD system was designed so that trademark owners would only need to seek registrations for the names they intended to use.

27.    To achieve this, ICM priced its .XXX TLDs at such a level that cybersquatters would be discouraged from applying for multiple domain names, thereby protecting the intellectual property rights interests of the legitimate owner. ICM Registry believes that its price point encourages competition because it is at a level that is not price-prohibitive but still discourages illegitimate consumers from buying up names.

28.     Thus, this case does not involve "supracompetitive pricing" as Manwin and Digital Playground suggest but rather involves Internet traffic and hit counts and the potential drop in hit counts to Manwin's tube sites.  Manwin claims to have 60 million hits on its online adult entertainment platforms daily.  Should non-Manwin "tube" sites such as tube.xxx, freesexmovies.xxx and others appear on .XXX, this number may drop precipitously and with it, Manwin's monopoly income and dominance over access to online adult entertainment.  That is Manwin's motivation for suing and for its anti-competitive and unlawful conduct described more fully below.

### C.     Manwin's Anti-Competitive and Unlawful Conduct

29.     For the reasons set forth above, Manwin has utilized its monopoly power and market power to inhibit the commercialization of the .XXX TLD, and engaged in predatory acts to prevent and coerce others in the adult entertainment industry from utilizing the .XXX TLD platform.

30.     On information and belief, Manwin has used its monopoly power and its market power to attempt to improperly extort concessions from ICM, namely, (1) a price reduction for .XXX domain names of $10 per domain name; (2) registration of exact matches and typos of Manwin's existing trademarks and domain names in .XXX for free; (3) assurance that neither ICM nor the International Foundation for Online Responsibility ("IFFOR"), as the sponsoring organization for the .XXX TLD, would introduce registry policies that would limit or prevent tube sites from existing in .XXX, with the obvious effect, *inter alia*, that Manwin's tube sites could then continue to host copyright-infringing material; and (4) a commitment from Stuart Lawley, ICM's CEO, that he would step down as chair of IFFOR.

31.     Manwin sought to establish a revenue split approximately between 80/20 and 70/30 of profits acquired from running certain premium .XXX domains (such as search.xxx) from ICM by leveraging Manwin's market power.

32.     On information and belief, Manwin has and continues to engage in "tying" arrangements with webmasters, conditioning promotion of the webmasters websites on Manwin's tube sites on the webmasters' boycotting use of .XXX and has secured agreement, either express or implied, that the webmasters will not do business with .XXX.

33.     On information and belief, Manwin pulled advertising and video clips submitted to Manwin's tube sites by the owners of orgasms.xxx and casting.xxx because the content was from a .XXX site.  This led to the loss of substantial revenue to these .XXX site owners and damaged ICM's relationship with these site owners.

34.     On information and belief, Manwin has improperly attempted to destroy competition to its tube sites by requiring that ICM grant it certain premium or high value tube site names such as "tube.xxx" at below market prices and has indicated that failure to comply would result in litigation being instituted against ICM.

35.     On information and belief, Manwin has attempted to prevent webmasters with whom it works from doing business with .XXX by reserving the right under the terms and conditions of its website agreements to reduce or cease payment to these parties if they register certain domain names, URLs or paid ad schemes with .XXX.  Manwin has secured agreement from these webmasters, either express or implied, that they will not do business with .XXX.

36.     Manwin has engaged in unfair anti-competitive practices by demanding that ICM allocate it several thousand domain names either at below market prices or for free, as well as ensure that ICM's and/or IFFOR's policies would not prohibit tube sites on .XXX.

37.     On information and belief, Manwin has instigated a boycott of .XXX by refusing to advertise, promote or host content for companies, individuals or groups that use .XXX.

38.     On information and belief, Manwin has publicly and privately denounced the .XXX TLD in the adult entertainment industry and engaged in an unfair and anti-competitive campaign against ICM in order to prevent ICM from commercializing .XXX and to interfere with ICM's existing and prospective contractual relationships.

39.     On information and belief, Manwin interfered with ICM's sponsor-ship of the X Rated Critics Association ("XRCO") Award Show in 2012 by encouraging the wholesale boycott by companies, performers and participants if ICM were permitted to participate in order to destroy ICM's ability to market and commercialize .XXX.  Manwin has secured agreement, either express or implied, that XRCO will not do business with .XXX.

40.     On information and belief, Manwin has utilized its dominance in the adult entertainment industry to encourage the wholesale boycott of .XXX TLD in the industry in order to destroy any competition that may arise from commercial-ization of .XXX and has secured agreement, either express or implied, by those within the industry that they will not do business with .XXX .

41.     On information and belief, Manwin improperly interfered with ICM's potential sponsorships of Adult Video News ("AVN") and XBIZ's adult industry events and interfered with advertising opportunities with AVN and XBIZ in order to destroy any competition that may arise from commercialization of .XXX and has secured agreement, either express of implied, by AVN and XBIZ that they will not do business with .XXX.  This coercion constitutes a wrongful restraint of trade because it unfairly prohibits ICM from marketing and promoting its goods in the stream of commerce.

42.     On information and belief, Manwin has coerced industry groups into blocking the promotion of .XXX by ICM through sponsorship of industry events. This coercion constitutes a wrongful restraint of trade because it unfairly prohibits

1   ICM Registry from marketing and promoting its goods in the relevant streams of
2   commerce.

3       43.    On information and belief, Manwin has coerced .XXX spokes models
4   to end relationships with ICM, insinuating that their revenue generating relation-
5   ships with Manwin would be impacted by their involvement with .XXX.  Manwin
6   has secured agreement, either express of implied, that they will not do business with
7   .XXX..  This coercion constitutes a wrongful restraint of trade because it unfairly
8   prohibits ICM from marketing and promoting its goods in the stream of commerce.

9       44.    On information and belief, Manwin has conditioned contracts with
10  third parties on their non-involvement with the .XXX TLD.  These contracts
11  constitute improper agreements in restraint of trade.

12      45.    Manwin has engaged in libel and trade defamation by publishing false
13  statements to third parties via press release that ICANN and ICM have engaged in
14  an illegal scheme to eliminate competitive bidding and market restraints in
15  violation of federal and state unfair competition laws.

16      46.    On information and belief, Manwin asserted that it plans on
17  maintaining its monopoly or market power by starting its own adult industry trade
18  group consisting of two or three more "powerhouses" in the industry (without
19  inclusion of smaller webmasters) in order to maintain its monopoly or market
20  power and control of the adult entertainment industry.

21      **C.    Manwin's Mischaracterization of ICM Registry, LLC**

22      45.    Manwin wrongly alleges or mischaracterizes ICM as a company
23  formed and operated to exploit defensive .XXX domain name registrations.  Such
24  mischaracterization is knowingly false. The sale of defensive reservations by ICM
25  during the so-called Sunrise B period was merely to provide a mechanism for intel-
26  lectual property owners to preemptively protect their trademarks from pirating by
27  third parties, and has been praised by those in the intellectual property community
28  as a positive step toward deterring improper misappropriation of trademark rights

1   by third parties.  Indeed, the period for purchasing such defensive reservations was

2   only open during a two-month period from September 7 to October 28, 2011.  Any

3   such business model would be short-sighted and highly unlikely on its face.

4        46.    The .XXX TLD effectively acts as a seal program under the

5   International Foundation for Online Responsibility ("IFFOR").  IFFOR is a non-

6   profit organization dedicated to combating images of child abuse and child

7   pornography and to facilitating user choice and parental control of access to online

8   adult entertainment.  IFFOR aims to protect the privacy, security, and consumer

9   rights of consenting adult consumers of online adult entertainment goods and

10   services.  An Independent Review Panel appointed pursuant to ICANN's Bylaws

11   acknowledged that IFFOR both identified a legitimate sponsored community and

12   was a legitimate sponsoring organization.

13        47.    Like other seal programs, .XXX is a voluntary program whereby

14   members of the adult entertainment community may identify themselves as

15   adhering to certain best practices, including respect for intellectual property.

16   Manwin's very business model, by contrast, historically relied and may still rely

17   on the unauthorized dissemination of copyright-infringing material posted and/or

18   uploaded on tube sites.  ICM and/or IFFOR reserves the right to scan the websites

19   of those bearing the .XXX seal to ensure that these sites meet IFFOR's criteria and

20   standards.  If they do not, ICM and/or IFFOR have the right to withdraw the seal

21   and prohibit participation by that party in .XXX.  Thus, .XXX hardly bears the

22   hallmark of a company trying to maintain a monopoly over .XXX defensive

23   domain name registrations.  Instead, it bears the hallmarks of a company intending

24   to establish best practices in the online adult entertainment industry for the

25   protection of minors and the benefit of the adult entertainment community and the

26   public at large.

27   ///

28   ///

**First Counterclaim for Combination or Conspiracy in Restraint of Trade Under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Against All Counterdefendants)**

48.     ICM repeats and re-alleges each and every allegation set forth above.

49.     This is a counterclaim under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

50.     For purposes of this claim, the relevant product market consists of online search and access to adult entertainment via websites.  Other relevant product markets may also exist.

51.     The relevant geographic markets are global.

52.     Manwin has market power over online adult entertainment tube sites, which as alleged above, is the dominant mechanism for searching and accessing adult entertainment via websites.  Manwin has colluded with at least, Digital Playground, and their related companies, affiliates, brands and certain third party affiliates to prevent the emergence of other tube sites in .XXX through improper means in order to protect its dominance in the relevant market or markets as alleged herein.

53.     Manwin, Digital Playground, and their related companies, affiliates, brands, and certain third party affiliates have conspired to boycott the .XXX TLD and have coerced and/or encouraged the boycott of .XXX websites by third parties in order to maintain a monopoly over the relevant market or markets as alleged herein.

54.     Manwin, Digital Playground, and their related companies, affiliates, brands, and certain third party affiliates have intended to restrain trade in the product market mentioned above through inhibiting commercialization and utilization of the .XXX TLD.

55.     Plaintiffs are informed and believe that Manwin and Digital Playground have combined and conspired to undertake at least the following anti-

competitive practices intended to restrain trade in the relevant market or markets mentioned above:

(a)     Engaging in horizontal agreements, either express or implied, with certain third party affiliates in which the parties agree that they will not compete for online adult entertainment search traffic in .XXX and will confine their competitive activities to TLDs other than .XXX.

(b)     Colluding with third parties to boycott content from shemale.xxx and ladyboy.xxx on Manwin's tube sites based upon the affiliation these sites have with .XXX.

(c)     Engaging in improper "tying" arrangements with webmasters in which said Counterdefendants condition the promotion of the webmasters' websites on Manwin's tube sites on a boycott of the .XXX TLD;

(d)     Instigating a boycott of .XXX and refusing to advertise, promote or host content for companies, individuals or groups that use .XXX;

(e)     Engaging in harassment and coercion to extort high value tube site names such as "tube.xxx" for below market prices;

(f)     Demanding that ICM allocate it several thousand domain names at below market prices and requiring assurances that neither ICM nor IFFOR would introduce any registry policies that limited or prevented tube sites from existing in .XXX.  This obviously would have the effect, *inter alia*, that Manwin's tube sites could then continue to host copyright-infringing material.

(g)     Improperly coercing industry groups into blocking the promotion of .XXX at adult entertainment events and gatherings in an attempt to improperly restrain the trade of ICM;

(h)     Conditioning contracts with third parties on non-involvement with the .XXX TLD; and

(i)     Engaging in an unfair anti-competitive campaign against .XXX in order to prevent ICM from bringing .XXX to market.

56.     Manwin has conspired and combined with Digital Playground, a leading content provider, to maintain Manwin's monopoly or market power (and Digital Playground's visibility) by harassing, oppressing, boycotting, and interfering with ICM Registry's commercialization of .XXX.

57.     Manwin's and Digital Playground's conspiracy to restrain trade in the relevant market has had, and unless enjoined will continue to have, the effect of harming the competitive process in interstate commerce and will result in actual injury to competition.

58.     If not enjoined, Manwin's and Digital Playground's restraint of trade will continue and result in existing and potential competitors being excluded from competing in the relevant market resulting in higher prices for the "tied goods" (i.e. online adult entertainment content) and poorer quality product options within the relevant market.

59.     Manwin's and Digital Playground's conspiracy and combinations have caused, and unless enjoined will continue to cause, injury to ICM since they will unlawfully prevent ICM from commercializing the .XXX TLD.  This harm will also destroy or damage competition by preventing Internet stakeholders from competing with Manwin's tube sites in .XXX, and may result in higher prices and fees to end consumers and lower quality goods.

**Second Counterclaim for Monopolization Under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2**

**(Against All Counterdefendants)**

60.     ICM repeats and re-alleges each and every allegation set forth above.

61.     This is a counterclaim under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

62.     For purposes of this claim, the relevant product market consists of online search and access to adult entertainment via websites.  Other relevant markets may also exist.

63.    The relevant geographic market is global.

64.    By engaging in the above activities, Manwin and Digital Playground have improperly restrained trade, harmed competition and engaged in predatory conduct in the above listed product market to the detriment of business and consumers in violation of Section 2 of the Sherman Antitrust Act.

65.    The actions stated above have inhibited and continue to inhibit ICM from being a market participant and dealing or supplying the mechanisms necessary for use in the relevant market, and, unless such actions are enjoined, Manwin and Digital Playground will prevent ICM from commercializing the .XXX TLD.

66.    Counterdefendants' ability to exclude ICM from market participation is a result of Manwin's being a multi-market company.  In addition to its dominance over "online search and access to adult entertainment via websites" through its ownership and control of several of the major tube sites, Counterdefendant Manwin owns and licenses a large volume of adult entertainment content through its relationships with Counterdefendant Digital Playground and other adult content brands such as Brazzers, Mofos, Twistys, Playboy and Wicked Pictures.  These relationships give Manwin significant influence in the adult entertainment industry and have enabled Manwin to implement a boycott of .XXX and exclude ICM from participating in the relevant market.

### Third Counterclaim for Attempted Monopolization Under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (Against Manwin)

67.    ICM repeats and re-alleges each and every allegation set forth above.

68.    This is a counterclaim under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

69.    For purposes of this claim, the relevant product market consists of online search and access to adult entertainment via websites.  Other relevant markets may also exist.

70.    The relevant geographic markets are global.

71.    By engaging in the predatory conduct mentioned above, Manwin had and manifested the specific intent to control the price that it and others paid for .XXX TLDs, prevent commercialization of .XXX by ICM and to inhibit competition in online search and access to adult content via websites in .XXX. Moreover, Manwin also had and manifested the intent to destroy competition by usurping control over ICM Registry policies.

72.    Manwin is a large multi-market adult entertainment company that owns and licenses a large volume of adult entertainment content through its relationship with Brazzers, Counterdefendant Digital Playground, and Playboy, among others.  Its acquisition and control of several of the most trafficked and popular tube sites, combined with its access, control and ownership of a large library of adult entertainment content, place Manwin in a position to engage in improper tying arrangements with adult industry members, including webmasters, conditioning the promotion of the webmasters websites on Manwin's tube sites on the webmasters' boycotting use of .XXX.  Manwin has secured agreement, either express or implied, that the webmasters will not do business with .XXX.  These tying arrangements allow Manwin to establish, or maintain a monopoly in the relevant market.

73.    If not enjoined, there is a high likelihood that Manwin's monopolization or attempted monopolization over the relevant markets will result in the exclusion of existing and potential competitors giving Manwin unfettered discretion to fix prices, refuse to deal and restrain trade.

///

///

## Fourth Counterclaim for Conspiracy to Monopolize

## Under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2

## (Against All Counterdefendants)

74.     ICM repeats and re-alleges each and every allegation set forth above.

75.     This is a counterclaim under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

76.     For purposes of this claim, the relevant product market consists of online search and access to adult entertainment via websites.  Other relevant markets may also exist.

77.     The relevant geographic markets are global.

78.     The combination or conspiracy between Manwin, Digital Playground and their related companies, affiliates, brands, and certain third party affiliates was undertaken with the specific intent of maintaining Manwin's dominance over search and access to online adult entertainment content via websites.

79.     The overt acts mentioned above were done with the specific intent to monopolize the relevant market and to prevent commercialization of .XXX which would prevent ICM from becoming a market participant in the relevant market.

80.     The unlawful conspiracy of Manwin, Digital Playground, and their related companies, affiliates, brands and certain third party affiliates has caused and, unless enjoined by this Court, will continue to cause adverse and anti-competitive injury to ICM, to consumers and to the business and property of adult content stakeholders and to .XXX applicants, webmasters and others in the adult entertainment community.

## Fifth Counterclaim for Unfair Competition

## Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

## (Against All Counterdefendants)

81.     ICM repeats and re-alleges each and every allegation set forth above.

- 20 -

82.     This is a counterclaim for unfair competition under 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

83.     Manwin, Digital Playground, and their affiliates and related companies, have engaged in predatory practices intended to drive out ICM from supplying goods and services for use in the adult entertainment industry in order to maintain the status quo and reap monopoly rewards.

84.     Manwin has engaged in libel and trade defamation, including without limitation a libelous press release about this very lawsuit in which Manwin's false allegations were reported as established facts rather than mere unproven allegations.  Specifically, Manwin stated that this "lawsuit reveals ICM intended to exploit the defensive registration process to reap profits and conspired with ICANN to monopolize the .XXX domain TLD."  Moreover, the report also asserted that Manwin's suit revealed "new details about the illegal scheme by ICANN and ICM to eliminate competitive bidding and market restraints in, and to monopolize, the markets for .XXX registry services."  These statements were made in a press release dated February 17, 2011 on Manwin's website at www.manwin.com.  The press release is and was targeted to members of the adult entertainment industry, including ICM's actual and prospective customers seeking registration of domain names in the .XXX TLD.

85.     Such statements are false and were made with the intent to interfere with ICM's existing and prospective business relationships and are likely to deceive a substantial segment of the adult entertainment community about the goods and services of ICM, namely the nature and value of .XXX TLDs.  As a result of such statements, it is likely that a substantial segment of prospective purchasers will avoid procurement of .XXX TLDs.  This will result in decreased sales and decreased revenue to ICM.

86.     Manwin's dissemination of these false statements was for illegitimate commercial purposes, namely to drive out ICM from supplying goods to the adult entertainment industry.

87.     Such actions constitute unfair competition in violation of Section 43(a) of the Lanham Act because they are designed to drive a legitimate market participant out of the market by improper means.

88.     Counterdefendants' acts complained of herein have damaged and will continue to damage Counterclaimant irreparably.

89.     Counterclaimant is therefore entitled to an injunction restraining and enjoining Counterdefendants from further acts of unfair competition.

### Sixth Counterclaim for Unfair Competition

### Under California Business & Professions Code § 17200

### (Against All Counterdefendants)

90.     ICM repeats and re-alleges each and every allegation set forth above.

91.     This is a counterclaim for unfair competition under California Business and Professions Code §§ 17200, *et seq.*

92.     Counterdefendants' actions violate California unfair competition laws since they are intended to drive out and prevent competition in order to reap monopoly rewards.

93.     Counterdefendants' business acts and practices are unlawful and unfair and in violation of California's unfair competition law because they have restrained trade and competition in violation of the antitrust laws and competition laws as more fully alleged above.

94.      Counterdefendants' business acts and practices are also unlawful and unfair in that they impermissably interfere with ICM's prospective economic advantage.  Counterdefendants have impaired the value of contracts ICM has entered into with third parties, namely, .XXX Founder Premium Domain Name

1  Licensing Fees Contracts and .XXX Premium Generic Names Contracts, for

2  registration of .XXX domains.

3       95.  For example, ICM entered into a .XXX Founder Premium Domain

4  Name Licensing Fee Contract with Reality Kings, whereby Reality Kings was

5  obligated to develop websites on certain domain names that contained .XXX

6  TLDs.  On or about April 16, 2012, Reality Kings was acquired by

7  Counterdefendant, Manwin, who must have had knowledge of the agreement

8  between Reality Kings and ICM by virtue of its acquisition of Reality Kings.

9  Pursuant to Manwin's boycott of .XXX, Reality Kings has not developed its

10  domains and is in breach of the .XXX Founder Premium Domain Name Licensing

11  Fee Contract.  Reality Kings' breach is a direct result of Manwin's interference

12  with this contract.  As a result of this interference, ICM has been deprived of the

13  consideration it was entitled to under the .XXX Founder Premium Domain Name

14  Licensing Fee Contract.  Manwin has also tortiously interfered with ICM's

15  prospective economic advantage in other ways as set forth below.  Such actions

16  violate California unfair competition laws.

17       96.  Additionally, ICM entered into registration agreements with Really

18  Useful, Ltd., the registrant for the domain names orgasms.xxx and casting.xxx.

19  Really Useful, Ltd. intended to enter into additional premium name contracts with

20  ICM for other .XXX domains.  Under its contracts with this registrant, ICM was to

21  receive a series of payments in exchange for reservation of those domains.

22       97.  On information and belief, Manwin intended to disrupt the economic

23  relationship between ICM and Really Useful, Ltd. by indicating that Manwin

24  would not take video uploads, links, sites or ads from .XXX sites.  Manwin's

25  actions deterred Really Useful, Ltd. from purchasing additional .XXX domain

26  names because its ability to monetize such domain names would be greatly

27  inhibited by Manwin's boycott.  Really Useful, Ltd. also lost revenue as a direct

28  result of Manwin's boycott of its content and advertising and consequently was

1   forced to seek deferral of payment to ICM for the generic .XXX domain names it

2   had acquired.

3       98.    Counterdefendants have also impaired and interfered with ICM's

4   potential sponsorships of Adult Video News ("AVN") and XBIZ's adult industry

5   events and advertising opportunities with AVN and XBIZ in order to destroy any

6   competition that may arise from commercialization of .XXX.  ICM has secured

7   agreement, either express of implied, by AVN and XBIZ that they will not do

8   business with .XXX.  This interference has prohibited ICM from marketing and

9   promoting its goods in the stream of commerce.

10       99.    On information and belief, Manwin has coerced .XXX spokes models

11   to end relationships with ICM by insinuating that the spokes models' revenue-

12   generating relationships with Manwin would be impacted by their involvement with

13   .XXX.  Manwin has secured agreement, either express of implied, with the

14   spokesmodels that they will not do business with .XXX.  This interference

15   constitutes unfair competition because it improperly prohibits ICM from marketing

16   and promoting its goods in the stream of commerce.

17       100.    Counterdefendants undertook these acts to drive out ICM from the

18   online adult entertainment industry and prevent ICM from supplying goods and

19   services for use in the adult entertainment industry in order to maintain the status

20   quo and reap monopoly rewards.

21       101.    Counterdefendants' acts and practices as herein alleged present clear

22   and convincing evidence of oppression and malice, under California Civil Code

23   Section 3294.

24       102.    Counterdefendants' acts and practices complained of herein have

25   damaged and will continue to damage Counterclaimant irreparably and constitute

26   unfair competition under California Business and Professions Code § 17200 *et seq*.

27       103.    ICM is therefore entitled to an injunction restraining and enjoining

28   Counterdefendants from further acts of unfair competition.

## Seventh Counterclaim for Tortious Interference With Prospective Economic Advantage

### (Against Manwin)

104.   ICM repeats and re-alleges each and every allegation set forth above.

105.   This is a claim for tortious interference with prospective economic advantage.

106.   As part of its .XXX Founders Program and Sunrise A reservation period, ICM offered members of the adult entertainment industry the ability to secure and develop .XXX domain names and apply for advanced registration of .XXX domains in exchange for a registration fee.

107.   In response to these offerings, members of the adult entertainment industry expressed their intention to enter agreements and/or did enter into agreements with ICM, including .XXX Founder Premium Domain Name Licensing Fees Contracts and .XXX Premium Generic Names Contracts, for registration of .XXX domains.

108.   For example, ICM entered into a .XXX Founder Premium Domain Name Licensing Fee Contract with Reality Kings, whereby Reality Kings was obligated to develop websites on certain domain names with .XXX TLDs.  On or about April 16, 2012, Reality Kings was acquired by Manwin, who must have had knowledge of the agreement between Reality Kings and ICM by virtue of its acquisition of Reality Kings.  Pursuant to Manwin's boycott of .XXX, Reality Kings has not developed the above mentioned domains and is in breach of the .XXX Founder Premium Domain Name Licensing Fee Contract.  Reality Kings' breach is a direct result of Manwin's interference with this contract.  As a result of this interference, ICM has been deprived of the consideration it was entitled to under the .XXX Founder Premium Domain Name Licensing Fee Contract.

109.   In addition to the agreements mentioned above, ICM entered into registration agreements with Really Useful, Ltd., the registrant for the domain

1   names orgasms.xxx and casting.xxx.  Under its contracts with this registrant, ICM

2   was to receive a series of payments in exchange for reservation of those domains.

3       110.   In addition to the contracts for the orgasms.xxx and casting.xxx

4   domains, Really Useful, Ltd. intended to enter into additional premium name

5   contracts with ICM for other .XXX domains.

6       111.   Manwin had knowledge of ICM's offering of domain name

7   registration to the members of the adult entertainment industry and ICM's

8   agreements obtained from this offering based on various public announcements,

9   including ICM's announcement on the successful conclusion of its .XXX Founders

10  Program, which included the orgasms.xxx and casting.xxx domains.

11      112.   On information and belief, Manwin had knowledge of adult

12  entertainment industry members' intention to apply and/or actual applications for

13  registration of .XXX domains based on communications with those members

14  and/or Internet publications expressing these members' intention to apply for

15  registration.

16      113.   On information and belief, Manwin intended to disrupt the economic

17  relationship between ICM and these industry members who intended to apply for

18  and/or did apply for .XXX registrations by indicating that Manwin would not take

19  video uploads, links, sites or ads from .XXX sites.

20      114.   The actions of Manwin disrupted the relationship ICM had with these

21  industry members who intended to apply for and/or did apply for .XXX

22  registrations.  Manwin's actions deterred these parties from purchasing .XXX

23  domain names because their ability to monetize such domain names would be

24  greatly inhibited by Manwin's boycott.  These parties decided to forego their

25  applications to register .XXX domain names with ICM as a result of Manwin's

26  actions.  Certain of these parties also lost revenue as a direct result of Manwin's

27  boycott of their content and advertising and consequently were forced to seek

28  deferral of payment to ICM for the generic .XXX domain names they had

1   acquired.  Additionally, Reality Kings has not developed its domains within the
2   .XXX TLD and is in breach of the .XXX Founder Premium Domain Name
3   Licensing Fee Contract.  These lost registrations and breaches of existing
4   agreements are a direct result of Manwin's interference.

5   115.   ICM has suffered economic harm as a direct result of Manwin's
6   activities because ICM has been deprived of revenue from .XXX domain
7   registrations from adult entertainment industry members who had otherwise
8   expressed their intention to apply for registrations.  ICM has also suffered
9   economic harm by being deprived of prompt full payment and other consideration
10  under its existing .XXX generic names contracts with parties who have lost
11  revenue as a direct result of Manwin's boycott of their content and advertising or
12  who have otherwise ceased development of their domain names within the .XXX
13  TLD in breach of their agreements with ICM.

## PRAYER FOR RELIEF

14

15  **WHEREFORE,** Counterclaimant prays for judgment against
16  Counterdefendants, and each of them, as follows:

17  1.   Judgment on each and all of its counterclaims for:
18      a.   actual damages, general and special no less than $40 million;
19      b.   consequential damages;
20      c.   punitive and/or exemplary damages in an amount to be
21          determined at trial, which would punish and deter such further
22          conduct by Counterdefendants; and
23      d.   treble damages, according to proof.
24  2.   Enjoining and restraining Counterdefendants, from, in any manner,
25  directly or indirectly, maintaining or renewing anti-competitive contracts or any
26  concert of action aimed at boycotting the adoption, use, commercialization,
27  development, promotion, marketing or advertising of the .XXX TLD, and from
28  adopting any practice, plan, program, or design having a similar purpose or effect.

1    3.    Awarding Counterclaimant its costs and reasonable attorneys' fees

2    incurred in this action.

3    4.    For such other relief as the Court may deem just and proper.

4    Dated: November 13, 2012                    Respectfully submitted,

5                                               GORDON & REES LLP

6

7                                        by    _____

8                                               Richard P. Sybert
                                               Hazel Mae B. Pangan
9                                               Attorneys for Defendant and
                                               Counterclaimant
10                                              ICM REGISTRY, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ICM REGISTRY, LLC'S FIRST AMENDED COUNTERCLAIMS**

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ICM Registry, LLC hereby demands a trial by jury on all issues so triable.

Dated:  November 13, 2012

Respectfully submitted,

GORDON & REES LLP

by _____

Richard P. Sybert
Hazel Mae B. Pangan
Attorneys for Defendant and
Counterclaimant
ICM REGISTRY, LLC

**ICM REGISTRY, LLC'S FIRST AMENDED COUNTERCLAIMS**
**CASE NO.  CV 11-9514-PSG**

# CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2012, a copy of the foregoing document and was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail (N/A). Parties may access this filing through the Court's electronic filing system.

| | |
|---|---|
| Kevin Elliot Gaut<br>Jean P. Nogues<br>Thomas P. Lambert<br>Mitchell Silberg and Knupp LLP<br>11377 West Olympic Boulevard<br>Los Angeles, CA  90064<br>(310) 312-3179<br>Fax: (310) 312-3100<br>keg@msk.com<br>jpn@msk.com<br>tpl@msk.com<br><br>Attorneys for Plaintiffs<br>Manwin Licensing International<br>S.A.R.L. and Digital Playground, Inc. | Jeffrey A. LeVee<br>Kathleen P. Wallace<br>Cindy Zone Reichline<br>Jones Day<br>555 South Flower Street, 50th Floor<br>Los Angeles, CA  90071<br>(213) 489-3939<br>Fax: (213) 243-2539<br>jlevee@jonesday.com<br>kwallace@jonesday.com<br>creichline@jonesday.com<br><br>Attorneys for Defendant,<br>Internet Corporation for Assigned<br>Names and Numbers |
| J. Matthew Williams<br>Mitchell Silberg and Knupp LLP<br>1818 N Street NE 8th Floor<br>Washington, DC  20036<br>(202) 355-7900<br>Fax: (310) 312-3100<br>mxw@msk.com<br>Attorneys for Plaintiffs<br>Manwin Licensing International<br>S.A.R.L. and Digital Playground, Inc. | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and executed on November 13, 2012, in the City of San Diego, State of California.

*/s/ Richard P. Sybert*

Richard P. Sybert

**ICM REGISTRY, LLC'S FIRST AMENDED COUNTERCLAIMS**

**CASE NO.  CV 11-9514-PSG**

ICM/1083510/14082791v.1